Christina Goodrich (SBN 261722)
christina.goodrich@klgates.com
Connor J. Meggs (SBN 336159)
connor.meggs@klgates.com
K&L GATES LLP
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

*Attorneys for Plaintiff*
*Entropic Communications, LLC*

(*Additional counsel listed in signature block*)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC, | ~~Case No. _____~~ |
| Plaintiff, | Case No.: 2:23-cv-01043-JWH-KES (Lead Case) |
| v. | Case No. 2:23-cv-05253-JWH-KES (Member Case) |
| ~~DIRECTV, LLC; AT&T, INC.; AT&T SERVICES, INC.; AND AT&T COMMUNICATIONS, LLC,~~ | |
| DISH NETWORK CORPORATION, *et al.*, | ~~ORIGINAL~~**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT** |
| Defendants. | |

1

ENTROPIC COMMUNICATIONS, LLC,

2
     Plaintiff,

3

4
     v.

5
DIRECTV, LLC, *et al.,*

6
     Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff, Entropic Communications, LLC ("Entropic"), files this complaint for patent infringement against DIRECTV, LLC ("the DIRECTV defendants"), AT&T, Inc., and AT&T Services, Inc., and AT&T Communications, LLC (the defendants are collectively referred to as "DIRECTV"), and in support thereof alleges as follows:

1.     Around the turn of the millennium, cable and satellite providers were eager to deploy new and improved services, but they faced a big problem. The providers needed a high-speed data network inside buildings to deliver those services to various rooms. With existing technology, this meant installing new cabling inside each premises to carry the network. Aside from the costly materials themselves, technicians would be forced to spend hours planning the work, cutting and drilling into walls, and fishing cables throughout a building, all while doing so in ways customers might tolerate. The costs would run into the billions of dollars.

2.     A group of inventors had a vision: what if they could repurpose the already-existing coaxial cables common in buildings to do the job? The challenges were daunting. Existing coaxial cabling was never intended to work this way. The mess of existing coax topologies in homes and businesses was a formidable barrier. The splitter devices used to distribute legacy TV obstructed signals from room-to-room. Making it all work would require nothing less than the invention of a new networking architecture founded upon a host of new technologies.

3.     They succeeded. The inventors' company, called Entropic Communications Inc. ("Entropic Inc."), made the technology work. The company was awarded a portfolio of patents for the advances that made it possible. And the company spearheaded forming a new industry standard for the architecture, commonly called Multimedia over Coax Alliance standards (the "MoCA" standards).

4.     Today, MoCA is the backbone of data and entertainment services for tens of millions of customers. MoCA is widely used by every major provider in the industry, saving them billions of dollars in costs and avoiding the hassle of re-wiring

for providers and customers alike. Unfortunately, the defendants take advantage of MoCA without paying appropriate licensing fees for the technology. This lawsuit is about redressing that wrong.

5.     This is a civil action arising under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including specifically 35 U.S.C. § 271, based on the defendants' infringement of U.S. Patent Nos. 7,295,518 (the "'518 Patent"), 7,594,249 (the "'249 Patent") ~~(together the "Network Patents");~~ U.S. Patent Nos. 7,889,759 (the "'759 Patent"), 8,085,802 (the "'802 Patent") ~~(together the "Node Admission Patents");~~ U.S. Patent Nos. 9,838,213 (the "'213 Patent"), 10,432,422 (the "'422 Patent") ~~(together the "PQoS Flows Patents");~~ U.S. Patent Nos. 8,631,450 (the "'450 Patent"), 8,621,539 (the "'539 Patent") ~~(together the "Link Maintenance Patents");~~ U.S. Patent No. 8,320,566 (the "'0,566 ~~Patent" or the "OFDMA~~ Patent"); U.S. Patent No. 10,257,566 (the "'7,566 Patent" ~~or the "Network Coordinator Patent"~~); U.S. Patent No. 8,228,910 (the "'910 ~~Patent" or the "Packet Aggregation~~ Patent"); U.S. Patent No. 8,363,681 (the "'681 Patent" ~~or the "Clock Sync Patent"~~) (collectively all of the patents are referred to herein as the "Patents-in-Suit" or "Asserted Patents"). These patents incorporate various elements of technology set forth in the ~~Multimedia over Coax Alliance~~MoCA standards ~~(the "MoCA" standards)~~[1].

**THE PARTIES**

6.     Entropic is a Delaware limited liability company with an office at 7150 Preston Road, Suite 300, Plano, Texas 75024.

7.     Entropic is the owner by assignment to all right, title, and interest to the Patents-in-Suit. Entropic is the successor-in-interest for the Patents-in-Suit.

8.     The DIRECTV defendants have as their registered agent in California, CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, California 91023.

---

[1] ~~Each version of the MoCA standards is referred to herein as "MoCA 1.0," "MoCA 1.1," and "MoCA 2.0."~~

1    9. AT&T Services, Inc. and AT&T Communications, LLC are wholly owned
2    by AT&T, Inc. (collectively "AT&T").
3    10. AT&T, Inc. is a corporation organized and existing under the laws of the
4    State of Delaware with a principal place of business at 208 S. Akard St., Dallas, Texas
5    75202.
6    9.    11. AT&T Services, Inc. is a Delaware corporation with a place of
7    business at 208 South Akard Street, Dallas, Texas 75202.
8    12. AT&T Communications, LLC is a Delaware limited liability company
9    with a place of business at 208 South Akard Street, Dallas, Texas 75202.
10   10.    13. As further alleged herein, this Court has personal jurisdiction over
11   DIRECTV, and venue is proper in this Judicial District.
12   **PRESUIT DISCUSSIONS AND DIRECTV'S KNOWLEDGE OF THE**
13   **ASSERTED PATENTS**
14   14. Prior to filing this Complaint, Entropic contacted DIRECTV numerous
15   times in an attempt to reach a license agreement with DIRECTV regarding Entropic's
16   patent portfolio, including discussions aimed at the field of technology standardized
17   by the MoCA. For example: Entropic sent a communication by electronic means to
18   DIRECTV on March 9, 2022, including the Patents-in-Suit. On December 23, 2022
19   and January 2, 2023, Entropic sent DIRECTV another communication by both
20   physical and electronic means regarding a separate license to Entropic's patents for
21   the field of the standardized networking technology commonly called MoCA, and
22   also seeking to discuss with DIRECTV a typical non-disclosure agreement in order
23   to share such information. The parties subsequently entered a non-disclosure
24   agreement to permit licensing discussions. However, as of now DIRECTV has not
25   taken a license to any patent owned by Entropic, including the Patents-in-Suit.
26   15. DIRECTV has been aware since no later than February 17, 2023 of
27   DIRECTV's infringement by the deployment of MoCA standardized technology of

3
ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1  numerous Entropic patents, including the Asserted Patents. For example, in early
2  February 2023, Entropic provided DIRECTV copies of claim charts illustrating
3  DIRECTV's patent infringement of each Asserted Patent by virtue of DIRECTV's
4  deployment of MoCA technology.

5  ## HISTORY OF TELEVISION NETWORKING TECHNOLOGY AND
6  ## THE STATE OF THE ART AS OF THE EARLY 2000s

7      11.     Cable television in the United States traces its origins back to the late
8  1940s. At that time, the existing method for delivering TV signals was over-the-air
9  broadcast in which content was transmitted as radio waves from a TV station to TV
10  antennas. However, homes in mountain valleys, such as in Eastern Pennsylvania, had
11  poor reception of broadcast TV signals. To solve this problem, mountaintop antennas
12  were used to receive the signals, and then cabling was installed to connect the homes
13  to those mountaintop antennas. This method proved to be effective and reliable, and
14  cable television took off in popularity in the decades that followed, expanding far
15  beyond its original application and leaving the mountain valleys to become a
16  ubiquitous feature of TV distribution nationwide.

17      12.     At its core, a cable system centers around a "head-end," a facility for
18  distributing television signals to subscribers' homes. These signals would be carried
19  over coaxial cable or, more recently, a combination of fiber optic and coaxial cables,
20  which allow for transmission over long distances with little signal loss or
21  interference. Coaxial cables owned by the cable provider run to a point of entry at
22  the user's premises, where the cable provider's coaxial network connects to the on-
23  premises coaxial network; the signal from the cable provider are distributed
24  throughout the premises via the on-premises coaxial network.

25      13.     In the 1970s, satellite television was developed. A conventional setup
26  for satellite service was "direct-to-home" distribution. With direct-to-home service,
27  television signals are transmitted from an uplink facility to satellites, which transmit

28

4

1   the signals to an outdoor unit installed on a home or multi-dwelling unit. The outdoor

2   unit has a receiver and an antenna that focuses the satellite signals onto the receiver.

3   The outdoor receiver in turn distributes the satellite signals to devices on the premises

4   through, for instance, installed conventional coaxial cabling.

5          14.     As of the early 2000s, coaxial cabling was connected to over 300 million

6   television sets in the United States. At that time, coaxial cabling connections were

7   the preferred in-on-premises video distribution medium for over 90 million cable and

8   satellite homes in the United States.

9   / / /

10         15.     As of the early 2000s, and in the decades prior, many homes in the

11  United States had multiple devices that received cable or satellite service over coaxial

12  cabling.

13         16.     In a home or building with multiple devices connected to coaxial

14  cabling, it was standard to use splitters to distribute the signal received from outside

15  the premises to the multiple on-premises devices, such as multiple TVs or digital

16  video recorders, and to connect those devices back to the source.

17         17.     Conventional splitters typically have a single input, also known as a

18  common port. The splitter splits the input signal into multiple outputs, also known as

19  tap ports. Coaxial cable extending from these ports could connect to devices in the

20  home and/or to yet another splitter (or splitters) before the signal finally reached the

21  devices.

22         18.     As used herein, the terms "conventional coaxial network" or

23  "conventional on-premises coaxial network" refers to the legacy coaxial cable

24  installation that was used as of the early 2000s to distribute programming, such as

25  television content, to consumer devices on premises, such as a home, office, or

26  apartment building.

27

28

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

19.    An exemplary architecture of a conventional coaxial network in the early 2000s is depicted below in an annotated version of Fig. 2 of the '450 Patent. Here, programming from a provider's network enters the premises at the point of entry. From the point of entry, coaxial cabling is used to connect each device to the provider's network. These connections are made using a series of splitters to connect each device with the source of programming. In the exemplary architecture below, there are three devices connected to the provider's network (Set-Top Boxes A, B, and C) through coaxial cabling and multiple splitters. For the connections on the splitters, input ports are marked in blue, with output ports marked in red:

6

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT



(Added graphics).

20.    An architecture network similar to that shown in Paragraph 18 could also be used with satellite systems, with appropriate technical variations. Signals could be received by a point of entry to the premises and then distributed throughout the premises through coaxial cabling and a series of splitters.

21.    The conventional coaxial network architecture was configured to support transmission from a source outside of the premises, such as a cable head-end, to devices on the premises, such as a set-top box. Thus, the splitters were configured to optimize transmission from the source to an endpoint.

7

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

22.     Among other things, in a conventional coaxial network architecture, splitters were designed to isolate the output ports from one another. In other words, the splitters were designed such that a signal being sent from the device towards the source of programming would not "couple" to the other output ports of the splitter. Rather, the splitters were designed to attenuate the passage of any signals between output ports. This was done to reduce interference in the communication channel between the source of programming and an individual device.

23.     Although this configuration helped facilitate communication from a programming source to a user's device, it impeded communication between devices. The conventional wisdom in the field as of the early 2000s, and for many years prior, was that the structure of conventional coaxial networks, including the isolation of end devices from each other, and the unknown and variable composition of the physical network, prevented devices on the same conventional coaxial network from communicating with one another across the output ports of the splitter.

24.     As a consequence of the isolation of the output ports and the attenuation of signals crossing between them, it was not well-known or routine to transmit signals between different devices that were connected to the output ports of a conventional coaxial network.

25.     In fact, in the conventional coaxial networks of the early 2000s, there was no mechanism, let alone a well-known one, for devices in a home or other premises to communicate with one another at all. Thus, while each consumer device in a home or premises could receive programming from a source outside of the home or premises, there existed no well-known path or method for them to communicate with one another.

26.     Just as there was no well-known mechanism for end devices in the home to communicate with each other over conventional coaxial networks in the early 2000s, there was also no well-known mechanism for those devices to locate one

8

another or become aware of each other's existence. For instance, there was no "discovery" or "admission" process that allowed devices within the home to admit a new device to such an environment. Thus, while each consumer device in a home or building could establish a connection with a source of programming from outside the building, there existed no well-known method for those devices to do so with respect to one another.

27.     An illustration of the capabilities of a conventional coaxial network as of the early 2000s is depicted below using the exemplary architecture shown in Paragraph 18. As shown below, a device connected to the conventional coaxial networks of the early 2000s (as an example, Set-Top Box A marked in blue) could communicate with the source of programming (also marked in blue). But that device would not communicate through the conventional coaxial network with any other device, such as Set-Top Boxes B or C, as indicated by the red X's:

**ENTROPIC'S LEGACY AS AN INNOVATOR**

9



(Added graphics)

28.     On-premises networks used for satellite TV were similarly limited. A device connected to a satellite receiver via on-premises coaxial cabling could receive programming from a source, but would not communicate through a conventional coaxial network with other devices connected to that network.

29.     Further, as noted above, the communication paths between different devices on a coaxial network have different characteristics. This could be due to, for instance, the number of splitters along the communication path, the attenuation characteristics of the splitter(s), the length or quality of the coaxial cable along the path, and so on.

10

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

30.     Further still, the characteristics of the paths can differ between the upstream and downstream paths between the same two devices. This is because the channel paths are not necessarily symmetrical and instead may have different properties depending on the direction of signals sent between the devices. For instance, the types of splitters used in conventional coaxial installations altered the properties of signals being sent towards the end devices in a very different way than they did for signals being sent away from them.

31.     For instance, in the illustration shown in Paragraph 27, the communication path from Set-Top Box A to Set-Top Box B (which has two splitters between them) could have different properties than the communication path from the Set-Top Box B to Set-Top Box C (which passes through only one splitter). So, too, could the characteristics of the path from Set-Top Box A to Set-Top Box B differ from the characteristics of the path from Set-Top Box B back to Set-Top Box A.

32.     These differences in channel characteristics posed yet another technological barrier to communication between devices in a home over a coaxial network. In particular, these characteristics made it difficult to determine the appropriate modulation scheme or other parameters that would allow two or more devices connected to a conventional coaxial network to communicate with one another.

33.     Around this same time in the early 2000s, digital video recording ("DVR") technology was introduced. This technology allowed devices to record television programming for later playback.

34.     The introduction of DVR technology created demand for the ability to record content on one device and transmit it to another device in the same home.

35.     As of the early 2000s, companies like Microsoft and Hewlett-Packard sold dedicated equipment that could stream content from an "Entertainment Center" to a "Media Extender" within a home or building. But these options were cost-

11

1    prohibitive for the vast majority of consumers. They also required a networking
2    infrastructure that very few consumers had in their homes at the time, such as
3    Ethernet cabling throughout the home or a high-speed wireless network that could
4    handle video streaming.

5        36.    In contrast, on-premises coaxial cabling had the benefit of being pre-
6    installed in tens of millions of homes, but it did not support the transmission of
7    content from one device to another.

8        37.    The technological limitations of coaxial networks were understood as of
9    the early 2000s to pose substantial barriers to meeting the demand for transmitting
10   content between devices in a home. For instance, the limitations of coaxial networks
11   in the early 2000s meant that video recorded on one device could not be streamed to
12   another device in the same home even though both devices were connected to the
13   same conventional coaxial network.

14       38.    In sum, the conventional coaxial network of the early 2000s was built
15   to facilitate "vertical" communication between the source of programming and a
16   particular consumer device. But as a consequence, it was not configured for, and in
17   many ways impeded or prevented, "horizontal" communication between devices
18   connected to the conventional coaxial network in a consumer's home.

19   / / /

20   / / /

21   **ENTROPIC INC. IS FOUNDED TO OVERCOME THE LIMITATIONS OF**
22                **CONVENTIONAL COAXIAL NETWORKS**

23       39.    16. Entropic Inc., the predecessor-in-interest to Entropic as to the
24   Patents-in-Suit, was founded in San Diego, California in 2001 by Dr. Anton Monk,
25   Itzhak Gurantz, Ladd El Wardani, and others. Entropic Inc. was exclusively
26   responsible for the development of the initial versions of the MoCA standards,
27   including MoCA 1.0, ratified in 2006, MoCA 1.1, ratified in 2007, and was

28

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

~~instrumental in the development of MoCA 2.0, ratified in 2010. It also developed Direct Broadcast Satellite ("DBS") Outdoor Unit ("ODU") single wire technology, and System-on-Chip ("SoC") solutions for set-top boxes (STBs) in the home television and home video markets.~~

~~17. Under the technical guidance of Dr. Monk, Entropic Inc. grew to be publicly listed on the NASDAQ in 2007. After the public listing, the company acquired RF Magic, Inc. in 2007, a company specializing in DBS ODU technology and related hardware.~~

~~18. Additional growth between 2007 and 2015 bolstered the technical expertise of Entropic Inc. with respect to signal acquisition, stacking, filtering, processing, and distribution for STBs and cable modems.~~

40.     Entropic Inc. set out to solve the problems with conventional coaxial networks described in Paragraphs 11 through 38 above.

41.     Entropic Inc. tackled the problem and managed what was considered technologically forbiddingly difficult, if not impossible: high-speed point-to-point digital communication using existing coaxial installations. This required substantial inventive effort that is embodied by the claimed inventions of the Patents-in-Suit.

42.     Entropic Inc.'s innovations, as embodied in the claimed inventions of the Patents-in-Suit, transformed coaxial networking technology by allowing for an on-premises network to be established over existing on-premises coaxial cabling.

43.     Among other applications, Entropic Inc.'s new technology allowed devices in the home to transmit content to one another over the existing coaxial cables.

44.     Entropic Inc.'s innovations, as embodied in the claimed inventions of the Patents-in-Suit, allowed a new type of logical network to exist on a physical structure—the conventional coaxial network—that was not designed to allow such a logical network to exist.

13

45.     Prior to Entropic Inc.'s innovations, the logical architecture of conventional coaxial networks was limited to a "top-down" model. This meant that a source of programming could transmit content to each of the individual devices connected to a conventional coaxial network, but the individual devices could not transmit content to one another. This limitation was a consequence of the technological limitations of the components of the coaxial network at the time, such as the characteristics of the splitters used.

46.     With Entropic Inc.'s innovations, as embodied in the claimed inventions of the Patents-in-Suit, an entirely new networking model became possible for communication over existing on-premises coaxial cabling. Now the conventional coaxial network could operate in a point-to-point or "mesh" fashion, creating new communication paths that did not exist before. The logical communication model thus enabled is illustrated below, using an example of a network that has four set-top boxes connected to a coaxial network (note that the arrows below represent logical

(Added)



ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

connections between devices, rather than physical links; the underlying coaxial cable topology remains unchanged from the conventional installations discussed above):

47. As explained in more detail below, each of the claimed inventions of the Patents-in-Suit contributed to this transformation in coaxial networking technology.

48. 19. ForOver the years that followed, Entropic Inc. pioneered innovative networking technologies, as well as television and internet related technologies. These technologies simplified or eliminated the need for installation requiredof new equipment to support wideband reception of multiple channels for demodulation, improved homeimprove internet performance, and enabled more efficient and responsive remote troubleshooting and upstream signal management for cable providers. These innovations represented significant advances in the field, simplified the implementation of those advances, and reduced expenses for providers and customers alike.

