Christina Goodrich (SBN 261722)
christina.goodrich@klgates.com
Cassidy T. Young (SBN 342891)
cassidy.young@klgates.com
K&L GATES LLP
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

*Attorneys for Plaintiff*
*Entropic Communications, LLC*

(*Additional counsel listed in signature block*)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> DISH NETWORK CORPORATION, *et al.*, <br><br> Defendants. | Case No.:  2:23-cv-01043-JWH-KES (Lead Case) <br> Case No.:  2:23-cv-01047-JWH-KES (Related Case) <br> Case No.:  2:23-cv-01048-JWH-KES (Related Case) <br> Case No.:  2:23-cv-05253-JWH-KES (Member Case) |
| ENTROPIC COMMUNICATIONS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> COX COMMUNICATIONS, INC., *et al.*, <br><br> Defendants. | **ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS** <br><br> Date:  January 16, 2023 <br> Time:  10:00AM <br> Courtroom:  9D (Santa Ana) |

ENTROPIC COMMUNICATIONS, LLC,

     Plaintiff,

     v.

COMCAST CORPORATION, *et al.*,

     Defendants.

ENTROPIC COMMUNICATIONS, LLC,

     Plaintiff,

     v.

DIRECTV, LLC, *et al.,*

     Defendants.

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................5

I.  INTRODUCTION .........................................................................................8

II.  BACKGROUND ...........................................................................................9

III.  LEGAL STANDARD ..................................................................................10

IV.  THE '518 PATENT RECITES A PATENTABLE IMPROVEMENT
IN COAXIAL CABLE NETWORKS (COUNT I) ....................................11

    a.  The '518 Patent is directed to a technological solution to
problems with signal transmission in coaxial cable networks,
not to an abstract idea.................................................................11

    b.  The '518 Patent recites unconventional activity in coaxial
networks. ....................................................................................16

V.  THE '759 PATENT RECITES A PATENTABLE IMPROVEMENT
IN COAXIAL NETWORK TECHNOLOGY (COUNT III).......................18

    a.  The '759 Patent is directed to a technological solution to
problems with broadcasting over coaxial cable installations,
not to an abstract idea.................................................................19

    b.  The '759 Patent recites unconventional activity in coaxial
networks. ....................................................................................22

VI.  THE '539 PATENT RECITES A PATENTABLE IMPROVEMENT
IN COAXIAL NETWORK TECHNOLOGY (COUNT VII) ....................25

    a.  The '539 Patent is directed to an improvement in modem
functionality for communication over a coaxial network, not to
an abstract idea..........................................................................25

    b.  The '539 Patent recites unconventional activity in coaxial
networks. ....................................................................................27

VII.  THE '802 PATENT RECITES A PATENT-ELIGIBLE
IMPROVEMENT IN COAXIAL CABLE NETWORKS (COUNT
IV)...............................................................................................................30

3

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

a.     The '802 Patent claims a patentable improvement to constructing data packets used to enable communication in a coaxial cable network...........................................................................30

b.     The '802 Patent recites unconventional activity in coaxial networks. ...........................................................................33

VIII.   THE '681 PATENT CLAIMS A PATENT-ELIGIBLE IMPROVEMENT TO NETWORK EFFICIENCY (COUNT XII).............35

a.     The '681 Patent claims a patentable improvement to packet transmission in a broadband coaxial network.....................................36

b.     The '681 Patent recites unconventional clock synchronization steps.....................................................................40

IX.     JOINDER IN THE COX MOTION IS INAPPROPRIATE........................42

4

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed. Cir. 2018)..............................................................11

*Adasa Inc. v. Avery Dennison Corp.*,
  55 F.4th 900 (Fed. Cir. 2022)................................................................10

*Alice Corp. Pty. Ltd. vs. CLS Bank Int'l*,
  573 U.S. 208 (2014) ......................................................................passim

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed. Cir. 2016)..............................................................24

*Bridge & Post, Inc. v. Verizon Comm'cns, Inc.*,
  778 F. App'x 882 (Fed. Cir. 2019.) ........................................................32

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
  927 F.3d 1306 (Fed. Cir. 2019)..............................................................30

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
  935 F.3d 1341 (Fed. Cir. 2019)..............................................................32

*Coop. Ent., Inc. v. Kollective Tech., Inc.*,
  50 F.4th 127 (Fed. Cir. 2022)...........................................................passim

*CosmoKey Sols. GmbH & Co. KG. v. Duo Sec. LLC*,
  15 F.4th 1091 (Fed. Cir. 2021).................................................23, 35, 42

*Data Engine Techs. LLC v. Google LLC*,
  906 F.3d 999 (Fed. Cir. 2018).........................................................22, 27

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016).................................................21, 22, 27

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016)..............................................................11

*Entropic Commcn's, LLC v. DISH Network Corp.*,
  No. 2:23-cv-1043-JWH-KES, Dkt. 103 (C.D. Cal. Sept. 6, 2023)...........15, 23, 42

*Fortinet, Inc. v. Forescout Techs., Inc.*,
  2020 WL 6415321 (N.D. Cal. Nov. 2, 2020) .......................................40

5

*Illumina, Inc. v. Ariosa Diagnostics, Inc.*,
   967 F.3d 1319 (Fed. Cir. 2020)...........................................................................11

*Implicit, LLC v. Ziff Davis, Inc.*,
   2023 WL 4366351 (C.D. Cal. July 3, 2023)........................................................39

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
   942 F.3d 1143 (Fed. Cir. 2019)....................................................................26, 27

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   837 F.3d 1299 (Fed. Cir. 2016)..........................................................10, 14, 39

*Mentone Sols. LLC v. Digi Int'l Inc.*,
   2021 WL 5291802 (Fed. Cir. Nov. 15, 2021).........................13, 19, 20, 25

*OIP Techs., Inc. v. Amazon.com, Inc.*,
   788 F.3d 1359 (Fed. Cir. 2015)..........................................................................27

*Packet Intel. LLC v. NetScout Sys., Inc.*,
   965 F.3d 1299 (Fed. Cir. 2020)....................................................................passim

*Realtime Data LLC v. Array Networks Inc.*,
   2023 WL 4924814 (Fed. Cir. Aug. 2, 2023)......................................................16

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018)..........................................................................39

*Tatung Co., Ltd. v. Shu Tze Hsu*,
   217 F. Supp. 3d 1138 (C.D. Cal. 2016) .............................................................42

*TecSec, Inc. v. Adobe Inc.*,
   978 F.3d 1278 (Fed. Cir. 2020).......................................................14, 20, 21, 24

*Trinity Info Media, LLC v. Covalent, Inc.*,
   562 F. Supp. 3d 770 (C.D. Cal. 2021) .......................................................21, 22

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017)....................................................................15, 33

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
   957 F.3d 1303 (Fed. Cir. 2020)...................................................................passim

*Usher v. City of Los Angeles*,
   828 F.2d 556 (9th Cir. 1987)..............................................................11, 33, 38

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

**Statutes & Codes**

35 U.S.C. § 101.............................................................................................8, 11, 36

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

The patents-in-suit are directed to *specific* technological solutions to *specific* technological problems related to data transmission over coaxial cable installations. These patents claim improvements in the functionality of coaxial cable installations, and they implement these improvements with activity that was both unconventional and contrary to the conventional wisdom in the art. Thus, the patents-in-suit recite patent-eligible subject matter under 35 U.S.C. § 101.

Prior to the patents-in-suit, coaxial cable installations were designed to allow communications between an external source of programming, such as a "head-end," and user devices in homes or other buildings. (Dkt. 168, Entropic First Am. Compl. ("FAC"), ¶¶ 12, 21.) But this technology was not configured for—and in many ways prevented—communication between user devices in a home or building. (*Id.*, ¶¶ 23–32.) As a result, devices such as cable boxes could not send data (e.g., recorded video) to peer devices over existing coaxial cable installations. (*Id.*, ¶¶ 37–38.) Entropic's[1] patents-in-suit overcame several technological barriers in coaxial installations and enabled the device-to-device communication that was not possible in the prior art.

DirecTV's[2] Motion to Dismiss ("Motion") challenges five of the patents-in-suit under 35 U.S.C. § 101. DirecTV's Motion overgeneralizes the claims, rips the inventions out of their coaxial cable context, divorces them from the technical problems they were designed to solve, and ignores Entropic's well-pleaded allegations regarding what was unconventional when the patents were invented. (Dkt. 160 ("Mot.").) These errors are fatal. The technical environment of existing coaxial installations is central to the problems in the art, the solutions claimed in Entropic's

---

[1] "Entropic" refers to Plaintiff Entropic Communications, LLC.

[2] "DirecTV" refers to Defendants DirecTV, LLC and AT&T Services, Inc. collectively.

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

patents, and the reasons why those solutions are concrete, non-abstract, and unconventional. DirecTV's Motion should thus be denied as to all five patents.

## II.   BACKGROUND

The patents-in-suit are directed to improving the functionality of coaxial cable installations. In such installations, cable wiring within a home or building typically connected to an outside network via a single point of entry, allowing communication with a cable "head end" or other source of data. (FAC, ¶¶ 12, 21.) Splitters were used to allow the wiring within the building to branch out from the single point of entry to multiple user devices. (*Id.*, ¶¶ 15–17.) The configuration of these installations was optimized for transmission between the data source and the devices. (*Id.*, ¶¶ 21–22.) But if one wanted instead to transmit data between user devices, this same configuration posed several obstacles. First, the splitters intentionally isolated the devices from one another to avoid interference. (*Id.*, ¶ 22.) Second, the number and arrangement of splitters, along with the nature of the other network elements, created differences in the communication pathways between any two devices. (*Id.*, ¶¶ 23, 29.) Third, the characteristics of the communication pathways between any two devices differed depending on which direction the signals were transmitted due to the properties of the splitters. (*Id.*, ¶¶ 30–31.) The "conventional wisdom" at the time was that these problems prevented communication between devices in existing cable installations. (*Id.*, ¶ 23; *see also* Dkt. 168-13 ("'539 Pat."), 3:54–61.)

