David Frist (admitted *pro hac vice*)
David.frist@alston.com
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA   30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

Yuri Mikulka (SBN 185926)
yuri.mikulka@alston.com
Rachel E. K. Lowe (SBN 246361)
rachel.lowe@alston.com
ALSTON & BIRD LLP
333 S. Hope Street, 16th Floor
Los Angeles, California 90071
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

Attorneys for DIRECTV, LLC and AT&T Services, Inc.

(Additional counsel information omitted)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>DIRECTV, LLC; AT&T, INC.; AT&T SERVICES, INC.; AND AT&T COMMUNICATIONS, LLC<br><br>Defendants. | **Lead Case No. 2:23-cv-01043-JWH-KES**<br><br>Consolidated with Case Nos.:<br>2:23-CV-01047-JWH-KES<br>2:23-CV-01048-JWH-KES<br>2:23-CV-05253-JWH-KES<br><br>Assigned to Hon. John W. Holcomb<br><br>**REPLY IN SUPPORT OF DEFENDANTS DIRECTV, LLC ET AL.'S RULE 12(b)(6) MOTION TO DISMISS UNDER 35 U.S.C. § 101**<br><br>Hearing Date: January 16, 2024<br>Hearing Time: 10:00AM<br>Courtroom: 9D |

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ........................................................................................5

II.     THE '681 PATENT CLAIMS OF COUNT XII ARE PATENT
        INELIGIBLE ............................................................................................5

III.    THE '759 PATENT CLAIMS OF COUNT III ARE PATENT
        INELIGIBLE ............................................................................................9

IV.     THE '518 PATENT CLAIMS OF COUNT I ARE PATENT
        INELIGIBLE ..........................................................................................12

V.      THE '539 PATENT CLAIMS OF COUNT VII ARE PATENT
        INELIGIBLE ..........................................................................................16

VI.     THE '802 PATENT CLAIMS OF COUNT IV ARE PATENT
        INELIGIBLE ..........................................................................................20

VII.    JOINDER TO THE DISH AND COX MOTION .............................................24

VIII.   CONCLUSION .......................................................................................24

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
  573 U.S. 208, 225-226 (2014) ............................................................ 17

*Affinity Labs of Tex., LLC v. DIRECTV LLC,*
  838 F.3d 1253 (Fed. Cir. 2016) ................................................... passim

*Arctic Cat Inc. v. GEP Power Prods., Inc.,*
  919 F.3d 1320 (Fed. Cir. 2019) ................................................. 10, 17

*Bridge & Post v. Verizon Commc'ns, Inc.,*
  778 F. App'x 882 (Fed. Cir. 2019) ................................................... 22

*Cellspin Soft, Inc. v. Fitbit, Inc.,*
  927 F.3d 1306 (Fed. Cir. 2019) ....................................................... 20

*Chamberlain Grp. v. Techtronic Indus. Co.,*
  935 F.3d 1341 (Fed. Cir. 2019) ....................................................... 22

*ChargePoint, Inc. v. SemaConnect, Inc.,*
  920 F.3d 759 (Fed. Cir. 2019) ........................................................... 6

*Clarilogic, Inc. v. FormFree Holdings Corp.,*
  681 F. App'x 950 (Fed. Cir. 2017) ................................................... 15

*Coop. Entm't, Inc. v. Kollective Tech., Inc.,*
  50 F.4th 127 (Fed. Cir. 2022) ....................................................... 9, 16

*Dropbox, Inc. v. Synchronoss Techs., Inc.,*
  815 F. App'x 529 (Fed. Cir. 2020) ............................................. 10, 23

*Elec. Power Grp., LLC v. Alstom S.A.,*
  830 F.3d 1350 (Fed. Cir. 2016) ................................................. 10, 18

*Hawk Tech. Sys. LLC v. Castle Retail, LLC,*
  60 F.4th 1349 (Fed. Cir. 2023) ..................................................... 6, 24

*Implicit, LLC v. Ziff Davis, Inc.,*
  No. 2:22-cv-09453-AB-AFMx, 2023 U.S. Dist. LEXIS 116270 (C.D. Cal.
  July 3, 2023) ......................................................................................... 7

- 3 -

*Intell. Ventures I LLC v. Erie Indem. Co.*,
  850 F.3d 1315 (Fed. Cir. 2017) ........................................................16, 19, 20

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
  942 F.3d 1143 (Fed. Cir. 2019) ........................................................18

*Mentone Sols. LLC v. Digi Int'l Inc.*,
  2021 WL 5291802 (Fed. Cir. Nov. 15, 2021) ...................................14

*OIP Techs., Inc. v. Amazon.com, Inc.*,
  788 F.3d 1359 (Fed. Cir. 2015) ........................................................18

*Packet Intel. LLC v. NetScout Sys.*
  965 F.3d 1299 (Fed. Cir. 2020) ........................................................14

*Realtime Data LLC v. Array Networks Inc.*,
  No. 2021-2251, 2023 U.S. App. LEXIS 19857 (Fed. Cir. Aug. 2, 2023)
  (unpublished) ....................................................................................14

*Sanderling Mgmt. v. Snap Inc.*,
  65 F.4th 698 (Fed. Cir. 2023) ...........................................................9, 20, 21

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018) ........................................................7, 17

*TecSec, Inc. v. Adobe Inc.*,
  978 F.3d 1278 (Fed. Cir. 2020) ........................................................10, 11

*Trinity Info Media, LLC, v. Covalent, Inc.*,
  72 F.4th 1355 (Fed. Cir. 2023) .........................................................8

*Two-Way Media Ltd v. Comcast Cable Commc'ns., LLC*,
  874 F.3d 1329 (Fed. Cir. 2017) ........................................................15, 18, 23

