# Exhibit 3

# Multimedia over Coax Alliance
# Intellectual Property Rights (IPR) Policy

1. **BACKGROUND**

The Alliance has been formed as a non-profit mutual benefit corporation for the purpose of developing and promoting specifications for the transport of digital entertainment and information content over in-home coaxial environments, and to develop a certification process for products implementing the specifications to ensure interoperability between products and manufacturers.

This Intellectual Property Rights Policy ("IPR Policy") is intended to maximize the likelihood of widespread adoption of such specifications.  At times, the activities of the Alliance will result in the creation of Draft Deliverables, Approved Draft Deliverables and Deliverables to which intellectual property rights will attach.  These rights may be owned by either the Alliance or one or more Alliance Parties, either alone or in combination.   This document (the "IPR Policy") outlines the policy of the Alliance regarding the incorporation and use of certain proprietary materials in the Draft Deliverables, Approved Draft Deliverables and Deliverables of the Alliance.

This IPR Policy is the complete and exclusive statement of the policy of the Alliance for Intellectual Property, and applies to all Alliance Parties and their Affiliates (as defined below), and governs all of the Alliance's activities as of the effective date, except where the Alliance Board of Directors ("Board") has determined and has specified as part of an applicable Alliance activity that this IPR Policy does not apply.  This IPR Policy supersedes any and all prior documentation regarding the Intellectual Property of the Alliance.

This IPR Policy is designed and intended to comply with all applicable law, including all federal and state antitrust laws.

2. **DEFINITIONS**

For purposes of this IPR Policy, the following terms having initial capitals shall have the meaning specified below. Other terms having initial capitals used herein, but which are not defined herein shall have the definitions ascribed to them in the Alliance Bylaws or the Applicable Agreement.  In the case of inconsistent definitions, the Alliance Bylaws shall have first preference, and this document ("IPR Policy") shall have precedence over the Applicable Agreement.

*"Affiliates"* shall have the meaning set forth in the Alliance's Bylaws.

**Multimedia over Coax Alliance**　　　　　Page 1 of 11
Revision Date: 1/24/11

Exhibit 3
Page 50

"*Alliance Bylaws*" means the bylaws that govern the Alliance at the time an issue arises, unless there exists an express determination by the Board that the bylaws of some other point in time should prevail.

"*Alliance Party(ies)*" means a Participant or a Voting Member.

"*Applicable Agreement*" means the agreement that governs the relationship between an Alliance Party and the Alliance at the time an issue arises, including without limitation Promoter Member Agreement (as defined in Section 3.1 of the Alliance Bylaws), other Voting Member Agreement (as defined in Section 3.2 of the Alliance Bylaws) or Participant Agreement (as defined in Section 3.3 of the Alliance Bylaws), unless there exists an express determination by the Board that the agreement of some other point in time should prevail.

"*Approved Draft Deliverable*" means a Draft Deliverable which has been approved by the Board of Directors (i.e., the Board of Directors meeting minutes or resolution that indicates such approval) in accordance with the procedures specified in this IPR Policy.

"*Board of Directors*" means the Board of Directors of the Alliance as described in the Alliance Bylaws.

"*Compliance Test(s)*" means one or more tests, test scripts or procedures, programs and/or documentation that are used to test and determine whether a product that implements a Full Specification is a Fully Compliant Product.

"*Confidential Information*" shall have the meaning set forth in the Applicable Agreement.

"*Contribution*" shall mean a submission to or for the Alliance proposing an addition to or modification of an existing Deliverable or Draft Deliverable or a portion thereof, whether in-person or in any written or electronic form.

"*Deliverable*" means an Approved Draft Deliverable, or a portion thereof, which has been designated as such by a Majority Vote of the Board of Directors in accordance with Section 3.4 of this IPR Policy.

"*Developed*" means contributed sufficiently to the creation of Intellectual Property to be eligible for legal protection of that Intellectual Property.

"*Draft Deliverable(s)*" means Technical Specifications, Compliance Tests, field test plans, reports or other work product (i) prepared by the Alliance; or (ii) prepared by one or more Alliance Parties and delivered to the Alliance by the Technical Working Group responsible for such preparation as a submission for consideration by the Board for adoption as an Approved Draft Deliverable in accordance with Section 3 of this IPR Policy.