20. In 2015, MaxLinear, Inc. ("MaxLinear")  a leading provider of radio-frequency, analog, digital, and mixed-signal semiconductor solutions  acquired Entropic Inc., and the pioneering intellectual property developed by Dr. Monk and his team.

21. In 2021, Plaintiff Entropic was established and MaxLinear transferred to Entropic a portfolio of intellectual property representing the Entropic and MaxLinear innovation in the cable and satellite services markets.

49. Entropic Inc. received multiple awards, recognition, and praise for its early innovative work that transformed the types of communication that were possible over coaxial cable networks. These awards and recognition include:

- In 2003, the "Breakthrough Innovation in Communications" Award from the T Sector San Diego;

- In 2004, the "Most Innovative New Product" Award for Telecommunications (17th Annual CONNECT Awards);

- In 2004, the first annual "Innovator in Telecommunications" Award from the San Diego Telecom Council;
- In 2004, a finalist for the "Startup of the Year" Award from EDN Magazine;
- In 2005, a finalist for the "Innovation of the Year" Award from EDN Magazine.

### MOCA® AND THE MOCA® STANDARDS

50.    At the same time Entropic Inc. was inventing a new networking architecture for coaxial networks, it also founded an organization to standardize the new networking architecture it had invented and to promote its use. This became known as the Multimedia over Coax Alliance, or "MoCA."

51.    ~~22.~~ MoCA is an alliance of companies that operate in the field of technology associated with providing multimedia services, such as television operators, consumer electronics manufacturers, semiconductor vendors, and original equipment manufacturers (OEMs). MoCA has developed and published a standard governing the operation of devices using existing coaxial cable.

~~23. By the year 2000, cable and satellite providers were facing the problem of distributing services as data between the various locations in a dwelling where desired by customers. This would require a full digital network, capable of communication between any node in the network, in any direction. Traditional computer networking such as Ethernet provided some of the functionality, but the cabling necessary for Ethernet or the like was (and is) very expensive to install.~~

~~24. At the time, millions of dwellings and businesses across the United States often already had existing coaxial cable ("coax") deployed throughout the premises to provide traditional television programming services to various rooms. However, this cabling was not designed or envisaged as a two-way and point-to-point network, nor a network capable of carrying high speed digital data traffic. The coax was~~

16
ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1  ~~deployed as a "tree" topology which simply splits the signal coming from an external~~
2  ~~source (the cable or satellite feed) for distribution of video content to the various~~
3  ~~locations on the premises in the "downlink" direction only. Thus, it was impossible~~
4  ~~to simply use this existing cable to make the new point-to-point high-quality network~~
5  ~~connections between devices located on the premises desired by the cable and~~
6  ~~satellite providers.~~

7  ~~25. Entropic Inc. tackled the problem and managed what was considered~~
8  ~~unlikely or impossible—to make a high-speed point-to-point digital communication~~
9  ~~network using existing coax installations. This required substantial inventive effort~~
10 ~~that is embodied by the Patents-in-Suit. For example, one of the significant~~
11 ~~challenges faced by Entropic Inc. was the varying nature of the exact topology of~~
12 ~~existing on-premises coax infrastructure that a network architecture would have to~~
13 ~~handle. The topology and types of devices (such as passive or active splitters, their~~
14 ~~characteristics, etc.) greatly influence the environment for signals transferred from~~
15 ~~node to node.~~

16 52. ~~26. Entropic Inc. later founded an organization to standardize the~~
17 ~~networking architecture and promote its use. This became known as the Multimedia~~
18 ~~over Coax Alliance, or "MoCA." That~~The MoCA acronym has also come into
19 common usage as the name given to the networking architecture ~~itself—~~that Entropic
20 Inc. had invented, now embodied in ~~the MoCA~~technical standards.~~—~~ documents
21 promulgated by MoCA.

22 53. ~~-~~The technology defined in the MoCA standards enables ~~the~~point-to-
23 point high-quality network ~~so badly needed by~~communication that met a long-felt
24 need in the cable and satellite ~~providers~~television industries. Crucially, it also
25 provides the operators the ability to deploy ~~their~~cutting-edge services that require
26 transmitting content between end devices without the enormously costly effort of
27 installing Ethernet or similar cabling to carry the data.

28

17

~~ORIGINAL~~FIRST AMENDED COMPLAINT FOR PATENT
INFRINGEMENT

27. There have been several iterations of the MoCA standards, beginning with MoCA 1.0, which was ratified in 2006. Since 2006, MoCA has ratified subsequent versions of the MoCA standards, including MoCA 1.1 and MoCA 2.0.

54. Entropic Inc. was exclusively responsible for the development of the initial version of the MoCA standards, including MoCA 1.0, ratified in 2006.

55. 28. The MoCA standards ensure network robustness along with inherent low packet error rate performance and very low latency that is relatively independent of network load. The logical network model of the MoCA network is significantly different from the underlying on-premises legacy coaxial network. For example, due to the effects of splitter jumping and reflections, the channel characteristics for a link between two MoCA nodes may be dramatically different from a link between any other two MoCA nodes.

29. The Asserted Patents address the very technological advances set forth in the MoCA standards. **The Network Patents (the '518 and '249 Patents)** and the **OFDMA Patent (the '0,566 Patent)** describe MoCA networks, including how data communicated via MoCA networks is modulated by full-mesh pre-equalization techniques known as Adaptive Constellation Multitone (ACMT), a form of OFDM modulation.

30. As described in the **Network Coordinator Patent (the '7,566 Patent) and the Node Admission Patents (the '759 and '802 Patents)**, a particular MoCA node, known as a Network Coordinator, controls the admission of nodes to the MoCA Network. The Network Coordinator sends out a variety of data packets using a modulation profile that all the MoCA nodes can receive. For broadcast and multicast transmissions, a broadcast bitloading profile can be calculated and used for each node receiving the transmissions in the MoCA network.

31. MoCA nodes use a modulation profile for every point-to-point link. A variety of probe messages are transmitted by the MoCA nodes and used to create

18

modulation profiles, optimize performance, and allow for various calibration mechanisms. In order to maintain network performance as network conditions change, the MoCA standards define techniques to maintain optimized point-to-point and broadcast links between all of the MoCA nodes. The **Link Maintenance Patents (the '450 and '539 Patents)** describe link maintenance operations involving the processing of probe messages at regular intervals to recalculate parameters such as modulation profile and transmit power.

32. This MoCA network allows for devices (MoCA nodes) connected to a MoCA network to communicate data formatted in a variety of formats. **The Packet Aggregation Patent (the '910 Patent),** for example, describes the communication of data packets in an Ethernet format, via the on-premises coaxial network without the need to deploy a separate physical network on the premises.

33. **The Clock Sync Patent (the '681 Patent)** describes the synchronization of the clocks of each MoCA node in the network with a master clock provided by the Network Coordinator as these transmissions are fully coordinated.

34. The MoCA standards and the **PQoS Flow Patents (the '213 and '422 Patents)** describe how particular MoCA nodes can request additional network resources and/or transmission opportunities. This allows the MoCA node to transfer data more quickly across the MoCA network by borrowing resources that have been scheduled to other MoCA nodes.

56. 35. TheseThe technological developments embodied in the MoCA standard enable users to avoid the significant costs associated with rewiring their home or business in order to deploy a number ofallow high speed point-to-point to communication between devices throughout the premises. Further, these technological developments allow services requiring reliable, high-speed data and video communications between devices on a home network to be provided to the user

19

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

while utilizing the on-premises coaxial ~~network~~cabling already present in the user's home or business.

57.     Entropic Inc. spearheaded MoCA, and its founders are the inventors of several patents—including each of the Patents-in-Suit—that cover various mandatory aspects of the MoCA standards.

58.     ~~36. Entropic Inc. spearheaded MoCA, and its founders are the inventors of several patents that cover various mandatory aspects of the MoCA standards. In other words, by~~By conforming to the MoCA standards, a product necessarily practices those patents, either by itself, as a part of a MoCA-compliant system, or in the method in which it operates.

**ENTROPIC INC.'S EARLY INVENTIONS ARE DIRECTED TO SOLVING TECHNOLOGICAL PROBLEMS IN COAXIAL NETWORKS**

59.     Several of the Patents-in-Suit claim priority to dates between 2001 to 2004. These include the '518 Patent, the '249 Patent, the '759 Patent, the '802 Patent, the '539 Patent, and the '450 Patent.

60.     Each of these Patents-in-Suit, as described below, claims a technological solution to a problem arising in the context of enabling packet-based, point-to-point networking over installed coaxial cable infrastructure in homes or buildings, as of the early 2000s.

61.     The technology claimed in each of these Patents-in-Suit solves specific technological problems inherent in transforming the topology of existing coaxial networks to enable point-to-point communication between devices in a customer's home.

62.     Each of these Patents-in-Suit claims activities that whether viewed alone or in combination were not routine or conventional in existing on-premises coaxial networks as of the date the patents were filed.

~~ORIGINAL~~FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

63.   **The '518 Patent.** Claim 1 of the '518 Patent recites a data communication network comprising:

at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data; and

/ / /

cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices;

whereby network devices communicate with each other through the cable wiring using multi-carrier signaling;

wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics.

64.   Claim 1 of the '518 Patent is directed to enabling communication between devices that are connected to the tap (output) ports of a coaxial splitter. This type of communication has since been referred to as "splitter jumping" or "jumping the splitter."

65.   Claim 1 of the '518 Patent recites a solution to the technological hurdles associated with "splitter jumping."

66.   Claim 1 of the '518 Patent recites the use of probe messages to determine channel characteristics and bit loading for communication between network devices connected to a splitter. These recited activities improve the

21

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1  functionality of coaxial networking technology. In particular, these recited activities
2  overcome the problems with conventional coaxial networks, where communication
3  paths between devices were impeded by the isolation between splitter ports and the
4  high variance in channel characteristics between those devices.

5      67.     Prior to the invention of the '518 Patent, communication between
6  devices that are connected to the output ports of a coaxial splitter (splitter jumping)
7  faced numerous technological hurdles, and was not routine, conventional, or well-
8  known, as explained in Paragraphs 11 to 38 above.

9  / / /

10  / / /

11      68.     Prior to the invention of the '518 Patent, splitter jumping in a coaxial
12  network for the purpose of high bandwidth communications between devices in a
13  home, such as streaming of video, was not routine, conventional, or well-known.

14      69.     Prior to the invention of the '518 Patent, it was not a routine,
15  conventional, or well-known activity to determine the characteristics of the
16  communication channels between devices in a home coaxial network.

17      70.     The invention of the '518 Patent enabled a new type of communication
18  over coaxial networks that was not routine, conventional, or well-known. It achieved
19  this innovation by improving the technology that had been installed in millions of
20  homes across this United States for years, but which no one had previously been able
21  to improve in the same way.

22      71.     The element of "cable wiring comprising a splitter with a common port
23  and a plurality of tap ports, and a plurality of segments of coaxial cable connecting
24  between the splitter tap ports and the network devices" recites a particular
25  technological environment, namely a coaxial network within a home with devices
26  connected by a splitter.

27

28

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

72.      As described in Paragraphs 11 to 38 above, the conventional coaxial network had unique technological limitations as of the priority date of the '518 Patent that made horizontal communication between devices (splitter jumping) difficult and impractical. In particular, the isolation between output ports and attenuation of the signals crossing between them posed a technological barrier to this type of communication.

73.      Claim 1 of the '518 Patent recites multiple elements that were not routine or conventional activity in the particular technological environment of existing on-premises coaxial networks as of the priority date of the '518 Patent.

74.      The element of "whereby network devices communicate with each other through the cable wiring using multi-carrier signaling" recites a technological capability that was not routine or conventional as of the priority date of the '518 Patent. As of that date, communication between network devices connected to the tap ports of a splitter in a coaxial network (splitter jumping) was not a routine or well-known activity for the reasons explained in Paragraphs 11 to 38 above.

75.      The element of "wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics" recites a technological capability that was not routine or conventional as of the priority date of the '518 Patent for the reasons explained in Paragraphs 11 to 38 above.

76.      As of the priority date of the '518 Patent, network devices connected to the tap ports of a splitter in a conventional coaxial network did not send or receive signals to one another. Sending signals of any kind between such devices was not a routine or well-known activity in this type of network for the reasons explained in Paragraphs 11 to 38 above.

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

77.     As of the priority date of the '518 Patent, network devices connected to the tap ports of a splitter did not send or receive probe messages to one another. Sending probe messages between devices connected to the tap ports of a splitter in a conventional coaxial network was not a routine or well-known activity as of that date for the reasons explained in Paragraphs 11 to 38 above.

78.     As of the priority date of the '518 Patent, network devices connected to the tap ports of a splitter in a conventional coaxial network did not determine the characteristics of the communication channel between them. Characterizing the communication channel between two devices in such a network was not a routine or well-known activity as of that date for the reasons explained in Paragraphs 11 to 38 above.

79.     As of the priority date of the '518 Patent, it was not routine or conventional to combine (1) communicating between devices connected to the tap ports of a splitter in a coaxial network; (2) sending and receiving probe messages between those devices using the coaxial network; and (3) determining the characteristics of the channel between them.

80.     **The '249 Patent**. Claim 10 of the '249 Patent recites a broadband local area network for transmitting modulated signals using coaxial cable building wiring containing a plurality of branches comprising:

a filter located at the point of entry of the building wiring that rejects network signals originating in the building wiring such that the rejected network signals do not pass through the filter, but rather are reflected by the filter back into all branches of the building wiring;

at least one signal splitter;

a plurality of terminal devices connected to the wiring branches, each terminal device capable of communicating with other terminal devices the reflected signal path created by the filter, wherein the terminal

1          devices perform equalization on the received signal that restores a flat

2          frequency response to overcome communication channel impairments

3          caused by the reflected signals.

4          81.    Claim 10 of the '249 Patent is directed to enabling communication

5  between devices that are connected to a broadband local area network using coaxial

6  cabling.

7          82.    Claim 10 of the '249 Patent recites a solution to the technological

8  hurdles associated with "splitter jumping." Claim 10 of the '249 Patent recites the

9  use of a filter at the point of entry to a building as part of a coaxial network that

10  includes a splitter. Claim 10 of the '249 Patent further recites communication

11  between devices within the building using a reflected signal path created by the filter

12  and using equalization to overcome communication channel impairments caused by

13  the reflected signals.

14          83.    These recited activities improve the functionality of conventional

15  coaxial networking technology. In particular, these recited activities overcome the

16  problems with conventional coaxial networks, where communication paths between

17  devices were impeded by the isolation between splitter ports and the high variance in

18  channel characteristics between those devices.

19          84.    Prior to the invention of the '249 Patent, it was not routine,

20  conventional, or well-known in conventional coaxial networks to use a filter that

21  rejects signals and reflects them, building back into the branches of the building

22  wiring.

23          85.    Prior to the invention of the '249 Patent, communication between

24  devices using a reflected signal path in a conventional coaxial network was not

25  routine, conventional, or well-known.

26

27

28

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT
INFRINGEMENT

86. Prior to the invention of the '249 Patent, communication between devices in a conventional coaxial network that includes a signal splitter was not routine, conventional, or well-known.

87. Prior to the invention of the '249 Patent, performing equalization on a received signal to overcome channel impairments caused by reflected signals in a conventional coaxial network was not routine, conventional, or well-known.

88. The element of "a plurality of terminal devices connected to the wiring branches, each terminal device capable of communicating with other terminal devices the reflected signal path created by the filter" recites a technological capability that was not routine or conventional as of the priority date of the '249 Patent for the reasons explained in Paragraphs 11 to 38 above.

89. As of the priority date of the '249 Patent, it was not routine or conventional to combine (1) a filter located at the point of entry of a building to reflect signals back through all branches of coaxial wiring; (2) a signal splitter; (3) a plurality of terminal devices connected to the wiring branches that are capable of communicating with other terminal devices through the reflected signal path created by the filter; and (4) terminal devices performing equalization on the received signal to overcome communication channel impairments caused by the reflected signal.

90. **The '759 Patent**. Claim 1 recites a method for determining a common bit-loading modulation scheme for communicating between a plurality of nodes in a broadband cable network ("BCN"), the method comprising:

transmitting a probe signal from a transmitting node within the plurality of nodes to a sub-plurality of receiving nodes within the plurality of nodes;

receiving a plurality of response signals from the sub-plurality of receiving nodes wherein each response signal includes a bit-loading modulation scheme determined by a corresponding receiving node; and

26

determining the common bit-loading modulation scheme from the received plurality of response signals;

receiving the probe signal at one receiving node of the plurality of receiving nodes through a channel path of transmission;

determining the transmission characteristics of the channel path at the one receiving node; and

transmitting a response signal from the one receiving node to the transmitting node,

wherein the transmission characteristics of the channel path are determined by measuring the signal-to-noise ("SNR") characteristics of the received probe signal at the one receiving node and

wherein determining a common bit-loading modulation scheme includes:

    comparing a plurality of bit-loading modulation schemes from the corresponding received plurality of response signals; and

    determining the common bit-loading modulation scheme in response to comparing the plurality of bit-loaded modulation schemes.

/ / /

91.    Claim 1 is directed to solving a technological problem in the field of broadband cable networks. In particular, conventional broadband cable networks at the time were used for transmission of programming in a "top-down" fashion to devices in a home or other building. These conventional broadband cable networks did not facilitate transmission of data from one device to another device on the network, let alone from one device to multiple devices simultaneously on the network.

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

92.     Claim 1 is directed to a point-to-point topology, where each device in a network communicates with the other devices in that network in a direct and non-hierarchical fashion. As of the priority date of the '759 Patent, this network topology was not routine, conventional, or well-known in the field of conventional coaxial or broadband cable networks for the reasons explained in Paragraphs 11 to 38 above.

93.     Claim 1 improves the technology of broadband cable networking by enabling devices to communicate using broadcast transmissions that are customized for the characteristics of the communication paths in that network.

94.     At the time of the invention of the '759 Patent, it was not routine, conventional, or well-known in the art for devices connected to a conventional broadband cable network in the home or other premises to operate as nodes that could send data to, and receive data from, other nodes on that network.

95.     At the time of the invention of the '759 Patent, it was not routine, conventional, or well-known in the art for a device connected to a conventional broadband cable network to send probes to, or receive probes from another device on that network.

96.     At the time of the invention of the '759 Patent, it was not routine, conventional, or well-known in the art for devices connected to a broadband cable network to determine characteristics of the channel path between them.

97.     At the time of the invention of the '759 Patent, it was not routine, conventional, or well-known in the art for devices connected to a broadband cable network to communicate with another simultaneously through the use of broadcast transmissions.

98.     At the time of the invention of the '759 Patent, it was not known in the art that when transmitting data over a broadband cable network from one node to multiple nodes it is generally more efficient to broadcast data over a common bit-

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

loading scheme than to transmit data to each receiving node using a bit-loading scheme specific to each individual communication path.