Entropic's predecessor-in-interest to the patents-in-suit, Entropic Communications, Inc. ("Entropic Inc."), set out to solve these problems. (FAC, ¶¶ 39–40.) Entropic Inc. developed technical solutions that are embodied in the claims of the patents-in-suit. (*Id.*, ¶¶ 41–44.) Entropic Inc. also developed a new standard to implement its inventions, known as the "Multimedia over Cable Alliance" ("MoCA"). (*Id.*, ¶¶ 50–53.) Four of the five challenged patents arise from Entropic Inc.'s work in the early 2000s: U.S. Patent Nos. 7,295,518 (the "'518 Patent"); 7,889,759 (the "'759 Patent"); 8,621,539 (the "'539 Patent"); and 8,085,802 (the

9

"'802 Patent"). The fifth patent, U.S. Patent No. 8,363,681 (the "'681 Patent"), improves upon this work. The technological problems solved by each patent are described in more detail in Sections IV–VIII below.

## III.   LEGAL STANDARD

The patent-eligibility test is a two-step analysis under the Supreme Court's decision in *Alice Corporation Pty. Ltd. vs. CLS Bank International*, 573 U.S. 208 (2014). At step one, the court analyzes the basic character of the invention to determine whether it is directed to patentable subject matter. "In [this] eligibility analysis, we consider the claim as a whole . . . and read it in light of the specification." *Packet Intel. LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1309 (Fed. Cir. 2020) (internal citations omitted). When analyzing claims in light of the specification, "courts 'must be careful to avoid oversimplifying the claims' by looking at them generally and failing to account for the specific requirements of the claims." *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) (citation omitted). "If the focus of the claim is a specific and concrete technological advance, for example an improvement to a technological process or in the underlying operation of a machine, our inquiry ends and the claim is eligible." *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022); *see also Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307 (Fed. Cir. 2020).

If and only if the court determines that a patent is directed to ineligible subject matter does it proceed to step two of the *Alice* test. At step two, the court determines "whether the claim elements, individually and as an ordered combination, contain an inventive concept, which is more than merely implementing an abstract idea using well-understood, routine, [and] conventional activities previously known to the industry." *Coop. Ent., Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130 (Fed. Cir. 2022) (alteration in original) (quotations and citations omitted). The Federal Circuit has held that claims contain an inventive concept when they recite functionality that is "different from and improves upon the prior art." *Id.* at 132. "Whether the claim

10

elements or the claimed combination are well-understood, routine, [or] conventional is a question of fact." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).

As the moving party, DirecTV bears the burden to show that the patents-in-suit are invalid under 35 U.S.C. § 101. *Illumina, Inc. v. Ariosa Diagnostics, Inc.*, 967 F.3d 1319, 1328 (Fed. Cir. 2020). At the pleading stage, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). "Thus, patent eligibility may be resolved at the Rule 12 stage only if there are no plausible factual disputes after drawing all reasonable inferences from the intrinsic and Rule 12 record in favor of the non-movant." *Kollective*, 50 F.4th at 130.

## IV.   THE '518 PATENT RECITES A PATENTABLE IMPROVEMENT IN COAXIAL CABLE NETWORKS (COUNT I)

The '518 Patent is patent-eligible because it claims a specific improvement to, and recites functionality that was not routine or conventional in, coaxial networks.

### a.   The '518 Patent is directed to a technological solution to problems with signal transmission in coaxial cable networks, not to an abstract idea.

The '518 Patent claims a specific technological solution to a specific problem in communications over legacy coaxial cable installations. Claims that are directed to a specific technological solution to a technological problem are not directed to an abstract idea. *Enfish*, *LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016). The '518 Patent thus claims patent-eligible subject matter at *Alice* step one.

As described in the '518 Patent and in Entropic's First Amended Complaint, major technological obstacles prevented user devices in a building from communicating with one another over legacy coaxial cable installations. (Dkt. 168-1 ("'518 Pat."), 4:28–32; FAC, ¶¶ 22–32.) These problems arose from the structure of these installations, which typically used a series of splitters and a web of coaxial cables to connect multiple end devices to a single "entry point" between a building

and an external cable "plant" or other network. (*Id.*, ¶¶ 16–19, 23.) While this architecture allowed end devices to receive content from a service provider, it impeded communication between the end devices. (*Id.*, ¶¶ 22–23, 38.)

For example, existing installations included "splitters" that "split" a signal coming from the cable network into multiple outputs, such as TVs or modems in different rooms. These splitters were specifically designed ***not*** to allow communications between user devices that were connected to different "branches" or "taps" of the splitter. ('518 Pat., 2:35–46.) For instance, the splitters impeded, or attenuated, transmission of signals between their outputs. (FAC, ¶¶ 22–23.) The splitters also created variability in the characteristics of the communication paths between end devices. (*Id.*, ¶ 29.) And they created asymmetry in how signals moved through the network depending on which direction they were transmitted. (*Id.*, ¶¶ 30–31.) Both of these properties posed obstacles to device-to-device communications.

Further compounding the problem, user devices that might want to communicate over a legacy cable installation had no information regarding the characteristics of the communication pathway(s) theoretically available between them. (*Id.* ¶¶ 25–26.) This was a particular issue in cable installations because the paths between any two end devices were different due to differences in the length and composition of the cable and the number of splitters. (*Id.*, ¶ 29.) Also, any device-to-device communications needed to be strong enough to be received by the target without creating interference in the network. (*See* '518 Pat., 3:21–24.) The inability of devices to communicate over a conventional cable installation was thus the result of numerous technological problems in such installations.

The '518 Patent's claims are directed to a technological solution to one such technological problem. Claim 1 uses a particular signal (a "probe message") sent between devices using a particular technology ("multi-carrier signaling") on a particular network ("cable wiring") to measure "channel characteristics" of the path between devices. ('518 Pat., cl. 1.) The claim then uses "bit loading" to transmit

different amounts of information in different parts of the signal based on the results of the "probe message." (*Id.*) Collectively, this allows end devices in a legacy cable installation—which previously could not communicate—to learn the properties of the previously-unknown path between them and identify a set of parameters that allows for effective communication. ('518 Pat., 4:37–47; FAC, ¶ 66.)

The Federal Circuit has repeatedly held patentable claims that, like those of the '518 Patent, are directed to improvements to how networks operate. *See, e.g.*, *Packet Intel.*, 965 F.3d at 1309; *Mentone Sols. LLC v. Digi Int'l Inc.*, Nos. 2021-1202, 2021-1203, 2021 WL 5291802, at *5–6 (Fed. Cir. Nov. 15, 2021). For instance, in *Packet Intel.*, the Federal Circuit held that claims directed to a "challenge unique to computer networks, identifying disjointed connection flows in a network environment," were patent-eligible. 965 F.3d at 1309. Like the claim in *Packet Intel.*, claim 1 of the '518 Patent is directed to a challenge unique to a type of computer network (coaxial cable installations): overcoming structural and interference problems that precluded communication between devices. (*See, e.g.*, '518 Pat., 2:28–46.) Similarly, in *Mentone*, the Federal Circuit held claims patentable because they were directed to enhancing data transmission "by enabling the use of timeslots for transmission that were not previously available." 2021 WL 5291802, at *5. Similarly, claim 1 is directed to enabling the use of a resource—cable installations—"that [was] not previously available" for communication by claiming a way to overcome the "signal reflections and tap port isolation of splitters." ('518 Pat., 4:19–32.)

In its Motion, DirecTV attempts to characterize claim 1 of the '518 Patent as directed to "(i) transmitting and analyzing information, and (ii) determining a bit loading scheme." (Mot. at 26.) This characterization is wrong for several reasons.

***First***, DirecTV's characterization of claim 1 as solely directed to determining a bit loading scheme ignores key limitations that define the technical problem being solved. (*Id.*) Claim 1 requires a specific network where "at least two network devices" are connected to "splitter tap ports" through "coaxial cable." ('518 Pat.,

cl. 1.) These limitations define a specific network environment with specific technological problems that the claimed invention solves. (FAC, ¶ 66); *see Uniloc*, 957 F.3d at 1307 (claims directed to solving specific technological problem in communications systems were patent-eligible). Thus, that environment must be considered part of claim 1's character as a whole. Indeed, the Federal Circuit has "previously cautioned" against "failing to account for the specific requirements of the claims." *McRO*, 837 F.3d at 1313. Here, contrary to DirecTV's argument, "[t]he focus of the claimed advance cannot ignore all but the [determination of a bit-loading scheme]," *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1295 (Fed. Cir. 2020). When properly viewed as a whole, claim 1 is directed to a specific technological solution to a specific technical problem, not an abstract idea.