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
  957 F.3d 1303 (Fed. Cir. 2020) ........................................................6, 7, 16, 22

*Weisner v. Google LLC*,
  51 F.4th 1073 (Fed. Cir. 2022) .........................................................12

## I.   INTRODUCTION

Entropic's opposition ignores that the claims, not the specification or the Amended Complaint, are the focal point of a § 101 inquiry. The Federal Circuit has repeatedly rejected attempts to import details from a patent specification to breathe life into claims directed to an abstract idea. Entropic ignores this precedent as it attempts to rewrite claims to require, for example, communications across a coaxial network. Dkt. 215 ("Opp.") at 8 (alleging the patents claim "improvements" to coaxial networks). Several of the challenged patents (*e.g.*, the '681, '759, and '539 Patents), however, do not require such communications. Similarly, Entropic argues that the challenged patents enable peer-to-peer communication using a common bit loading scheme in a coaxial network. *See* Opp. at 12 (alleging that splitters in a coaxial cable network "were specifically designed *not* to allow communications between user devices") (emphasis in original). None of the challenged patents, however, require peer-to-peer communication, nor does any claim propose a novel splitter.[1] Entropic cannot rewrite its claims, which are on their face directed to abstract ideas. Nor can it import details from the specification to inject an inventive concept. Thus, DIRECTV respectfully requests that the Court dismiss Counts I, III, IV, VI through X, and XII.

## II.   The '681 Patent Claims of Count XII Are Patent Ineligible

The '681 Patent is directed to use of the abstract idea of time synchronization in any type of network using any type of configuration. Contrary to Entropic's Opposition, there is no requirement in the claims regarding use of a coaxial network, and thus the '681 Patent improperly attempts to preempt all uses of the particular time synchronization idea identified in the claims. For this reason and the reasons stated

---

[1] Because the challenged patents do not require peer-to-peer coaxial communication, the Court does not have to reach the merits of Entropic's allegation that it was the first to invent such communication. DIRECTV notes, however, that the allegation is inconsistent with prior art that the applicant submitted during prosecution of the challenged patents, which clearly discloses a home coaxial network that allows for "interconnectivity" or "intra-room" communication between nodes referred to as "home network modules" or HNMs over coaxial cables, even in the presence of a splitter. Ex. 4 ('539 Pros. History, IDS) (citing US 2009/0217325 ("Kliger")); *see, e.g.*, Ex. 5 (Kliger) at [0002]-[0005], [0044], [0046]-[0047], FIG.1 ("Home Network over Coax").

below, the '681 Patent is directed to ineligible subject matter.

**Claim 1 is improperly directed to the idea of synchronization in any type of network using any type of configuration.** The cornerstone of Entropic's defense is that claim 1 improves "broadband coaxial networks." Opp. at 36. Claim 1 is not so limited as it can be performed in any type of network, and the specification emphasizes that the purported invention could be "implemented using a variety of alternative architectures and configurations." '681 Patent, 11:23-30; *see Hawk Tech. Sys. LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1357 (Fed. Cir. 2023) ("The analysis at step one 'must focus' on the claim language.") (citation omitted); *ChargePoint, Inc. v. SemaConnect, Inc.,* 920 F.3d 759, 769 (Fed. Cir. 2019) ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims."). Notably, even if the claims were limited to a coaxial network, such a limitation would "not change the analysis." Dkt. 103 (the "*DISH Order*"), at 10 (citing *Affinity Labs of Tex., LLC v. DIRECTV LLC*, 838 F.3d 1253, 1258-59 (Fed. Cir. 2016)).

Entropic also alleges that the '681 Patent "is directed to overcoming problems with delay, latency, and unpredictability in conventional networks." Opp. at 38-39. As described in DIRECTV's Motion (*see* Dkt. 160 ("Mot.") at 16-17), the claims are not restricted to computer networks, much less conventional coaxial cable networks. And the solution proposed by claim 1 is just as broad as it claims ownership over the use of ranging methods (*i.e.*, mathematical processes) that could be performed in any manner—including by a human with a pen and paper—in any communication network.

Entropic's citation to *Uniloc* is inapt. Opp. at 37. The *Uniloc* claim is directed to a system ("a primary station") including a "means... for broadcasting a series of inquiry messages" and "means… for adding to each inquiry message… an additional data field for polling at least one secondary station." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306 (Fed. Cir. 2020)). The Federal Circuit held the "claimed invention changes the normal operation of the communication system itself to 'overcome a

problem specifically arising in the realm of computer networks'" and improved computer functionality by enabling a "primary station to simultaneously send inquiry messages and poll parked secondary stations." *Id.* at 1307-08 (citation omitted).

Unlike the *Uniloc system* claim, the '681 Patent includes *method* claims that can be performed in any type of network using any type of functional, logical, or physical configuration. '681 Patent, 11:23-30. Thus, the '681 Patent is not directed to a "specific asserted improvement[] in computer capabilities." *Cf. Uniloc*, 957 F.3d at 1307. Instead, the '681 Patent proposes using existing functionality in a network to communicate time between two nodes and to update existing clocks using existing functionality in those clocks. Thus, the '681 Patent is directed to "a process or system that qualifies as an abstract idea for which computers are invoked merely as a tool." *Id.* at 1307. The problem of time synchronization is not limited to computers or computer networks as it applies to any "communication network," including train or postal networks. The claims are thus "directed to a function, instead of 'a particular way of performing that function.'" *See DISH Order* at 15 (quoting *Affinity Labs,* 838 F.3d at 1258-59).[2]

The requirement of synchronization of clocks does not dictate a different result. Contrary to Entropic's argument, time synchronization is no different than the database synchronization in *Implicit, LLC v. Ziff Davis, Inc.*, No. 2:22-cv-09453-AB-AFMx, 2023 U.S. Dist. LEXIS 116270 (C.D. Cal. July 3, 2023). There, the Court rejected the notion that the synchronization improved database functionality because the alleged improvements were untied to the claim language. *Id.* at *8. Here, similarly, the claim language is untethered from the alleged improvements identified by Entropic. And like *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018), the claims here are impermissibly abstract because they are directed to the "improved mathematical analysis" claimed in the ranging and adjusting functions.