"*Essential Patent Claims*" means those claim(s) in issued patents (excluding design patents and design registrations) anywhere in the world, which an Alliance Party or its Affiliates has the right, at any time during the term of this IPR Policy, to grant licenses which claims are necessarily infringed by compliance with any portion of a Full Specification and which are within the bounds of the Scope, where such infringement could not have been avoided by another commercially reasonable non-infringing implementation of such portion of a Full Specification, and, where the term Essential Patent Claims does not include any claims: (i) other than those set forth above even if contained in the same patent as those claims set forth above; or (ii) that read on implementation examples included solely in any appendix, exhibit or other attachment to the actual Full Specification; or (iii) that, if licensed, would require consent from, and/or a payment of royalties by the licensor to unaffiliated third parties. Essential Patent Claims shall include claims in issued patents regardless of when the patent applications were filed, when the patents issue or when the inventions included in such patents were conceived, reduced to practice, created, derived, developed, or made.

"*Full Specification*" means all Technical Specifications included within an Approved Draft Deliverable or a Deliverable.
.
"*Fully Compliant Product*" means only those specific portions of a product (hardware, software or combinations thereof) that: (i) implement all Normative Requirements of a Full Specification applicable to those specific portions of the product, to the extent specifically disclosed in the Full Specification and where the purpose of such requirements is to enable such products to interoperate, interconnect or communicate as defined within the Full Specification provided and only to the extent that, such portions are within the bounds of the Scope; and (ii) pass all applicable compliance tests. The 1.X Full Specification is intended to completely and accurately document all of the relevant behaviors of a Golden Node.  However, in those rare instances in which the Golden Node does not conform to the 1.X Full Specification, a Fully Compliant Product shall: (i) implement the prevailing behavior of the Golden Node; and (ii) meet all remaining requirements of a Fully Compliant Product listed above. In such cases, the applicable Full Specification shall be modified with due process within 60 days to comply with the prevailing behavior of the Golden Node.

"*Golden Node*" for purposes of this Policy means a 1.X Reference Implementation that is approved as a Golden Node in accordance with established MoCA certification policies and procedures.  Golden Nodes include 1.X Reference Implementations having the part numbers as certified and listed by the Certification Working Group on the MoCA web site.

"*Intellectual Property*" means all trademarks, service marks, patents, patent applications, inventions (whether or not patentable), registrations, petit patents, works of authorship, copyrights, trade secrets, protectable designs, mask works, and other similar intellectual property the rights to which are necessary to use, make, reproduce, sell, offer for sale, or otherwise distribute or import Deliverables, Draft Deliverables, Approved Draft Deliverables, and/or Fully Compliant Products.

**Multimedia over Coax Alliance**         Page 3 of 11
Revision Date: 1/24/11

Exhibit 3
Page 52

"*Majority Vote*" shall have the meaning in the Alliance Bylaws.

"*Normative Requirement*" means requirements of an Approved Draft Deliverable or Deliverable that convey criteria that must be fulfilled for full compliance with Approved Draft Deliverables or Deliverables, and from which no deviation is allowed.

"*Participant*" means a non-voting class of participant as defined as defined in Section 3.3 of the Alliance Bylaws, including without limitation a Contributor of the Alliance and an Associate of the Alliance, that has entered into a Participant Agreement with the Alliance pursuant to which such member agrees to the terms of this IPR Policy.

"*RAND*" shall have the meaning specified in Section 5.1.1 (Limited Obligation to License Essential Patent Claims).

"*Reference Implementation(s)*" shall mean a Fully Compliant Product prototype implementation that is created using or based on a Technical Specification and that is meant to be used as a guide for developers when creating, developing or manufacturing their own products implementations that are based on a Technical Specification. In the case of a 1.X product, a Reference Implementation shall include a certified "Golden Node".

"*Voting Member*" means a voting class of member as defined in Section 3.2 of the Alliance Bylaws, including without limitation a Promoter Member, that has entered into a Voting Member Agreement with the Alliance pursuant to which such member agrees to the terms of this IPR Policy.

"*Scope*" means

(i) the electrical characteristics and protocols of physical and media access control interfaces which allow data transmission using coaxial cables, and/or
(ii) a standard set of transmitted signals described in a Technical Specification, but only to the extent that:
 1) they are described with particularity and as requirements in such Technical Specification; and
 2) the sole purpose of such description of the transmitted signals is to enable Fully Compliant Products to interoperate, interconnect or communicate as defined within such Technical Specification.