99.   **The '802 Patent**. Claim 3 of the '802 Patent recites a method for transmitting packets from a Broadband Cable Network ("BCN") modem to a plurality of nodes in a broadband cable network, the method comprising:

formatting the packets in a MAC subsystem that transmits the packets within the broadband cable network, including formatting a data and control packet for transmission within the broadband cable network, the data and control packet having a header and a variable length payload, the header having at least five fields selected from the group consisting of a transmit clock field, packet type field, packet subtype field, version field, source node ID field, destination node ID field, and header check sequence field;

receiving the packets from the MAC subsystem at a Modem subsystem that is in signal communication with the MAC subsystem and that appends information to the packets; and

upconverting the packets with the information for transmission via the broadband cable network at a RF subsystem that is in signal communication with the Modem subsystem;

wherein at least one of the packets is a beacon packet that has a channel number field, change field, sequence number field, network coordinator ID field, next beacon index field, admission frame length field, admission window, asynchronous MAP length field and a beacon Cyclic Redundancy Checking (CRC) field.

100.   Claim 3 of the '802 Patent improves the technology of broadband cable networking by enabling data connections between a BCN modem and nodes of a broadband cable network directly over the existing coaxial cable with its current architecture, without the need to modify the existing cable infrastructure. The

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

claimed methodology is used in a process that has since been referred to as "node admission," during which a BCN modem forms initial connections to, and becomes part of, a logical point-to-point network running on a conventional coaxial data network.

101.    Claim 3 of the '802 Patent recites unique data structures that are specific, and contribute to the improvement in conventional coaxial networking technology that allows a modem on a broadband cable network to communicate with a plurality of other modems on that network.

102.    In particular, claim 3 of the '802 Patent recites use of a "source node ID field," "destination node ID field," and a "network coordinator ID field." Each of these fields are unique to the node-to-node communication recited in claim 3 of the '802 Patent, and which are used to achieve the technological advance in broadband cable networking that enabled communication between devices on the network.

103.    Prior to the invention of the '802 Patent, admitting a new node into an conventional coaxial network that allowed high bandwidth communications between devices in a home was not routine, conventional, or well-known.

104.    Prior to the invention of the '802 Patent, establishing optimal modulation and other transmission parameters that are optimized and periodically adapted to the channel between pairs of devices in a broadband cable network was not routine, conventional, or well-known.

105.    Prior to the invention of the '802 Patent, the use of a "source node ID field," "destination node ID field," and a "network coordinator ID field" was not routine, conventional, or well-known in a broadband cable network. This is because devices in a conventional broadband cable network at the time did not communicate with one another and thus did not identify the source, destination, or network coordinator.

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

106.   The invention of the '802 Patent enabled flexibility—by allowing admission of nodes—in this new type of communication over conventional coaxial networks that was not routine, conventional, or well-known. It achieved this innovation without requiring changes to the legacy coaxial cables or splitters that were already installed in millions of homes across the United States.

107.   The element of "transmitting packets from a Broadband Cable Network (BCN) modem to a plurality of nodes in a broadband cable network" recites a particular technological environment, namely a broadband cable network.

108.   As described in Paragraphs 11 to 38 above, this broadband cable network environment had unique technological limitations as of the priority date of the '802 Patent that made locating nodes on the network difficult and impractical. In particular, the isolation between output ports and attenuation of the signals crossing between them posed a technological barrier to forming this type of connection between nodes.

109.   Claim 3 of the '802 Patent recites multiple limitations that were not a routine or conventional activity in the particular technological environment of broadband cable networking as of the priority date of the '802 Patent.

110.   The element of "formatting the packets in a MAC subsystem that transmits the packets within the broadband cable network, including formatting a data and control packet for transmission within the broadband cable network, the data and control packet having a header and a variable length payload, the header having at least five fields selected from the group consisting of a transmit clock field, packet type field, packet subtype field, version field, source node ID field, destination node ID field, and header check sequence field" recites a technological capability that was not routine or conventional as of the priority date of the '802 Patent. As of that date, the transmitting of packets (including the format of those packets) between network

31

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1  devices connected to the tap ports of a splitter in a coaxial network was not a routine

2  or well-known activity for the reasons explained in Paragraphs 11 to 38 above.

3      111.   The element of "upconverting the packets with the information for

4  transmission via the broadband cable network at a RF subsystem that is in signal

5  communication with the Modem subsystem" recites a technological capability that

6  was not routine or conventional as of the priority date of the '802 Patent. As of that

7  date, upconverting packets so that the transmitted data is carried on RF signals at

8  frequencies higher than the range typically used by cable TV was not a routine or

9  well-known activity because as explained in Paragraphs 11 to 38 above, packet

10  communications between network devices on a home coaxial network was not

11  routine or well-known.

12      112.   The element of "wherein at least one of the packets is a beacon packet

13  that has a channel number field, change field, sequence number field, network

14  coordinator ID field, next beacon index field, admission frame length field,

15  admission window, asynchronous MAP length field and a beacon Cyclic

16  Redundancy Checking (CRC) field" recites a technological capability that was not

17  routine or conventional as of the priority date of the '802 Patent. As of that date,

18  packet communications between network devices connected to the tap ports of a

19  splitter in a coaxial network (splitter jumping)—and therefore the type and the

20  formatting of such communications packets—was not a routine or well-known

21  activity for the reasons explained in Paragraphs 11 to 38 above.

22      113.   As of the priority date of the '802 Patent, network devices connected to

23  the tap ports of a splitter in a coaxial network did not send or receive signals to one

24  another. Sending signals of any kind between such devices was not a routine or well-

25  known activity in this type of network for the reasons explained in Paragraphs 11 to

26  38 above.

27  / / /

28

32

/ / /

114.   As of the priority date of the '802 Patent, network devices connected to the tap ports of a splitter did not send or receive beacon messages to one another. Sending beacon messages between devices connected to the tap ports of a splitter in a coaxial network was not a routine or well-known activity as of that date for the reasons explained in Paragraphs 11 to 38 above.

115.   **The '450 Patent**. Claim 29 of the '450 Patent recites a broadcasting method within a Broadband Coaxial Network ("BCN"), comprising:

a transmitting node transmitting a probe signal to a plurality of receiving nodes;

the transmitting node receiving a plurality of response signals comprising a plurality of bit-loading modulation schemes from the plurality of receiving nodes, wherein each of the plurality of receiving nodes

receives the probe signal through a corresponding channel path,

determines transmission characteristics of the corresponding channel path,

determines a bit-loading modulation scheme for the corresponding channel path based on the transmission characteristics, and

transmits a response signal to the transmitting node informing the transmitting node of the bit-loading modulation scheme for the corresponding channel path;

the transmitting node comparing the plurality of bit-loading modulation schemes to determine a common bit-loading modulation scheme; and

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

the transmitting node transmitting a broadcast signal relaying the common bit-loading modulation scheme to the plurality of receiving nodes.

/ / /

116.    Claim 29 is directed to solving a technological problem in the field of broadband coaxial networks. In particular, conventional broadband coaxial networks at the time did not facilitate transmission of data from one device to another device on the network, let alone from one device to multiple devices simultaneously on the network.

117.    Claim 29 recites a broadcasting method that is specific, and contributes to the improvement in conventional coaxial networking technology that allows a node on a broadband coaxial network to communicate efficiently with a plurality of other nodes on that network.

118.    In particular, claim 29 recites determining a "common bit-loading modulation scheme" based on a "plurality of bit-loading modulation schemes" determined by a plurality of receiving nodes on the network in response to probe signals sent by a transmitting node. The sending of probes and determination of a common bit-loading scheme is used to achieve the technological advance in broadband coaxial networking that enabled efficient communication between devices on the network.

119.    Claim 29 improves the technology of conventional broadband coaxial networks by enabling devices to communicate using broadcast transmissions that are customized for the characteristics of the communication paths in that network.

120.    At the time of the invention of the '450 Patent, it was not routine, conventional, or well-known in the art for devices connected to a conventional broadband coaxial network in the home to operate as nodes that could send data to, and receive data from other nodes on that network.

34

121.   At the time of the invention of the '450 Patent, it was not routine, conventional, or well-known in the art for a device connected to a conventional broadband coaxial network to send probe signals to, or receive probe signals from another device on that network.

/ / /

122.   At the time of the invention of the '450 Patent, it was not routine, conventional, or well-known in the art for devices connected to a conventional broadband coaxial network to determine characteristics of the channel path between them.

123.   At the time of the invention of the '450 Patent, it was not routine, conventional, or well-known in the art for devices connected to a conventional broadband coaxial network to communicate with another simultaneously through the use of broadcast transmissions.

124.   At the time of the invention of the '450 Patent, it was not routine, conventional, or well-known in the art for a device connected to a conventional broadband coaxial network to relay a common bit-loading modulation scheme to other devices on a coaxial network.

125.   At the time of the invention of the '450 Patent, it was not known in the art that when transmitting data over a broadband coaxial network from one node to multiple nodes it is generally more efficient to broadcast data over a common bit-loading scheme than to transmit data to each receiving node using a bit-loading scheme specific to each individual communication path.

126.   **The '539 Patent**. Claim 1 of the '539 Patent recites a modem for communication to at least one node across at least one channel of a coaxial network, the modem comprising:

a transmitter; and

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

a MAC layer in signal communication with the transmitter, the MAC layer using at least one probe packet as an echo profile probe to measure node delay spread on the network and the MAC layer optimizing the preamble and cyclic prefix requirements or other parameters in response to the measured node delay spread on the network;

wherein the transmitter communicates the at least one probe packet.

/ / /

127.   Claim 1 is directed to solving a technological problem in the field of coaxial networks. In particular, modems on a conventional coaxial network at the time of the '539 Patent did not communicate with one another, and thus did not have a means for measuring the delay on the network or optimizing parameters based on that measurement.

128.   Claim 1 recites the use of probes to measure network delay spread that is specific, and contributes to the improvement in coaxial networking technology that allows a modem on a conventional coaxial network to communicate efficiently with other nodes on that network.

129.   Claim 1 recites the use of probes to optimize communication parameters that is specific, and contributes to the improvement in conventional coaxial networking technology that allows a modem on a coaxial network to communicate efficiently with other nodes on that network.

130.   Claim 1 improves the communication capabilities of modems connected to a coaxial network. In particular, claim 1 recites the use of an echo profile probe to measure node delay spread, which conventional coaxial networks did not measure or have reason to measure. Claim 1 also recites optimizing communication parameters in response to the measured delay spread, which conventional coaxial networks did not do or have reason to do.

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

131.    At the time of the invention of the '539 Patent, it was not routine, conventional, or well-known in the art for modems connected to a conventional broadband cable network to communicate with another.

132.    At the time of the invention of the '539 Patent, it was not routine, conventional, or well-known in the art for modems connected to a conventional broadband cable network to transmit probe packets, let alone for the specific purpose of measuring node delay spread on the network.

133.    The element of "a MAC layer in signal communication with the transmitter, the MAC layer using at least one probe packet as an echo profile probe to measure node delay spread on the network" recites a technological capability that was not routine or conventional in existing on-premises coaxial networks as of the priority date of the '539 Patent for the reasons explained in Paragraphs 11 to 38 above.

134.    The element of "the MAC layer optimizing the preamble and cyclic prefix requirements or other parameters in response to the measured node delay spread on the network" recites a technological capability that was not routine or conventional in existing on-premises coaxial networks as of the priority date of the '539 Patent for the reasons explained in Paragraphs 11 to 38 above.

## ENTROPIC INC. CONTINUES TO INNOVATE WITH IMPROVEMENTS TO CONVENTIONAL COAXIAL NETWORKS

135.    Through MoCA and the inventions of the Patents-in-Suit described in Paragraphs 39 through 134 above, Entropic Inc. revolutionized the delivery of high-speed data networking services to customers on existing home coaxial infrastructure. For example, using MoCA, cable and satellite providers were able to link multiple devices in a customer's home in a data network, allowing for a DVR device to record content and stream it to another device in the home.

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

136.   Now that devices in a conventional coaxial network could communicate with one another due to Entropic Inc.'s inventions, a greater need arose for faster, more reliable data connections to support applications such as transmitting high-quality video. This became more and more apparent as customers continued to want to connect more devices to their home networks.

137.   Furthermore, Internet subscribers expected delivery of more and higher-bandwidth services, including multimedia-based applications such as real-time streaming of high definition ("HD") video and entertainment. This demand for higher-bandwidth services included the use of bandwidth for streaming video stored on one device on a coaxial network to another device on that network in another room in a subscriber's home.

138.   In the 2000s, system operators faced a growing challenge of supporting real-time, multimedia streaming applications simultaneous with standard Internet access traffic while maintaining coexistence with already existing services, such as TV, within the same home network environment. Critical to effectively serving all these data flows is a method to ensure that each application is guaranteed the bandwidth and minimal latency necessary to provide a satisfactory user experience.

139.   One barrier to streaming video between devices in a home over coaxial network was latency in video transmission. High amounts of latency, or delay, adversely affects the viewing experience. A disruption to the flow of streaming video or audio can result in stuttering playback, blocky video, or a complete loss of audio, which can prompt a service call from the subscriber. As a result, there was a need for technical solutions that could provide quality of service ("QoS") mechanisms to control the operation of the network. These mechanisms would manage the priorities of different traffic flows on the network to ensure that data was delivered in accordance with the technical requirements, such as latency or throughput requirements, of particular devices or applications.

38

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

140.   Another challenge for streaming video between devices in a home over a coaxial network was managing the demands for bandwidth made by the different devices. This challenge arose in part from Entropic Inc.'s prior inventions, which allowed for communications between devices over a coaxial network. In the mid-2000s, there arose a need for technological solutions that could improve the operation of a packet-based, point-to-point network over conventional coaxial installations, such as a MoCA network, to provide bandwidth allocations to multiple devices in these new network architectures that Entropic Inc. had made possible.

141.   Another challenge for streaming video between devices in a home over a coaxial network was establishing the role of a network coordinator to manage bandwidth demands and quality of service. In point-to-point communication within a packet-based network on conventional coaxial installations, such as that enabled by the MoCA network architecture, no specific device in the home would be pre-defined as the node that manages communications of all other devices on that network.

142.   Instead, the devices would need to coordinate with one another to determine dynamically, based on characteristics of the network, which device would serve as a "Network Coordinator (NC) node." Thus, the specific nature of the point-to-point network architecture in question required new solutions for how the NC node would operate in order to achieve the bandwidth allocation and quality of service requirements that the network required.

143.   As of the mid-2000s, it was not routine or conventional to distinguish between types of data or to guarantee bandwidth for a type of data flow for data transmitted over a logical point-to-point network running over a conventional coaxial network architecture.

144.   To address these new challenges brought on by its own prior innovative work on coaxial networks, Entropic Inc. continued its inventive work in coaxial networking after the initial development of MoCA 1.0.

39

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

145.    Entropic Inc. was exclusively responsible for the development of the next version of the MoCA standard, MoCA 1.1, ratified in 2007.

146.    Entropic Inc. was also instrumental in the development of MoCA 2.0, ratified in 2010.

**ENTROPIC INC.'S LATER INVENTIONS FURTHER IMPROVED CONVENTIONAL COAXIAL NETWORK TECHNOLOGY**

147.    Several of the Patents-in-Suit claim priority to 2007 to 2008. These Patents-in-Suit include the '213 Patent, the '422 Patent, the '0,566 Patent, and the '681 Patent.

148.    These Patents-in-Suit, described below, recite improvements in the efficiency and capabilities of the logical point-to-point networks running on top of conventional coaxial networking technology.

/ / /

149.    The claimed inventions of the Patents-in-Suit below were standardized in subsequent versions of the MoCA standards.

150.    **The '213 Patent**. Claim 1 of the '213 Patent recites a communication method implemented in a Network Coordinator ("NC") node of a communication network of a premises, the method comprising:

broadcasting to a plurality of nodes of the network, a request for a guaranteed quality of service flow in the network from a source node to at least one egress node, the plurality of nodes of the network to which the NC node broadcasts the request including at least the source node and the at least one egress node;

receiving a first response to the request from the source node, wherein the source node is the point of origin for the purposes of the guaranteed quality of service flow for data to be communicated within the guaranteed quality

40

of service flow, the first response indicating whether the source node has available resources to support the guaranteed quality of service flow;

receiving a second response to the request from the at least one egress node indicating whether the at least one egress node has available resources to support the guaranteed quality of service flow; and

if the source node and the at least one egress node have available resources to support the guaranteed quality of service flow, then allocating resources for the guaranteed quality of service flow;

if the source node and the at least one egress node do not have available resources to support the guaranteed quality of service flow, then:

denying the guaranteed quality of service flow; and

if the guaranteed quality of service flow is denied based on bandwidth-related reasons, then determining a maximum data rate that would have resulted in a successful request for a guaranteed quality of service flow, and transmitting a message comprising information describing the maximum data rate that would have resulted in a successful request for a guaranteed quality of service flow.

151.    Claim 1 of the '213 Patent is directed to improving a specific networking architecture where one node functions as a "Network Coordinator (NC) node" to manage quality of service for a plurality of nodes on the network. The role of an NC node is not generic to networks, but arises in specific point-to-point networking technologies, such as MoCA.

152.    Claim 1 of the '213 Patent improves the technology of broadband cable networking by establishing and maintaining guaranteed quality of service flows in a network using specific functions of the NC node. This type of QoS mechanism has since been referred to as "parameterized quality of service" or "PQoS."

41

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

153.   Claims 3 and 4 of the '213 Patent, which depend from claim 1, recite the particular technological environment of a coaxial cable-based network within a home.

154.   Prior to the invention of the '213 Patent, guaranteeing bandwidth for particular data types in a network through use of an NC node was not routine, conventional, or well-known.

155.   Prior to the invention of the '213 Patent, establishing dedicated quality of service flows for particular data types in a logical point-to-point network through use of an NC node was not routine, conventional, or well-known.

156.   Prior to the invention of the '213 Patent, it was not a routine, conventional, or well-known activity to distinguish the types of data transmitted on a logical point-to-point network through use of an NC node.

157.   The invention of the '213 Patent enabled a new type of QoS method for networks through use of an NC node that was not routine, conventional, or well-known. It further improved the performance of the logical point-to-point data networks formed over conventional coaxial networks.

/ / /

158.   The elements of "a communication network of a premises," "a plurality of nodes of the network," "a source node," and "at least one egress node" recite a particular technological environment, namely a physical communication network of a premises, such as a home or office.

159.   As described in Paragraphs 135 to 143 above, such networks faced unique technological challenges as of the priority date of the '213 Patent as customers' demand rose for higher-bandwidth services through their Internet subscriptions. In particular, known QoS methods proved inadequate as video streaming became more prevalent.

42

160. Claim 1 of the '213 Patent recites multiple elements that were not routine or conventional activity in the particular technological environment of logical point-to-point networks that used an NC node as of the priority date of the '213 Patent, including logical networks running on a conventional coaxial network.

161. The element of "broadcasting to a plurality of nodes of the network, a request for a guaranteed quality of service flow in the network from a source node to at least one egress node, the plurality of nodes of the network to which the NC node broadcasts the request including at least the source node and the at least one egress node" recites a technological capability that was not routine or conventional as of the priority date of the '213 Patent. As of that date, initiating a guaranteed quality of service flow in a logical point-to-point network running on a conventional coaxial network was not a routine or well-known activity for the reasons explained in Paragraphs 135 to 143 above.