**Second**, DirecTV is wrong that "[t]he '518 Patent does not claim a system that alters how signals are transmitted in a coaxial cable communication network." (Mot. at 25.) The '518 Patent emphatically **does** alter how signals are transmitted on such cable installations. Legacy coaxial installations did not allow "signals [to be] transmitted" between user devices **at all**, much less with a specific bit loading pattern based on a probe of the network. (FAC, ¶¶ 22–23, 29–32; '518 Pat., 4:19–33.) Similarly, DirecTV is wrong that the '518 Patent "does not propose a new mechanism for applying bit loading to a network." (Mot. at 25.) The factual allegations in Entropic's First Amended Complaint—which must be taken as true—show that bit loading had never before been applied to communication between user devices on a coaxial network. (FAC, ¶¶ 75–78.) Thus, the '518 Patent recites and teaches an invention that DirecTV implicitly concedes is patentable: altering how signals are transmitted in a coaxial cable installation.

**Third**, DirecTV ignores disclosures in the specification about the technical problems addressed by the '518 Patent. "In [an] eligibility analysis, [the court] consider[s] the claim as a whole . . . and read[s] it in light of the specification." *Packet Intel.*, 965 F.3d at 1309 (internal citations omitted). Here, the specification discusses

specific technical problems with prior art coaxial cable installations, such as high signal attenuation, and ties the claimed functions of probing and bit loading to a specific technical solution to these problems. (*See* '518 Pat., 2:28–34, 4:37–47.) DirecTV's oversimplified step one analysis ignores all of this, and thus fails to read claim 1 in view of the specification as the Federal Circuit requires.

**Fourth**, DirecTV disregards the factual allegations in Entropic's First Amended Complaint. These allegations explain the technical challenges that legacy coaxial installations posed to communication between user devices. (FAC, ¶¶ 22–32.) And they explain, based on these facts, that the claimed combination of probing and bit loading overcame these problems. (*Id.*, ¶ 66.) Although DirecTV cites this Court's Order in the *DISH* case, that Order related to different claims of different patents. (*DISH* Order at 1.) Further, the record here is different because of Entropic's well-plead allegations regarding the shortcomings of the art and how the '518 Patent addresses them. (FAC, ¶¶ 64–66.) These allegations must be credited at the pleading stage, *Kollective,* 50 F.4th at 133, and underscore that claim 1 is patent-eligible.

**Lastly**, DirecTV's cited cases are inapposite. (Mot. at 27.) In *Two-Way Media*, the patentee argued that its claims were directed to a "particular scalable network architecture" and thus patentable. *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 at 1338 (Fed. Cir. 2017). The Federal Circuit rejected this argument because the claims were not "sufficiently tie[d]" to this architecture and instead recited generic functions that failed to "lead[] to an improvement in the *functioning* of the system." *Id.* at 1338 (emphasis added). By contrast, the channel probing and bit loading of claim 1 are tied directly to the specific architecture of "cable wiring comprising a splitter . . . and a plurality of segments of coaxial cable connecting between the splitter . . . and the network devices." ('518 Pat., cl. 1.) The specification also ties the claimed invention to "overcom[ing] the problem of multipath and high attenuation," thus improving the functioning of coaxial cable networks. (*Id.*, 4:37–47.)

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

*Realtime Data* is similarly irrelevant. There, "[n]either the claim nor the specification" of the patents at issue taught how the claimed functions were performed or how they improved upon the prior art. *Realtime Data LLC v. Array Networks Inc.*, Nos. 2021-2251, 2021-2291, 2023 WL 4924814, at *8–9 (Fed. Cir. Aug. 2, 2023). By contrast, the '518 Patent claims specific functions (channel probing and bit loading), and the specification teaches in detail how these functions are performed and how they improved upon the prior art by overcoming specific issues in coaxial installations (multipath interference and signal attenuation). ('518 Pat., 4:37–62, 8:9–11:6.) Claim 1 of the '518 Patent is thus directed to patent-eligible subject matter under *Alice* step one.

### b. The '518 Patent recites unconventional activity in coaxial networks.

Even if claim 1 of the '518 Patent were (incorrectly) characterized as directed to an abstract idea, it would still be patent-eligible because it recites an inventive combination of elements that were neither routine nor conventional in the art.

As described above, the '518 Patent addresses specific technical problems in coaxial installations using a combination of probing and bit loading. (*See supra* at IV.a.) This combination of techniques was neither routine nor conventional. Probes had not previously been sent between devices in a home coaxial network in the prior art, and doing so was considered unconventional. (FAC, ¶¶ 77–78.) Likewise, selecting a bit loading scheme based on these probe results had not been used in coaxial networks in the prior art and was considered unconventional. (*Id.*, ¶ 79.) The use of these techniques thus provides an inventive concept.

The Federal Circuit's decision in *Kollective* is on all fours here. 50 F.4th 127. In *Kollective*, the claims related to structuring peer-to-peer networks for content distribution. *Id.* at 129. The claim recited "a particular arrangement of peer nodes for distributing content . . . which did not exist in the prior art." *Id.* at 133. This arrangement established a new type of network topology that allowed for exchange of data between peer nodes. *Id.* The specification then "explain[ed] how claim 1's

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

dynamic P2P network structure is different from and improves upon the prior art." *Id.* at 132. Accordingly, the Federal Circuit held that the claimed invention recited an inventive concept. *Id.* at 133.

Here, claim 1 is directed to a particular form of communication in a coaxial networking environment that did not exist in the prior art. Specifically, claim 1 requires devices communicating through the tap ports of a splitter using channel probes and bit loading. This topology did not previously exist in coaxial networks, which were limited to communication with the cable head end. (*See* '518 Pat., 4:19– 33.) The specification also explains how the claimed channel probing and bit loading enabled a new form of communication. (*Id.*, 9:35–41 (probes use a predetermined data sequence "to estimate the channel characteristics"), 8:9–15 (bit loading uses different modulation schemes based on "signal to noise ratio"), 4:42–47 (bit loading used "to implement a network that overcomes the problem of multipath and high attenuation in building cable wiring").) Claim 1, like the claims in *Kollective*, recites an improvement to networking technology that "is different from and improves upon the prior art." 50 F.4th at 132.

In response, DirecTV argues that individual components in claim 1—coaxial networks and splitters—were known. (Mot. at 28.) "This argument misses the point: useful improvements to [coaxial] networks are patentable regardless of whether the network is comprised of standard computing equipment," *Kollective*, 50 F.4th at 135. That the invention starts with existing equipment and adds new capabilities is precisely why it claims an advance: it improves the operation of cable networks without requiring any new hardware or re-wiring. *See Uniloc*, 957 F.3d at 1309.

Further, contrary to DirecTV's argument, even in isolation, the claimed communication "between the splitter tap ports and the network devices" was ***not*** routine or conventional. ('518 Pat., cl.1; FAC, ¶¶ 76–78.) The prior art DirecTV cites proves Entropic's point. That art relates only to communication between a head end ("network unit" or "central office") and a single customer device ("network

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

termination" or "remote terminal"). (*See, e.g.*, Ex. 1[3], U.S. Patent No. 6,438,174 at Fig. 1, 6:30–35; Ex. 2, U.S. Patent No. 6,259,746 at Fig. 1, 2:51–67.) The '518 Patent explicitly distinguishes its invention from this art: "The prior art references address communicating between a cable head end and in-home units but do not address the impairments present in the home wiring that restricts high bandwidth communication between devices within the home." ('518 Pat., 4:19–32.)

Even if DirecTV's attacks on the unconventionality of claim 1's individual limitations were true, they would not be sufficient. *Alice* step two requires analysis of the elements as an "ordered combination." *Kollective*, 50 F.4th at 130. Here, claim 1 of the '518 Patent recites a combination of probing and bit loading functions within a coaxial installation in a building. This environment had never before used, and never before benefited from, these functions. (FAC, ¶¶ 76–78.) It is irrelevant that DirecTV argues that probing in the abstract was known, or that bit loading in the abstract was known, or that coaxial cable networks were known. *See Kollective*, 50 F.4th at 135 (rejecting argument that claim lacked an inventive concept "because P2P networks and CDNs are conventional."). The **combination** of technologies used in claim 1, which was neither routine nor conventional, supplies an inventive concept. Claim 1 is thus patent-eligible under step two of the *Alice* analysis.

## V.   THE '759 PATENT RECITES A PATENTABLE IMPROVEMENT IN COAXIAL NETWORK TECHNOLOGY (COUNT III)

Claim 2 of the '759 Patent (DirecTV's representative claim) is directed to enabling broadcast communications in a coaxial cable network. The '759 Patent claims a specific improvement to, and recites functionality that was not routine or conventional in such networks. Thus, the '759 Patent is patentable.

/ / /

/ / /

---

[3] All exhibits cited herein are annexed to the Declaration of Douglas Jordan Winnard filed concurrently herewith, unless otherwise noted.

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

**a. The '759 Patent is directed to a technological solution to problems with broadcasting over coaxial cable installations, not to an abstract idea.**

Like the '518 Patent, claim 2 of the '759 Patent claims a specific technological solution to a specific problem in communications over legacy coaxial cable installations and is thus patent-eligible.

The basic character of claim 2 of the '759 Patent is enabling broadcast communication in a specific environment (broadband cable networks) with variable and unknown pathways between multiple devices. As argued above in Section III and IV.a, the Federal Circuit has repeatedly held that improvements to how networks operate are patentable inventions. *See, e.g.*, *Packet Intel.*, 965 F.3d at 1309; *Mentone*, 2021 WL 5291802, at *5–6. And like claim 1 of the '518 Patent, claim 2 of the '759 Patent is another example of such a patentable improvement.