---

[2] Entropic also incorrectly argues that the '681 Patent claims are similar to *Uniloc* because claim 1 adds specific data types to transmissions. Opp. at 37. The '681 Patent claims do not specify a new data type. Instead, the claims merely describe values of time (which was a known data type) that could be communicated between nodes (*see, e.g.*, "a first packet clock time" and "scheduled arrival clock time").

Entropic incorrectly alleges that the "network coordinator" (claim 6), "mesh network" (claim 9), and "MoCA network" (claim 10) create separate grounds for eligibility. Opp. at 40. None of these dependent claims provide anything more than a context in which the abstract method is performed. *E.g.*, Opp. at 9-10 (alleging that the '681 Patent improves upon the previously established MoCA standard). Applying an idea in a particular environment, *e.g.*, a MoCA network, does not transform an otherwise unpatentable abstract idea. *DISH Order* at 10 (citation omitted).

**Entropic's attempts to inject an inventive concept to survive Step 2 fail.** *First*, Entropic alleges that the use of ranging "improved upon existing MoCA networks." Opp. at 40-41. However, the claims are not limited to existing MoCA networks, nor to "multipath environments." *See* Opp. at 41. Entropic has not alleged that the use of ranging to calculate propagation delays was not conventional in the field of communications generally. And Entropic has not alleged that the claims cover anything other than generic elements such as "nodes" and a "communication network" that perform previously known simple mathematical equations by transmitting information. The '681 Patent is thus improperly directed to *any* configuration and *any* "functional, logical or physical partitioning." '681 Patent, 11:23-30.

*Second*, Entropic alleges that adjusting local clock times in "networks such as broadband coaxial networks" was not routine nor conventional. Opp. at 41 (citing Dkt. 168 at ¶ 194). Conclusory allegations that an element was not "routine, conventional, or well-known" are not entitled to any weight and cannot rewrite the express disclosure in the '681 Patent. *Trinity Info Media, LLC, v. Covalent, Inc.,* 72 F.4th 1355, 1366 (Fed. Cir. 2023). The specification of the '681 Patent also contradicts Entropic's allegation, describing prior-art MoCA networks including a synchronization step in which each node "maintains a local channel time clock (CTC) counter," "synchroniz[es] their CTC counts," and "adjusts its own CTC count to synchronize it." '681 Patent, 2:44-69.

Finally, Entropic argues that the combination of the (conventional) steps of "exchanging local clock times," "using ranging to estimate a propagation delay," and

"adjusting local clocks based on the estimated delay" was not routine or conventional. Entropic's argument is again based solely on conclusory allegations in the Amended Complaint, which is insufficient to "alter what a patent itself states." *Sanderling Mgmt. v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023). Moreover, the claims are silent as to exactly how to transmit the information, calculate the propagation delay, or adjust the local clock times, as they are directed to the mere concept of ranging and adjusting, and not a specific way of performing the concept. *See DISH Order* at 15. Entropic's citations to *Coop. Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 131 (Fed. Cir. 2022) are inapposite. In *Kollective*, the Federal Circuit noted that the representative claim "recites a specific type of content-sharing network and delineates both the network's structure and function." *Kollective*, 50 F.4th at 131. Here, any communication network, of any structure, serving any function, is claimed.

## III.    The '759 Patent Claims of Count III Are Patent Ineligible

Here again, Entropic improperly attempts to import an alleged technological solution that is untethered to the language of the '759 Patent claims. The claims, however, are directed to the abstract idea of analyzing and comparing data.

**Entropic's attempt to add requirements to the claims to avoid a finding that the claims are abstract should be rejected.** Entropic improperly attempts to import unclaimed subject matter in the specification to claim 2.[3] For example, Entropic argues that the "basic character" of claim 2 is enabling communication in "broadband cable networks" with "variable and unknown pathways between multiple devices." Opp. at 19. Entropic then alleges that the claimed use of a common bit-loading scheme allows transmission of information "simultaneously" to multiple nodes when a coaxial splitter is present in the network. Opp. at 20. Claim 2, however, does not require communication between nodes connected via a splitter or other "variable unknown pathways." Claim 2 also does not require any steps (such as transmission, simultaneously or otherwise) using a common bit-loading scheme. Instead, the focus of claim 2 is on the abstract

---

[3] Entropic does not challenge that claim 2 is representative.

"method for *determining* a common bit-loading modulation scheme" by "comparing" at least two of them. '759 Patent, cl. 2 (emphasis added). The claims thus do not capture the alleged technological contribution of simultaneous information transmission in a broadband cable network, particularly when a splitter is present.

Claim 2 also does not require a "broadband cable network." The only reference to a "broadband cable network" is in the preamble, which Entropic has not argued is limiting (nor is it). *Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1328 (Fed. Cir. 2019) (a preamble that only states "a purpose or intended use for the invention" is not limiting). That the term "broadband cable network" only appears in the preamble emphasizes that there is no aspect of the claim that is an improvement *to* a broadband cable network itself. At most, if the preamble is limiting, the claims describe applying the abstract idea of determining a bit-loading modulation scheme *in* a broadband cable context. Applying an abstract idea in a particular environment does not transform that idea to patent-eligible subject matter. *DISH Order* at 10.