Notwithstanding the foregoing, the Scope shall not include

(iii) any enabling technologies that may be necessary to make or use any product or portion thereof that complies with a Technical Specification, but are not themselves expressly set forth in a Technical Specification (e.g., semiconductor manufacturing technology, compiler technology, object oriented technology, basic operating system technology, etc.); or

**Multimedia over Coax Alliance**  Page 4 of 11
Revision Date: 1/24/11

Exhibit 3
Page 53

 (iv) encryption technology (e.g., conditional access, copy protection or digital rights management) that resides above the link layer; or

 (v) the implementation or use of other specifications published or otherwise made available but not developed by the Alliance Parties pursuant to this IPR Policy, but referred to in the body of a Technical Specification.

 (vi) any portions of any product and any combinations thereof the purpose or function of which is not required for compliance with a Technical Specification; or

 (vii) reference or informational portions of the Technical Specification, including any elements that are required only for conformance with any such reference or informational portions.

In those rare instances involving a 1.X product in which the behavior of a Golden Node does not conform to the 1.X Full Specification and the behavior of the Golden Node prevails, then the above definition of "Scope" shall apply to the Golden Node.

"*Subcontractor*" means any third party performing services or work under this Agreement for an Alliance Party other than employees of the Alliance Party.

"*Technical Specification*" means all versions of a document designated as a Multimedia over Coax Alliance Technical Specification.

"*Technical Working Group*" means a Committee created by authorization of the MoCA Board of Directors in accordance with Article 7.1 of the Alliance Bylaws to undertake certain specific defined tasks for the purposes of generating, developing or revising Technical Specifications, Draft Deliverables and Approved Draft Deliverables.

"*Technical Working Group Member*" means an Alliance Party's representative that participates in the Technical Working Group charged with the generating, developing or revising Technical Specifications, Draft Deliverables and Approved Draft Deliverables.

### 3. DELIVERABLES AND IP REVIEW PERIOD

3.1 A Technical Working Group chartered by the Board of Directors shall have the responsibility of drafting and developing Draft Deliverables, as defined in Section 2 above.

3.2 **Delivery of Draft Deliverables to Alliance Parties.** At such time as the Technical Working Group determines that a Draft Deliverable is ready for final review, the Draft Deliverable shall be submitted to the Board of Directors for consideration as an Approved Draft Deliverable. The Board of Directors shall direct the Alliance to send complete copies of the Draft Deliverable to Alliance Parties for review pursuant to Section 3.3, below.

3.3 **Draft Deliverable Review Period** The applicable Draft Deliverable shall be provided by the Alliance to Alliance Parties no less than thirty (30) calendar days prior to a scheduled vote on which the Draft Deliverable is to be considered by the Board of

**Multimedia over Coax Alliance** Page 5 of 11
Revision Date: 1/24/11

Exhibit 3
Page 54

Directors (hereinafter the "Review Period"). With respect to infringement of an Alliance Party's Essential Patent Claims by Fully Compliant Products, Alliance Parties, on behalf of themselves and their Affiliates, may review the Draft Deliverable for any Essential Patent Claims that may be implicated by the Draft Deliverable. While there is no requirement for an Alliance Party to perform a patent search or to review its patent portfolio for Essential Patent Claims, by assent to this Policy, Alliance Party is committing to the licensing provisions of Section 5 with regard to Essential Patent Claims implicated by the Draft Deliverable, if and when the Draft Deliverable implicating those Essential Patent Claims is adopted by the Alliance as an Approved Draft Deliverable in accordance with this Section 3 unless (i) Alliance Party identifies any Essential Patent Claims of the Alliance Party that it does not agree to license to other Alliance Parties pursuant to Section 5.1 (RAND Licenses) and that has not already been contributed by the Alliance Party in the Draft Deliverable under review or included as part of a previously Approved Draft Deliverable; or (ii) Alliance Party withdraws from the Alliance pursuant to the Applicable Agreement prior to the end of the first Review Period after the introduction of the technology covered by the Essential Patent Claim in question.

3.4     **Majority Approval of Draft Deliverables**. After completion of the Draft Deliverable review process stated in Sections 3.2 and 3.3 above, the Technical Working Group shall submit such Draft Deliverable to the Board of Directors for final approval. If the Board of Directors approves such Draft Deliverable (including any version of a Draft Deliverable) via a Majority Vote, the Draft Deliverable shall become an Approved Draft Deliverable of the Alliance. In the event that the Board of Directors fails to approve such Draft Deliverable as an Approved Draft Deliverable, such Draft Deliverable shall be returned to the Technical Working Group. The Board of Directors may from time to time require that one or more versions of a Draft Deliverable be submitted to the Board of Directors for consideration as an Approved Draft Deliverable.