162. The elements of "receiving a first response to the request from the source node, wherein the source node is the point of origin for the purposes of the guaranteed quality of service flow for data to be communicated within the guaranteed quality of service flow, the first response indicating whether the source node has available resources to support the guaranteed quality of service flow" "receiving a second response to the request from the at least one egress node indicating whether the at least one egress node has available resources to support the guaranteed quality of service flow" recite technological capabilities that were not routine or conventional as of the priority date of the '213 Patent. As of that date, determining whether the endpoint nodes of a data flow have the available resources to guarantee a quality of service flow in a logical point-to-point network was not a routine or well-known activity for the reasons explained in Paragraphs 135 to 143 above.

163. The element of "if the source node and the at least one egress node have available resources to support the guaranteed quality of service flow, then allocating

43

resources for the guaranteed quality of service flow" and "if the source node and the at least one egress node do not have available resources to support the guaranteed quality of service flow, then . . . transmitting a message comprising information describing the maximum data rate that would have resulted in a successful request for a guaranteed quality of service flow" recite technological capabilities that were not routine or conventional as of the priority date of the '213 Patent. As of that date, establishing a guaranteed quality of service flow in a logical point-to-point network if the endpoint nodes of a data flow have available resources to guarantee a particular bandwidth, or alternatively determining a maximum bandwidth, was not a routine or well-known activity for the reasons explained in Paragraphs 135 to 143 above.

164.   As of the priority date of the '213 Patent, subscribers' on-premises communication networks were not equipped to handle the growing demand for Internet services, including multimedia applications such as video streaming. Prioritizing data flow by data type and guaranteeing bandwidth for a particular data type was not a routine or well-known activity in conventional coaxial networks for the reasons explained in Paragraphs 135 to 143 above.

165.   **The '422 Patent**. Claim 1 of the '422 Patent recites a communication network comprising:

a requesting node;

a Network Coordinator (NC) node; and

a plurality of requested nodes,

wherein:

the requesting node is operable to, at least, communicate a first message to the NC node requesting a list comprising parameterized quality of service (PQoS) flows of the communication network; and

the NC node is operable to, at least:

receive the first message from the requesting node; and

in response to the received first message:

communicate a second message to each requested node of the plurality of requested nodes, the second message requesting from said each requested node a list identifying PQoS flows for which said each requested node is an ingress node;

receive, from said each requested node a respective third message comprising a list identifying PQoS flows for which said each requested node is an ingress node;

form an aggregated list of PQoS flows comprising each respective list identifying PQoS flows from each received third message; and

communicate a fourth message to at least the requesting node comprising the aggregated list,

wherein the second message specifies a range of PQoS flows being queried.

166. The '422 Patent is a family member of the '213 Patent, and as described above, the type of QoS mechanism described in the '213 and '422 Patents has since been referred to as "parameterized quality of service" or "PQoS."

/ / /

/ / /

167. Claim 1 of the '422 Patent is directed to evaluating the existing guaranteed quality of service flows in a logical point-to-point network that uses an NC node to manage QoS.

168. Like the '213 Patent, Claim 1 of the '422 Patent improves the technology of specific network architectures by enabling PQoS through use of an NC node.

45

169.    As described above with respect to the '213 Patent, the invention of the '422 Patent is directed to improving the technology used in networks that rely on an NC node, such as a coaxial cable-based network within a home that uses MoCA technology to enable communication between all nodes in the home.

170.    As described above with respect to the '213 Patent, prior to the invention of the'422 Patent, guaranteeing bandwidth for particular data types in a logical point-to-point network using an NC node, such as a MoCA network, was not routine, conventional, or well-known.

171.    Prior to the invention of the'422 Patent, establishing dedicated quality of service flows for particular data types in a logical point-to-point network through use of an NC node was not routine, conventional, or well-known.

172.    Prior to the invention of the '422 Patent, it was not a routine, conventional, or well-known activity to distinguish the types of data transmitted through a logical point-to-point network using an NC node.

173.    The invention of the '422 Patent enabled a new type of QoS method for networks using an NC node that was not routine, conventional, or well-known. It further improved the performance of logical point-to-point networks formed over legacy coaxial cables or splitters that were already installed in millions of homes across the United States.

174.    The elements of "a communication network," "a requesting node," "a Network Coordinator (NC) node," and "a plurality of requested nodes" recite a particular technological environment, namely a physical communication network of a premises, such as a home or office.

175.    As described in Paragraphs 135 to 143 above, such networks faced unique technological challenges as of the priority date of the '422 Patent as customers' demand rose for higher-bandwidth services through their Internet

46

subscriptions. In particular, known QoS methods proved inadequate as video streaming became more prevalent.

176.   Claim 1 of the '422 Patent recites multiple elements that were not routine or conventional activity in the particular technological environment of communications networks as of the priority date of the '422 Patent.

177.   The elements of "communicate a first message to the NC node requesting a list comprising PQoS flows of the communication network" and "communicate a second message to each requested node of the plurality of requested nodes, the second message requesting from said each requested node a list identifying PQoS flows for which said each requested node is an ingress node" recite a technological capability that was not routine or conventional as of the priority date of the '213 Patent. As of that date, requesting a list of existing guaranteed quality of service flows in a network was not a routine or well-known activity for the reasons explained in Paragraphs 135 to 143 above.

178.   The element of "receive, from said each requested node a respective third message comprising a list identifying PQoS flows for which said each requested node is an ingress node" recites a technological capability that was not routine or conventional as of the priority date of the '213 Patent. As of that date, identifying resource commitments of existing guaranteed quality of service flows of a source or ingress node in a logical point-to-point network was not a routine or well-known activity for the reasons explained in Paragraphs 135 to 143 above.

179.   The element of "form an aggregated list of PQoS flows comprising each respective list identifying PQoS flows from each received third message" recites a technological capability that was not routine or conventional as of the priority date of the '213 Patent. As of that date, identifying and aggregating resource commitments of existing guaranteed quality of service flows of all source or ingress nodes in a

47

logical point-to-point network was not a routine or well-known activity for the reasons explained in Paragraphs 135 to 143 above.

180.   As of the priority date of the '422 Patent, subscribers' on-premise communication networks were not equipped to handle the growing demand for Internet services, including multimedia application such as video streaming. Prioritizing data flow by data type and guaranteeing bandwidth for a particular data type was not a routine or well-known activity in conventional coaxial networks for the reasons explained in Paragraphs 135 to 143 above.

181.   **The '0,566 Patent**. Claim 1 of the '0,566 Patent recites a method for communications transmission using orthogonal frequency division multiple access on a network comprising:

a) providing a plurality of transmitting network devices with a set of available subcarriers for orthogonal frequency division multiple access;

b) providing a corresponding element of a pseudorandom noise sequence for each subcarrier of the set of available subcarriers;

c) allocating a subset of the set of available subcarriers to each of the transmitting network devices;

d) a transmitting network device of the plurality of devices mapping a packet onto a plurality of used subcarriers of its allocated subset of available subcarriers, wherein the step of mapping the packet comprises mapping the packet onto a plurality of quadrature amplitude modulated symbols to be transmitted on the used subcarriers;

e) the transmitting network device performing a predetermined transformation on a quadrature amplitude modulated symbol using the element of the pseudorandom noise sequence corresponding to the used subcarrier;

f) the transmitting network device transmitting the transformed symbol to a receiving network device.

182.   Claim 1 of the '0,566 Patent is directed to solving a technological problem in the field of broadband coaxial networks. In particular, with the many continued advancements in data communication technology in the 2000s, as described above in Paragraphs 135 to 143, more and more devices were being introduced into home data networks with high bandwidth communications capabilities, and subscribers were expecting delivery of more and higher-bandwidth services such as HD video streaming. This increase in demand presented technical challenges to data networks formed on existing coaxial networks.

183.   Claim 1 improves the performance of a coaxial communications network by enabling multiple transmitting network devices to transmit under an orthogonal frequency divisional multiple access ("OFDMA") scheme to a receiving network device. Such a communications method enables the efficient allocation of bandwidth among various communicating devices on the network.

184.   At the time of the invention of the '0,566 Patent, employing OFDMA schemes on a coaxial network was not routine, conventional, or well-known.

185.   At the time of the invention of the '0,566 Patent, it was not a routine, conventional, or well-known activity to provide, on a conventional coaxial network, "a plurality of transmitting network devices with a set of available subcarriers for orthogonal frequency division multiple access" and "a corresponding element of a pseudorandom noise sequence for each subcarrier of the set of available subcarriers."

186.   At the time of the invention of the '0,566 Patent, it was not a routine, conventional, or well-known activity to allocate, on a conventional coaxial network, "a subset of the set of available subcarriers to each of the transmitting network devices."

187.   At the time of the invention of the '0,566 Patent, it was not a routine, conventional, or well-known activity for a network device on a coaxial data network to "map[] a packet onto a plurality of used subcarriers of its allocated subset of

49

available subcarriers, wherein the step of mapping the packet comprises mapping the packet onto a plurality of quadrature amplitude modulated symbols to be transmitted on the used subcarriers," to "perform[] a predetermined transformation on a quadrature amplitude modulated symbol using the element of the pseudorandom noise sequence corresponding to the used subcarrier," or to "transmit[] the transformed symbol to a receiving network device."

188.    The invention of the '0,566 Patent enabled a new and more efficient data communication scheme (i.e., OFMDA) over existing on-premises coaxial networks that was not routine, conventional, or well-known. It achieved this innovation without requiring changes to the legacy coaxial cables or splitters that were already installed in millions of homes across the United States.

189.    **The '681 Patent.** Claim 1 of the '681 Patent recites a method for synchronizing a plurality of nodes on a communication network, comprising:

exchanging a local clock time between a first node and a second node over the communication network, wherein the exchange comprises:

transmitting a first packet from the first node to the second node, wherein the first packet includes a first packet clock time set to the local clock time of the first node at transmission time, and includes a scheduled arrival clock time, and

setting the local clock time of the second node to the first packet clock time;

performing a ranging method between the first and second nodes based on the local clock time exchanged, wherein the ranging method results in an estimated propagation delay between the first and second node, and wherein the ranging method comprises:

transmitting a second packet from the second node to the first node, wherein the second packet is transmitted from the second node at the

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1    scheduled arrival clock time, and wherein the second packet is

2    received by the first node at an actual arrival clock time,

3    calculating and storing the estimated propagation delay at the first node,

4    wherein calculating the estimated propagation delay is based on the

5    scheduled arrival clock time and the actual arrival time, and

6    transmitting a third packet from the first node to the second node,

7    wherein the third packet comprises the estimated propagation delay;

8    and

9    adjusting the local clock time of either the first or second node based on the

10    estimated propagation delay, thereby resulting in a synchronized local

11    clock time between the first and second node.

12    190.    Claim 1 of the '681 Patent is directed to solving a technological problem

13    in the field of broadband coaxial networks. In particular, with the many continued

14    advancements in data communication technology in the 2000s, as described above in

15    Paragraphs 135 to 143, more and more devices are being introduced into home data

16    networks with high bandwidth communications capabilities, and subscribers were

17    expecting delivery of more and higher-bandwidth services such as HD video

18    streaming. This increase in demand presented technical challenges to data networks

19    formed on existing coaxial networks.

20    191.    Claim 1 of the '681 Patent recites an improvement in clock

21    synchronization that solves a problem in estimating and accounting for propagation

22    delay. The solution is directed to logical point-to-point networks, such as coaxial

23    networks using MoCA technology, that require an estimate of propagation delay in a

24    multipath environment where the propagation delay between two nodes is not known

25    in advance, can vary dynamically based on changes in the channel path

26    characteristics between them, and where the delay between two nodes in one

27    direction can differ from the delay in the opposite direction.

28

1   / / /

2       192.   At the time of the invention of the '681 Patent, it was not a routine,

3   conventional, or well-known activity to exchange, on a conventional coaxial

4   network, "a local clock time between a first node and a second node over the

5   communication network" involving "transmitting a first packet from the first node to

6   the second node, wherein the first packet includes a first packet clock time set to the

7   local clock time of the first node at transmission time, and includes a scheduled

8   arrival clock time" and "setting the local clock time of the second node to the first

9   packet clock time."

10      193.   At the time of the invention of the '681 Patent, it was not a routine,

11  conventional, or well-known activity to "perform[] a ranging method between the

12  first and second nodes based on the local clock time exchanged, wherein the ranging

13  method results in an estimated propagation delay between the first and second node"

14  involving "transmitting a second packet from the second node to the first node,

15  wherein the second packet is transmitted from the second node at the scheduled

16  arrival clock time, and wherein the second packet is received by the first node at an

17  actual arrival clock time," "calculating and storing the estimated propagation delay

18  at the first node, wherein calculating the estimated propagation delay is based on the

19  scheduled arrival clock time and the actual arrival time," and "transmitting a third

20  packet from the first node to the second node, wherein the third packet comprises the

21  estimated propagation delay."

22      194.   At the time of the invention of the '681 Patent, it was not a routine,

23  conventional, or well-known activity to "adjust[] the local clock time of either the

24  first or second node based on the estimated propagation delay, thereby resulting in a

25  synchronized local clock time between the first and second node."

26      195.   The invention of the '681 Patent enabled improvements to the efficiency

27  of conventional coaxial networks that were not routine, conventional, or well-known.

28

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

It achieved this innovation without requiring changes to the legacy coaxial cables and splitters that were already installed in millions of homes across the United States.

### THE ACCUSED MOCA INSTRUMENTALITIES AND ACCUSED SERVICES

196. 37. DIRECTV utilizes various instrumentalities, deployable as nodes in a MoCA-compliant coaxial cable network.

197. 38. DIRECTV deploys the instrumentalities to, *inter alia*, provide a whole-premises DVR network over an on-premises coaxial cable network, with products including DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17 (and devices that operate in a similar manner) serving as nodes operating with data connections compliant with MoCA 1.0, 1.1, and/or 2.0. Such components are referred to herein as the "Accused MoCA Instrumentalities." The MoCA-compliant services offered by DIRECTV employing the Accused MoCA Instrumentalities, including the operation of a MoCA-compliant network in which such instrumentalities are deployed, are referred to herein as the "Accused Services."

198. 39. An exemplary illustration of the topology of various Accused MoCA Instrumentalities in a DIRECTV deployment is pictured below.[1]

---

[1] This is an example of the products used in the infringing network and is not intended to limit the scope of products accused of infringement.

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT



199. 40. Upon information and belief, the Accused MoCA Instrumentalities form networks over a coaxial cable network in accordance with the MoCA 1.0, 1.1, and/or 2.0.

200. 41. Specifically, upon information and belief, DIRECTV instrumentalities including the DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17 form networks over a coaxial cable network in accordance with MoCA 1.0, 1.1, and/or 2.0.

201. 42. Most commonly, the Accused Services are offered and provided in exchange for fees paid to DIRECTV.

202. 43. DIRECTV itself also sometimes tests and demonstrates the Accused Services, by means of Accused MoCA Instrumentalities.

54

1  / / /

2      203.  44. In some deployments of the Accused MoCA Instrumentalities and

3  the performance of the Accused Services, DIRECTV uses one or more of the

4  DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K,

5  DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and

6  DIRECTV HS17 (and devices that operate in a similar manner), to provide signals,

7  programming and content utilizing a data connection carried over a coaxial cable

8  network in accordance with the MoCA standards.

9      204.  45. In or about January 2013 Rudy Ramirez, in his capacity as

10  DIRECTV Panamericana's senior director of product development, stated that

11  MoCA technology "will allow for simpler home network installations and home

12  topology that will allow us to provide our customers with the best entertainment

13  experience in the region."[32]

14      205.  46. Upon information and belief, Mr. Ramirez, and/or other authorized

15  DIRECTV or DIRECTV Panamericana personnel authorized the publication and

16  attribution of the preceding quote to Mr. Ramirez.

17      206.  47. In January 2010, Romulo Pontual, in his capacity as DIRECTV's

18  chief technology officer stated, "[b]y integrating MoCA technology into our STBs

19  along with the existing deployment of Single Wire Multiswitch, we will set ourselves

20  apart from the competition as a leading provider of connected home technology."[43]

21

22

23

_____

24  [32] https://www.globenewswire.com/news-
25  release/2013/01/08/515194/9308/en/DIRECTV-PanAmericana-Selects-Entropic-s-
    Silicon-and-Software-to-Roll-Out-Advanced-TV-Viewing-Services.html

26  [43] https://www.globenewswire.com/news-
27  release/2010/01/25/412869/9308/en/Entropic-Communications-Silicon-Selected-
    by-DIRECTV-for-Home-Networking-Deployments.html

28

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

207. 48. Upon information and belief, Mr. Pontual, and/or other authorized DIRECTV personnel authorized the publication and attribution of the preceding quotation to Mr. Pontual.

/ / /

208. 49. In or about January 2012, Mike Pulli, in his capacity as CEO of Pace Americas, the manufacturer and/or supplier of DIRECTV receivers, announced that MoCA was a core requirement in DIRECTV receivers.[5][4]

209. 50. Upon information and belief, DIRECTV required that its receivers be equipped with MoCA capabilities in at least 2012.

210. 51. Upon information and belief, DIRECTV continues to require that certain of DIRECTV's set top boxes have MoCA capabilities.

211. 52. DIRECTV was aware of its deployment and use of MoCA at least as early as the later of its involvement with MoCA and six years prior to the filing of this complaint.

212. 53. Upon information and belief, DIRECTV was aware that Entropic Inc. invented technology underlying the MoCA standards. Accordingly, such Entropic Inc. technology would be incorporated into any instrumentality compliant with the MoCA standards.

213. 54. Upon information and belief, DIRECTV and/or its subsidiaries was a member of MoCA beginning in 2012 through at least October, 2019, providing it with full access to then-existing versions of the MoCA standards.

214. 55. Upon information and belief, DIRECTV was aware that Entropic Inc. intended to and did pursue patent protection for technology related to MoCA, at

---

[5][4] https://www.globenewswire.com/en/news-release/2012/01/11/465253/9308/en/Entropic-Communications-Powers-the-Pace-HR34-Home-Media-Center-HD-DVR-for-DIRECTV.html

least as early as the later of its involvement with MoCA and the issue date of the Asserted Patents.

215. 56. When DIRECTV obtained, deployed and/or used instrumentalities with MoCA functionality not provided by Entropic Inc., DIRECTV knew or should have known that Entropic Inc. had provided no authorization for such activities, for example by a patent license.

216. 57. Upon information and belief, when DIRECTV obtained, deployed and/or used instrumentalities with MoCA functionality not provided by Entropic Inc., DIRECTV failed to investigate whether Entropic Inc. authorized the use of Entropic Inc.'s patents for such activity.

217. 58. Alternatively, upon information and belief, when DIRECTV obtained, deployed and/or used instrumentalities with MoCA functionality not provided by Entropic Inc., DIRECTV knew the use of Entropic Inc.'s patents for such activity was not authorized by Entropic Inc.

**ENTROPIC ACQUIRES THE PATENTS AND CONTACTS DIRECTV ABOUT TAKING A LICENSE TO THE ASSERTED PATENTS**

218. Entropic Inc. achieved technological and commercial success from its inventive work with coaxial networks throughout the 2000s.

219. In addition to its work on MoCA and the inventions that enabled it, Entropic Inc. also developed Direct Broadcast Satellite ("DBS") Outdoor Unit ("ODU") single-wire technology, and System-on-Chip ("SoC") solutions for set-top boxes ("STBs") in the home television and home video markets.

220. Under the technical guidance of Dr. Monk, Entropic Inc. grew to be publicly listed on the NASDAQ in 2007. After the public listing, the company acquired RF Magic, Inc. in 2007, a company specializing in DBS ODU technology and related hardware.