The '759 Patent is directed at a solution to another aspect of the technological problems discussed above in Section IV, applied to the scenario where one user device on a coaxial installation communicates with multiple other such devices. For instance, "users in a home may desire to play network video games between different rooms in home environment utilizing the coaxial cable network" and "may want to share other types of digital data (such [as] video and/or computer information) between different rooms in a home." (Dkt. 168-5 ("'759 Pat."), 3:14–21.) In addition to the challenges discussed in Section IV, this type of communication faced the additional obstacle of how to determine appropriate communication parameters, such as bit-loading, that worked on all of the different and unknown channels between the sender and the multiple recipients.

The '759 Patent claims a technological solution to this problem in which "probe signals" are sent to multiple recipients. The receiving nodes receive the probe, use it to measure a characteristic of the channel, and respond to the sender. These responses are used to "determining a common bit-loading modulation scheme for communicating between a plurality of nodes in a broadband cable network ('BCN')."

('759 Pat., cl. 2.) The common bit-loading scheme is a particular communications parameter that defines how much data can be sent at a given time, and it allows a user device to send data to multiple recipients simultaneously by accounting for differences in channels between the sender and multiple recipients. (*Id.*, 6:52–7:4.)

The specification confirms that claim 2 is directed to a non-abstract technical improvement in cable networking. For instance, the specification provides several different examples of network configurations where, due to the placement and design of coaxial splitters, the channels between any two devices are "physically and electrically different." (*Id.*, 7:5–18, 7:31-9:60, Figs. 6–8.) As the specification explains, the communication path from a first node ("Node A") to a second node ("Node B") has different properties than the path from Node A to a third node ("Node C"). (*Id.*, 7:31–9:60, Figs. 6–8.) Thus, a bit-loading scheme for one channel may not work for the other. The specification explains that a common bit-loaded scheme is determined by comparing carrier signal values of the two paths and "choosing the lowest corresponding modulation value for each carrier number." (*Id.*, 10:41–57, Fig. 11C.) The use of this scheme, as claimed, allows the transmitter to transmit information to "node B and node C simultaneously," which was not previously possible. (*Id.*, 10:56–57.) Claim 2 is directed to a specific improvement to communication in cable installations and is thus patent-eligible. *See, e.g.*, *Packet Intel.*, 965 F.3d at 1309; *Mentone*, 2021 WL 5291802, at *5–6.

The patentability of Claim 2 is confirmed by its similarity to claims the Federal Circuit has held to be patent-eligible. In *TecSec*, for example, the Federal Circuit analyzed claims related to "the simultaneous transmission of secure information to a large group of recipients connected to a decentralized network." 978 F.3d at 1295–96. The Federal Circuit concluded that the claims were not directed to an abstract idea because they were "directed to improving a basic function of a computer data-distribution network" and "aimed at solving a particular problem of multicasting computer networks." *Id.* Similarly, claim 2 of the '759 Patent relates to "simultaneous

transmission" of information to multiple recipients. *Id.* It also "solves a particular problem of multicasting" by allowing communication between end devices connected in a cable network by channels with different and unknown properties. *Id.* And, as in *TecSec*, the claimed solution of the '759 Patent "improv[ed] a basic function" of the cable network. *Id.* It did so by probing multiple channels of that network and establishing a common bit loading scheme based on the results, overcoming the barriers that had prevented "simultaneous transmission" of data in that network. (*Id.*; '759 Pat., 6:45–7:4, 10:41–57.)

DirecTV contends that the '759 Patent is directed to the "abstract idea of analyzing and comparing data and determining a common bit-loading modulation scheme." (Mot. at 21.) But, as it did with the '518 Patent, DirecTV oversimplifies the claims and ignores the invention's context. Claim 2 recites a specific set of steps directed to solving problems specific to communication "in a broadband cable network," not analyzing data generally. ('759 Pat., cl 2.) The specification confirms as much, defining its invention as addressing the "need for a system and method to connect a variety of CPEs into a local network . . . allowing the utilization of an existing coaxial cable network." (*Id.*, 3:63–4:3.) As Entropic's First Amended Complaint alleges, prior broadband cable networks did not permit communications from one user device to multiple other devices simultaneously. (FAC, ¶ 91.) DirecTV thus disregards the actual problem identified, and solved, by the '759 Patent.

Further, claim 2 is nothing like the claims in the cases cited by DirecTV, *Electric Power Group* and *Trinity Info Media*. (Mot. at 22.) The claims in those cases were directed to collecting and analyzing information for display. *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) (characterizing claims as "merely selecting information, by content or source, for collection, analysis, and display"); *Trinity Info Media, LLC v. Covalent, Inc.*, 562 F. Supp. 3d 770, 779 (C.D. Cal. 2021) (claims for polling users and displaying matching results). There, the collection and display of data had no effect on the operation of the networks, and

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

computers were used solely as tools. *Elec. Power*, 830 F.3d at 1354; *Trinity*, 562 F. Supp. 3d at 782. Here, in contrast, claim 2 does not use cable networks as a mere tool to collect and display data; indeed, it does not display data at all. Rather, it uses a combination of probing and bit-loading to improve the operation of the network itself by overcoming the problem of differences in the characteristics of different channels. Thus, claim 2 recites a "technical solution and improvement" to cable networks and is not "directed generally to displaying information on a screen." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008–09, 1011 (Fed. Cir. 2018). It is thus directed to patent-eligible subject matter under step one of the *Alice* analysis.

### b. The '759 Patent recites unconventional activity in coaxial networks.

Even if claim 2 of the '759 Patent were (incorrectly) characterized as directed to an abstract idea, it would still be patent-eligible because it recites multiple inventive concepts distinct from that abstract idea. *Kollective*, 50 F.4th at 136.

***First***, transmitting probes from one device to multiple devices in a broadband cable network at all was not routine or conventional. (FAC, ¶¶ 94–95.) This was due, at least in part, to the "conventional wisdom" at the time that the structure of that network "prevented devices . . . from communicating with one another." (*Id.*, ¶¶ 23, 25.) Thus, the transmission of probes in a broadband cable network, particularly to multiple receivers, was not considered conventional or routine. (*Id.*)

***Second***, it was not routine or conventional to broadcast data from one end device to multiple others over a cable installation, let alone to do so using a bit-loading scheme that is common to the devices on that network. (*Id.*, ¶¶ 97–98.) For example, "it was not known in the art" that a common bit loading scheme would be "generally more efficient" for sending data from one device to multiple devices. (*Id.*; *see also* Dkt. 168-7 ("'802 Pat."), 18:48–19:14.)

***Third***, the combination of transmitting probes, generating response signals, and determining a common bit loading scheme was not routine or conventional. (FAC, ¶¶ 93–97.) This combination recites non-conventional functionality because

22

it allows for "transmit[ting] information from node A to node B and node C simultaneously" within a cable installation in a home or building, which was not previously possible, let alone conventional. ('759 Pat., 10:41–11:36, Figs. 10C, 11.) These elements, in combination, embody inventive concepts that contribute a specific improvement to the operation of cable installations, and thus claim 2 is patent-eligible under step two. *Kollective*, 50 F.4th at 133.

DirecTV's arguments on step two all fail. For one, DirecTV argues that this Court's tentative order in the *DISH* case found that the "use of probes alone is insufficient" to provide an inventive concept. (Mot. at 24 (citing *DISH* Order at 11–12).) But the Court's findings in *DISH* relate to different claim limitations of a different patent regarding different arguments made about different pleadings. Thus, the findings in *DISH* do not apply to the record here. *See CosmoKey Sols. GmbH & Co. KG. v. Duo Sec. LLC*, 15 F.4th 1091, 1099 (Fed. Cir. 2021) (Reyna, J, concurring) (patent eligibility "must be decided on a case-by-case basis in light of the particular claim limitations, patent specification, and invention at issue.") Indeed, in *DISH*, the Court found that "Entropic does not plead or argue" that a logical link established by probing a communication channel (in a different patent) was "in any way unconventional." *DISH Order* at 12. Here, however, Entropic **has** both plead and argued that transmitting probes between end devices in a cable installation was, in fact, neither routine nor conventional. (FAC, ¶¶ 94–95.) And Entropic plead specific facts to support this allegation, (*id.*, ¶¶ 22–32), which are supported by statements in the '759 Patent about the shortcomings of the prior art, ('759 Pat., 3:22–62).

DirecTV also argues that "[e]ach element of representative claim 2 is directed to a well-known, routine, or conventional function." (Mot. at 24.) The allegations described above show that this is incorrect. (FAC, ¶¶ 93–97.) DirecTV argues these allegations are "conclusory," (Mot. at 24), but DirecTV is wrong. Entropic alleged in extensive detail **why** broadcast communication was not performed in prior art broadband cable installations within a building, and it did so by describing the

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

properties and technical limitations of the splitters those installations used. (FAC, ¶¶ 22–32.) The '759 Patent describes the same problems. ('759 Pat., 3:22–4:3.) Entropic's allegations, when taken as true as required, show that the combination of recited functions in the '759 Patent was unconventional and an improvement on the prior art. *Kollective*, 50 F.4th at 133, 135.

Because DirecTV cannot reasonably contest that broadcasting data between end devices in a legacy cable installation was not conventional, it tries a different tack. DirecTV labels this broadcasting an "abstract idea" and argues that it therefore cannot supply an inventive concept. (Mot. at 23.) But broadcasting data from one device to many in a broadband cable network using a common bit-loading scheme is not abstract. It is a specific capability grounded in a specific networking environment that had previously impeded such broadcasts, and the steps of claim 2 are directed to overcoming this specific impediment. (FAC, ¶¶ 93, 97–98.) Further, this "abstract idea" is not part of DirecTV's characterization of the abstract idea in its step one analysis, i.e., "analyzing and comparing data and determining a common bit-loading modulation scheme." (Mot. at 21.) DirecTV cannot characterize claim 2 one way for step one and a different way for step two. *See, e.g.*, *Alice*, 573 U.S. at 221 (step two looks to whether a claim transforms "the abstract idea" from step one into a patent-eligible invention).