Entropic argues that the claims are directed to a technological solution because the claims provide for sending and receiving "probe signals," measuring a characteristic of a channel, and responding to the sender. Opp. at 19. However, this alleged solution consists of "entirely functional" language that sheds no light on how it is achieved. Instead, as described in DIRECTV's Motion, the "solution" consists of nothing more than abstract ideas like transmitting, receiving, and analyzing data, ideas that have repeatedly been invalidated. *See* Mot. at 21-22 (citing, *e.g.*, *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016)); *DISH Order* at 9. The claimed steps fail to "amount to a *non-abstract* improvement—that is, a technological solution." *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 535 (Fed. Cir. 2020).

Entropic mischaracterizes *TecSec* as standing for the proposition that a solution "aimed at solving a particular problem of multicasting computer networks" is patent eligible. *See* Opp. at 20. In *TecSec*, the defendant argued that the claims were directed to the abstract idea of "managing access to objects using multiple levels of encryption."

*TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020). The Federal Circuit rejected that argument because the claims went beyond that abstract idea to require "accessing an 'object-oriented key manager' and specif[ying] uses of a 'label' as well as encryption for the access management," which were part of the "focus of the claimed advance." *Id.* at 1295. Contrary to Entropic's argument, the key to the *TecSec* decision was not the presence of multicasting, but the specific improvements to the computer technology using a key manager and a label. Claim 2, here, lacks that specificity as it does not provide a specific improvement to how information is transmitted, how to analyze the information transmitted, or how to determine a bit-loading scheme. Claim 2 is merely directed to the abstract idea of analyzing and comparing data and determining a common bit-loading modulation scheme.

**Claim 2 does not recite unconventional activity sufficient to survive Step 2.** Entropic touts allegedly unconventional activities that are both outside the scope of the asserted claims and conventional. *First*, Entropic alleges "the transmission of probes in a broadband cable network, particularly to multiple receivers" was not conventional. Opp. at 22. However, the use of a "known signal" such as a probe signal to "[d]etermin[e] a channel response, multipath, and SNR profile" was already "well known in the art." '518 Patent, 10:12-14. In addition, the probe transmission element is simply directed to the idea of *transmitting* probe signals to multiple receiving nodes. It does not explain how such transmission would occur or any improvement that would enable transmission of probes to multiple devices, which Entropic alleges was not possible prior to the '759 Patent. Opp. at 22 (citing Dkt. 168 at ¶¶ 94-95). The idea of transmission of a probe alone is not sufficient to provide an inventive concept. *See, e.g.*, *DISH Order* at 12.[4]

*Second*, Entropic alleges that "broadcast[ing] data from one end device to

---

[4] Entropic citation to paragraphs 22-32 of the Amended Complaint (Opp. at 23) are irrelevant because those paragraphs do not state that transmission of probe signals was unconventional. Regardless, Entropic cannot avoid the disclosures of the '518 and '759 Patents about the known use of probe signals.

multiple others over a cable installation," including "using a bit-loading scheme that is common to the devices on that network," was not conventional. Opp. at 22. The asserted method claims, however, do not require broadcasting data to multiple devices *using* the determined bit-loading scheme. Even if the claim was rewritten to require broadcasting, the idea of transmission of data between devices without more is abstract and cannot supply an inventive concept. *DISH Order* at 9.

 *Finally*, Entropic states in a conclusory fashion that "the ordered combination of elements [of claim 2] is neither routine nor conventional." Opp. at 24. But Entropic fails to identify what about the specific order of steps in claim 2 is unconventional or provides the inventive concept. As described in DIRECTV's Motion (Mot. at 20), bit loading is a technique that was commonly used prior to the '759 Patent. '518 Patent, 4:57-62, 8:9-1; '759 Patent, 7:12-18 (incorporating by reference the application that led to the '518 Patent). Similarly, transmission of bit-loading information to another node was known. *See* Ex. 1, U.S. Patent No. 6,438,174,[5] 8:53-59 (describing transmission of bit-loading information to a transmitter of another node). The '759 Patent merely adds to these conventional steps the abstract idea of comparing the received bit-loading information and determining a common one. *See Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022) ("[S]imply appending conventional steps, specified at a high level of generality, to . . . abstract ideas cannot make those . . . ideas patentable.") (citation omitted). The claims thus lack an inventive concept.

## IV. The '518 Patent Claims of Count I Are Patent Ineligible

 Entropic's opposition is premised on a fundamental misconception that applying an abstract idea in a specific technical environment is sufficient to survive § 101. The Federal Circuit has expressly rejected that approach, and the claims are not so limited.

 **Claim 1 is directed to abstract concepts in prior art networks.** The '518 Patent admits that prior art cable networks (i) included network devices with up and down converters, (ii) included cable wiring including splitters with common and tap ports,

---

[5] The '174 Patent is incorporated by reference into the '518 Patent, 8:19-23.

and (iii) were capable of communicating using multi-carrier signaling. '518 Patent, 1:53-57, 3:37-40, 3:56-61, 8:19-26; *see also* Dkt. 168 at ¶¶ 16-19, 22, 27, 30. Thus, claim 1 is directed to the use of conventional components of a conventional network device. The final element of claim 1 proposes a use of that conventional equipment:

> wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics.

This final element merely requires that the conventional network devices transmit probe messages, analyze probe messages to determine channel characteristics, and select or determine a bit loading scheme. Claim 1 is thus directed to the abstract concepts of (i) transmitting and analyzing information and (ii) determining a bit loading scheme. *See* Mot. at 26-27.