3.5     **Alliance Party Access to Approved Draft Deliverables**. All Approved Draft Deliverables shall be provided to the Alliance Parties no more than thirty (30) calendar days after the Board of Directors approves the Draft Deliverable as an Approved Draft Deliverable.

3.6     **Disclosure of Deliverables to Unrelated Parties**. Upon a Majority Vote of the Board of Directors, an Approved Draft Deliverable, or a portion thereof, may obtain the designation of a "Deliverable" and in such event, the Board of Directors shall, subject to the terms in this Section, determine the process, nature and scope of disclosure of the Deliverable to third parties that are not Alliance Parties ("*Unrelated Parties*"). Nothing in this IPR Policy shall require the Board of Directors to, and the Board of Directors may elect not to, disclose a Deliverable or any portion thereof to Unrelated Parties. Disclosure of a Deliverable or any portion thereof to Unrelated Parties shall require a Majority Vote of the Board of Directors and the written consent of any then-current Alliance Party whose Confidential Information is included in the Deliverable, provided that such consent shall not be unreasonably withheld. If an Alliance Party ceases to be an Alliance Voting Member or Participant prior to the time of distribution of the Deliverable to Unrelated Parties, then such Alliance Party hereby consents to such

distribution to Unrelated Parties even if that Alliance Party's Confidential Information is included in the Deliverable.  If there is Confidential Information included in the Deliverable or any portion thereof, then, prior to distribution to an Unrelated Party, the Unrelated Party shall be required to enter into a confidentiality agreement with the Alliance with confidentiality terms at least as restrictive as the terms in this IPR policy.  The Board of Directors may elect to pre-approve specific Unrelated Parties or groups of Unrelated Parties for distribution of Deliverables subject to the terms of this Section 3.6.  Such pre-approval will require the Unrelated Party to enter into a confidentiality agreement with the Alliance with confidentiality terms at least as restrictive as the terms in this IPR policy.

4. **INTELLECTUAL PROPERTY**

   4.1 **Ownership of Rights**.

   4.1.1 **Alliance Party Intellectual Property.**  All right, title and interest in and to Alliance Party Intellectual Property shall be owned exclusively by the Alliance Party(ies)  who developed the Intellectual Property or by the Alliance Party(ies)  to whom the Intellectual Property was properly and legally assigned.

   4.1.2 **Authority to Grant Licenses; No Attempt to Circumvent.** Each Alliance Party  represents, warrants and covenants to the Alliance and to other Alliance Parties that it has the power and authority to bind itself and all of its Affiliates to the obligations contained herein, including without limitation, the obligation to grant patent licenses as set forth in this IPR Policy.  Each Alliance Party  further represents and warrants and agrees that it has not and will not intentionally transfer or otherwise encumber its patents that reasonably may contain Essential Patent Claims for the purpose of circumventing the obligation to grant licenses contained in this IPR Policy.  Each Alliance Party further agrees and states that it shall use commercially reasonable efforts to ensure all employees and Subcontractors used by the Alliance Party in connection with the conception, reduction to practice, creation, development or making of inventions that result in Essential Patent Claims have executed or will execute an assignment of Intellectual Property Rights sufficient to ensure that the Alliance Party has all the rights from such employees and Subcontractors necessary to grant patent licenses as set forth in this IPR Policy to any such Essential Patent Claims.

5. **LICENSES.**

   5.1 **RAND Licenses**.

   5.1.1 **Limited Obligation to License Essential Patent Claims**.  Subject to the terms in this IPR Policy, following Board of Director approval of an Approved Draft Deliverable and upon the written request of any other then-current Alliance Party, each Alliance Party shall offer to license to the requesting Alliance Party(ies), under the terms of a separate written agreement, such Alliance Party's and its Affiliates' Essential Patent Claims to the extent necessary to use, make, have made, offer for sale, sell and