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

221.    Additional growth between 2007 and 2015 bolstered the technical expertise of Entropic Inc. with respect to signal acquisition, stacking, filtering, processing, and distribution for STBs and cable modems.

222.    In 2015, MaxLinear, Inc. ("MaxLinear")—a leading provider of radio-frequency, analog, digital, and mixed-signal semiconductor solutions—acquired Entropic Inc., and the pioneering intellectual property developed by Dr. Monk and his team.

/ / /

223.    In 2021, Plaintiff Entropic Communications, LLC was established.

224.    In 2021, MaxLinear transferred to Entropic a portfolio of intellectual property representing the innovations of Entropic and MaxLinear in the cable and satellite services markets.

225.    Prior to filing this Complaint, Entropic contacted DIRECTV numerous times in an attempt to reach a license agreement with DIRECTV regarding Entropic's patent portfolio, including discussions aimed at the field of technology standardized by the MoCA.

226.    On March 9, 2022, Entropic sent a communication by electronic means to DIRECTV, including the Patents-in-Suit.

227.    On December 23, 2022, and January 2, 2023, Entropic sent DIRECTV another communication by both physical and electronic means regarding a separate license to Entropic's patents for the field of the standardized networking technology commonly called MoCA, and also seeking to discuss with DIRECTV a typical non-disclosure agreement in order to share such information.

228.    The parties subsequently entered a non-disclosure agreement to permit licensing discussions. However, as of now DIRECTV has not taken a license to any patent owned by Entropic, including the Patents-in-Suit.

229.   In early February 2023, Entropic provided DIRECTV copies of claim charts illustrating DIRECTV's patent infringement of each Asserted Patent by virtue of DIRECTV's deployment of MoCA technology.

230.   As of at least February 17, 2023, DIRECTV has been on notice of Entropic's assertions of infringement of the Asserted Patents.

**JURISDICTION AND VENUE**

231.   ~~59.~~ This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the claims herein arise under the patent laws of the United States, 35 U.S.C. § 1 et seq., including 35 U.S.C. § 271.

/ / /

232.   ~~60.~~ Venue in this Judicial District is proper under 28 U.S.C. § 1400(b) because DIRECTV has regular and established places of business in this District. DIRECTV, by itself and/or through its agents have committed acts of patent infringement within the State of California and in this Judicial District by making, importing, using, selling, offering for sale, and/or leasing the Accused MoCA Instrumentalities, as well as Accused Services employing the Accused MoCA Instrumentalities, that comply with one or more of MoCA 1.0, 1.1, and/or 2.0.

233.   ~~61.~~ This Court currently has before it another case involving the same parties that also concerns DIRECTV providing satellite television services to its customers, including those in this Judicial District. *Entropic Comm's. LLC v. DIRECTV LLC*, Case No. 2:22-cv-07775-JWH-JEM (*DIRECTV I CDCA*). That co-pending matter was transferred to this Court from the Eastern District of Texas on October 26, 2022 on motion from the DIRECTV defendants, which alleged that such matter could have been properly brought originally in this Judicial District. *See DIRECTV I CDCA*, Dkt. No. 110.

234.   ~~62.~~ Venue in this Judicial District of California is proper pursuant to 28 U.S.C. § 1400(b), because DIRECTV has regular and established places of business

59

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

in this District, and have committed acts of patent infringement in this Judicial District. DIRECTV has committed acts of patent infringement within the State of California and in this Judicial District by making, using, selling, offering for sale, and/or leasing the Accused MoCA Instrumentalities, as well as Accused Services employing the Accused MoCA Instrumentalities, that comply with one or more of MoCA 1.0, 1.1, and/or 2.0.

235.   63. This Court has general personal jurisdiction over the DIRECTV defendants because the DIRECTV defendants conduct systematic and regular business within the State of California by, *inter alia* providing satellite television and internet services to businesses and residents throughout this State.

/ / /

236.   64. This Court has general personal jurisdiction over AT&T because AT&T conducts systematic and regular business within the State of California by, *inter alia* providing telephone, satellite television and internet services to businesses and residents throughout this State.

237.   65. The Court has specific personal jurisdiction over DIRECTV because it has committed acts of infringement within the State of California and this Judicial District through, for example, making infringing networks using the Accused MoCA Instrumentalities, and using the Accused MoCA Instrumentalities to provide the Accused Services in the State of California and this Judicial District.

238.   66. DIRECTV's regular and established places of business within this District are used to conduct DIRECTV's business, i.e. the development, maintenance, and provision of the Accused Services and Accused MoCA Instrumentalities.

239.   67. DIRECTV's business in this Judicial District includes employing hardware and software engineers who developed and maintain the Accused MoCA Instrumentalities and related software.

240.   68. Upon information and belief, DIRECTV, by itself and/or through its agents offers various telecommunication services throughout the United States. DIRECTV operates and maintains a nationwide television and data network through which DIRECTV sells, leases, and offers for sale or lease products and services, including the Accused MoCA Instrumentalities, to businesses, consumers, and government agencies. DIRECTV offers to sell, sells, and provides DIRECTV branded products and services, including, set top boxes and digital video, audio, and other content services to customers. Subscribers to DIRECTV's television services receive one or more receivers and/or set-top boxes, within this Judicial District.

241.   69. Upon information and belief, AT&T, by itself and/or through its agents has offered and continues to offer various "DIRECTV" branded telecommunication services throughout the United States. AT&T has operated and maintained a nationwide television and data network through which AT&T sold, leased, offered for sale, sells, leases, and offered for sale and/or continues to do so, products and services, including the Accused MoCA Instrumentalities, to businesses, consumers, and government agencies. AT&T offers to sell, sells, and provides DIRECTV branded products and services, including, set top boxes and digital video, audio, and other content services to customers. Subscribers to the "DIRECTV" branded television services receive one or more receivers and/or set-top boxes, within this Judicial District.

242.   70. Upon information and belief, DIRECTV provides the Accused Services and Accused MoCA Instrumentalities throughout the United States and in this Judicial District.

243.   71. Upon information and belief, DIRECTV employs and/or contracts with persons and directs them to install, service, repair, and/or replace equipment, as appropriate, in this District.

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

244. 72. Venue is further proper because DIRECTV has committed and continues to commit acts of patent infringement in this Judicial District, including, making, using, importing, offering to sell, and/or selling Accused Services and Accused MoCA Instrumentalities, and MoCA networks, and thereafter providing Accused Services in this Judicial District, including by Internet sales and sales via retail and wholesale stores. Furthermore, for example, DIRECTV deploys Accused MoCA Instrumentalities to many thousands of locations (customer premises) in this Judicial District and subsequently, by means of those Accused MoCA Instrumentalities, uses the claimed inventions at those locations in this Judicial District. DIRECTV infringes by inducing and contributing to acts of patent infringement in this Judicial District and/or committing at least a portion of any other infringements alleged herein in this Judicial District.

245. 73. DIRECTV continues to conduct business in this Judicial District, including the acts and activities described in the preceding paragraph.

246. 74. By virtue of AT&T's prior ownership of the DIRECTV defendants, Entropic alleges that AT&T is liable for the DIRECTV defendants' infringement below.

## COUNT I

### (Infringement of the '518 Patent)

247. 75. Entropic incorporates by reference each allegation of Paragraphs 1 through 74.

248. 76. The '518 Patent duly issued on November 13, 2007 from an application filed December 18, 2002, an application filed August 29, 2002 and, *inter alia*, a provisional application filed August 30, 2001.

249. 77. Entropic owns all substantial rights, interest, and title in and to the '518 Patent, including the sole and exclusive right to prosecute this action and enforce the '518 Patent against infringers, and to collect damages for all relevant times.

250. 78. The '518 Patent is one of the Network Patents, and is generally directed to, *inter alia,* broadband local area data networks using on-premises coaxial cable wiring for interconnection of devices. Probe messages can be "sent between devices to characterize the communication channel and determine optimum bit loading" for communicating data between devices. '518 Patent, Abstract. The '518 Patent has four claims, of which claims 1 and 4 are independent. At least these claims of the '518 Patent are directed to the creation of the MoCA network using the on-premises coaxial cable wiring. A true and accurate copy of the '518 Patent is attached hereto as Exhibit A.

251. 79. The '518 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

252. 80. The '518 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

253. 81. DIRECTV deploys one or more of the Accused MoCA Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing the Accused Services.

254. 82. The Accused MoCA Instrumentalities deployed by DIRECTV to customer premises remain the property of DIRECTV while deployed.

255. 83. The Accused MoCA Instrumentalities operate while deployed in a manner controlled and intended by DIRECTV.

256. 84. As set forth in the attached non-limiting claim chart (Exhibit B), any product or system operating in a MoCA network compliant with the charted provisions of MoCA 1.0, 1.1, and/or 2.0 necessarily infringes at least claim 1 of the '518 Patent.

257. 85. Each aspect of the functioning of the Accused MoCA Instrumentalities described in the claim chart operates while deployed to customer premises in a manner controlled and intended by DIRECTV.

258. 86. DIRECTV provides no software, support or other facility to customers to modify any aspect of the functioning described in the claim chart of the Accused MoCA Instrumentalities while deployed to customer premises.

259. 87. The Accused MoCA Instrumentalities are compliant with the provisions of MoCA 1.0, 1.1., and/or 2.0, as described in the '518 Patent claim chart, Exhibit B.

260. 88. DIRECTV therefore directly infringes at least claim 1 of the '518 Patent by using the Accused MoCA Instrumentalities to provide Accused Services to customers.

261. 89. DIRECTV directly infringes at least claim 1 of the '518 Patent when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate or otherwise provide Accused Services.

262. 90. DIRECTV directly infringes at least claim 1 of the '518 Patent by making, importing, selling, and/or offering for sale the Accused MoCA Instrumentalities in connection with providing the Accused Services over an on-premises coaxial cable network, which meets each and every limitationelement of at least claim 1 of the '518 Patent.

263. 91. DIRECTV had knowledge of the '518 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

264. 92. DIRECTV has been aware that it infringes the '518 Patent since at least as early as receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

265. 93. DIRECTV has known of or has been willfully blind to the '518 Patent since before the March 9, 2022 communications from Entropic.

64

266. ~~94.~~ The '518 Patent issued while or before DIRECTV was a member of MoCA.

267. ~~95.~~ Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '518 Patent before March 9, 2022 or was willfully blind to its existence.

268. ~~96.~~ DIRECTV has been aware of its infringement of the '518 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '518 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '518 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

269. ~~97.~~ The claims of the '518 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

270. ~~98.~~ DIRECTV knew, or was willfully blind to the fact that the technology of the '518 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '518 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.0, 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '518 Patent.

271. ~~99.~~ Since learning of the '518 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

272. ~~100.~~ DIRECTV's customers and subscribers directly infringe at least claim 1 of the '518 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

273. ~~101.~~ DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services and associated support.

274. ~~102.~~ For example, DIRECTV actively induces infringement of at least claim 1 of the '518 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities in a manner that infringes the '518 Patent.

275. ~~103.~~ DIRECTV aids, instructs, supports, and otherwise acts with, the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities in a manner that infringes each and every element of at least claim 1 of the '518 Patent.

276. ~~104.~~ Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides at least the Accused MoCA Instrumentalities that create and are at least substantially all of a MoCA network to be used to infringe at least claim 1 of the '518 Patent.

277. ~~105.~~ The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV, the end user necessarily directly infringes at least claim 1 of the '518 Patent. The Accused MoCA Instrumentalities are therefore especially made or especially adapted for use in an infringing manner.

*/ / /*

278. ~~106.~~ DIRECTV's inducement of, and contribution to, the direct infringement of at least claim 1 of the '518 Patent has been, and is, continuous and ongoing through the acts described above in connection with DIRECTV's provision of the Accused Services.

279. ~~107.~~ DIRECTV's infringement of the '518 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

280. ~~108.~~ Entropic has been damaged as a result of the infringing conduct alleged above. DIRECTV is liable to Entropic in an amount that compensates Entropic for DIRECTV's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

281. ~~109.~~ Upon information and belief there is no duty to mark any instrumentality with the '518 Patent in accordance with 35 U.S.C. § 287.

## COUNT II

### (Infringement of the '249 Patent)

282. ~~110.~~ Entropic incorporates by reference each allegation of Paragraphs 1 through 109.

283. ~~111.~~ The '249 Patent duly issued on September 22, 2009 from an application filed July 21, 2001, and a provisional application filed May 4, 2001.

284. ~~112.~~ Entropic owns all substantial rights, interest, and title in and to the '249 Patent, including the sole and exclusive right to prosecute this action and enforce the '249 Patent against infringers, and to collect damages for all relevant times.

285. ~~113.~~ The '249 Patent is ~~one of the Network Patents, and is~~ generally directed to, *inter alia*, broadband cable networks that allow devices to communicate directly over the existing coaxial cable with its current architecture without the need to modify the existing cable infrastructure. Each device communicates with the other devices in the network and establishes parameters to overcome channel impairments in the coaxial cable network. '249 Patent, col. 3, lines 11–22. The '249 Patent has 17 claims, of which claims 1, 5, and 10 are independent. At least these claims of the '249 Patent are directed to the creation of the MoCA network using the on-premises

67

coaxial cable wiring. A true and accurate copy of the '249 Patent is attached hereto as Exhibit C.

286. 114. The '249 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

287. 115. The '249 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

288. 116. DIRECTV deploys one or more of the Accused MoCA Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing the Accused Services.

289. 117. The Accused MoCA Instrumentalities deployed by DIRECTV to customer premises remain the property of DIRECTV while deployed.

290. 118. The Accused MoCA Instrumentalities operate while deployed in a manner controlled and intended by DIRECTV.

291. 119. As set forth in the attached non-limiting claim chart (Exhibit D), any product or system operating in a MoCA network compliant with the charted provisions of MoCA 1.0, 1.1, and/or 2.0 necessarily infringes at least claim 10 of the '249 Patent.

292. 120. Each aspect of the functioning of the Accused MoCA Instrumentalities described in the claim chart operates while deployed to customer premises in a manner controlled and intended by DIRECTV.

293. 121. DIRECTV provides no software, support or other facility to customers to modify any aspect of the functioning described in the claim chart of the Accused MoCA Instrumentalities while deployed to customer premises.

294. 122. The Accused MoCA Instrumentalities are compliant with MoCA 1.0, 1.1., and/or 2.0, as described in the '249 Patent claim chart, Exhibit D.

68

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1    / / /

2        295.   123. DIRECTV therefore directly infringes at least claim 10 of the '249

3    Patent by using the Accused MoCA Instrumentalities to provide Accused Services to

4    customers.

5        296.   124. DIRECTV directly infringes at least claim 10 of the '249 Patent

6    when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate

7    or otherwise provide Accused Services.

8        297.   125. DIRECTV directly infringes at least claim 10 of the '249 Patent by

9    making, importing, selling, and/or offering for sale the Accused MoCA

10   Instrumentalities in connection with providing the Accused Services over an

11   on-premises coaxial cable network, which meets each and every limitationelement of

12   at least claim 10 of the '249 Patent.

13       298.   126. DIRECTV had knowledge of the '249 Patent no later than its

14   receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

15       299.   127. DIRECTV has been aware that it infringes the '249 Patent no later

16   than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

17       300.   128. DIRECTV has known of or has been willfully blind to the '249

18   Patent since before the March 9, 2022 communications from Entropic.

19       301.   129. The '249 Patent issued while or before DIRECTV was a member

20   of MoCA.

21       302.   130. Because of DIRECTV's knowledge of Entropic Inc.'s work and

22   contributions related to MoCA technology, DIRECTV had knowledge of the '249

23   Patent before March 9, 2022 or was willfully blind to its existence.

24       303.   131. DIRECTV has been aware of its infringement of the '249 Patent

25   no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing

26   the infringement of the '249 Patent by MoCA technology, which is deployed by

27   DIRECTV. The claim charts DIRECTV received approximately three months before

28

the filing of this Complaint show that the claims of the '249 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

304. ~~132.~~ The claims of the '249 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

305. ~~133.~~ DIRECTV knew, or was willfully blind to the fact that the technology of the '249 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '249 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.0, 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '249 Patent.

306. ~~134.~~ Since learning of the '249 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

307. ~~135.~~ DIRECTV's customers and subscribers directly infringe at least claim 10 of the '249 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

308. ~~136.~~ DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services and associated support.

309. ~~137.~~ For example, DIRECTV actively induces infringement of at least claim 10 of the '249 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities in a manner that infringes the '249 Patent.

310. ~~138.~~ DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the

Accused MoCA Instrumentalities in a manner that infringes every element of at least claim 10 of the '249 Patent.

311. ~~139.~~ Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides at least the Accused MoCA Instrumentalities that create and are at least substantially all of a MoCA network to be used to infringe at least claim 10 of the '249 Patent.

312. ~~140.~~ The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV, the end user necessarily directly infringes at least claim 10 of the '249 Patent. The Accused MoCA Instrumentalities are therefore especially made or especially adapted for use in an infringing manner.

313. ~~141.~~ DIRECTV's inducement of, and contribution to, the direct infringement of at least claim 10 of the '249 Patent has been, and is, continuous and ongoing through the acts described above in connection with DIRECTV's provision of the Accused Services.

314. ~~142.~~ DIRECTV's infringement of the '249 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

315. ~~143.~~ Entropic has been damaged as a result of the infringing conduct alleged above. DIRECTV is liable to Entropic in an amount that compensates Entropic for DIRECTV's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

316. ~~144.~~ Entropic is aware of no obligation to mark any instrumentality with the '249 Patent in accordance with 35 U.S.C. § 287.

~~ORIGINAL~~FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

**COUNT III**

**(Infringement of the '759 Patent)**

317. ~~145.~~ Entropic incorporates by reference each allegation of Paragraphs 1 through 144.

318. ~~146.~~ The '759 Patent duly issued on February 15, 2011 from an application filed July 12, 2004, an application filed August 29, 2002, and, *inter alia* a provisional application filed August 30, 2001.

*/ / /*

319. ~~147.~~ Entropic owns all substantial rights, interest, and title in and to the '759 Patent, including the sole and exclusive right to prosecute this action and enforce the '759 Patent against infringers, and to collect damages for all relevant times.

320. ~~148.~~ The '759 Patent is ~~one of the Node Admission Patents, and is~~ generally directed to, *inter alia*, broadband cable networks that allow devices to communicate directly over the existing coaxial cable with its current architecture without the need to modify the existing cable infrastructure. Each device communicates with the other devices in the network and establishes a common modulation scheme between the devices in the network. '759 Patent, Abstract. The '759 Patent has 22 claims, of which claims 1–7, 14, 20–22 are independent. At least these claims of the '759 Patent are directed to a variety of techniques for establishing a modulation scheme for communications between nodes in the MoCA network. A true and correct copy of the '759 Patent is attached hereto as Exhibit E.

321. ~~149.~~ The '759 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

322. ~~150.~~ The '759 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

323. ~~151.~~ DIRECTV deploys one or more of the Accused MoCA Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV

72

C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing the Accused Services.

324. 152. The Accused MoCA Instrumentalities deployed by DIRECTV to customer premises remain the property of DIRECTV while deployed.

325. 153. The Accused MoCA Instrumentalities operate while deployed in a manner controlled and intended by DIRECTV.

326. 154. As set forth in the attached non-limiting claim chart (Exhibit F), any product or system operating in a MoCA network compliant with the charted provisions of MoCA 1.0, 1.1, and/or 2.0 necessarily infringes at least claim 2 of the '759 Patent.