Finally, DirecTV again fails to analyze the claims as an "ordered combination," as the law requires. It is not sufficient for DirecTV to argue, as it does, that "[e]ach element of representative claim 2" is routine or conventional (nor is it true, as explained above). (Mot. at 24); *see Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Even if the individual elements of claim 2 were routine (which they are not), the ordered combination of elements is neither routine nor conventional. DirecTV thus "ignore[s] . . . the focus of the claimed advance in the combination [of elements]," *TecSec*, 978 F.3d at 1296. Claim 2 of the '759 Patent recites inventive concepts under step two of the *Alice* test.

## VI. THE '539 PATENT RECITES A PATENTABLE IMPROVEMENT IN COAXIAL NETWORK TECHNOLOGY (COUNT VII)

The '539 Patent is patent-eligible because it claims a specific improvement to, and recites functionality that was not routine or conventional in, cable networks.

### a. The '539 Patent is directed to an improvement in modem functionality for communication over a coaxial network, not to an abstract idea.

As set forth above, the Federal Circuit has repeatedly held that improvements to how networks operate are patentable inventions. *See, e.g.*, *Packet Intel.*, 965 F.3d at 1309; *Mentone*, 2021 WL 5291802, at *5–6. Claim 1 of the '539 Patent, like the '518 and '759 Patents, recites such a patentable improvement.

Like the '518 and '759 Patents, the '539 Patent is directed to overcoming barriers to communication between devices in a coaxial network. The patent explains that "the existing conventional wisdom is that the use of splitters in the existing broadband cable networks prevents networking between devices in the network because signals returning from the devices cannot be routed back through the splitters, i.e., cannot 'jump' a splitter." ('539 Pat., 3:54–61.) Further, the '539 Patent explains that variations in channel characteristics were a barrier to creating a "logical network" that allowed the devices to communicate. (*Id.*, 6:52–58.) If these variations are not accounted for, a given channel "may be very poorly utilized" and the entire network would no longer "operate well." (*Id.*, 6:55–67.)

The '539 Patent claims a specific technological solution to this technological problem. Claim 1 recites a "modem for communication to at least one node across at least one channel of a coaxial network." (*Id.*, cl. 1.) The claimed modem also comprises a "MAC Layer" that uses "at least one probe packet as an echo profile probe to measure node delay spread." (*Id.*) As the specification explains, this measurement can be performed using the "impulse response of the inter-node channel," which can indicate channel conditions such as distance between nodes. (*Id.*, 10:30–31.) Claim 1 then recites that the "measured node delay spread" is used

25

to "optimiz[e] the preamble and cyclic prefix requirements or other parameters." (*Id.*, cl. 1, 10:31–32.) The cyclic prefix is a component of a data packet whose length can be adjusted based on the conditions of the network. (*See id.*, Fig. 20, 14:11–15, 16:4–18.) In particular, the cyclic prefix will have different lengths based on the "multi-path delay spread in the network." (*Id.*, 14:11–15.) This cyclic prefix is used to "accommodate echo and multipath," which are specific types of undesirable interference that can vary based on the "distance between nodes." (Ex. 3, Provisional Appl. No. 60/632,797, ¶ 54.[4]) Thus, claim 1 recites a solution to the problem of variable and unknown distances in a coaxial network by probing those distances and optimizing the construction of data packets in response.

Claim 1 of the '539 Patent is similar to other claims the Federal Circuit has held to be patent-eligible. For example, in *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, the Federal Circuit held a claim to be patent-eligible that "employ[ed] a new way of generating check data that enables the detection of persistent systematic errors in data transmissions that prior art systems were previously not equipped to detect." 942 F.3d 1143, 1151 (Fed. Cir. 2019). The claims were patentable because they recited a "specific means or method that solves a problem in an existing technological process." *Id.* at 1150. Likewise, claim 1 recites a specific means to solve a specific problem: the variation in channel characteristics in existing coaxial networks that had impeded communication. The claimed solution employs a specific probing and optimization technique that enables communication that prior networks were "previously not equipped" to achieve. *Id.* at 1151; ('539 Pat., 3:54–61). Similarly, as with other claims the Federal Circuit has found to be patentable, claim 1 of the '539 Patent recites a "sufficiently specific implementation"—optimizing parameters of network packets ("preamble and cyclic prefix") using a specific technique (an "echo

---

[4] This provisional application is incorporated by reference in the '539 Patent and is thus considered part of the specification of that patent. ('539 Pat., 1:5–19.)

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

profile probe") to "improve[] the functioning of the overall technological process" (communication over a coaxial network). *Koninklijke*, 942 F.3d at 1151.

DirecTV again argues, as it did for the '518 and '759 Patents, that the '539 Patent is directed to the abstract idea of "transmitting information and analyzing and measuring and adjusting parameters." (Mot. at 33.) And again, as it did for the '518 and '759 Patents, DirecTV ignores the coaxial networking environment that defines the invention. The '539 Patent is not about transmitting or analyzing data in the abstract. It is directed to improvements in the functionality of specific hardware (a modem) for a specific type of communication: "communication to at least one node across at least one channel of a coaxial network." ('539 Pat., cl. 1.) It achieves this improvement by sending a specific probe type (echo profile) to measure a specific network characteristic (node delay spread) to optimize specific parameters (cyclic prefix). These functions had not been performed in coaxial networks before, (FAC, ¶¶ 130–134), and improved how the networks operated.

DirecTV also argues, as it did for the '518 and '759 Patents, that the claimed invention is analogous to the claims held invalid in *Elec. Power*. (Mot. at 33.) And, as it did for the '518 and '759 Patents, DirecTV misunderstands the invention. The '539 Patent does not use computers as tools to transmit and analyze data for display, as was the case in *Electric Power*. 830 F.3d at 1353–54. Nor does it use computers as tools to gather and analyze pricing data, as was the case in *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1361–62 (Fed. Cir. 2015). Rather, the claim recites sending a specific probe to optimize specific parameters to overcome a specific problem on specific networks: variation in channel characteristics that had made it difficult to establish a logical network over coaxial installations. Thus, claim 1 is distinguishable from claims that use networks or computers as a mere tool to display or analyze data. *See Data Engine Techs.*, 906 F.3d at 1011.

**b. The '539 Patent recites unconventional activity in coaxial networks.**

Even if claim 1 of the '539 Patent were directed to an abstract idea (which it is

27

not), it would still recite patent-eligible subject matter. The claimed invention of the '539 Patent recites multiple inventive concepts that differ from and improve upon the prior art, as shown by Entropic's First Amended Complaint and the '539 Patent itself.

**First,** claim 1 recites the inventive concept of transmitting probes to measure delay spread in a coaxial network. As recited in Entropic's First Amended Complaint, it was not routine or conventional to transmit probe packets or to measure delay over such a network. (FAC, ¶¶ 131–134.) This is because, among other reasons, modems on a conventional coaxial network "did not communicate with one another" at the time of the '539 Patent. (*Id.*, ¶ 127.) They thus had no reason to measure delay for transmissions between them or optimize communication based on that measurement. (*Id.*, ¶¶ 128–130.) These factual allegations are consistent with the '539 Patent, must be taken as true, and are sufficient to identify an inventive concept in the improvement of coaxial networking. *Kollective*, 50 F.4th at 136.

In its Motion, DirecTV argues that the inability for devices to communicate over prior art coaxial networks is irrelevant because the '539 Patent does not "require communication between nodes." (Mot. at 35.) But that is precisely what is claimed. Claim 1 requires that a "transmitter communicate" a packet containing an echo profile probe to "at least one node across at least one channel of a coaxial network." ('539 Pat., cl. 1.) Thus, the claim specifically requires "communication between nodes," which was not routine or conventional at the time. (FAC, ¶¶ 22–32.)

DirecTV also argues that the claims and specification fail to explain how the invention is implemented. (Mot. at 35–36.) Not so. Claim 1 specifies the type of probe sent (echo profile probe) and what it measures (node delay spread). The specification then explains how the probe operates (measuring "impulse response" of a channel) and how this measurement affects transmissions (determining the length of a cyclic prefix) in a BCN. ('539 Pat., 10:30–37, 14:11–16.) The '539 Patent also explains that the echo profile probe is used to "determine how far apart the BCN modems (i.e. nodes) are in the BCN network" and that "the determined distance

between nodes is used to calculate the cyclic prefix that is used in messages to accommodate echo and multipath." (Ex. 3, Provisional Appl. No. 60/632,797, ¶ 54.) These disclosures state how the claimed invention works and how it helps solve the problem of variable channel characteristics in a broadband cable network.

***Second,*** claim 1 also contains an inventive concept in the ordered combination of (1) transmitting probes from one end device to another in a coaxial installation; (2) measuring node delay spread; and (3) optimizing packet construction based on the measured spread. This combination was not routine and conventional. (*Id.*, ¶¶ 130, 133–134.) And it achieves a technical improvement by enabling communication that "conventional wisdom" believed could not be done. ('539 Pat., 3:54–61.)