Entropic criticizes DIRECTV for failing to recognize that conventional cable networks could allegedly be improved by the transmission of probe messages and determination of bit-loading. Opp. at 11-12. Entropic, however, ignores well established law that "merely limiting the field of use of the abstract idea to a particular existing technological environment"—here, coaxial cable networks with conventional equipment—"does not render the claims any less abstract." *Affinity Labs*, 838 F.3d at 1259. Entropic then argues that claim 1 describes a specific improvement because it is directed to "a particular signal (a 'probe message') sent between devices using a particular technology ('multi-carrier signaling') on a particular network ('cable wiring') to measure 'channel characteristics' of the path between devices," and "then uses 'bit loading' to transmit different amounts of information in different parts of the signal based on the results of the 'probe message.'" Opp. at 12-13. Entropic's argument is misguided. The claims do not specify that (i) probe messages be sent "between devices"; (ii) how to measure channel characteristics; or (iii) bit loading be used "to transmit different amounts of information in different parts of the signal based on the results of the 'probe message.'" *See id.* Instead of specifying any particular technique

- 13 -

to "identify how th[e] functional result is achieved by limiting the claim scope to structures specified at some level of concreteness . . . or to concrete action," the claims merely state the functional results of "analyz[ing]" probe messages, "determin[ing]" channel characteristics, and "select[ing]" bit loading, without more. *See Realtime Data LLC v. Array Networks Inc.*, No. 2021-2251, 2023 U.S. App. LEXIS 19857, at *22-23 (Fed. Cir. Aug. 2, 2023) (unpublished).

Entropic argues that the required technical solution exists because its Amended Complaint establishes that "bit loading had never before been applied to communication between user devices on a coaxial network." Opp. at 14. Entropic's argument again ignores the scope of claim 1, which does not require applying bit-loading to communication between user devices. Claim 1 merely states that communication would occur using conventional equipment (network devices) and conventional signaling (multi-carrier signaling). It does not, for example, provide for a novel splitter or a splitter with new features to allow for communication between user devices to occur. *See* Opp. at 12 (alleging that splitters "were specifically designed *not* to allow communications between user devices"). Because the claim allows for the use of a conventional splitter, the claim cannot provide the alleged improvement touted by Entropic. Instead, the claim merely targets the abstract ideas of transmitting and analyzing information and determining a bit loading scheme in a conventional network.

Entropic's citation to *Packet Intel.* and *Mentone* also fails because the claims in those cases provided the required specific detail that is missing from the '518 claims. *Packet Intel. LLC v. NetScout Sys.* 965 F.3d 1299, 1309 (Fed. Cir. 2020) (including requirements for "identifying and refining a conversational flow" that solved an existing problem in the art); *Mentone Sols. LLC v. Digi Int'l Inc.,* 2021 WL 5291802 at *3 (Fed. Cir. Nov. 15, 2021) (using a shifted USF that broke the fixed relationship in the timing of downlink allocation signaling and subsequent uplink transmissions). The '518 Patent lacks any specificity as it only claims idea of transmitting, analyzing, and determining.

**Entropic fails to tie any unconventional improvement to the requirements of claim 1.** Entropic does not dispute (nor could it) that the hardware recited in claim 1 is conventional. *See* Dkt. 215 at 17 ("[I]t improves the operation of cable networks without requiring any new hardware."). Instead, Entropic argues that claim 1 supplies an inventive concept because "[it] recites a *combination* of probing and bit loading functions *within a coaxial installation in a building.*" *Id.* at 18. This argument fails.

First, Entropic's argument is divorced from the claim language. *See Two-Way Media Ltd v. Comcast Cable Commc'ns., LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) ("the claim—as opposed to something purportedly described in the specification—is missing an inventive concept."). Claim 1 does ***not*** recite that "devices communicat[e] through the tap ports of a splitter *using channel probes and bit loading*;" only that network devices, broadly, "transmit probes messages through the cable wiring . . . and bit loading is selected based on the determined channel characteristics." Opp. at 17 (emphasis added); '518 Patent, cl. 1. Moreover, there is nothing in claim 1 limiting the scope of the claimed "data communications network" to "a coaxial installation *in a building.*" The purported improvement to "home wiring that restricts high bandwidth communication between devices within the home," (Opp. at 17-18), is also entirely missing from the claims. *See Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 F. App'x 950, 954-55 (Fed. Cir. 2017) (holding claim ineligible where it recited an "unknown and unclaimed process" to allegedly transform data).

Second, the specification does not explain "how the claimed [combination of] channel probing and bit loading enabled a new form of communication," and thus supplies an inventive concept. Opp. at 17. As the '518 Patent specification admits, "[d]etermination of a channel response, multipath, and SNR profile from a known signal is well known in the art." '518 Patent, 10:10-14. A probe message is one such example of a known signal: it uses "a predetermined bit sequence which i[s] known by the receiving device." *Id.* at 9:37-41. And "[b]y passing a known data sequence through the channel, the response of the channel can be determined, including multipath and SNR

profile." *Id.* Likewise, selecting bit loading is a technique well-known in the art. For example, the specification incorporates by reference a patent "disclos[ing] discrete multi-tone [or OFDM] modulation and a technique for bit loading applied to point-to-point twisted pair wirings." *Id.* at 8:19-23, 8:23-26. Indeed, this Court already found similar claim limitations directed to "prob[ing] a communication link" and "adapt[ing] transmission parameters for the communication link" failed to recite an inventive feature that would have transformed the abstract idea of "transmitting and receiving information" into patent-eligible subject matter. *DISH Order* at 9, 12.