import Fully Compliant Products in conformance with or as described in such Approved Draft Deliverable.  Such licenses shall be non-exclusive, non-transferable, non-sub-licensable, world wide, and on fair, reasonable and nondiscriminatory terms and conditions (collectively, "**RAND**") which may include defensive suspension provisions.  Alliance Party  (on behalf of itself and its Affiliates) hereby agrees that it shall not seek an injunction and hereby waives its rights to an injunction with respect to infringement of the Alliance Party 's Essential Patent Claims by Fully Compliant Products against any other Alliance Parties that are entitled to receive a RAND license as described in this Section.  Such waiver of injunctive relief shall not prohibit the waiving Alliance Party from seeking or receiving damages in connection with such infringement, nor shall such waiver prohibit the waiving Alliance Party from seeking injunctive relief against another Alliance Party that has (i) filed or joined any action in a court of competent jurisdiction seeking injunctive relief against the waiving Alliance Party alleging patent infringement; or (ii) is in breach of a license granted pursuant to this Section.  Upon joining the Alliance as a Voting Member or Participant, the Alliance Party is deemed to make the RAND commitment described in this Section 5.1 [for clarity, without the benefit of any exception set forth in Section 3.3 (i) or (ii)]with respect to Essential Patent Claims that are required to use, make and sell Fully Compliant Products described in Draft Deliverables approved by the Board of Directors as Approved Draft Deliverables prior to the Alliance Party joining the Alliance.

       5.1.2   **Transfer of Essential Patent Claims.**   Any sale, assignment or other transfer by an Alliance Party or its Affiliates to an unaffiliated third party of an Essential Patent Claim shall be subject to the terms in this IPR Policy.  An Alliance Party may choose the manner in which it complies with this Section 5.1.2, provided that any agreement for transferring or assigning Essential Patent Claims includes a provision that such transfer or assignment is subject to existing licenses and obligations to license imposed on the Alliance Party by this Agreement and the Alliance Bylaws.

       5.1.3   **Reciprocity.**   Any Alliance Party or that Alliance Party's Affiliates that does not, in fact and practice, make the license grant of Section 5.1.1 (Limited Obligation to License Essential Patent Claims) available to all other Alliance Parties and their Affiliates, shall not be entitled to the benefits of the provisions of Section 5.1.1.

   5.2   **Copyrights.**

       5.2.1   **License Granted by Alliance Party to Alliance.**   The Alliance Parties grant to the Alliance a worldwide, irrevocable, nonexclusive, nontransferable copyright license to reproduce, create derivative works, distribute, display, perform and sublicense the rights to reproduce, distribute, display and perform the Contributions of the granting Alliance Party solely for the purposes of developing, publishing and distributing Draft Deliverables, Approved Draft Deliverables, Deliverables and related materials.

       5.2.2   **License Granted by Alliance to Alliance Parties.**   As to copyrighted materials published by the Alliance, including but not limited to Approved Draft Deliverables adopted by the Alliance prior to or during an Alliance Party's

membership or participation in the Alliance, the Alliance grants each Alliance Party a worldwide, irrevocable (except upon breach of this IPR Policy by licensee), non-exclusive, non-sub-licensable, non-transferable copyright license to internally (within the Alliance Party company including Affiliates or, subject to a restricted use nondisclosure agreement, third party contractors of Alliance Party) reproduce, distribute, perform, create derivative works of and display such copyrighted materials solely for the purposes of: i) developing or promoting products based upon the Approved Draft Deliverables; ii) procuring products based upon the Approved Draft Deliverables; or iii) designing, developing or implementing internal systems and processes based upon the Approved Draft Deliverables.

       5.3    **No Other Licenses**.  The Alliance Parties agree that no license, immunity or other right is granted under this IPR Policy by any Alliance Party or its Affiliates to any other Alliance Parties or their Affiliates or to the Alliance, either directly or by implication, estoppel or otherwise, other than the agreements to grant licenses expressly set forth herein.

       5.4    **Intellectual Property of Third Parties**.  No licenses to Unrelated Party Intellectual Property in the Draft Deliverables, Approved Draft Deliverables or Deliverables are granted herein and neither the Alliance nor any Alliance Party is responsible for obtaining licenses to such Unrelated Party Intellectual Property for the benefit of or on behalf of the Alliance or any other Alliance Party.

       5.5    **Conduct.**  Alliance Party shall:

       5.5.1   Use commercially reasonable efforts to ensure the accuracy of all information provided by it and its Affiliates and Subcontractors pursuant to this IPR Policy, and, promptly upon being notified of or becoming aware of any error or other deficiency in such information, to supply the appropriate corrections.

       5.5.2   Promptly disclose to the Alliance and other Alliance Parties any breach of confidentiality which it believes would be actionable against any of the Alliance Parties or Alliance by virtue of disclosure of any Deliverables, Draft Deliverables or Approved Draft Deliverables or by virtue of using, making, reproducing, importing, selling or otherwise distributing a Fully Compliant Product.