327. 155. Each aspect of the functioning of the Accused MoCA Instrumentalities described in the claim chart operates while deployed to customer premises in a manner controlled and intended by DIRECTV.

328. 156. DIRECTV provides no software, support or other facility to customers to modify any aspect of the functioning described in the claim chart of the Accused MoCA Instrumentalities while deployed to customer premises.

329. 157. The Accused MoCA Instrumentalities are compliant with MoCA 1.0, 1.1., and/or 2.0, as described in the '759 Patent claim chart, Exhibit F.

330. 158. DIRECTV therefore directly infringes at least claim 2 of the '759 Patent by using the Accused MoCA Instrumentalities to provide Accused Services to customers.

331. 159. DIRECTV sells the Accused Services to its customers and subscribers for a fee. Pursuant to the sale of these services, DIRECTV uses the method recited in at least claim 2 of the '759 Patent to provide the Accused Services to DIRECTV's customers and subscribers through the Accused MoCA Instrumentalities. DIRECTV is therefore engaging in the infringing use of at least

73

claim 2 of the '759 Patent in order to generate revenue from its customers and subscribers.

332. 160. DIRECTV directly infringes at least claim 2 of the '759 Patent when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate or otherwise provide Accused Services.

333. 161. DIRECTV had knowledge of the '759 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

334. 162. DIRECTV has been aware that it infringes the '759 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

335. 163. DIRECTV has known of or has been willfully blind to the '759 Patent since before the March 9, 2022 communications from Entropic.

336. 164. The '759 Patent issued while or before DIRECTV was a member of MoCA.

337. 165. Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '759 Patent before March 9, 2022 or was willfully blind to its existence.

338. 166. DIRECTV has been aware of its infringement of the '759 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '759 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '759 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

339. 167. The claims of the '759 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

340. 168. DIRECTV knew, or was willfully blind to the fact that the technology of the '759 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

'759 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.0, 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '759 Patent.

341. 169. Since learning of the '759 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

342. 170. DIRECTV's customers and subscribers directly infringe at least claim 2 of the '759 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

343. 171. DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services and associated support.

/ / /

344. 172. For example, DIRECTV actively induces infringement of at least claim 2 of the '759 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities to infringe the '759 Patent.

345. 173. DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities to infringe every element of at least claim 2 of the '759 Patent.

346. 174. Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides at least the Accused MoCA Instrumentalities that create and are at least substantially all of a MoCA network to be used to infringe at least claim 2 of the '759 Patent.

347. 175. The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in

1  connection with the Accused Services provided by DIRECTV, the end user
2  necessarily directly infringes at least claim 2 of the '759 Patent. The Accused MoCA
3  Instrumentalities are therefore especially made or especially adapted for use in an
4  infringing manner.

5  348. 176. DIRECTV's inducement of, and contribution to, the direct
6  infringement of at least claim 2 of the '759 Patent has been, and is, continuous and
7  ongoing through the acts described above in connection with DIRECTV's provision
8  of the Accused Services.

9  349. 177. DIRECTV's infringement of the '759 Patent is, has been, and
10  continues to be willful, intentional, deliberate, and/or in conscious disregard for
11  Entropic's rights under the patent.

12  350. 178. Entropic has been damaged as a result of the infringing conduct
13  alleged above. DIRECTV is liable to Entropic in an amount that compensates
14  Entropic for DIRECTV's infringement, which by law cannot be less than a
15  reasonable royalty, together with interest and costs as fixed by this Court under 35
16  U.S.C. § 284.

17  351. 179. Upon information and belief, there is no duty to mark any
18  instrumentality with the '759 Patent in accordance with 35 U.S.C. § 287.

19  **COUNT IV**
20  **(Infringement of the '802 Patent)**

21  352. 180. Entropic incorporates by reference each allegation of Paragraphs 1
22  through 179.

23  353. 181. The '802 Patent duly issued on December 27, 2011 from an
24  application filed December 2, 2005 and a provisional application filed December 2,
25  2004.

26
27
28

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

354.  182. Entropic owns all substantial rights, interest, and title in and to the '802 Patent, including the sole and exclusive right to prosecute this action and enforce the '802 Patent against infringers, and to collect damages for all relevant times.

355.  183. The '802 Patent is one of the Node Admission Patents, and is generally directed to, *inter alia,* broadband cable networks that allow devices to communicate directly over the existing coaxial cable with its current architecture without the need to modify the existing cable infrastructure. Each device communicates with the other devices in the network and establishes the best modulation and other transmission parameters that is optimized and periodically adapted to the channel between each pair of devices. '802 Patent, col. 4, lines 7–24. The '802 Patent has four claims, all of which are independent. At least these claims of the '802 Patent are directed to a variety of techniques for establishing a modulation scheme for communications between nodes in the MoCA network. A true and accurate copy of the '802 Patent is attached hereto as Exhibit G.

356.  184. The '802 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

357.  185. The '802 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

/ / /

358.  186. DIRECTV deploys one or more of the Accused MoCA Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing the Accused Services.

359.  187. The Accused MoCA Instrumentalities deployed by DIRECTV to customer premises remain the property of DIRECTV while deployed.

77

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

360. 188. The Accused MoCA Instrumentalities operate while deployed in a manner controlled and intended by DIRECTV.

361. 189. As set forth in the attached non-limiting claim chart (Exhibit H), any product or system operating in a MoCA network compliant with the charted provisions of MoCA 1.0, 1.1, and/or 2.0 necessarily infringes at least claim 3 of the '802 Patent.

362. 190. Each aspect of the functioning of the Accused MoCA Instrumentalities described in the claim chart operates while deployed to customer premises in a manner controlled and intended by DIRECTV.

363. 191. DIRECTV provides no software, support or other facility to customers to modify any aspect of the functioning described in the claim chart of the Accused MoCA Instrumentalities while deployed to customer premises.

364. 192. The Accused MoCA Instrumentalities are compliant with MoCA 1.0, 1.1., and/or 2.0, as described in the '802 Patent claim chart, Exhibit H.

365. 193. DIRECTV therefore directly infringes at least claim 3 of the '802 Patent by using the Accused MoCA Instrumentalities to provide Accused Services to customers.

366. 194. DIRECTV sells the Accused Services to its customers and subscribers for a fee. Pursuant to the sale of these services, DIRECTV uses the method recited in at least claim 3 of the '802 Patent to provide the Accused Services to DIRECTV's customers and subscribers through the Accused MoCA Instrumentalities. DIRECTV is therefore engaging in the infringing use of at least claim 3 of the '802 Patent in order to generate revenue from its customers and subscribers.

367. 195. DIRECTV directly infringes at least claim 3 of the '802 Patent when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate or otherwise provide Accused Services and/or the Accused MoCA Instrumentalities.

368. ~~196.~~ DIRECTV had knowledge of the '802 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

369. ~~197.~~ DIRECTV has been aware that it infringes the '802 Patent no later than its receipt of Entropic's communication sent to DIRECTV on March 9, 2022.

370. ~~198.~~ DIRECTV has known of or has been willfully blind to the '802 Patent since before the March 9, 2022 communications from Entropic.

371. ~~199.~~ The '802 Patent issued while or before DIRECTV was a member of MoCA.

372. ~~200.~~ Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '802 Patent before March 9, 2022 or was willfully blind to its existence.

373. ~~201.~~ DIRECTV has been aware of its infringement of the '802 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '802 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '802 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

374. ~~202.~~ The claims of the '802 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

375. ~~203.~~ DIRECTV knew, or was willfully blind to the fact that the technology of the '802 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '802 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.0, 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '802 Patent.

376. 204. Since learning of the '802 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

377. 205. DIRECTV's customers and subscribers directly infringe at least claim 3 of the '802 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

378. 206. DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services and associated support.

379. 207. For example, DIRECTV actively induces infringement of at least claim 3 of the '802 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities to infringe the '802 Patent.

380. 208. DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities to infringe every element of at least claim 3 of the '802 Patent.

381. 209. Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides at least the Accused MoCA Instrumentalities that create and are at least substantially all of a MoCA network to be used to infringe at least claim 3 of the '802 Patent.

382. 210. The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV, the end user necessarily directly infringes at least claim 3 of the '802 Patent. The Accused MoCA Instrumentalities are therefore especially made or especially adapted for use in an infringing manner.

383. 211. DIRECTV's inducement of, and contribution to, the direct infringement of at least claim 3 of the '802 Patent has been, and is, continuous and ongoing through the acts described above in connection with DIRECTV's provision of the Accused Services.

384. 212. DIRECTV's infringement of the '802 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

385. 213. Entropic has been damaged as a result of the infringing conduct alleged above. DIRECTV is liable to Entropic in an amount that compensates Entropic for DIRECTV's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

386. 214. Upon information and belief, there is no duty to mark any instrumentality with the '802 Patent in accordance with 35 U.S.C. § 287.

## COUNT V

### (Infringement of the '450 Patent)

387. 215. Entropic incorporates by reference each allegation of Paragraphs 1 through 214.

388. 216. The '450 Patent duly issued on January 14, 2014, from an application filed September 19, 2005, and, *inter alia*, a provisional application filed December 2, 2004.

389. 217. Entropic owns all substantial rights, interest, and title in and to the '450 Patent, including the sole and exclusive right to prosecute this action and enforce the '450 Patent against infringers, and to collect damages for all relevant times.

390. 218. The '450 Patent is one of the Link Maintenance Patents, and is generally directed to, *inter alia*, broadband cable networks that allow devices to communicate directly over the existing coaxial cable with its current architecture

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1    without the need to modify the existing cable infrastructure. Each device

2    communicates with the other devices in the network and establishes a common

3    modulation scheme between the devices in the network. '450 Patent, col. 4, lines 12-

4    28. The '450 Patent has 38 claims, of which, claim 1, 8, 27, 29, and 34 are

5    independent. At least these claims of the '450 Patent are directed to a variety of

6    techniques for determining a common modulation scheme for communications

7    between nodes in the MoCA network. A true and accurate copy of the '450 Patent is

8    attached hereto as Exhibit I.

9    391. 219. The '450 Patent is directed to patent-eligible subject matter

10   pursuant to 35 U.S.C. § 101.

11   392. 220. The '450 Patent is valid and enforceable, and presumed as such,

12   pursuant to 35 U.S.C. § 282.

13   393. 221. DIRECTV deploys one or more of the Accused MoCA

14   Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV

15   C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44,

16   DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing

17   the Accused Services.

18   394. 222. The Accused MoCA Instrumentalities deployed by DIRECTV to

19   customer premises remain the property of DIRECTV while deployed.

20   395. 223. The Accused MoCA Instrumentalities operate while deployed in a

21   manner controlled and intended by DIRECTV.

22   396. 224. As set forth in the attached non-limiting claim chart (Exhibit J),

23   any product or system operating in a MoCA network compliant with the charted

24   provisions of MoCA 1.0, 1.1, and/or 2.0 necessarily infringes at least claim 29 of the

25   '450 Patent.

26

27

28

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT
INFRINGEMENT

397. 225. Each aspect of the functioning of the Accused MoCA Instrumentalities described in the claim chart operates while deployed to customer premises in a manner controlled and intended by DIRECTV.

398. 226. DIRECTV provides no software, support or other facility to customers to modify any aspect of the functioning described in the claim chart of the Accused MoCA Instrumentalities while deployed to customer premises.

/ / /

399. 227. The Accused MoCA Instrumentalities are compliant with MoCA 1.0, 1.1., and/or 2.0, as described in the '450 Patent claim chart, Exhibit J.

400. 228. DIRECTV therefore directly infringes at least claim 29 of the '450 Patent by using the Accused MoCA Instrumentalities to provide Accused Services to customers.

401. 229. DIRECTV sells the Accused Services to its customers and subscribers for a fee. Pursuant to the sale of these services, DIRECTV uses the method recited in at least claim 29 of the '450 Patent to provide the Accused Services to DIRECTV's customers and subscribers through the Accused MoCA Instrumentalities. DIRECTV is therefore engaging in the infringing use of at least claim 29 of the '450 Patent in order to generate revenue from its customers and subscribers.

402. 230. DIRECTV directly infringes at least claim 29 of the '450 Patent when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate or otherwise provide Accused Services.

403. 231. DIRECTV had knowledge of the '450 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

404. 232. DIRECTV has been aware that it infringes the '450 Patent no later than its receipt of Entropic's communication sent to DIRECTV on March 9, 2022.

405. 233. DIRECTV has known of or has been willfully blind to the '450 Patent since before the March 9, 2022 communications from Entropic.

406. 234. The '450 Patent issued while or before DIRECTV was a member of MoCA.

407. 235. Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '450 Patent before March 9, 2022 or was willfully blind to its existence.

408. 236. DIRECTV has been aware of its infringement of the '450 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '450 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '450 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

409. 237. The claims of the '450 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

410. 238. DIRECTV knew, or was willfully blind to the fact that the technology of the '450 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '450 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.0, 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '450 Patent.

411. 239. Since learning of the '450 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

412. 240. DIRECTV's customers and subscribers directly infringe at least claim 29 of the '450 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

413. 241. DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services and associated support.

414. 242. For example, DIRECTV actively induces infringement of at least claim 29 of the '450 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities to infringe the '450 Patent.

415. 243. DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities to infringe every element of at least claim 29 of the '450 Patent.

416. 244. Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides at least the Accused MoCA Instrumentalities that create and are at least substantially all of a MoCA network to be used to infringe at least claim 29 of the '450 Patent.

417. 245. The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV, the end user directly infringes at least claim 29 of the '450 Patent. The Accused MoCA Instrumentalities are especially made or especially adapted for use in an infringing manner.

418. 246. DIRECTV's inducement of, and contribution to, the direct infringement of at least claim 29 of the '450 Patent has been, and is, continuous and ongoing through the acts described above in connection with DIRECTV's provision of the Accused Services.

419. 247. DIRECTV's infringement of the '450 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

420. 248. Entropic has been damaged as a result of the infringing conduct alleged above. DIRECTV is liable to Entropic in an amount that compensates Entropic for DIRECTV's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

421. 249. Upon information and belief, there is no duty to mark any instrumentality with the '450 Patent in accordance with 35 U.S.C. § 287.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## **COUNT VI**

### **(Infringement of the '7,566 Patent)[5]**

422. 250. Entropic incorporates by reference each allegation of Paragraphs 1 through 249.

423. 251. The '7,566 Patent duly issued on April 9, 2019 from an application filed February 7, 2017 and an application filed September 19, 2005, and *inter alia*, a provisional application filed December 2, 2004.

424. 252. Entropic owns all substantial rights, interest, and title in and to the '7,566 Patent, including the sole and exclusive right to prosecute this action and enforce the '7,566 Patent against infringers, and to collect damages for all relevant times.

_____

[5] The parties are discussing how they intend to proceed with respect to the '7,566 Patent. Entropic has included these allegations from the Original Complaint pending the result of those discussions.

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

425. 253. The '7,566 Patent is the Network Coordinator Patent, and it uses the claimed controller to form, manage, and optimize mesh networks over coaxial cable, thereby allowing nodes to communicate efficiently with each other. *Id.* at col. 3, lines 21-24; col. 4, lines 22-42. This invention resulted in creating the ability for set top boxes to communicate with one another over coaxial cable networks. '7,566 Patent*, col. 3, lines 39-46. The '7,566 Patent is generally directed to, *inter alia,* broadband cable networks that allow devices to communicate directly over the existing coaxial cable with its current architecture without the need to modify the existing cable infrastructure. Each device communicates with the other devices in the network and establishes the best modulation and other transmission parameters that is optimized and periodically adapted to the channel between each pair of devices. '7,566 Patent, col. 4, lines 23–39. The '7,566 Patent has 20 claims, of which claims 1, 11, and 19 are independent. At least these claims of the '7,566 Patent are directed to a variety of techniques for controlling the admission of nodes in the MoCA network. A true and accurate copy of the '7,566 Patent is attached hereto as Exhibit K.

426. 254. The '7,566 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

427. 255. The '7,566 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

428. 256. DIRECTV deploys one or more of the Accused MoCA Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing the Accused Services.

429. 257. The Accused MoCA Instrumentalities deployed by DIRECTV to customer premises remain the property of DIRECTV while deployed.

430. 258. The Accused MoCA Instrumentalities operate while deployed in a manner controlled and intended by DIRECTV.

431. 259. As set forth in the attached non-limiting claim chart (Exhibit L), any product or system operating in a MoCA network compliant with the charted provisions of MoCA 1.0, 1.1, and/or 2.0 necessarily infringes at least claim 11 of the '7,566 Patent.

432. 260. Each aspect of the functioning of the Accused MoCA Instrumentalities described in the claim chart operates while deployed to customer premises in a manner controlled and intended by DIRECTV.

433. 261. DIRECTV provides no software, support or other facility to customers to modify any aspect of the functioning described in the claim chart of the Accused MoCA Instrumentalities while deployed to customer premises.

434. 262. The Accused MoCA Instrumentalities are compliant with MoCA 1.0, 1.1., and/or 2.0, as described in the '7,566 Patent claim chart, Exhibit L.

/ / /

/ / /

435. 263. DIRECTV therefore directly infringes at least claim 11 of the '7,566 Patent by using the Accused MoCA Instrumentalities to provide Accused Services to customers.

436. 264. DIRECTV directly infringes at least claim 11 of the '7,566 Patent when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate or otherwise provide Accused Services and/or the Accused MoCA Instrumentalities.

437. 265. DIRECTV directly infringes at least claim 11 of the '7,566 Patent by making, importing, selling, and/or offering for sale the Accused MoCA Instrumentalities, which meet every limitationelement of at least claim 11 of the '7,566 Patent, in connection with providing the Accused Services over an on-premises coaxial cable network.

438. 266. DIRECTV had knowledge of the '7,566 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

439. 267. DIRECTV has been aware that it infringes the '7,566 Patent no later than its receipt of Entropic's communication sent to DIRECTV on March 9, 2022.

440. 268. DIRECTV has known of or has been willfully blind to the '7,566 Patent since before the March 9, 2022 communications from Entropic.

441. 269. The '7,566 Patent issued while or before DIRECTV was a member of MoCA.

442. 270. Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '7,566 Patent before March 9, 2022 or was willfully blind to its existence.

443. 271. DIRECTV has been aware of its infringement of the '7,566 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '7,566 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '7,566 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

444. 272. The claims of the '7,566 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

445. 273. DIRECTV knew, or was willfully blind to the fact that the technology of the '7,566 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '7,566 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.0, 1.1, and/or 2.0 to deliver

DIRECTV services would necessarily infringe one or more claims of the '7,566 Patent.

446. 274. Since learning of the '7,566 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

447. 275. DIRECTV's customers and subscribers directly infringe at least claim 11 of the '7,566 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

448. 276. DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services through the Accused MoCA Instrumentalities, and associated support.

449. 277. For example, DIRECTV actively induces infringement of at least claim 11 of the '7,566 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities to infringe the '7,566 Patent.

450. 278. DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities to infringe every element of at least claim 11 of the '7,566 Patent.

/ / /

451. 279. Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides, *inter alia*, the Accused MoCA Instrumentalities designed and configured to create a MoCA network and operate as nodes in the network, the use of which infringes at least claim 11 of the '7,566 Patent.