Instead of addressing the claimed combination of elements, DirecTV argues that the '539 Patent recites "generic equipment [that] is used for generic, conventional functions." (Mot. at 34.) This argument "misses the point" because "useful improvements to [coaxial] networks are patentable regardless of whether the network is comprised of standard computing equipment," *Kollective*, 50 F.4th at 135. As the Federal Circuit has explained, a "claimed invention's compatibility with conventional [cable] communication systems does not render it abstract," *Uniloc*, 957 F.3d at 1309. Further, the '539 Patent does not recite "generic equipment." It recites a modem for communicating over a specific type of network (coaxial) that is programmed at a specific layer (MAC Layer) to perform specific functions (transmitting echo profile probes and optimizing cyclic prefix for data packet construction). ('539 Pat., cl. 1.) And, as the Federal Circuit has found, it is not material that the improvement defined by the '539 Patent is implemented at a specific layer of software architecture (MAC Layer), rather than "by reference to 'physical' components." *Uniloc*, 957 F.3d at 1309.

Because DirecTV cannot dispute that transmitting probes to measure node delay and optimizing packet construction in response was unconventional in a coaxial

installation, DirecTV instead argues that "limiting the invention to a particular technological environment (i.e., coaxial networks) does not render the claims any less abstract." (Mot. at 36.) Again, this argument fails to appreciate the critical importance of the coaxial context. Coaxial cabling is not a "field of use" limitation; it is the basis for the specific technical problem that the '539 Patent solves. ('539 Pat., 3:38–61.) The invention of the '539 Patent recites a specific solution to a problem specific to coaxial installations by measuring the node delay spread and using it to optimize packet construction. Claim 1 thus "uses an environment—[coaxial cable networks]—to do significantly more than simply carry out an abstract idea" and is thus patent-eligible. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) (rejecting argument that claimed improvements in use of Bluetooth were field of use limitations).

## VII.   THE '802 PATENT RECITES A PATENT-ELIGIBLE IMPROVEMENT IN COAXIAL CABLE NETWORKS (COUNT IV)

The '802 Patent is patent-eligible because it claims a specific improvement to, and recites functionality that was not routine or conventional in, coaxial networks.

### a. The '802 Patent claims a patentable improvement to constructing data packets used to enable communication in a coaxial cable network.

As set forth above, and as described in the '802 Patent and in Entropic's First Amended Complaint, legacy coaxial cable installations posed major technological obstacles to communication between end devices in a building. One such problem was "coordinating network resources . . . and optimizing communications between CPEs" in the "difficult" broadband cable network environment. ('802 Pat., 3:60–4:3.) The problem arose with the initial connection of a device, as there was no well-known mechanism for devices to locate one another or become aware of each other's existence. (FAC, ¶ 108.) For instance, there was no "discovery" or "admission" process that allowed for the admission of a new device to an in-home cable network, much less for user devices to admit one another. (*Id.*, ¶¶ 26, 103.)

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

The '802 Patent claims a specific technological solution to this problem. In particular, claim 3 recites transmitting packets from a "Broadband Cable Network (BCN) modem" to a plurality of nodes in a broadband cable network, including a "beacon packet" that is formatted with specific data fields. ('802 Pat., cl. 3.) The claimed beacon packet is a type of "robust packet" used to broadcast important control and timing information to all nodes on the network. (*Id.*, 9:40–44.) Such beacon packets are particularly adapted to solve the technological challenges in cable installations because they "are very robust and can be received even in a very poor channel environment." (*Id.*, 13:15–17.) The '802 Patent further explains that "[w]hen a BCN modem is activated, it attempts to locate the network timing by receiving a beacon packet [] which identifies network timing and essential network control information." (*Id.*, 25:14–21.) This "essential network control information" is claimed in the beacon packet data fields of claim 3. Claim 3 is thus directed to a patentable improvement that solves technological problems in the art.

Federal Circuit precedent confirms that claim 3 is patentable. In *Uniloc*, the Federal Circuit held that claims which recited the inclusion of "an additional data field" to an "inquiry message prior to transmission" were patent-eligible because they were directed to an "improvement to computer functionality." The Federal Circuit reasoned that the "additional data field enables a primary station to simultaneously send inquiry messages and poll parked secondary stations," which "eliminates or reduces the delay present in conventional systems where the primary station alternates between polling and sending inquiry messages." 957 F.3d at 1307–08. Similarly, claim 3 of the '802 Patent includes specific fields in a particular packet type to overcome technological problems that had prevented the admission of new nodes to a broadband cable network. ('802 Pat., 3:54–4:3.) These specific fields, like the "additional data field" in *Uniloc*, provide an improvement in how a communication network operates. (*Id.,* cl. 3); 957 F.3d at 1307–08.

/ / /

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

In its Motion, DirecTV contends that the '802 Patent is directed to the "abstract idea of transmitting messages containing the claimed fields of information." (Mot. at 39.) DirecTV again disregards context of the patent. The '802 Patent is not just about transmitting messages, or even "transmitting information in a coaxial cable environment." (*Id.* at 41.) It is about transmitting specific information (admission-related information such as "network coordinator ID field" and "admission window") in a specific packet type (a "robust" beacon packet) in a specific environment (broadband cable networks) to overcome problems with poor or unknown channel conditions. (FAC, ¶¶ 100–106.) Thus, the '802 Patent claims a type of invention that the Federal Circuit has held to be patentable: improving the performance of a network by adding particular data fields to a message that provide a technological benefit. *See Uniloc,* 957 F.3d at 1307–08 (The "additional data field" enabled "[t]he claimed invention" to "eliminate[] or reduce[] the delay present in conventional systems.").

Next, DirecTV argues that requiring the packets to include specific information does not make the claim patent-eligible. (Mot. at 39.) DirecTV is wrong because the specific data fields in claim 3 solve problems with node-to-node communications. Further, DirecTV's cited cases are inapposite. (Mot. at 40 (citing *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341 (Fed. Cir. 2019) and *Bridge & Post, Inc. v. Verizon Comm'cns, Inc.*, 778 F. App'x 882 (Fed. Cir. 2019)).) The claims in those cases were directed to communicating information to achieve a purpose other than improving a network, namely alerting a user about the status of a garage door or tracking users to serve advertisements. Here, claim 3 is not transmitting "network status information" for some non-networking purpose. (*Id.*) Instead, the specific data fields of the claimed packet types enable nodes to locate and communicate with each other in unpredictable and unreliable conditions, whereas previously they could not communicate at all. (*See* '802 Pat., 25:13–21, 36–47.) Thus, claim 3 is "directed to a specific asserted improvement to the functionality of the communication system itself." *See Uniloc*, 957 F.3d at 1309.

DirecTV's Motion also ignores the factual allegations in Entropic's First Amended Complaint. For instance, Entropic plead that the legacy coaxial environment "made locating nodes on the network difficult and impractical" and that "devices in a conventional broadband cable network at the time did not communicate with one another and thus did not identify the source, destination, or network coordinator." (FAC, ¶¶ 108, 105.) These allegations confirm the technological problems in the art and that claim 3 is directed to overcoming them using specific packet types with particular fields that allow devices to locate and identify one another. Entropic's allegations must be presumed to be true at this stage, (*Usher*, 828 F.2d at 561), and further establish that claim 3 of the '802 Patent is directed to solving a technological problem.

DirecTV's other arguments also fail. For instance, DirecTV suggests that the claims here "merely invoke[] generic processes and machinery," like the claims in *Two-Way Media*. (Mot. at 40 (citation omitted).) This argument disregards the technological environment of the claims. As the Federal Circuit noted in *Uniloc*, the claims held ineligible in *Two-Way Media* failed to "concretely capture any improvement in computer functionality." *Uniloc*, 957 F.3d at 1308. Not so here. First, as discussed above, the '802 Patent claims facilitate node-to-node communication on a network architecture that previously prevented it. Second, DirectTV mischaracterizes the technological environment of the '802 Patent. It does not involve just any "coaxial cable installation," but the implementation of a "peer-to-peer mesh network" over existing coaxial cable. ('802 Pat., 3:30–34, 6:66–7:3.) The solution recited in claim 3 solves a technological problem arising in a specific type of network, and is thus directed to patent-eligible subject matter under *Alice* step one.

### b. The '802 Patent recites unconventional activity in coaxial networks.

Even if claim 3 of the '802 Patent was (incorrectly) characterized as directed to an abstract idea, it would nevertheless be patent-eligible because it recites multiple inventive concepts that were neither routine nor conventional in the art.

*First,* upconverting and transmitting packets from a BCN modem to multiple node devices in a broadband cable network was not routine or conventional. (FAC, ¶¶ 101, 103–106, 111.) Because it was the "conventional wisdom" at the time that the structure of cable installations "prevented devices . . . from communicating with one another," the transmission of packets between end devices was unconventional, particularly to multiple receiving nodes. (*Id.*, ¶¶ 23, ¶ 25.) Further, because the communications enabled by the patent are implemented on existing coaxial cabling that was traditionally installed to carry television signals, claim 3 requires upconverting the packets for transmission, which can be done to avoid interference with frequencies typically used by those television signals. (*Id.*, ¶ 111; '802 Pat., Fig. 6, 15:64–16:2.) This too was an unconventional step.

*Second,* formatting a beacon packet with the specific data fields recited in claim 3 was not routine or conventional for a modem in a broadband cable network. (*Id.*, ¶ 112.) As the specification explains, there were needs in the art for "coordinating network resources, access to the network, and to optimize the communication between CPEs" (customer premises equipment). ('802 Pat., 4:1–3.) With the claimed invention, a BCN modem "attempts to locate the network timing by receiving a beacon packet [] which identifies network timing and essential network control information." (*Id.*, 25:14–21.) Thus, the beacon packet facilitates "access to the network," addressing a need in the art. (*Id.*, 4:1–3; FAC, ¶ 102.) Because this beacon packet element provides access to a broadband cable network that was not previously available, it was not routine and conventional.