Entropic's reliance on *Kollective* and *Uniloc* cannot save it here. The *Kollective* claims survived because they—unlike the '518 Patent—recited "a specific type of content-sharing network and delineate[d] both the network's structure and function." *Kollective,* 50 F.4th at 131. In other words, the claims in *Kollective* recited a specific type of network in a particular arrangement and recited how to perform and achieve the functional results. This is entirely different from the '518 Patent, which broadly claims "[a] data communications network" using conventional equipment without more. There is no requirement in the claims that specifies how communication between devices is enabled, how probe messages are created, transmitted or analyzed, or how to determine channel characteristics or select a bit loading scheme. *DISH Order* at 12 (quoting *Intell. Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1331-32 (Fed. Cir. 2017)) ("Without an explanation of the mechanism for how the result is accomplished, this purported feature of the invention cannot supply an inventive concept."). The '518 Patent claims thus fail to supply an inventive concept.[6]

## V.   The '539 Patent Claims of Count VII Are Patent Ineligible

While Entropic again relies on alleged improvements to cable networks, the picture it tries to paint is untethered to the claim language. Instead, the claims are

---

[6] Entropic mischaracterizes the prior art cited in DIRECTV's Motion as "prov[ing] Entropic's point," but that art demonstrates that components recited in claim 1 were conventional structures. *See* Opp. at 17-18. Entropic does not dispute this.

directed to the abstract idea of transmitting information and measuring and adjusting parameters. *See SAP,* 898 F.3d at 1167. Because the claims do not contain the required inventive concept, they are invalid. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l,* 573 U.S. 208, 225-226 (2014).[7]

**Claim 1 is not directed to a patentable improvement to coaxial networks.** Entropic's response focuses on its misplaced allegation that claim 1 enables communications between devices in a coaxial network. Opp. at 25. But the only reference to a "coaxial network" is in claim 1's preamble, which Entropic has not argued is limiting. *See Arctic Cat,* 919 F.3d at 1328. The preamble is not limiting because it merely states an intended use of the invention. *See id.* at 1329. Even if it were limiting, the fact that the preamble's "coaxial network" requirement is untethered to any other element emphasizes that none of the claimed features are a specific improvement *to* the coaxial network. For example, the claim does not include improvements to a splitter to avoid the "jumping" problem or address issues specific channel to characteristics of cable wiring. *See* Opp. at 25 (describing alleged coaxial-specific challenges).

Entropic also mischaracterizes claim 1 as requiring probe messages be sent between user devices. Claim 1 only describes a single modem, and it does not require that probe messages be transmitted from one modem in a coaxial network to another. '539 Patent, cl. 1. For example, a modem in a network device that transmitted a probe message to a modem upstream of a splitter would satisfy the claims, and the '518 Patent and Entropic concede that such communications existed in the prior art. '518 Patent, 4:6-17, 10:12-14; Dkt. 168 at ¶¶ 12, 18-21. Entropic's attempt to point to the requirement of an echo profile probe and measurement of node delay spread similarly fail. There are no disclosures as to any specific hardware or software required to implement the MAC layer, let alone *how* it uses a probe packet as an echo profile probe

---

[7] Entropic does not dispute that claim 1 is representative.

to measure node delay spread[8] or *how* the resulting measured node delay spread is used to optimize the preamble and cyclic prefix requirements or other parameters. *See Two-Way*, 874 F.3d at 1339; *Affinity Labs*, 883 F.3d at 1258-59. Notably, Entropic does not even contend that the MAC layer itself is a specific improvement, nor did it contest DIRECTV's statement that the MAC layer is merely an abstraction. *See* Mot. at 31.

Even setting aside those fundamental flaws, Entropic's supposed "specific" solution rests on a distorted reading of claim 1—that the measured node delay spread is used to adjust the *cyclic prefix*. Opp. at 25-26. Claim 1 does not require any specific adjustment to the cyclic prefix. Instead, claim 1 provides that the measured node delay spread can be used to optimize *any* parameter, not just the preamble or cyclic prefix. '539 Patent, cl. 1 ("optimizing the preamble and cyclic prefix requirements *or other parameters* in response to the measured node delay spread on the network") (emphasis added). Neither the claims nor the specification confines what those parameters may be, or how they relate to improving communication between devices in a coaxial environment.

Entropic's reliance on *KPN* is misplaced. Opp. at 26. The *KPN* claims recited a specific improvement to the process of detecting systematic errors in data transmissions "by varying the way check data is generated by modifying the permutation applied to different data blocks," not the "mere desired result of catching previously undetectable systematic errors." *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1151 (Fed. Cir. 2019). Here, the claims do not provide any specificity as to how a parameter is optimized. The claims are thus more analogous to cases invalidating claims directed to the abstract idea of measuring and adjusting parameters based on the measurements. *See* Mot. at 33 (citing *Elec. Power Grp.*, 830 F.3d at 1353; *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-63 (Fed. Cir. 2015)).

---

[8] Contrary to Entropic's representation, the specification does not explain that the measurement "can be performed using the 'impulse response of the inter-node channel.'" Opp. at 25. The echo profile probe is described only by its result without disclosing *how* it accomplishes the intended result. '539 Patent, 10:30-31.

**Claim 1 does not require unconventional activity sufficient to survive Step 2.** Entropic offers two purported inventive concepts: (1) claim 1 recites the concept of transmitting probes to measure delay spread in a coaxial network, and (2) the ordered combination of the claim elements was not routine or conventional. Opp. at 28-30.

*First*, Entropic's contention that "modems on a conventional coaxial network 'did not communicate with one another,'" and therefore had no reason to measure delay or optimize communication based on that measurement, bears no relevance to the claim language and contradicts the specification. *Id.* at 28. As described earlier, the '539 Patent claims do not require (i) a coaxial network or (ii) communication between nodes. For the latter argument, Entropic points only to the transmitter that transmits a packet. *Id.* A single transmission does not constitute bidirectional communication *between* nodes as Entropic implies.[9] Additionally, Entropic, and claim 1, fail to explain *how* the invention is implemented, including how the invention supposedly accomplishes node-to-node communication that was allegedly not possible prior to the '539 Patent. *See DISH Order* at 12 (quoting *Intell. Ventures I*, 850 F.3d at 1331-32).