       5.5.3   Require that its employees and Subcontractors, who participate in the development of Draft Deliverables at the premises of or at locations provided by another Alliance Party, abide by its own rules and the rules which apply to visitors working at the premises of said other Alliance Party.

6.    **FREEDOM OF ACTION**

Nothing contained in this IPR Policy shall be construed as restricting the right of any Alliance Party to independently design, develop, acquire, manufacture, market or service or otherwise deal in, directly or indirectly, competitive products or services independent of any Draft Deliverables or Approved Draft Deliverables or any

**Multimedia over Coax Alliance**           Page 9 of 11
Revision Date: 1/24/11

Exhibit 3
Page 58

Deliverable. The foregoing shall not be construed or deemed as a license (express, implied or by way of estoppel) or an immunity from suit under any Intellectual Property or Confidential Information of the Alliance or any Alliance Party. This Section shall survive any termination or expiration of this IPR Policy.

7. **TERMINATION; SURVIVAL OF IPR POLICY**

    7.1 **Termination of Applicable Agreement by Alliance without Cause**. If the Alliance terminates an Alliance Party 's Applicable Agreement, and therefore such Alliance Party 's membership or participation in the Alliance, without cause (i.e., for no reason) as provided in the Bylaws, then this IPR Policy shall, notwithstanding anything to the contrary in this IPR Policy, terminate in its entirety. In such event the terminated Alliance Party shall not be entitled to request or require any Alliance Party of the Alliance to license such Alliance Party's Essential Patent Claims to the terminated Alliance Party as provided in Sections 5.1 (RAND Licenses) and no Alliance Party shall be entitled to request or require the terminated Alliance Party to license the terminated Alliance Party's Essential Patent Claims to any such other Alliance Party as provided in Sections 5.1 (RAND Licenses).

    7.2 **Other Termination of the Applicable Agreement.** If an Alliance Party's membership or participation in the Alliance terminates or expires for any reason other than termination by the Alliance without cause as provided in the Bylaws, then (i) the terminated Alliance Party shall be entitled to request or require any Alliance Party to license such Alliance Party 's Essential Patent Claims under Section 5.1 (RAND Licenses) , but only to the extent necessary to use, make, have made, offer for sale, sell and import Fully Compliant Products in conformance with or as described in Draft Deliverables or Approved Draft Deliverables approved by the Board of Directors prior to such expiration or termination; and (ii) the terminated Alliance Party shall no longer be entitled to request or require any Alliance Party to license such Alliance Party's Essential Patent Claims to the terminated Alliance Party as provided in Sections 5.1 (RAND Licenses) to any extent with regard to Fully Compliant Products in conformance with or as described in Draft Deliverables or Approved Draft Deliverables approved by the Board of Directors after such expiration or termination; and (iii) the terminated Alliance Party and its Affiliates shall, after such termination, continue to offer and to license to any other Alliance Parties the terminated Alliance Party's (and its Affiliates') Essential Patent Claims as provided as provided in Sections 5.1 (RAND Licenses), including Alliance Parties that become Alliance Party after such termination. The terminated Alliance Party's obligations under (iii) above shall only apply to Essential Patent Claims that are required to use, make and sell Fully Compliant Products described in or covered by Approved Draft Deliverables approved by the Board of Directors prior to such expiration or termination. The terminated Alliance Party 's obligations under (iii) above shall not apply to Essential Patent Claims that are required to use, make and sell Fully Compliant Products described in Draft Deliverables approved by the Board of Directors as Approved Draft Deliverables after such expiration or termination, except as to portions of such Approved Draft Deliverable approved by the

Board of Directors as a separate Approved Draft Deliverable prior to such termination or expiration (e.g., an earlier version of the Approved Draft Deliverable).

    7.3    **<u>Identification of Confidential Information and Intellectual Property.</u>** Within twenty (20) business days after the termination of an Alliance Party's membership in the Alliance, that Alliance Party shall identify in writing to the Alliance, with reasonable specificity, any of such Alliance Party's Confidential Information or Intellectual Property that the Alliance Party has delivered or provided to the Alliance with regard to any as yet Draft Deliverables or proposed Draft Deliverables being developed or worked on by the Alliance at the time of such termination or expiration or to any Approved Draft Deliverable approved prior to such termination or expiration.

8.    **AMENDMENTS**

This IPR Policy may only be amended in accordance with the terms and conditions in the Alliance Bylaws.