452. 280. The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV, the end user directly

1    infringes at least claim 11 of the '7,566 Patent. The Accused MoCA Instrumentalities

2    are therefore especially made or especially adapted for use in an infringing manner.

3    453. 281. DIRECTV's inducement of, and contribution to, the direct

4    infringement of at least claim 11 of the '7,566 Patent has been, and is, continuous

5    and ongoing through the acts described above in connection with DIRECTV's

6    provision of the Accused Services.

7    454. 282. DIRECTV's infringement of the '7,566 Patent is, has been, and

8    continues to be willful, intentional, deliberate, and/or in conscious disregard for

9    Entropic's rights under the patent.

10    455. 283. Entropic has been damaged as a result of the infringing conduct

11    alleged above. DIRECTV is liable to Entropic in an amount that compensates

12    Entropic for DIRECTV's infringement, which by law cannot be less than a

13    reasonable royalty, together with interest and costs as fixed by this Court under 35

14    U.S.C. § 284.

15    456. 284. Entropic is aware of no obligation to mark any instrumentality with

16    the '7,566 Patent in accordance with 35 U.S.C. § 287.

17    <u>**COUNT VII**</u>

18    **(Infringement of the '539 Patent)**

19    457. 285. Entropic incorporates by reference each allegation of Paragraphs 1

20    through 284.

21    / / /

22    / / /

23    458. 286. The '539 Patent duly issued on December 31, 2013 from an

24    application filed September 29, 2005 and, *inter alia*, a provisional application filed

25    December 2, 2004.

26

27

28

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

459. 287. Entropic owns all substantial rights, interest, and title in and to the '539 Patent, including the sole and exclusive right to prosecute this action and enforce the '539 Patent against infringers, and to collect damages for all relevant times.

460. 288. The '539 Patent is one of the Link Maintenance Patents, and is generally directed to, *inter alia,* a physical layer transmitter that performs all of the necessary RF, analog and digital processing required for transmitting MAC messages between devices in a broadband cable network. '539 Patent, col. 4, lines 37–48. The '539 Patent has seven claims, of which claim 1 is independent. At least this claim of the '539 Patent is directed at a variety of techniques for monitoring and maintaining utilized modulation profiles in the MoCA network. A true and accurate copy of the '539 Patent is attached hereto as Exhibit M.

461. 289. The '539 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

462. 290. The '539 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

463. 291. DIRECTV deploys one or more of the Accused MoCA Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing the Accused Services.

464. 292. The Accused MoCA Instrumentalities deployed by DIRECTV to customer premises remain the property of DIRECTV while deployed.

465. 293. The Accused MoCA Instrumentalities operate while deployed in a manner controlled and intended by DIRECTV.

466. 294. As set forth in the attached non-limiting claim chart (Exhibit N), any product or system operating in a MoCA network compliant with the charted

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

provisions of MoCA 1.0, 1.1, and/or 2.0 necessarily infringes at least claim 1 of the '539 Patent.

467. 295. Each aspect of the functioning of the Accused MoCA Instrumentalities described in the claim chart operates while deployed to customer premises in a manner controlled and intended by DIRECTV.

468. 296. DIRECTV provides no software, support or other facility to customers to modify any aspect of the functioning described in the claim chart of the Accused MoCA Instrumentalities while deployed to customer premises.

469. 297. The Accused MoCA Instrumentalities are compliant with MoCA 1.0, 1.1., and/or MoCA 2.0, as described in the '539 Patent claim chart, Exhibit N.

470. 298. DIRECTV therefore directly infringes at least claim 1 of the '539 Patent by using the Accused MoCA Instrumentalities to provide Accused Services to customers.

471. 299. DIRECTV directly infringes at least claim 1 of the '539 Patent when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate or otherwise provide Accused Services.

472. 300. DIRECTV directly infringes at least claim 1 of the '539 Patent by making, importing, selling, and/or offering for sale the Accused MoCA Instrumentalities, which meet every limitationelement of at least claim 1 of the '539 Patent, in connection with providing the Accused Services over an on-premises coaxial cable network.

473. 301. DIRECTV had knowledge of the '539 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

474. 302. DIRECTV has been aware that it infringes the '539 Patent no later than its receipt of Entropic's communication sent to DIRECTV on March 9, 2022.

475. 303. DIRECTV has known of or has been willfully blind to the '539 Patent since before the March 9, 2022 communications from Entropic.

/ / /

476. ~~304.~~ The '539 Patent issued while or before DIRECTV was a member of MoCA.

477. ~~305.~~ Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '539 Patent before March 9, 2022 or was willfully blind to its existence.

478. ~~306.~~ DIRECTV has been aware of its infringement of the '539 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '539 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '539 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

479. ~~307.~~ The claims of the '539 Patent are essential to practicing at least MoCA standards versions 1.0, 1.1, and/or 2.0.

480. ~~308.~~ DIRECTV knew, or was willfully blind to the fact that the technology of the '539 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '539 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.0, 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '539 Patent.

481. ~~309.~~ Since learning of the '539 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

482. ~~310.~~ DIRECTV's customers and subscribers directly infringe at least claim 1 of the '539 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

483. 311. DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services through the Accused MoCA Instrumentalities, and associated support.

484. 312. For example, DIRECTV actively induces infringement of at least claim 1 of the '539 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities to infringe the '539 Patent.

485. 313. DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities to infringe every element of at least claim 1 of the '539 Patent.

486. 314. Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides, *inter alia*, the Accused MoCA Instrumentalities designed and configured to create a MoCA network and operate as nodes in the network, the use of which infringes at least claim 1 of the '539 Patent.

487. 315. The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV, the end user directly infringes at least claim 1 of the '539 Patent. The Accused MoCA Instrumentalities are therefore especially made or especially adapted for use in an infringing manner.

488. 316. DIRECTV's inducement of, and contribution to, the direct infringement of at least claim 1 of the '539 Patent has been, and is, continuous and ongoing through the acts described above in connection with DIRECTV's provision of the Accused Services.

489. ~~317.~~ DIRECTV's infringement of the '539 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

490. ~~318.~~ Entropic has been damaged as a result of the infringing conduct alleged above. DIRECTV is liable to Entropic in an amount that compensates Entropic for DIRECTV's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

491. ~~319.~~ Entropic is aware of no obligation to mark any instrumentality with the '539 Patent in accordance with 35 U.S.C. § 287.

## COUNT VIII

### (Infringement of the '213 Patent)

492. ~~320.~~ Entropic incorporates by reference each allegation of Paragraphs 1 through 319.

493. ~~321.~~ The '213 Patent duly issued on December 5, 2017 from an application filed February 6, 2008, and, *inter alia*, a provisional application filed on February 6 2007.

494. ~~322.~~ Entropic owns all substantial rights, interest, and title in and to the '213 Patent, including the sole and exclusive right to prosecute this action and enforce the '213 Patent against infringers, and to collect damages for all relevant times.

495. ~~323.~~ The '213 Patent is ~~one of the PQoS Flows Patents, and is~~ generally directed to, *inter alia*, low-cost and high-speed management of resources within a network in order to secure the capability to distribute multimedia data (such as video/audio, games, images, generic data, and interactive services) between devices within existing on-premises coaxial cable networks. '213 Patent, col. 3, lines 46–53. The '213 Patent has 24 claims, of which claims 1, 13, and 23 are independent. At least these claims of the '213 Patent are directed to a variety of techniques for

96

allocating resources for guaranteed quality of service flows in the MoCA network. A true and accurate copy of the '213 Patent is attached hereto as Exhibit O.

496. 324. The '213 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

497. 325. The '213 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

/ / /

498. 326. DIRECTV deploys one or more of the Accused MoCA Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing the Accused Services.

499. 327. The Accused MoCA Instrumentalities deployed by DIRECTV to customer premises remain the property of DIRECTV while deployed.

500. 328. The Accused MoCA Instrumentalities operate while deployed in a manner controlled and intended by DIRECTV.

501. 329. As set forth in the attached non-limiting claim chart (Exhibit P), any product or system operating in a MoCA network compliant with the charted provisions of MoCA 1.1, or 2.0 necessarily infringes at least claim 1 of the '213 Patent.

502. 330. Each aspect of the functioning of the Accused MoCA Instrumentalities described in the claim chart operates while deployed to customer premises in a manner controlled and intended by DIRECTV.

503. 331. DIRECTV provides no software, support or other facility to customers to modify any aspect of the functioning described in the claim chart of the Accused MoCA Instrumentalities while deployed to customer premises.

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

504. ~~332.~~ The Accused MoCA Instrumentalities are compliant with MoCA 1.1 and/or MoCA 2.0, as described in the '213 Patent claim chart, Exhibit P.

505. ~~333.~~ DIRECTV therefore directly infringes at least claim 1 of the '213 Patent by using the Accused MoCA Instrumentalities to provide Accused Services to customers.

506. ~~334.~~ DIRECTV sells the Accused Services to its customers and subscribers for a fee. Pursuant to the sale of these services, DIRECTV uses the method recited in at least claim 1 of the '213 Patent to provide the Accused Services to DIRECTV's customers and subscribers through the Accused MoCA Instrumentalities. DIRECTV is therefore engaging in the infringing use of at least claim 1 of the '213 Patent in order to generate revenue from its customers and subscribers.

507. ~~335.~~ DIRECTV directly infringes at least claim 1 of the '213 Patent when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate or otherwise provide Accused Services.

508. ~~336.~~ DIRECTV had knowledge of the '213 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

509. ~~337.~~ DIRECTV has been aware that it infringes the '213 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

510. ~~338.~~ DIRECTV has known of or has been willfully blind to the '213 Patent since before the March 9, 2022 communications from Entropic.

511. ~~339.~~ The '213 Patent issued while or before DIRECTV was a member of MoCA.

512. ~~340.~~ Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '213 Patent before March 9, 2022 or was willfully blind to its existence.

513. ~~341.~~ DIRECTV has been aware of its infringement of the '213 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '213 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '213 Patent are essential to practicing at least MoCA standards versions 1.1, and/or 2.0.

514. ~~342.~~ The claims of the '213 Patent are essential to practicing at least MoCA standards versions 1.1, and/or 2.0.

515. ~~343.~~ DIRECTV knew, or was willfully blind to the fact that the technology of the '213 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '213 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '213 Patent.

516. ~~344.~~ Since learning of the '213 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

517. ~~345.~~ DIRECTV's customers and subscribers directly infringe at least claim 1 of the '213 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

518. ~~346.~~ DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services and associated support.

519. ~~347.~~ For example, DIRECTV actively induces infringement of at least claim 1 of the '213 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities to infringe the '213 Patent.

520. 348. DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities to infringe every element of at least claim 1 of the '213 Patent.

521. 349. Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides at least the Accused MoCA Instrumentalities that create and are at least substantially all of a MoCA network to be used to infringe at least claim 1 of the '213 Patent.

522. 350. The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV, the end user directly infringes at least claim 1 of the '213 Patent. The Accused MoCA Instrumentalities are therefore especially made or especially adapted for use in an infringing manner.

523. 351. DIRECTV's inducement of, and contribution to, the direct infringement of at least claim 1 of the '213 Patent has been, and is, continuous and ongoing through the acts described above in connection with DIRECTV's provision of the Accused Services.

524. 352. DIRECTV's infringement of the '213 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

525. 353. Entropic has been damaged as a result of the infringing conduct alleged above. DIRECTV is liable to Entropic in an amount that compensates Entropic for DIRECTV's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

526. 354. Upon information and belief, there is no duty to mark any instrumentality with the '213 Patent in accordance with 35 U.S.C. § 287(a).

1

2

## COUNT IX

### (Infringement of the '422 Patent)

3    527.  ~~355.~~ Entropic incorporates by reference each allegation of Paragraphs 1

4    through 354.

5    528.  ~~356.~~ The '422 Patent duly issued on October 1, 2019 from an application

6    filed December 5, 2017, an application filed February 6, 2008, and, *inter alia*, a

7    provisional application filed February 6, 2007.

8    529.  ~~357.~~ Entropic owns all substantial rights, interest, and title in and to the

9    '422 Patent, including the sole and exclusive right to prosecute this action and enforce

10   the '422 Patent against infringers, and to collect damages for all relevant times.

11   530.  ~~358.~~ The '422 Patent is ~~one of the PQoS Flows Patents, and is~~ generally

12   directed to, *inter alia*, low-cost and high-speed management of resources within a

13   network in order to secure the capability to distribute multimedia data (such as

14   video/audio, games, images, generic data, and interactive services) between devices

15   within existing on-premises coaxial cable networks. '422 Patent, col. 3, lines 53–60.

16   The '422 Patent has 20 claims, of which, claims 1, 5, 12–17 are independent. At least

17   these claims of the '422 Patent are directed to a variety of techniques for allocating

18   resources for guaranteed quality of service flows in the MoCA network. A true and

19   accurate copy of the '422 Patent is attached hereto as Exhibit Q.

20   531.  ~~359.~~ The '422 Patent is directed to patent-eligible subject matter

21   pursuant to 35 U.S.C. § 101.

22   532.  ~~360.~~ The '422 Patent is valid and enforceable, and presumed as such,

23   pursuant to 35 U.S.C. § 282.

24   533.  ~~361.~~ DIRECTV deploys one or more of the Accused MoCA

25   Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV

26   C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44,

27

28

101

DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing the Accused Services.

534. ~~362.~~ The Accused MoCA Instrumentalities deployed by DIRECTV to customer premises remain the property of DIRECTV while deployed.

535. ~~363.~~ The Accused MoCA Instrumentalities operate while deployed in a manner controlled and intended by DIRECTV.

536. ~~364.~~ As set forth in the attached non-limiting claim chart (Exhibit R), any product or system operating in a MoCA network compliant with the charted provisions of MoCA 1.1, or 2.0 necessarily infringes at least claim 1 of the '422 Patent.

537. ~~365.~~ Each aspect of the functioning of the Accused MoCA Instrumentalities described in the claim chart operates while deployed to customer premises in a manner controlled and intended by DIRECTV.

538. ~~366.~~ DIRECTV provides no software, support or other facility to customers to modify any aspect of the functioning described in the claim chart of the Accused MoCA Instrumentalities while deployed to customer premises.

539. ~~367.~~ The Accused MoCA Instrumentalities are compliant with MoCA 1.1 and/or MoCA 2.0, as described in the '422 Patent claim chart, Exhibit R.

540. ~~368.~~ DIRECTV therefore directly infringes at least claim 1 of the '422 Patent by using the Accused MoCA Instrumentalities to provide Accused Services to customers.

541. ~~369.~~ DIRECTV directly infringes at least claim 1 of the '422 Patent when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate or otherwise provide Accused Services.

542. ~~370.~~ DIRECTV directly infringes at least claim 1 of the '422 Patent by making, importing, selling, and/or offering for sale the Accused MoCA Instrumentalities in connection with providing the Accused Services over an

102

on-premises coaxial cable network, which meets every ~~limitation~~element of at least claim 1 of the '422 Patent.

543. ~~371.~~ DIRECTV had knowledge of the '422 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

544. ~~372.~~ DIRECTV has been aware that it infringes the '422 Patent no later than its receipt of Entropic's communication sent to DIRECTV on March 9, 2022.

545. ~~373.~~ DIRECTV has known of or has been willfully blind to the '422 Patent since before the March 9, 2022 communications from Entropic.

546. ~~374.~~ The '422 Patent issued while or before DIRECTV was a member of MoCA.

547. ~~375.~~ Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '422 Patent before March 9, 2022 or was willfully blind to its existence.

548. ~~376.~~ DIRECTV has been aware of its infringement of the '422 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '422 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '422 Patent are essential to practicing at least MoCA standards versions 1.1, and/or 2.0.

549. ~~377.~~ The claims of the '422 Patent are essential to practicing at least MoCA standards versions 1.1, and/or 2.0.

550. ~~378.~~ DIRECTV knew, or was willfully blind to the fact that the technology of the '422 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '422 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its

customers) of instrumentalities compliant with MoCA 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '422 Patent.

551. ~~379.~~ Since learning of the '422 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

552. ~~380.~~ DIRECTV's customers and subscribers directly infringe at least claim 1 of the '422 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

553. ~~381.~~ DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services and associated support.

554. ~~382.~~ For example, DIRECTV actively induces infringement of at least claim 1 of the '422 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities to infringe the '422 Patent.

555. ~~383.~~ DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities to infringe every element of at least claim 1 of the '422 Patent.

556. ~~384.~~ Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides at least the Accused MoCA Instrumentalities that create and are at least substantially all of a MoCA network to be used to infringe at least claim 1 of the '422 Patent.

557. ~~385.~~ The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV, the end user directly infringes at least claim 1 of the '422 Patent. The Accused MoCA Instrumentalities are therefore especially made or especially adapted for use in an infringing manner.

104

558. 386. DIRECTV's inducement of, and contribution to, the direct infringement of at least claim 1 of the '422 Patent has been, and is, continuous and ongoing through the acts described above in connection with DIRECTV's provision of the Accused Services.

559. 387. DIRECTV's infringement of the '422 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

560. 388. Entropic has been damaged as a result of the infringing conduct alleged above. DIRECTV is liable to Entropic in an amount that compensates Entropic for DIRECTV's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

561. 389. Upon information and belief, there is no duty to mark any instrumentality with the '422 Patent in accordance with 35 U.S.C. § 287.

## COUNT X

### (Infringement of the '910 Patent)[6]

562. 390. Entropic incorporates by reference each allegation of Paragraphs 1 through 389.

/ / /

563. 391. The '910 Patent duly issued on July 24, 2012 from an application filed May 9, 2008, and a provisional application filed May 9, 2007.

564. 392. Entropic owns all substantial rights, interest, and title in and to the '910 Patent, including the sole and exclusive right to prosecute this action and enforce the '910 Patent against infringers, and to collect damages for all relevant times.

---

[6] The parties are discussing how they intend to proceed with respect to the '910 Patent. Entropic has included these allegations from the Original Complaint pending the result of those discussions.

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

565. ~~393.~~ The '910 Patent is the Packet Aggregation Patent, and it addresses the problem in the prior art that "overhead admission is associated with each packet transmitted through the network," and such information, "including identifiers, source and destination addresses, error control fields, etc., is added to the user data and reduces the availability of network bandwidth for user data." '910 Patent, col. 1, lines 32-37. To address this problem the '910 Patent is generally directed to, *inter alia,* transmitting data over a network, where the transmitting device aggregates packets that are directed to a common destination node. This reduces the transmitted packet overhead of the network by eliminating interframe gaps, preamble information, and extra headers. '910 Patent, col. 1, line 66 – col. 2, line 3. The '910 Patent has three claims, all of which are independent. At least these claims of the '910 Patent are directed to a variety of techniques for aggregating packet data units in the MoCA network. A true and accurate copy of the '910 Patent is attached hereto as Exhibit S.

566. ~~394.~~ The '910 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

567. ~~395.~~ The '910 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

568. ~~396.~~ DIRECTV deploys one or more of the Accused MoCA Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing the Accused Services.

*/ / /*

569. ~~397.~~ The Accused MoCA Instrumentalities deployed by DIRECTV to customer premises remain the property of DIRECTV while deployed.

~~ORIGINAL~~FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1   570. 398. The Accused MoCA Instrumentalities operate while deployed in a

2   manner controlled and intended by DIRECTV.