*Third,* the combination of transmitting, upconverting, and formatting a beacon packet with the claimed data fields was not routine or conventional in the field of coaxial networks. This combination recites functionality that is different from, and improves upon, existing coaxial installations because it enables "a peer-to-peer mesh network, such that every BCN modem enabled device can communicate directly with any other BCN modem enabled device on the network." ('802 Pat., 7:1–3.)

These elements, alone and in combination, embody inventive concepts that contribute a specific improvement to the operation of broadband cable networks, and thus claim 3 is patent-eligible under step two. *Kollective*, 50 F.4th at 133 (reversing holding of invalidity under § 101 because the claim elements were alleged to "improve the performance of the content delivery network").

DirecTV's arguments on step two are unavailing. DirecTV asserts that the specification "makes clear that beacon packets and control and data packets were well-known." (Mot. at 41 (citing '802 Pat., 9:31–36, 9:44–49, 9:52–54, 10:7–12).) DirecTV gets it backwards. The cited parts of the specification describe packet types that are "prevalent" in the **invention**, not what is known in the prior art. (*See* '802 Pat., 9:31–34 (describing packet types used in the invention to "enable efficient data transmission in the network").) The claimed packet types were "developed by the inventors" and thus "are not admitted prior art." *CosmoKey*, 15 F.4th at 1098.

Furthermore, DirecTV's argument that the claimed "modem subsystem," "MAC subsystem," and "RF subsystem" are generic components ignores the Federal Circuit's guidance that "useful improvements to [coaxial] networks are patentable regardless of whether the network is comprised of standard computing equipment." *Kollective*, 50 F.4th at 135. The '802 Patent invented an improvement to networking technology by including specific data fields in specific packet types to overcome specific problems in coaxial networks of the prior art. The '802 Patent recites a patentable inventive concept under step two of the *Alice* analysis, and DirecTV's Motion to Dismiss Count IV should be denied.

## VIII. THE '681 PATENT CLAIMS A PATENT-ELIGIBLE IMPROVEMENT TO NETWORK EFFICIENCY (COUNT XII)

The claimed invention of the '681 Patent is directed to technical improvements in clock synchronization, a key aspect of communications between devices operating in a network such as a mesh network implemented on conventional coaxial cabling. Because the '681 Patent claims a specific improvement to network efficiency and

recites functionality that was not routine or conventional in coaxial networks, the '681 Patent is patentable under 35 U.S.C. § 101.

### a. The '681 Patent claims a patentable improvement to packet transmission in a broadband coaxial network.

Entropic's earlier patents, described above, "revolutionized the delivery of highspeed data networking services to customers on existing home coaxial infrastructure." (FAC, ¶ 135; Dkt. 168-23 ("'681 Pat."), 1:59–2:3.) But a need then arose for faster, more reliable data connections across such networks to support applications such as transmitting high-quality video. (FAC, ¶ 136.) A challenge to achieving this goal was "managing multiple communications from various devices across a limited channel." ('681 Pat., 2:5–7; FAC, ¶ 138.) One way to address this challenge was to use a dedicated network coordinator node (NC) to "schedule all traffic on the network." ('681 Pat., 2:37–39, cl. 6; FAC, ¶ 142.) To facilitate the scheduling, "the NC and each node in the network maintains a local channel time clock (CTC) counter and all nodes are responsible for synchronizing their CTC counts to that of the NC." ('681 Pat., 2:44–47.) But the scheduling was challenging due to differences in channel characteristics and properties of the splitters used. (FAC, ¶¶ 22–32.) In particular, "inaccuracies to the CTC [] can be introduced by several factors," resulting in an increase in the amount of time between network packets ("inter-frame gap (IFG)") and decreasing efficiency. (*Id.*, 3:1–2, 19–22.)

The '681 Patent provides a specific technological solution to this problem. (FAC, ¶ 190.) Specifically, claim 1 recites an improvement in clock synchronization that accounts for the actual delay experienced by transmissions between nodes in the network. (FAC, ¶ 191; '681 Pat., 3:54–60.) As pled in Entropic's First Amended Complaint, the solution is directed to "logical point-to-point networks, such as coaxial networks using MoCA technology, that require an estimate of propagation delay in a multipath environment where the propagation delay between two nodes is not known in advance, can vary dynamically based on changes in the channel path

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

characteristics between them, and where the delay between two nodes in one direction can differ from the delay in the opposite direction." (FAC, ¶ 191.) The claimed invention leverages a technological solution—the "ranging" techniques recited in claim 1—to "reduce[] [IFG] by more accurately controlling the expected started and end times for arriving network packets." ('681 Pat., 3:61–63.) Thus, viewed as a whole and in the context of the specification, claim 1 is directed to a patentable improvement in broadband coaxial networks. (FAC, ¶ 195.)

The *Uniloc* case confirms that claim 1 is patentable. In *Uniloc*, the claimed invention sought to solve a problem with latency that arose in "conventional systems, such as Bluetooth networks." 957 F.3d at 1305. The problem in the art was that the device managing the network had to send inquiry messages and polling messages separately, which resulted in extensive delays. *Id.* To solve this problem, the claim recited the use of "an additional data field" within an "inquiry message prior to transmission," which allowed the device managing the network "to simultaneously send inquiry messages and poll parked secondary stations." *Id.* at 1307–08. Although the claims applied generally to a "communication system," the Federal Circuit held them to be patent-eligible because they were directed to an "improvement to computer functionality, namely the reduction of latency experienced by parked secondary stations in communication systems." *Id.* at 1307.

Claim 1 of the '681 Patent is similarly directed to a patent-eligible improvement. Like the claims in *Uniloc*, the claimed invention here is addressed to a problem in the field of network management: delays and uncertainty introduced by the properties of a network, such as "delay in transmission" and "propagation delay." ('681 Pat., 3:1–14.) Just as the claims in *Uniloc* reduced latency in a network by adding a specific data field ("an additional data field for polling"), claim 1 reduces delays by adding specific data types (a "first packet clock time set to the local clock time of the first node at transmission time" and a "scheduled arrival clock time"). (*Id.*, cl. 1.) And just as the added polling field in *Uniloc* solved a specific problem

37

with delayed response times in conventional communication systems, *Uniloc*, 957
F.3d at 1307–08, the added clock data types in claim 1 solved specific problems with
unknown and unpredictable response times in networks such as MoCA networks.
('681 Pat., 2:60–3:65.) As in *Uniloc*, claim 1 of the '681 Patent is directed to an
improvement in computer functionality with respect to reducing latency in a
communication system, and it is thus eligible. 957 F.3d at 1307.

In its Motion, DirecTV contends that the '681 Patent is directed simply to
"synchronizing local clock times." (Mot. at 15.) DirecTV is wrong. ***First,*** claim 1 is
not, as DirecTV asserts, directed to an "improved time synchronization" and not an
"improved communications network." (Mot. at 16.) When analyzing a claim for
eligibility, the claim must be considered "as a whole . . . in light of the specification."
*Packet Intel.*, 965 F.3d at 1309 (internal citations omitted). Here, the specification
explicitly links the claimed ranging techniques to an improved communications
network: ranging "improve[s] network efficiency," "can result in reduced inter-frame
gap (IFG)," and "provides more predictable network packet arrival times." (*See* '681
Pat., 2:4–7, 3:54–65.) Thus, claim 1 of the '681 Patent is directed to an improved
communications network, not to synchronization for its own sake.

***Second,*** DirecTV ignores the factual allegations in Entropic's First Amended
Complaint. Entropic's pleading shows that, prior to the '681 Patent, there were
several technological problems with communication over conventional coaxial
networks: "the propagation delay between two nodes is not known in advance, can
vary dynamically based on changes in the channel path characteristics between them,
and [] the delay between two nodes in one direction can differ from the delay in the
opposite direction." (FAC, ¶ 191.) These allegations are consistent with the
disclosures of the '681 Patent, (e.g., '681 Pat., 2:4–13, 2:60–3:14), and must be
presumed to be true, *Usher*, 828 F.2d at 561. When viewed in the context of
Entropic's well-plead allegations, claim 1 of the '681 Patent is directed to
overcoming problems with delay, latency, and unpredictability in conventional

networks through use of specific timing and ranging techniques. Claim 1 of the '681 Patent is thus directed to solving a technological problem, not an abstract idea.

**Third,** DirecTV's cited cases are inapposite. (Mot. at 15.) In *SAP*, claims relating to statistical analysis of financial data were found to be abstract because the "focus of the claims is not any improved computer or network, but the improved mathematical analysis." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018). By contrast, claim 1 is focused on "ranging" and "adjusting" functions that are directed to an "improved computer or network," rather than use of computers as mere tools. *Id. Implicit, LLC* is similarly distinguishable. There, a claim relating to "synchronizing data between computer directories" did not "provide any additional detail with respect to how the computer systems performs the computer method" and "does not teach an improvement in computer functionality." *Implicit, LLC v. Ziff Davis, Inc.*, No. 2:22-CV-09453-AB-AFMx, 2023 WL 4366351, at *3 (C.D. Cal. July 3, 2023). By contrast, the '681 Patent claims a specific series of timing and ranging functions, and it explains how these functions improve the operation of networks, like MoCA networks, by reducing the uncertainties surrounding delay and clock times and providing "more predictable network packet arrival times." ('681 Pat., 3:1–14, 54–65.)

**Fourth,** DirecTV is wrong that the claims of the '681 Patent preempt "[t]rains, postal, or telegraph systems" because those systems can be considered "communication networks" with "nodes." (Mot. at 17.) Claim 1 of the '681 Patent "is limited to a specific process for [synchronizing nodes] and does not preempt approaches that use . . . different techniques," *McRO*, 837 F.3d at 1316. DirecTV does not and cannot argue, for instance, that the method of claim 1 is the only way to synchronize nodes. Rather, claim 1 recites a specific way to synchronize nodes using specified data such as "a first packet clock time" and a "scheduled arrival clock time," as well as use of a ranging method to calculate propagation delay. ('681 Pat., cl.1.) DirecTV's argument is also premature, if not entirely incorrect, because it assumes

that "nodes" could refer to train stations and that "packets" could refer to pieces of paper—assumptions that contradict the patent's focus on computer networking. ('681 Pat., 1:15–3:50.) These arguments are inappropriate at the pleading stage. *See, e.g., Fortinet, Inc. v. Forescout Techs., Inc.*, No. 20-CV-03343-EMC, 2020 WL 6415321, at *10 (N.D. Cal. Nov. 2, 2020) (denying motion to dismiss because "claim construction and development of facts . . . may inform the § 101 analysis").

**Lastly**, DirecTV is wrong to assert that "[t]he dependent claims do not add limitations that alter the ineligibility analysis." (Mot. at 14.) For example, claims 6, 9, and 10 add requirements that tie the invention to a particular type of network: one that uses a "network coordinator" (claim 6), or a mesh network (claim 9), or a MoCA network (claim 10). ('681 Pat.) At minimum, these claims "alter" DirecTV's analysis because they do not present the "preemption" issue cited in its Motion and contradict DirecTV's assertion that "the '681 Patent is directed to any communication network." (Mot. at 19.) Further, these claims are separately patentable because they even more explicitly link the claimed invention to the specific technological problem described in the specification, i.e., delays in a MoCA network. (*Id.*, 1:59–3:49.)

### b. The '681 Patent recites unconventional clock synchronization steps.

Even if claim 1 of the '681 Patent were (incorrectly) characterized as directed to an abstract idea, it would still be patent-eligible because it recites inventive concepts that were neither routine nor conventional in the art.

**First,** "perform[ing] a ranging method between the first and second nodes based on the local clock time exchanged" to obtain "an estimated propagation delay between the first and second node" was not routine or conventional. (FAC, ¶ 193.) At the time of the invention of the '681 Patent, the existing MoCA standard attempted to synchronize nodes to that of a network coordinator, but could not fully account for delays and ambiguities in that process. ('681 Pat., 2:44–47.) The use of a "ranging method," which measured or estimated the actual propagation delays to and from other nodes in the network, (*id.*, 3:58–60), was different from, and improved upon,

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

existing MoCA networks. It is this unconventional ranging method that allowed the claimed invention to improve on the art by calculating estimated propagation delays in a "multipath environment where the propagation delay between two nodes is not known in advance, can vary dynamically based on changes in the channel path characteristics between them, and where the delay between two nodes in one direction can differ from the delay in the opposite direction." (FAC, ¶ 191.)

**Second,** adjusting the local clock time of a node based on the estimated propagation delay was not routine or conventional. (*Id.*, ¶ 194.) As explained above, unpredictability in networks such as broadband coaxial networks required new ways to calculate propagation delay between nodes to improve network efficiency. ('681 Pat., 2:60–3:49.) Just as use of a ranging method based on estimates of propagation delay was not routine or conventional, so too was it neither routine nor conventional to adjust local time clocks based on the results of such ranging. (*Id.*, ¶ 194.)

**Third,** the combination of exchanging local clock times, using ranging to estimate a propagation delay, and adjusting local time clocks based on the estimated delay was not routine or conventional. This combination recites functionality that is different from, and improves upon, existing broadband coaxial networks because it "improve[s] network efficiency" and enables "more predictable network packet arrival times." ('681 Pat., 3:54–65; FAC, ¶ 195.) This combination is not a mere directive to "synchronize nodes." Rather, it is a collection of specific timing and ranging functions that together improve the efficiency and capabilities of communication networks with unpredictable channels, such as broadband coaxial networks. Thus, claim 1 is patent-eligible under step two. *Kollective*, 50 F.4th at 133.

DirecTV's Motion argues that the claims of the '681 Patent "rely on generic computer equipment to perform the claimed abstract idea of clock synchronization." (Mot. at 18.) Again, DirecTV misses the point: "useful improvements to [MoCA] networks are patentable regardless of whether the network is comprised of standard computing equipment." *Kollective*, 50 F.4th at 135. Nor is it a requirement that the

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

improvement over the prior art be "defined by reference to 'physical' components," as opposed to an improvement in how conventional networks operated. *Uniloc*, 957 F.3d at 1309. The '681 Patent thus recites a patentable inventive concept under *Alice* step two.

## IX.    JOINDER IN THE COX MOTION IS INAPPROPRIATE

At the end of its Motion, DirecTV requests to join motions filed by DISH and Cox in related cases. (Mot. at 43.) Entropic does not oppose DirecTV's request to join the *DISH* motion and related briefing as to the patents addressed there, on the condition that on appeal DirecTV would be bound by the arguments raised by DISH.[5] However, as argued throughout this brief, the findings in the Court's Order in the *DISH* case are not applicable to the five patents challenged in DirecTV's Motion. This is because this case involves different factual allegations, different patents, different claim limitations, and different arguments. *See CosmoKey*, 15 F.4th at 1099 (Reyna, J, concurring).

With respect to the motion filed in *Cox*, Entropic opposes DirecTV's request for joinder because Cox and DirecTV are not "so similarly situated that filing an independent motion would be redundant." *Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1151 (C.D. Cal. 2016). In this case, Entropic has plead facts regarding the technical limitations of coaxial networks in the prior art, (FAC, ¶¶ 22–32), and regarding the technological improvements recited by the two patents challenged in the Cox motion, (*id.*, ¶¶ 147–180). These allegations are not part of the pleadings in the Cox case, and thus the record before the Court is different. Thus, joinder is not appropriate because DirecTV is not "similarly situated" to Cox.

/ / /

/ / /

/ / /

---

[5] Dish argues that this Court "issued final judgment in the DISH case." (Mot. at 43.) This is incorrect. The Court issued an Order, but has not entered final judgment.

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS

Dated: December 20, 2023

Respectfully submitted,

By: */s/ Douglas Jordan Winnard*
Michael T. Pieja (SBN 250351)
mpieja@goldmanismail.com
Alan E. Littmann (*pro hac vice* pending)
alittmann@goldmanismail.com
Douglas Jordan Winnard (SBN 275420)
dwinnard@goldmanismail.com
Shaun Zhang (*pro hac vice* pending)
szhang@goldmanismail.com
Jennifer M. Hartjes (*pro hac vice* pending)
jhartjes@goldmanismail.com
Kurt A. Holtzman (*pro hac vice* pending)
kholtzman@goldmanismail.com
**GOLDMAN ISMAIL TOMASELLI**
**BRENNAN & BAUM LLP**
200 South Wacker Dr., 22nd Floor
Chicago, IL 60606
Tel: (312) 681-6000
Fax: (312) 881-5191

Christina Goodrich (SBN 261722)
christina.goodrich@klgates.com
Cassidy T. Young (SBN 342891)
cassidy.young@klgates.com
**K&L GATES LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

James A. Shimota *(pro hac vice)*
jim.shimota@klgates.com
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Tel.: (312) 372-1121
Facsimile: (312) 827-8000

Peter E. Soskin (SBN 280347)
peter.soskin@klgates.com

43

**K&L GATES LLP**
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 882-8200
Facsimile: (415) 882-8220

*Attorneys for Plaintiff*
*Entropic Communications, LLC*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Entropic Communications, LLC, certifies that this brief contains 35 pages of substantive argument, which complies with the page limit set by court order dated September 20, 2023.

Dated: December 20, 2023          Respectfully submitted,

By:   */s/ Douglas Jordan Winnard*
Michael T. Pieja (SBN 250351)
mpieja@goldmanismail.com
Alan E. Littmann (*pro hac vice* pending)
alittmann@goldmanismail.com
Douglas Jordan Winnard (SBN 275420)
dwinnard@goldmanismail.com
Shaun Zhang (*pro hac vice* pending)
szhang@goldmanismail.com
Jennifer M. Hartjes (*pro hac vice* pending)
jhartjes@goldmanismail.com
Kurt A. Holtzman (*pro hac vice* pending)
kholtzman@goldmanismail.com
**GOLDMAN ISMAIL TOMASELLI**
**BRENNAN & BAUM LLP**
200 South Wacker Dr., 22nd Floor
Chicago, IL 60606
Tel: (312) 681-6000
Fax: (312) 881-5191

Christina Goodrich (SBN 261722)
christina.goodrich@klgates.com
Cassidy T. Young (SBN 342891)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

cassidy.young@klgates.com
**K&L GATES LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

James A. Shimota *(pro hac vice)*
jim.shimota@klgates.com
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
Tel.: (312) 372-1121
Facsimile: (312) 827-8000

Peter E. Soskin (SBN 280347)
peter.soskin@klgates.com
**K&L GATES LLP**
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 882-8200
Facsimile: (415) 882-8220

*Attorneys for Plaintiff*
*Entropic Communications, LLC*

45

ENTROPIC'S OPPOSITION TO DIRECTV'S MOTION TO DISMISS