Entropic attempts to shift the focus to the use of an echo probe, node delay spread, and the specification's disclosure regarding an impulse response. The '539 Patent, and more importantly the claims, do not explain how to measure node delay spread or determine an impulse response other than that an echo profile probe is used to do so. '539 Patent, 10:30-31. The claims and the patent fail to provide any specificity regarding the echo profile probe. For example, the claims do not recite how the echo profile probe is created or how it is used to measure node delay spread. Further, as mentioned above, the '539 Patent fails to disclose how to use the measurement to optimize parameters. Entropic's citation to examples in the intrinsic record (Opp. at 28-29) are inapposite as the claims do not require such calculations, and neither of the

---

[9] Contrary to Entropic's misleading quotation of claim 1, there is no requirement that a transmitter communicate a packet containing an echo profile probe to "at least one node across at least one channel of a coaxial network" or that the transmitter communicate an echo profile probe to a node, nor that it be transmitted across a channel.

passages explain how to optimize the cyclic prefix or any "other parameters." *See DISH Order* at 12 (quoting *Intell. Ventures I*, 850 F.3d at 1331-32).

*Second*, Entropic's allegation that the ordered combination of claim 1 was not routine or conventional is unsupported and fails for the same reasons identified above. *See Sanderling*, 65 F.4th at 706.[10] As DIRECTV explained, the '539 Patent claims recite generic equipment used for conventional functions: (1) transmitting information (a probe packet); (2) using that information to measure a parameter (node delay spread), and (3) adjusting other parameters in response to the measurement. Mot. at 34-37. The *Cellspin* case cited by Entropic is inapposite. *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019) (claims included an inventive concept because the patentee specifically alleged *why* separating the steps was unconventional). Entropic's conclusory allegations regarding the ordered combination here are insufficient to show why the ordered steps were unconventional.

## VI.    The '802 Patent Claims of Count IV Are Patent Ineligible

Entropic ignores that the claimed packet types of the '802 Patent and computer components that create them have long been known in networking. Claim 3 is nothing more than the abstract idea of transmitting information containing specific fields.

**The focus of claim 3 is on the abstract idea of transmitting packets containing certain information fields.** Entropic alleges that the '802 Patent provides a specific technological solution because previously "there was no 'discovery' or 'admission' process that allowed for the admission of a new device to an in-home cable network." Opp. at 30 (citing Dkt. 168 at ¶¶ 26, 103). Claim 3, however, does not provide for a discovery or admission process, and, regardless, courts have routinely found limitations regarding admission abstract. *See DISH Order* at 10. Similarly, Entropic alleges that the '802 Patent involves "the implementation of a 'peer-to-peer mesh network' over existing coaxial cable." Opp. at 33 (citation omitted). But claim 3 never

---

[10] For this proposition, Entropic cites to paragraphs 130 and 133-134 of Provisional App. No. 60/632,797, which do not exist. *See* Dkt. 215-4 (ending on paragraph 125).

mentions any such mesh network, nor does it require peer-to-peer communications. Instead, the claim describes a generic method for "transmitting" packets involving "formatting" and "upconverting" using generic, conventional components such as a "MAC subsystem," a "Modem subsystem," and "RF subsystem" without explaining how these results are achieved. The claims do not describe *how* the claimed packets are transmitted; *how* the MAC subsystem formats the packets with the claimed fields; *how* the modem appends information; or *how* the packets are upconverted.

Entropic thus argues that the beacon packet "formatted with specific data fields" itself provides the "specific technological solution," and that the '802 Patent "is about transmitting specific information . . . in a specific packet type (a "robust" beacon packet)." *Id*. at 32. It is important to note that the claims of the '802 Patent require two types of packets: (i) a beacon packet and (ii) a data and control packet. Entropic's Opposition focuses on the former. The '802 Patent, however, establishes that the use of a beacon packet was known in the art and cannot provide the technical improvement that Entropic seeks. *See* '802 Patent, 9:31-51 (describing the three most "prevalent" packet types, including robust packets that are also referred to as "beacon" packets). In addition, during prosecution, the Examiner rejected claims that required a "beacon packet" that included the claimed fields that Entropic highlights. Ex. 2, Aug. 3, 2010 Non-final Rejection at 5 (arguing that prior art "Cafarelli" teaches a beacon packet with the claimed fields). The Examiner only allowed the claims once the applicant added the "data and control packet," which Entropic does not contend to relate to any of the discovery or admission procedures. Ex. 3, Nov. 2, 2010 Applicant Amendment (adding the "data and control" packet). Accordingly, the entire premise to Entropic's Opposition (*i.e.*, that the claimed packet types were "developed by the inventors") is contrary to the intrinsic record, which shows that beacon packets were already known. Entropic's conclusory allegations regarding the importance of the "beacon packet" in its Amended Complaint thus carry no weight. *Sanderling*, 65 F.4th at 706.

There is also no disclosure in the '802 Patent as to how the specific fields in the

beacon packet would improve the BCN Modem or any alleged admission or discovery procedures. The specification fails to even define most of the claimed fields, let alone describe how the specific fields themselves "facilitate none-to-node communication" in "unpredictable and unreliable conditions." *See* Opp. at 32-33. Entropic's Amended Complaint also fails to provide any facts supporting how the use of any specific field solved any technical problem. *See* Dkt. 168 at ¶¶ 100-114.

Entropic's attempt to analogize *Uniloc* to the '802 Patent claims falls flat. As described earlier, the claim in *Uniloc* was directed to an improved primary station and provided improved functionality of the primary station itself as it allowed a "primary station to simultaneously send inquiry messages and poll parked secondary stations," thus reducing "the delay present in conventional systems where the primary station alternates between polling and sending inquiry messages." *Id.* at 1307-08. Contrary to the claim in *Uniloc*, the '802 Patent does not provide a specific improvement to a BCN Modem. For example, it does not reduce the number of messages that could be communicated or provide a new capability within the modem.

Tellingly, Entropic glosses over the *Chamberlain* and *Bridge & Post* cases cited by DIRECTV in its Motion, which are directly analogous to the claim here. The claims in *Chamberlain* were directed to the abstract idea of "wirelessly communicating status information about a system." *Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348 (Fed. Cir. 2019). Similarly, in *Bridge & Post*, the Federal Circuit found claims for generating an alphanumeric string containing "the local user identifier, instance information, and geographic location and demographic information," and "embedding that alphanumeric string in an extensible field of a packet" such as a portion of the "HTTP header field of the packet" to be directed to the abstract idea of "communicating information using a personalized marking." *Bridge & Post v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 890 (Fed. Cir. 2019). Here, like *Chamberlain* and *Bridge & Post*, the beacon packet merely broadcasts information about a node (*i.e.*, transmits information), and thus the Court should find that the claims are directed to the

abstract idea of transmitting information containing specific fields. *See also DISH Order* at 9 (invalidating claims directed to similar abstract ideas of information transmission); *Dropbox*, 815 F. App'x at 537; *Affinity Labs*, 838 F.3d at 1261. Rather than being directed to a specific improvement to computer functionality, as Entropic claims, claim 3 is directed to the use of an abstract idea in a broadband cable network.

**Entropic fails to identify any inventive concept sufficient to survive *Alice* Step 2.** Entropic identifies the following steps of the '802 Patent (individually and in an ordered combination) as supplying an inventive concept: (1) upconverting and transmitting packets to multiple node devices, and (2) formatting a beacon packet with the specific claimed fields. Opp. at 34. But Entropic's justifications stray from the language of the claim, which must itself supply the inventive concept. *See Two-Way Media*, 874 F.3d at 1338. When focusing on the claim language, the '802 Patent merely applies well-known principles to broadband cable networks.

Entropic first argues that upconverting and transmitting packets to multiple recipients in a broadband cable network was unconventional. Not so. It was well-known in communications that devices convert signals in the process of transmitting them. Mot. at 42. While Entropic asserts that the upconversion step of claim 3 "avoid[s] interference with frequencies typically used by [] television signals," no specific frequency is claimed. The claim does not address any interference issues beyond the conventional processes of converting and transmitting radio frequency signals.

Entropic next argues that "formatting a beacon packet with the specific data fields recited in claim 3 was not routine or conventional" in the broadband cable context. However, as described above, Entropic ignores that the beacon packet is a well-understood packet used to coordinate network resources and access in communications. *See* Ex. 2, Aug. 3, 2010 Non-final Rejection at 5 (Examiner finding that Cafarelli disclosed those fields); Ex. 3, Nov. 2, 2010 Applicant Amendment. The formatting of a beacon packet was routine and conventional.

Nor does the ordered combination of the routine steps result in an inventive

- 23 -

concept. The '802 Patent recites a "MAC subsystem," "Modem subsystem," and "RF subsystem," each of which are generic, core components of communications networks. It is well-established that "merely reciting an abstract idea performed on a set of generic computer components . . . would not contain an inventive concept." *Hawk Tech.*, 60 F.4th at 1359 (citations and internal quotation marks omitted). Thus, alone or in ordered combination, the elements of claim 3 fail to provide the inventive concept.

## VII.   Joinder to the DISH and Cox Motion

Entropic does not object to DIRECTV's request to have the *DISH Order* apply to the DIRECTV case, and thus the Court should dismiss Counts VI and X. For the '213 Patent (Count VIII) and '422 Patent (Count IX), Entropic objects to DIRECTV's joinder and incorporation of the pending Cox Motion, claiming that the allegations of the Amended Complaint in this case create a different record. Opp. at 42. Tellingly, while Entropic touts its new allegations here, it does not explain how they would dictate a different result from the Cox case. Entropic also ignores a practical problem. If this Court finds the '213 and '422 Patents invalid and that decision is upheld on appeal, those patents are invalid as to all defendants. Thus, upon a finding of invalidity in the Cox case, Entropic's only hope to prevail on the '213 and '422 Patents here is a Federal Circuit reversal. Entropic thus advocates for this Court and the parties to expend significant resources litigating patents in the hope that the Federal Circuit reverses any invalidity finding in the Cox case. Such an expenditure of the parties' and the Court's time and resources would be a waste. Joinder is the most efficient method for this Court to consider the eligibility of the patents at issue in the Cox Motion. Accordingly, DIRECTV respectfully requests that the Court dismiss Counts VIII and IX if the Court finds those patents invalid in the Cox case.

## VIII.  CONCLUSION

For the foregoing reasons, DIRECTV respectfully requests that the Court find the patents asserted in Counts I, III, IV, VI through X, and XII invalid under 35 U.S.C. § 101 and dismiss those Counts with prejudice.

1

2        Dated: January 2, 2024        DAVID S. FRIST

3                                        YURI MIKULKA
RACHEL E. K. LOWE
**ALSTON & BIRD LLP**

4

                                         By:   */s/ David S. Frist*

5                                               David S. Frist

6                                        Attorneys for Defendant
DIRECTV, LLC AND AT&T SERVICES,
INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DIRECTV'S REPLY IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P.12(B)(6)