3   571. 399. As set forth in the attached non-limiting claim chart (Exhibit T),

4   any product or system operating in a MoCA network compliant with the charted

5   provisions of MoCA 1.1, or 2.0 necessarily infringes at least claim 3 of the '910

6   Patent.

7   572. 400. Each aspect of the functioning of the Accused MoCA

8   Instrumentalities described in the claim chart operates while deployed to customer

9   premises in a manner controlled and intended by DIRECTV.

10   573. 401. DIRECTV provides no software, support or other facility to

11   customers to modify any aspect of the functioning described in the claim chart of the

12   Accused MoCA Instrumentalities while deployed to customer premises.

13   574. 402. The Accused MoCA Instrumentalities are compliant with MoCA

14   1.1., and/or MoCA 2.0, as described in the '910 Patent claim chart, Exhibit T.

15   575. 403. DIRECTV therefore directly infringes at least claim 3 of the '910

16   Patent by using the Accused MoCA Instrumentalities to provide Accused Services to

17   customers.

18   576. 404. DIRECTV directly infringes at least claim 3 of the '910 Patent

19   when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate

20   or otherwise provide Accused Services.

21   577. 405. DIRECTV directly infringes at least claim 3 of the '910 Patent by

22   making, importing, selling, and/or offering for sale the Accused MoCA

23   Instrumentalities, which meet every limitationelement of at least claim 3 of the '910

24   Patent, in connection with providing the Accused Services over an on-premises

25   coaxial cable network.

26   / / /

27

28

107

578. 406. DIRECTV had knowledge of the '910 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

579. 407. DIRECTV has been aware that it infringes the '910 Patent no later than its receipt of Entropic's communication sent to DIRECTV on March 9, 2022.

580. 408. DIRECTV has known of or has been willfully blind to the '910 Patent since before the March 9, 2022 communications from Entropic.

581. 409. The '910 Patent issued while or before DIRECTV was a member of MoCA.

582. 410. Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '910 Patent before March 9, 2022 or was willfully blind to its existence.

583. 411. DIRECTV has been aware of its infringement of the '910 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '910 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '910 Patent are essential to practicing at least MoCA standards versions 1.1, and/or 2.0.

584. 412. The claims of the '910 Patent are essential to practicing at least MoCA standards versions 1.1, and/or 2.0.

585. 413. DIRECTV knew, or was willfully blind to the fact that the technology of the '910 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '910 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '910 Patent.

586. 414. Since learning of the '910 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

587. 415. DIRECTV's customers and subscribers directly infringe at least claim 3 of the '910 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

588. 416. DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services through the Accused MoCA Instrumentalities, and associated support.

589. 417. For example, DIRECTV actively induces infringement of at least claim 3 of the '910 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities to infringe the '910 Patent.

590. 418. DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities to infringe every element of at least claim 3 of the '910 Patent.

591. 419. Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides, *inter alia*, the Accused MoCA Instrumentalities designed and configured to create a MoCA network and operate as nodes in the network, the use of which infringes at least claim 3 of the '910 Patent.

592. 420. The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV, the end user directly infringes at least claim 3 of the '910 Patent. The Accused MoCA Instrumentalities are therefore especially made or especially adapted for use in an infringing manner.

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

593. 421. DIRECTV's inducement of, and contribution to, the direct infringement of at least claim 3 of the '910 Patent has been, and is, continuous and ongoing through the acts described above in connection with DIRECTV's provision of the Accused Services.

594. 422. DIRECTV's infringement of the '910 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

595. 423. Entropic has been damaged as a result of the infringing conduct alleged above. DIRECTV is liable to Entropic in an amount that compensates Entropic for DIRECTV's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

596. 424. Entropic is aware of no obligation to mark any instrumentality with the '910 Patent in accordance with 35 U.S.C. § 287.

## COUNT XI

### (Infringement of the '0,566 Patent)

597. 425. Entropic incorporates by reference each allegation of Paragraphs 1 through 424.

598. 426. The '0,566 Patent duly issued on November 27, 2012 from an application filed October 15, 2009, and, *inter alia*, a provisional application filed October 16, 2008.

599. 427. Entropic owns all substantial rights, interest, and title in and to the '0,566 Patent, including the sole and exclusive right to prosecute this action and enforce the '0,566 Patent against infringers, and to collect damages for all relevant times.

600. 428. The '0,566 Patent is the OFDMA Patent, and is generally directed to, *inter alia,* "allow[ing] multiple transmitting network devices to transmit under an

~~orthogonal frequency divisional multiple access (~~OFDMA~~)~~ mode to a receiving network device." '0,566 Patent, Abstract. The '0,566 Patent has 18 claims, of which claims 1, 7, 13, and 16 are independent. At least these claims of the '0,566 Patent are directed to a variety of techniques for assigning communication resources to one or more nodes in the MoCA network. A true and accurate copy of the '0,566 Patent is attached hereto as Exhibit U.

*/ / /*

601. ~~429.~~ The '0,566 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

602. ~~430.~~ The '0,566 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

603. ~~431.~~ DIRECTV deploys one or more of the Accused MoCA Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44, DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing the Accused Services.

604. ~~432.~~ The Accused MoCA Instrumentalities deployed by DIRECTV to customer premises remain the property of DIRECTV while deployed.

605. ~~433.~~ The Accused MoCA Instrumentalities operate while deployed in a manner controlled and intended by DIRECTV.

606. ~~434.~~ As set forth in the attached non-limiting claim chart (Exhibit V), any product or system operating in a MoCA network compliant with the charted provisions of MoCA 2.0 necessarily infringes at least claim 1 of the '0,566 Patent.

607. ~~435.~~ Each aspect of the functioning of the Accused MoCA Instrumentalities described in the claim chart operates while deployed to customer premises in a manner controlled and intended by DIRECTV.

608. 436. DIRECTV provides no software, support or other facility to customers to modify any aspect of the functioning described in the claim chart of the Accused MoCA Instrumentalities while deployed to customer premises.

609. 437. The Accused MoCA Instrumentalities are compliant with MoCA 2.0, as described in the '0,566 Patent claim chart, Exhibit V.

610. 438. DIRECTV therefore directly infringes at least claim 1 of the '0,566 Patent by using the Accused MoCA Instrumentalities to provide Accused Services to customers.

611. 439. DIRECTV sells the Accused Services to its customers and subscribers for a fee. Pursuant to the sale of these services, DIRECTV uses the method recited in at least claim 1 of the '0,566 Patent to provide the Accused Services to DIRECTV's customers and subscribers through the Accused MoCA Instrumentalities. DIRECTV is therefore engaging in the infringing use of at least claim 1 of the '0,566 Patent in order to generate revenue from its customers and subscribers.

612. 440. DIRECTV directly infringes at least claim 1 of the '0,566 Patent when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate or otherwise provide Accused Services.

613. 441. DIRECTV had knowledge of the '0,566 Patent no later than its receipt of Entropic's communications sent to DIRECTV on March 9, 2022.

614. 442. DIRECTV has been aware that it infringes the '0,566 Patent no later than its receipt of Entropic's communication sent to DIRECTV on March 9, 2022.

615. 443. DIRECTV has known of or has been willfully blind to the '0,566 Patent since before the March 9, 2022 communications from Entropic.

616. 444. The '0,566 Patent issued while or before DIRECTV was a member of MoCA.

617. 445. Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '0,566 Patent before March 9, 2022 or was willfully blind to its existence.

618. 446. DIRECTV has been aware of its infringement of the '0,566 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '0,566 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '0,566 Patent are essential to practicing at least MoCA standards versions 1.1, and/or 2.0.

619. 447. The claims of the '0,566 Patent are essential to practicing at least MoCA standards versions 1.1, and/or 2.0.

620. 448. DIRECTV knew, or was willfully blind to the fact that the technology of the '0,566 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '0,566 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '0,566 Patent.

621. 449. Since learning of the '0,566 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

622. 450. DIRECTV's customers and subscribers directly infringe at least claim 1 of the '0,566 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

623. 451. DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services and associated support.

113

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

624. 452. For example, DIRECTV actively induces infringement of at least claim 1 of the '0,566 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities to infringe the '0,566 Patent.

625. 453. DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities to infringe every element of at least claim 1 of the '0,566 Patent.

626. 454. Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides at least the Accused MoCA Instrumentalities that create and are at least substantially all of a MoCA network to be used to infringe at least claim 1 of the '0,566 Patent.

627. 455. The Accused MoCA Instrumentalities have no substantial noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV, the end user directly infringes at least claim 1 of the '0,566 Patent. The Accused MoCA Instrumentalities are therefore especially made or especially adapted for use in an infringing manner.

628. 456. DIRECTV's inducement of, and contribution to, the direct infringement of at least claim 1 of the '0,566 Patent has been, and is, continuous and ongoing through the acts described above in connection with DIRECTV's provision of the Accused Services.

629. 457. DIRECTV's infringement of the '0,566 Patent is, has been, and continues to be willful, intentional, deliberate, and/or in conscious disregard for Entropic's rights under the patent.

630. 458. Entropic has been damaged as a result of the infringing conduct alleged above. DIRECTV is liable to Entropic in an amount that compensates

Entropic for DIRECTV's infringement, which by law cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

631. 459. Upon information and belief, there is no duty to mark any instrumentality with the '0,566 Patent in accordance with 35 U.S.C. § 287(a).

<u>**COUNT XII**</u>

**(Infringement of the '681 Patent)**

632. 460. Entropic incorporates by reference each allegation of Paragraphs 1 through 459.

633. 461. The '681 Patent duly issued on January 29, 2013 from an application filed October 15, 2009 and, *inter alia*, a provisional application filed October 16, 2008.

634. 462. Entropic owns all substantial rights, interest, and title in and to the '681 Patent, including the sole and exclusive right to prosecute this action and enforce the '681 Patent against infringers, and to collect damages for all relevant times.

635. 463. The '681 Patent is the Clock Sync Patent, and is generally directed to, *inter alia,* improving local clock time synchronization between a plurality of nodes in a communication network. '681 Patent, Abstract. The '681 Patent has 40 claims, of which claims 1, 11, 21, and 31 are independent. At least these claims of the '681 Patent are directed to a variety of techniques for clock synchronization for nodes in the MoCA network. A true and accurate copy of the '681 Patent is attached hereto as Exhibit W.

636. 464. The '681 Patent is directed to patent-eligible subject matter pursuant to 35 U.S.C. § 101.

637. 465. The '681 Patent is valid and enforceable, and presumed as such, pursuant to 35 U.S.C. § 282.

1    638. 466. DIRECTV deploys one or more of the Accused MoCA
2    Instrumentalities (e.g., DIRECTV C31, DIRECTV C41, DIRECTV C51, DIRECTV
3    C61, DIRECTV C61K, DIRECTV HR24, DIRECTV HR34, DIRECTV HR44,
4    DIRECTV HR54, and DIRECTV HS17) in connection with operating and providing
5    the Accused Services.

6    639. 467. The Accused MoCA Instrumentalities deployed by DIRECTV to
7    customer premises remain the property of DIRECTV while deployed.

8    640. 468. The Accused MoCA Instrumentalities operate while deployed in a
9    manner controlled and intended by DIRECTV.

10   641. 469. As set forth in the attached non-limiting claim chart (Exhibit X),
11   any product or system operating in a MoCA network compliant with the charted
12   provisions of MoCA 2.0 necessarily infringes at least claim 1 of the '681 Patent.

13   642. 470. Each aspect of the functioning of the Accused MoCA
14   Instrumentalities described in the claim chart operates while deployed to customer
15   premises in a manner controlled and intended by DIRECTV.

16   643. 471. DIRECTV provides no software, support or other facility to
17   customers to modify any aspect of the functioning described in the claim chart of the
18   Accused MoCA Instrumentalities while deployed to customer premises.

19   644. 472. The Accused MoCA Instrumentalities are compliant with MoCA
20   2.0 described in the '681 Patent claim chart, Exhibit X.

21   / / /

22   645. 473. DIRECTV therefore directly infringes at least claim 1 of the '681
23   Patent by using the Accused MoCA Instrumentalities to provide Accused Services to
24   customers.

25   646. 474. DIRECTV sells the Accused Services to its customers and
26   subscribers for a fee. Pursuant to the sale of these services, DIRECTV uses the
27   method recited in at least claim 1 of the '681 Patent to provide the Accused Services

28

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

to DIRECTV's customers and subscribers through the Accused MoCA Instrumentalities. DIRECTV is therefore engaging in the infringing use of at least claim 1 of the '681 Patent in order to generate revenue from its customers and subscribers.

647. ~~475.~~ DIRECTV directly infringes at least claim 1 of the '681 Patent when it, for example, uses the Accused MoCA Instrumentalities to test, demonstrate or otherwise provide Accused Services.

648. ~~476.~~ DIRECTV had knowledge of the '681 Patent no later than its receipt of Entropic's communications sent to DIRECTV on August 9, 2022.

649. ~~477.~~ DIRECTV has been aware that it infringes the '681 Patent no later than its receipt of Entropic's communication sent to DIRECTV on August 9, 2022.

650. ~~478.~~ DIRECTV has known of or has been willfully blind to the '681 Patent since before the August 9, 2022 communications from Entropic.

651. ~~479.~~ The '681 Patent issued while or before DIRECTV was a member of MoCA.

652. ~~480.~~ Because of DIRECTV's knowledge of Entropic Inc.'s work and contributions related to MoCA technology, DIRECTV had knowledge of the '681 Patent before August 9, 2022 or was willfully blind to its existence.

653. ~~481.~~ DIRECTV has been aware of its infringement of the '681 Patent no later than February 17, 2023 when Entropic sent DIRECTV claim charts detailing the infringement of the '681 Patent by MoCA technology, which is deployed by DIRECTV. The claim charts DIRECTV received approximately three months before the filing of this Complaint show that the claims of the '681 Patent are essential to practicing at least MoCA standards versions 1.1, and/or 2.0.

654. ~~482.~~ The claims of the '681 Patent are essential to practicing at least MoCA standards versions 1.1, and/or 2.0.

655. 483. DIRECTV knew, or was willfully blind to the fact that the technology of the '681 Patent directly relates to networking over coaxial cable, including MoCA, at least as early as DIRECTV became aware of the existence of the '681 Patent. Because of its familiarity with, and access to, the MoCA standards, DIRECTV knew, or was willfully blind to the fact, that use (by DIRECTV or its customers) of instrumentalities compliant with MoCA 1.1, and/or 2.0 to deliver DIRECTV services would necessarily infringe one or more claims of the '681 Patent.

656. 484. Since learning of the '681 Patent and its infringing activities, DIRECTV has failed to cease its infringing activities.

657. 485. DIRECTV's customers and subscribers directly infringe at least claim 1 of the '681 Patent by using the Accused MoCA Instrumentalities in connection with the Accused Services provided by DIRECTV.

658. 486. DIRECTV actively induces its customers' and subscribers' direct infringement by providing the Accused Services and associated support.

659. 487. For example, DIRECTV actively induces infringement of at least claim 1 of the '681 Patent by providing the Accused MoCA Instrumentalities to DIRECTV customers with specific instructions and/or assistance (including installation and maintenance) regarding the instantiation of a MoCA network and the use of the Accused MoCA Instrumentalities to infringe the '681 Patent.

660. 488. DIRECTV aids, instructs, supports, and otherwise acts with the intent to cause an end user to make and/or use the MoCA network and/or use the Accused MoCA Instrumentalities to infringe every element of at least claim 1 of the '681 Patent.

///

661. 489. Additionally, DIRECTV contributes to the customers' and subscribers' direct infringement. DIRECTV provides at least the Accused MoCA

118

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

1 | Instrumentalities that create and are at least substantially all of a MoCA network to
2 | be used to infringe at least claim 1 of the '681 Patent.

3 | 662. 490. The Accused MoCA Instrumentalities have no substantial
4 | noninfringing uses. When an end user uses the Accused MoCA Instrumentalities in
5 | connection with the Accused Services provided by DIRECTV, the end user directly
6 | infringes at least claim 1 of the '681 Patent. The Accused MoCA Instrumentalities
7 | are therefore especially made or especially adapted for use in an infringing manner.

8 | 663. 491. DIRECTV's inducement of, and contribution to, the direct
9 | infringement of at least claim 1 of the '681 Patent has been, and is, continuous and
10 | ongoing through the acts described above in connection with DIRECTV's provision
11 | of the Accused Services.

12 | 664. 492. DIRECTV's infringement of the '681 Patent is, has been, and
13 | continues to be willful, intentional, deliberate, and/or in conscious disregard for
14 | Entropic's rights under the patent.

15 | 665. 493. Entropic has been damaged as a result of the infringing conduct
16 | alleged above. DIRECTV is liable to Entropic in an amount that compensates
17 | Entropic for DIRECTV's infringement, which by law cannot be less than a
18 | reasonable royalty, together with interest and costs as fixed by this Court under 35
19 | U.S.C. § 284.

20 | 666. 494. Upon information and belief, there is no duty to mark any
21 | instrumentality with the '681 Patent in accordance with 35 U.S.C. § 287(a).

22 | **JURY DEMAND**

23 | Entropic hereby requests a trial by jury on all issues so triable by right.

24 | **PRAYER FOR RELIEF**

25 | WHEREFORE, Entropic requests that:

26 | A.     The Court find that DIRECTV has directly infringed the Patents-in-Suit
27 | and hold DIRECTV liable for such infringement;

28 |

ORIGINAL FIRST AMENDED COMPLAINT FOR PATENT
INFRINGEMENT

1      B.     The Court award damages pursuant to 35 U.S.C. § 284 adequate to

2 compensate Entropic for DIRECTV's past and future infringement of the Patents-in-

3 Suit, including both pre- and post-judgment interest and costs as fixed by the Court;

4      C.     The Court increase any award to Entropic by a judicially appropriate

5 amount;

6      D.     The Court declare that this is an exceptional case entitling Entropic to

7 its reasonable attorneys' fees under 35 U.S.C. § 285; and

8      E.     The Court award such other relief as the Court may deem just and

9 proper.

Dated: ~~July 1~~November 7, 2023        Respectfully submitted,

By: __/s/ *~~Christina Goodrich~~Douglas Jordan Winnard*_____
Michael T. Pieja (SBN 250351)
mpieja@goldmanismail.com
Douglas Jordan Winnard (SBN 275420)
dwinnard@goldmanismail.com
Goldman Ismail Tomaselli
Brennan & Baum LLP
200 South Wacker Dr., 22nd Floor
Chicago, IL 60606
Tel: (312) 681-6000
Fax: (312) 881-5191

Christina Goodrich (SBN 261722)
christina.goodrich@klgates.com
Connor J. Meggs (SBN 336159)
connor.meggs@klgates.com
**K&L GATES LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone: +1 310 552 5000
120

Facsimile: +1 310 552 5001

James A. Shimota *(pro hac vice forthcoming)*
jim.shimota@klgates.com
George C. Summerfield *(pro hac vice forthcoming)*
george.summerfield@klgates.com
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Tel.: (312) 372-1121
Facsimile: (312) 827-8000

Peter E. Soskin (SBN 280347)
peter.soskin@klgates.com
**K&L GATES LLP**
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 882-8200
Facsimile: (415) 882-8220

Darlene F. Ghavimi *(pro hac vice forthcoming)*
darlene.ghavimi@klgates.com
**K&L GATES LLP**
2801 Via Fortuna, Suite #650
Austin, TX 78746
Telephone: (512) 482-6919
Facsimile: (512) 482-6800

*Attorneys for Plaintiff*
*Entropic Communications, LLC*

ORIGINALFIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT