**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

Christopher S. Marchese (SBN 170239)
marchese@fr.com
Tyler R. Train (SBN 318998)
train@fr.com
FISH & RICHARDSON P.C.
633 West Fifth Street, 26th Floor
Los Angeles, CA 90071
Tel: (213) 533-4240 / Fax: (858) 678-5099

Oliver Richards (SBN 310972)
orichards@fr.com
John-Paul Fryckman (SBN 317591)
fryckman@fr.com
Fish & Richardson P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070

*Additional Counsel Listed on Signature Page*

Attorneys for Defendant
DISH Network Corporation, et al.

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| ENTROPIC COMMUNICATIONS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> DISH NETWORK CORPORATION; DISH NETWORK L.L.C.; DISH NETWORK SERVICE, L.L.C.; AND DISH NETWORK CALIFORNIA SERVICE CORPORATION, <br><br> Defendants. | Case No. 2:23-cv-1043-JWH-KES <br><br> **COUNTER-CLAIMANTS DISH NETWORK CORPORATION, ET AL.'S OPPOSITION TO COUNTER-DEFENDANT ENTROPIC COMMUNICATIONS, LLC'S MOTION TO DISMISS AMENDED COUNTERCLAIMS** <br><br> Hearing Date: March 29, 2024 <br> Hearing Time: 9:00 a.m. <br> Courtroom: 9D <br> Judge: Hon. John W. Holcomb |

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

DISH NETWORK CORPORATION; DISH NETWORK L.L.C.; DISH NETWORK SERVICE L.L.C.; DISH NETWORK CALIFORNIA SERVICE CORPORATION; AND DISH TECHNOLOGIES L.L.C.,

 Counter-Claimants,

v.

ENTROPIC COMMUNICATIONS, LLC; MAXLINEAR, INC.; AND MAXLINEAR COMMUNICATIONS LLC,

 Counter-Defendants.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTORY STATEMENT ........................................................................9

BACKGROUND ...............................................................................................9

    I.     Technical Standards—Generally and MoCA .....................................10

    II.    Events Leading to DISH's Counterclaims ........................................11

    III.   Overview of DISH's Counterclaims ...................................................12

LEGAL STANDARD .......................................................................................14

    I.     Breach of Contract: DISH Has Properly Alleged Entropic Breached the IPR Agreement ............................................................14

         A.    DISH has Properly Pled All Elements to Show Breach. ...............................................................................14

         B.    DISH Has Properly Pled that the Counterclaim Plaintiffs Are Parties to or Third-Party Beneficiaries of the MoCA IPR Policy. ..........................................15

         C.    DISH, Including DISH Technologies, Has Properly Alleged That It Made a Compliant Request for a License. .................................................................................18

         D.    DISH Has Properly Alleged Harm. ....................................19

    II.    DISH Has Properly Alleged Conspiracy ..........................................20

         A.    DISH Has Properly Alleged All Elements of Conspiracy. ..............................................................21

         B.    DISH's Allegations Are Plausible. ......................................22

         C.    DISH Adequately Alleges It Has Been Harmed by the Conspiracy. ..............................................................25

    III.   DISH Has Properly Alleged Violations of Antitrust Law ...................26

         A.    DISH Has Adequately Pled a Violation of the Sherman Act. .......................................................................27

            1.    DISH Adequately Alleges Anti-Competitive Injury. .................................................................28

            2.    DISH Adequately Alleges Anti-Competitive Effect. ................................................................29

         B.    DISH's Antitrust Claims Are Not Barred by the *Noerr-Pennington* Doctrine. ...........................................32

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

IV.    DISH Will Withdraw Its Patent Misuse Counterclaim..........................33

CONCLUSION.............................................................................................33

DISH'S OPPOSITION TO ENTROPIC'S MTD AMENDED COUNTERCLAIMS
Case No. 2:23-cv-1043-JWH-KES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AliveCor, Inc. v. Apple Inc.*,
   2023 WL 9181478 (N.D. Cal. June 30, 2023)......................................31

*Apple Inc. v. Samsung Elecs. Co.*,
   2011 WL 4948567 (N.D. Cal. Oct. 18, 2011) .............................10, 11

*Apple, Inc. v. Motorola Mobility, Inc.*,
   2011 WL 7324582 (W.D. Wis. June 7, 2011)....................................17

*Apple, Inc. v. Motorola Mobility, Inc.*,
   886 F. Supp. 2d 1061 (W.D. Wis. 2012)............................................33

*Arriola v. Flagstar Bank*,
   2016 WL 1449537 (C.D. Cal. Apr. 11, 2016).....................................14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..........................................................................14

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)..........................................................................24

*Brunswick Corp v Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)..........................................................................29

*In re Cardizem CD Antitrust Litig.*,
   105 F. Supp. 2d 618 (E.D. Mich. 2000) ............................................32

*CDF Firefighters v. Maldonado*,
   158 Cal. App. 4th 1226 (2008) .........................................................15

*Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*,
   111 F.3d 1427 (9th Cir. 1996) ..........................................................32

*Cousins v. Lockyer*,
   568 F.3d 1063 (9th Cir. 2009) .....................................................20, 24

*Datatreasury Corp. v. Wells Fargo & Co.*,
   522 F.3d 1368 (Fed. Cir. 2008) ........................................................24

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*Deakins Holding PTE Ltd. v. NewNet Inv. Grp. LLC*,
   2015 WL 468972 (C.D. Cal. Feb. 4, 2015) ........................................ 18

*Evolved Wireless, LLC v. Apple, Inc.*,
   2019 WL 831112 (D. Del. Feb. 21, 2019) ......................................... 26

*Gen. Commercial Packaging, Inc. v. TPS Package Eng'g, Inc.*,
   126 F.3d 1131 (9th Cir. 1997), *as amended on denial of reh'g and
   reh'g en banc* (9th Cir. 1997) ............................................. 30

*Glob. Hunter Sec., LLC v. MannKind Corp.*,
   2013 WL 2120865 (C.D. Cal. May 14, 2013) .................................. 18

*Havenrock Cap., LLC v. Brennan*,
   2018 WL 11354527 (C.D. Cal. Dec. 3, 2018) .................................. 14

*HTC Corp. v. Telefonaktiebolaget LM Ericsson*,
   12 F.4th 476 (5th Cir. 2021) .................................................. 17

*HTC Corp. v. Telefonaktiebolaget LM Ericsson*,
   2018 WL 6617795 (E.D. Tex. Dec. 17, 2018) ................................. 25

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
   2006 WL 1883353 (N.D. Cal. July 7, 2006) .................................. 32

*Hynix Semiconductor Inc. v. Rambus, Inc.*,
   527 F. Supp. 2d 1084 (N.D. Cal. 2007) .................................. 26, 31

*In re Innovatio IP Ventures, LLC Pat. Litig.*,
   921 F. Supp. 2d 903 (N.D. Ill. 2013) ......................................... 33

*In re Innovatio IP Ventures Patent Litig.*,
   2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) .................................... 17

*Kaiser Engineers, Inc. v. Grinnell Fire Prot. Sys. Co.*,
   173 Cal. App. 3d 1050 (Cal. Ct. App. 1985) .................................. 17

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ................................................ 27

*Klang v. Pflueger*,
   2014 WL 4922401 (C.D. Cal. July 10, 2014) .................................. 24

*Marble Bridge Funding Grp., Inc. v. Euler Hermes Am. Credit Indem.
   Co.*,
   225 F. Supp. 3d 1034 (N.D. Cal. 2016) ....................................... 21

DISH'S OPPOSITION TO ENTROPIC'S MTD AMENDED COUNTERCLAIMS
Case No. 2:23-cv-1043-JWH-KES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*Microsoft Corp. v. Motorola, Inc.*,
   696 F.3d 872 (9th Cir. 2012) ...................................................................11, 16, 17

*Microsoft Corp. v. Motorola, Inc.*,
   795 F.3d 1024 (9th Cir. 2015) ......................................................11, 25, 26, 31

*Microsoft Corp. v. Motorola, Inc.*,
   854 F. Supp. 2d 993 (W.D. Wash. 2012) ................................................17

*Mintel Learning Tech., Inc. v. Beijing Kaidi Educ.*,
   2007 WL 2288329 (N.D. Cal. Aug. 9, 2007) ........................................21

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
   779 F.3d 1036 (9th Cir. 2015) ................................................................16

*Ohio v. Am. Express Co.*,
   138 S. Ct. 2274 (2018)...........................................................................30

*In re San Jose Airport Hotel, LLC*,
   2018 WL 1426702 (N.D. Cal. Mar. 22, 2018) ......................................20

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ...............................................................24

*Sullivan v. Nat'l Football League*,
   34 F.3d 1091 (1st Cir. 1994).............................................................29, 30

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktienbolaget LM
   Ericsson*,
   2016 WL 7049263 (C.D. Cal. Aug. 9, 2016) ........................................33

*Toyo Tire & Rubber Co. v. Atturo Tire Corp.*,
   2017 WL 1178224 (N.D. Ill. Mar. 30, 2017) ........................................32

*United States v. Sanchez-Murillo*,
   608 F.2d 1314 (9th Cir. 1979) ...............................................................21

*Vizio, Inc. v. Funai Elec. Co.*,
   2010 WL 7762624 (C.D. Cal. Feb. 3, 2010) ........................................28

*Zuniga v. United Can Co.*,
   812 F.2d 443 (9th Cir.1987)...................................................................26

**Statutes**

35 U.S.C. § 261 .............................................................................................24

7

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Other Authorities**

Fed. R. Civ. P. 11 ..............................................................................................30

Fed. R. Civ. P. 12(b)(6) ....................................................................................14

Fed. R. Civ. P. 26(f) ..........................................................................................31

Restatement (Second) of Contracts § 302 (1981) ..............................................17

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## INTRODUCTORY STATEMENT

DISH Network Corporation, DISH Network L.L.C., Dish Network Service L.L.C., Dish Network California Service Corporation, and DISH Technologies L.L.C. (collectively, "Counter-Claimants" and "DISH") oppose Counter-Defendant Entropic Communications LLC's ("Entropic") Motion to Dismiss (D.I. 361) (the "Motion") DISH's Counterclaims (D.I. 316).   Entropic's Motion seeks to dismiss all counterclaims asserted against it except for Counts I and II, which are declaratory judgment claims that DISH is entitled to license the asserted patents on RAND terms (Count I) and to determine RAND terms (Count II).

Entropic's motion improperly urges the Court to reject factual allegations at the motion to dismiss stage simply because Entropic labels these allegations as implausible.  Entropic, though, offers nothing more than attorney argument to support its implausibility theory—a theory that is rarely sufficient to grant a motion to dismiss, and fails here.  Because the facts pled in the counterclaims are assumed true, the only question for the Court is whether those facts support each element of a given cause of action.  Because they do, Entropic's motion should be denied.

## BACKGROUND

This case generally relates to the alleged patent infringement by implementation of technical standards.  Entropic alleges infringement of patents it purchased from co-counterdefendants MaxLinear, Inc. and MaxLinear Communications LLC (collectively, "MaxLinear"), which Entropic claims are essential to implement a communications standard known as "MoCA."  (*See generally* D.I. 1.)  Though DISH denies infringement and validity, DISH contends that any damages for the alleged infringement is limited according to the RAND contractual terms agreed-to by Entropic's predecessors-in-interest to the asserted patents.  (*See generally* D.I. 316, Counterclaims, ¶¶ 25-35.)  DISH's counterclaims seek a judicial determination that these contractual limitations apply to the asserted patents, and seek further relief for breach of those contractual commitments, tortious

conduct, and violations of federal and state antitrust laws. (*See generally id.* ¶¶ 75-163.)  Below, we begin with a general discussion of technical standards, then turn to the events that underlie DISH's counterclaims against MaxLinear and Entropic.

## I.   Technical Standards—Generally and MoCA

Technical standards, such as WiFi, Bluetooth, and 5G, are essential to the modern world.  Product designers are willing to develop equipment and software compliant with technical standards because of the promise that the equipment and software will operate with other devices and software compliant with the standard. (D.I. 316 ¶ 2.)[1]  For example, the WiFi standard ensures that one manufacturer's laptop can still connect and talk to a WiFi router made by a different manufacturer. Standards also reduce investment needed to develop new technologies because costs are spread among the various companies working to create the standard.  (*Id.*)  These are commonly recognized competitive benefits of technical standards.  *See, e.g., Apple Inc. v. Samsung Elecs. Co.*, 2011 WL 4948567, at *1 (N.D. Cal. Oct. 18, 2011).

Technical standards, however, can present significant antitrust risks.  These risks are amplified when patents (i.e., government-granted monopolies) are involved. Two common risks include "lock-in" and "patent hold-up."  (D.I. 316, ¶ 3); *see also Apple*, 2011 WL 4948567, at *2.  "Lock-in" refers to a problem whereby, once a standard has been widely accepted in an industry (like WiFi), it is difficult for a company to avoid the standard.  (*Id.*)  "Patent Hold-Up" refers to a problem where a single patent owner can "hold-up" an entire industry based on claims that the patent owner's patents are necessary to practice the standard.  (*Id.*)  Thus, the standardization process can be abused by a single company that encourages adoption of its patented technology into a standard, lies in wait for the standard to be widely adopted, and then demands exorbitant damages.  (*Id.*)  Such is the case here, where the asserted patents were purportedly adopted into the MoCA standard years ago, and, despite years

---

[1]  All paragraph number cites to Docket No. 316 refer to DISH's Amended Counterclaims beginning at page 68 of that filing.

1 having passed without any notice of alleged infringement, the new patent owner
2 (Entropic) now demands $1 billion from DISH.  (*See* D.I. 76 at 11).

3     To address hold-up risks—and to avoid running afoul of antitrust scrutiny—
4 standards-setting organizations ("SSOs") have adopted rules for how the
5 promulgators of a standard behave toward implementers of the standard.  (D.I. 316 ¶
6 4.)  Generally, those rules require members of the SSOs to grant licenses for standard
7 essential patents to any implementor of the standard on fair, reasonable, and non-
8 discriminatory ("RAND") terms.  (*Id.*)  As courts have found, the RAND promise
9 must be available to all-comers, regardless of whether the potential licensee is a
10 member of the standards-setting organization. (*Id.* ¶ 5); *see also, e.g., Microsoft Corp.*
11 *v. Motorola, Inc.*, 696 F.3d 872, 885 (9th Cir. 2012) (stating that FRAND obligation
12 requires firm to license to "all comers")*; see also Microsoft Corp. v. Motorola, Inc.*,
13 795 F.3d 1024, 1031 (9th Cir. 2015) ("[A]n SEP holder cannot refuse a license to a
14 manufacturer who commits to paying the RAND rate.")  Without RAND license term
15 guarantees for all, a small number of companies can coordinate to develop a standard,
16 cross-license each other, but then hold up all others once a standard is widely adopted.

17     The communication standards here were developed by the Multimedia over
18 Coax Alliance, or "MoCA." (D.I. 316 ¶ 22.)  As with most SSOs, MoCA has rules
19 for how its members must behave when licensing intellectual property related to
20 MoCA standards.  (*Id.* ¶ 6.)  Also, as with most SSOs, MoCA requires its members,
21 and those members agree, to license intellectual property essential to the practice of
22 MoCA standards on RAND terms.  (*Id.*)  This is a contractual promise between each
23 member and MoCA, and between the members, for the benefit of those members,
24 other organizations, and the public that choose to implement MoCA standards.  (*Id.*;
25 *see also id.*, ¶¶ 25-35 (discussing the contracts more specifically).

26 **II.  Events Leading to DISH's Counterclaims**

27     Entropic Communications, Inc. ("Old Entropic")—the original assignee of the
28 Asserted Patents in this case—agreed as a member of MoCA to license patents

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

essential to MoCA on RAND terms. (D.I. 316, ¶¶ 40-41.) MaxLinear—a member of MoCA's Board of Directors since 2015—affirmed that promise when it acquired Old Entropic. (*Id.*, ¶ 43.) However, MaxLinear's transfer of the asserted patents to Plaintiff Entropic (among other things) revealed that affirmance to be false.

In addition to the RAND requirement itself, the MoCA IPR Policy has provisions to prevent circumventions of the RAND promise, including by requiring "any agreement for transferring or assigning Essential Patent Claims includes a provision that such transfer or assignment is subject to . . . obligations to license imposed on the Alliance Party by this Agreement." (*Id.*, ¶ 46.) But when MaxLinear sold the Asserted Patents to Plaintiff Entropic, ***MaxLinear failed to include language in the assignment agreement required by MoCA***. (D.I. 316 ¶ 7.) Despite the IPR Policy's rules and MaxLinear's commitments, MaxLinear made a contrary representation in the Patent Purchase Agreement:

(D.I. 306-8 § 3.1 (emphasis added); *id.*, Ex. G.)

Since acquiring the Old Entropic patents, Plaintiff Entropic has exacerbated this omission by failing to honor Old Entropic's and MaxLinear's RAND promises. For example, despite repeated written requests, Entropic failed to provide *any* licensing offer to DISH—much less one that complies with RAND obligations. (D.I. 316 ¶ 49-55.) Indeed, the only monetary demand Entropic has identified is $1 billion. (*See* D.I. 76 at 11.) Despite recent claims that it will comply with the policy, Entropic still has not indicated it will make a RAND-compliant license offer. Instead, Entropic has continued to litigate, causing DISH to incur significant expenses that likely could have been avoided, had Entropic simply complied with MoCA's IPR Policy.

## III.   Overview of DISH's Counterclaims

In its counterclaim complaint, DISH asserts 11 claims—three against Entropic, three against MaxLinear, and five against both Entropic and MaxLinear. These

DISH'S OPPOSITION TO ENTROPIC'S MTD AMENDED COUNTERCLAIMS
Case No. 2:23-cv-1043-JWH-KES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

claims fall into three categories: (1) contract; (2) fraud; and (3) antitrust.

For the contract claims, DISH first asks this Court to find that Plaintiff Entropic is required to license the asserted patents on RAND terms (Count I, D.I. 316, ¶¶ 75-84) and to determine what those RAND terms would be (Count II, *id.*, ¶¶ 85-90). DISH also alleges breach of the IPR Policy contract by Entropic (Count III) for failing to comply with the RAND promise attached to the asserted patents, (*id.*, ¶¶ 91-100); and by MaxLinear (Count IV) for attempting to circumvent the RAND promise it made and for failing to include language required by the IPR Policy when it transferred ownership of the patents to Entropic, (*id.*, ¶¶ 101-110).

As to the fraud claims, DISH alleges that MaxLinear fraudulently committed to compliance with the MoCA IPR Policy when, in reality, it had no intention of doing so—promises on which DISH relied when deciding what technology to implement in its products.  (Count V, D.I. 316, ¶¶ 111-122.)  DISH also alleges that MaxLinear conspired with Entropic to further that fraud by attempting to "wash" the asserted patents of any RAND commitment through the transfer to Entropic.  (Count VI, *id.*, ¶¶ 123-131.)  And finally, DISH alleges that MaxLinear was unjustly enriched by the widespread adoption of MoCA technology (which was achieved by its wrongful and fraudulent statements concerning the IPR Policy) and should be disgorged of those unjust gains.  (Count VII, *id.*, ¶¶ 132-138.)

Lastly, as to the antitrust claims, DISH alleges that, by attempting to wash the patents of their RAND obligations and after widespread adoption of MoCA technologies, Entropic and MaxLinear became unrestrained monopolists.  (*See* D.I. 316, ¶¶ 139-147.)  DISH identifies at least two markets (the markets for in-home networking and TV services), and alleges that those markets have been and will continue to be harmed by Entropic's and MaxLinear's attempts to demand monopoly rents for DISH's (and others') alleged use of patents that Entropic claims are essential to implement MoCA standards.  As DISH has alleged, these actions violated Federal Antitrust law (Count VIII), California Antitrust law (Count IX), the Patent Laws

DISH'S OPPOSITION TO ENTROPIC'S MTD AMENDED COUNTERCLAIMS
Case No. 2:23-cv-1043-JWH-KES

(Count X), and a California law governing business conduct (Count XI).

## LEGAL STANDARD

A claim "should not be dismissed under Rule 12(b)(6) 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Arriola v. Flagstar Bank*, 2016 WL 1449537, at *2 (C.D. Cal. Apr. 11, 2016) (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).   DISH's well-pleaded factual allegations must be taken as true and all reasonable inferences must be drawn in DISH's favor.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Havenrock Cap., LLC v. Brennan*, 2018 WL 11354527, at *3 (C.D. Cal. Dec. 3, 2018).

## ARGUMENT

Entropic moves to dismiss nearly all claims against it,[2] claiming that DISH has failed to plead certain elements.  Taking DISH's well-pled allegations as true, DISH has properly stated a claim for each of the counts challenged by Entropic.

**I.   Breach of Contract: DISH Has Properly Alleged Entropic Breached the IPR Agreement**

**A.      DISH has Properly Pled All Elements to Show Breach.**

DISH's counterclaim complaint levies one breach-of-contract count against Entropic—Count III.  In this count, DISH alleges that Entropic violated MoCA's IPR Policy by failing to offer to license its "Essential Patent Claims" on RAND terms, as the IPR Policy requires.  (*See* D.I. 361, ¶¶ 91-99.)  As recompense for this breach, DISH seeks (among other things) damages to make it whole, including the attorneys' fees expended defending itself in this suit—which likely could have been avoided had Entropic complied with the IPR Policy.  (*See id.*, ¶ 100.)

DISH's counterclaim complaint properly states a claim for breach of contract. The elements of a breach of contract claim are: (1) the existence of the contract; (2) the plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and

---

[2] As stated above in the Introduction, Entropic's motion addresses Counts III and Counts VI-XI.  It does not address Counts I and II.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

(4) damages to plaintiff as a result of the breach. *CDF Firefighters v. Maldonado*, 158 Cal. App. 4th 1226, 1239 (2008).

DISH has pled that: **(1)** the MoCA IPR Policy constitutes part of an enforceable contract (D.I. 316 ¶¶ 25-35) to which Counterclaim Plaintiff DISH Technologies L.L.C. ("DISH Technologies") is a party (*id.*, ¶¶ 58-63) and for which the other DISH counterclaim plaintiffs are third-party beneficiaries (*id.*, ¶¶ 64-74); **(2)** "[t]o the extent the MoCA IPR Policy imposes any obligations on DISH, DISH has discharged them" by, for example, making "a request, in writing, for a RAND-compliant license offer," (*id.*, ¶ 97); **(3)** Entropic has breached at least sections 5.1.1 and 9.2 of the MoCA IPR Policy "because it has failed to provide DISH with a RAND-compliant license offer," (*id.*, ¶¶ 98-99); and **(4)** that DISH has been harmed by Entropic's breach in at least the amount it is spending to defend itself in this case (*id.*, ¶ 100.)

Despite this proper pleading, Entropic raises various arguments as to why DISH's breach-of-contract claim should be dismissed. None have merit.

## B. DISH Has Properly Pled that the Counterclaim Plaintiffs Are Parties to or Third-Party Beneficiaries of the MoCA IPR Policy.

Entropic acknowledges (at 13), as it must, that DISH's counterclaims allege that DISH Technologies has standing to enforce the IPR Policy as a former member of MoCA. However, as to the other DISH counterclaimants (which Entropic calls the "DISH Defendants"), Entropic argues (at 12-14) that it owes no contractual obligations to these entities because "they never entered into an agreement with MoCA." Entropic is mistaken that (even if true) this means Entropic is relieved of its obligations to perform under the IPR Policy.

DISH's counterclaim complaint contains *two sections* addressing why the various DISH entities have standing. (*See generally* D.I. 316, ¶¶ 58-74.) The first (¶¶ 58-63) addresses DISH Technologies, which (as discussed above) has a right to enforce the IPR Policy. The second (¶¶ 64-74) addresses the DISH Defendants. (*See* D.I. at 316, ¶¶ 64-74.) As alleged in this section, both through the language of the

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

IPR Policy and through MoCA's actions, the IPR Policy makes any party wishing to implement a MoCA standard a third-party beneficiary.  (*See id.*, ¶¶ 68-70.)  The counterclaim complaint also alleges that all DISH entities—including the other counterclaim plaintiffs—"became de facto member[s] of MoCA through a course of conduct" because, during the many years in which the DISH entities participated in MoCA, they were treated as members.  (*See id.*, ¶¶ 73.)

Entropic's motion largely ignores these factual allegations.  As to the third-party beneficiary question, Entropic first asserts (at 13) that "[w]hether antitrust laws require an Alliance member to license patents on RAND terms to non-members is a separate question from whether the IPR Policy requires members to offer it to non-members *as a matter of contract*."  As DISH has properly alleged (and is explicit in the IPR Policy), the policy "is designed and intended to comply with all applicable law, including federal and state anti-trust laws." (D.I. 316, ¶ 70.)  Thus, antitrust laws are not irrelevant to the IPR Policy, and indeed can and should be used to interpret it.

Entropic next argues (at 13) that DISH has "plead [sic] no facts" to support a conclusion that the DISH parties are third-party beneficiaries, which Entropic calls a "bare legal assertion."  This, again, ignores the allegations in DISH's counterclaim complaint.  DISH points to provisions specific to the IPR Policy—such as the statement in the IPR Policy itself that its goal is "to maximize the likelihood of ***widespread adoption***" of MoCA standards, i.e., adoption beyond just the members of MoCA.  (D.I. 316, ¶ 68 (emphasis added).)  Moreover, DISH points to another statement in the IPR Policy that it should be interpreted to be consistent with antitrust law, which (as discussed above) requires that the RAND be made available to "all comers."  (*See* D.I. 316, ¶ 70); *Microsoft*, 696 F.3d at 885.  These allegations are enough to raise a fact issue as to whether the DISH parties are third-party beneficiaries. *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1065 (9th Cir. 2015) ("Because they involve factual questions of intent, third party beneficiary claims are often not appropriate for resolution via motion to dismiss.").

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Entropic is wrong to suggest (at 13) that third-party beneficiaries can only be created by "express" language in a contract.  To the contrary, a third-party beneficiary "need not be named or identified individually to be an express beneficiary." *Kaiser Engineers, Inc. v. Grinnell Fire Prot. Sys. Co.*, 173 Cal. App. 3d 1050, 1055 (Cal. Ct. App. 1985).  Instead, "[a] third party may enforce a contract if it can be shown that he or she is a member of the class for whose express benefit the contract was made." *Id.*  Where, as here, the "***circumstances*** indicate that the promisee" (here, each MoCA implementor) "intends to give the beneficiary the benefit of the promised performance" (i.e., the right to license essential patents on RAND terms), that beneficiary is entitled to enforce the terms of the contract against the contracting party (here MaxLinear).  *See, e.g.,* Restatement (Second) of Contracts § 302 (1981).  Accordingly, "[c]ompanies seeking to license under [FRAND] terms become third-party beneficiaries of the contract between the [SEP] holder and the [Standards Setting Organization (SSO)]. They are thus enabled to enforce the terms of that contract." *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 12 F.4th 476, 481 (5th Cir. 2021); *see also, e.g., Microsoft*, 696 F.3d at 884 (finding that an implementor of a standard is an intended third-party beneficiary)*; In re Innovatio IP Ventures Patent Litig.*, 2013 WL 5593609, at *4 (N.D. Ill. Oct. 3, 2013) (same); *Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 999 (W.D. Wash. 2012) (same); *Apple, Inc. v. Motorola Mobility, Inc.*, 2011 WL 7324582, at *10 (W.D. Wis. June 7, 2011) (same).

Entropic is also wrong (at 13) that the IPR Policy only provides RAND terms for current MoCA members.  For one, Entropic ignores that the MoCA IPR Policy also obligates it to provide RAND licenses to former members.  For another thing, Entropic's assertion ignores the other portions of the IPR Policy, suggesting that the RAND promise is also made for the benefit of all who wish to implement MoCA standards.  In any event, Entropic's argument suggests only (at best) that the MoCA IPR Policy is ambiguous on the topic.

Lastly, Entropic argues (at 12) that the course of conduct alleged in DISH's

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

counterclaim complaint "is irrelevant."  It is unclear what Entropic means by this, given that black-letter law that provides that a course of conduct can be used to interpret a contract, which is not ripe for dispute at the motion to dismiss stage.  *See Glob. Hunter Sec., LLC v. MannKind Corp.*, 2013 WL 2120865, at \*6 (C.D. Cal. May 14, 2013) ("While the parties' purpose and course of conduct are important to construing the meaning of the contract, they cannot be considered at the motion to dismiss stage.").  Entropic cannot write this off, nor can it ask this Court to weigh course-of-conduct on a motion to dismiss.  *See id.*; *see also Deakins Holding PTE Ltd. v. NewNet Inv. Grp. LLC*, 2015 WL 468972, at \*5 (C.D. Cal. Feb. 4, 2015).

## C.   DISH, Including DISH Technologies, Has Properly Alleged That It Made a Compliant Request for a License.

Entropic next argues (at 13-15) that DISH has failed to allege breach because, in its view, DISH, including DISH Technologies, did not make a pre-suit written request for a license.  Entropic is again wrong.

DISH has properly alleged that it *did* make a request, in writing, for a RAND license.  As DISH's counterclaim complaint states, DISH representatives "requested a licensing proposal from Entropic on behalf of DISH Network L.L.C. ***and all DISH entities***" on May 3, 2022.  (D.I. 316, ¶ 50 (emphasis added).)  DISH Technologies, of course, is one of those DISH entities.  The DISH representatives then followed up, in writing, with the same request, again on behalf of all DISH entities.  (*Id.*, ¶¶ 54-55.)[3] This is far from a "generic allegation" "that one of the DISH entities requested RAND terms in some form at some time" as suggested by Entropic (at 14).

Entropic also argues (at 13) that DISH's written request doesn't count because it was sent *after* Entropic filed the present suit.  Yet Entropic does not explain why

---

[3] Paragraph 55 of the counterclaims cites Exhibit 9 (316-9), which is a letter from DISH counsel that states: (1) on March 31, 2023, Max Gratton of DISH sent a letter to Entropic (which is the subject of Paragraph 54 of the counterclaims) requesting that "Entropic provide DISH with the same RAND licensing terms that Entropic has provided to other companies to resolve the MoCA Litigation"; and (2) DISH is "once again" asking "that Entropic provide fair and reasonable terms …"

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   this matters.  Regardless, once a request for RAND terms had been made, the IPR
2   Policy obligates Entropic to "offer to license" on RAND terms.  (*See*, D.I. 307-3("IPR
3   Policy") §§ 5.1.1, 5.1.2.)  Because Entropic did not, it breached.

4       In any event, the MoCA IPR Policy does not require written requests for
5   *previous members* of MoCA, such as DISH Technologies.  The portion of the IPR
6   Policy identified by Entropic applies to requests made by current MoCA Members.
7   (*See id.* § 5.1.1.)  The IPR Policy contains no similar requirement for requests made
8   by former members—the context pled in the counterclaims.  (*See id.* § 7.2.)  Thus, in
9   response to DISH's verbal request on May 3, 2022 (before Entropic filed suit),
10  Entropic was required to provide a RAND offer even before suit.  And, again, because
11  it didn't, Entropic breached the MoCA IPR Policy.

## D.    DISH Has Properly Alleged Harm.

13      Lastly, Entropic argues (at 14-15) that DISH has not properly alleged harm.
14  Most of this argument is simply a re-hash of the arguments it made regarding breach.
15  Namely, Entropic argues (at 15) that there is no causal link between the harm suffered
16  (i.e. DISH's costs to defend itself) and the breach (i.e., Entropic's failure to offer a
17  RAND license) because, in Entropic's view of the world, the only written request
18  came after the suit.  However, as discussed above, the IPR Policy does not require
19  written requests for former members.   In any event, even accepting Entropic's
20  incorrect view of the contract, Entropic is still liable for harm after the written request
21  was made because, even under this view, it still breached by failing to offer a license.

22      Entropic also argues (at 14-15) that DISH's harm is not proximately caused by
23  Entropic's breach because, even if it had made a RAND Offer, "Entropic would still
24  have had the right to bring suit."  Entropic's argument is pure speculation.  Indeed,
25  Entropic's argument assumes—without any justification—that DISH would have
26  rejected a RAND-compliant offer and that Entropic would still have had to file suit.
27  The facts support the opposite conclusion: DISH representatives repeatedly asked
28  Entropic to provide RAND terms in an effort to continue good-faith negotiations.

(*See, e.g.,* D.I. 316 at ¶¶ 50-55.)   In any event, the Court need not engage in such speculation at this stage.   California contract law requires the breach only be a substantial factor of the claimed damages—not the only factor.   *In re San Jose Airport Hotel, LLC*, 2018 WL 1426702, at *5 (N.D. Cal. Mar. 22, 2018).   Here, DISH properly pleaded its own performance (requesting a license) and Entropic's breach (failing to offer a license), which has been a substantial factor in causing harm to DISH.   Since at this stage of the case DISH's allegations must be taken as true and construed in a light most favorable to DISH, *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009), Entropic cannot avoid liability based on speculation as to how a license negotiation would have gone had it actually performed its contractual obligations.

Finally, as to DISH Technologies alone, Entropic argues (at 15) that DISH Technologies hasn't suffered any litigation expenses.   Entropic doesn't cite anything in support of this assertion, and any conclusion as how DISH is allocating its legal expenses would be (at this point) based on pure speculation.   In any event, DISH Technologies has also specifically alleged its own harm in the complaint—namely: "Entropic's failure to license on RAND terms . . . and the other wrongful acts undertaken by Entropic and MaxLinear, has harmed DISH Technologies' ability to sell its product, including ty raising its costs through this lawsuit …" (D.I. 316, ¶ 63). Entropic entirely ignores these additional alleged harms.

## II.   DISH Has Properly Alleged Conspiracy

Entropic also asks this Court to dismiss Count VI, which alleges a conspiracy between Entropic and MaxLinear to launder the asserted patents of the RAND promise attached to them.   As alleged in Count V (only asserted against MaxLinear), MaxLinear committed fraud by making false statements that it would comply with the IPR Policy (*see generally* D.I. 316, ¶¶ 111-122 (Count V)); and in Count VI, DISH alleges that Entropic entered into a conspiracy with MaxLinear to further the fraudulent scheme by constructing a patent assignment document that attempted to remove the RAND promise through a transfer to a purportedly innocent purchaser.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Entropic makes various arguments as to why DISH's pleading is insufficient. These arguments fail.

## A.    DISH Has Properly Alleged All Elements of Conspiracy.

Entropic argues (at 17) that "DISH does not come close to pleading a conspiracy or fraud."  This argument is belied by the actual allegations in the counterclaim complaint which more than sufficiently plead the "when" and "how" of both the fraud and the conspiracy.   The elements of conspiracy are: "(1) the formation and operation of a conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct." *Mintel Learning Tech., Inc. v. Beijing Kaidi Educ.*, 2007 WL 2288329, at *4 (N.D. Cal. Aug. 9, 2007).

DISH's complaint sets forth well-pled factual allegations for each of these elements: **(1)** "On information and belief, both Entropic and MaxLinear conspired to commit fraud and negligent misrepresentation to avoid having to license the Asserted Patents on RAND terms …"  (D.I. 316, ¶ 124.); **(2)** "As discussed above (paragraphs 111-122), MaxLinear made fraudulent and/or negligently false representations that it would license patents essential to the practice of MoCA standards on RAND terms." (*Id.*, ¶ 125; *see also id.*, ¶¶ 126-129.); and (3) "DISH has been harmed by the conspiracy between MaxLinear and Entropic, at least because the significant cost of the instant litigation may have been avoided if Entropic offered DISH a license to the Asserted Patents under RAND terms and conditions."  (*Id.*, ¶ 130; *see also id.*, ¶ 131.) DISH's complaint also adequately alleges circumstantial evidence sufficient to show intent.  *Marble Bridge Funding Grp., Inc. v. Euler Hermes Am. Credit Indem. Co.*, 225 F. Supp. 3d 1034, 1040 (N.D. Cal. 2016) (in a fraud case, recognizing that "[k]nowledge . . . is a question of fact and like any other fact, it may be proved by circumstantial evidence" (internal quotation marks omitted)); *see also United States v. Sanchez-Murillo*, 608 F.2d 1314, 1318 (9th Cir. 1979) (similar).  For example, DISH alleges the "intent of the Conspirators can be inferred by the knowledge each had" about the patents and "regarding MoCA's IPR policies …" (D.I. 316, ¶ 128);

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

and "by the financial relationship between them. . . ."). (*Id.,* ¶ 129.)

Apart from ignoring the allegations in DISH's counterclaim complaint, the only other argument Entropic makes (at 17) is that there are no allegations regarding "when" or "how" it could have formed a conspiracy with MaxLinear because Entropic was only founded a few days before MaxLinear sold it patents. First, there is no rule that a company cannot engage in fraud only days into its existence, and Entropic cites no authority to that point. If anything, that Entropic was formed just days before MaxLinear assigned the patents is further evidence of intent, as (inferring from this fact) Entropic was formed solely as a patent-assertion arm of MaxLinear, created for MaxLinear to sell it its patents in furtherance of the fraud and conspiracy alleged. Second, Count VI contains specific examples of when and how the conspiracy was formed, including identifying Original Entropic's and MaxLinear's Annual Reports and the MaxLinear/Entropic Patent Purchase Agreement, all of which support the existence of the conspiracy. (D.I. 316, ¶¶ 112-119.)

## B.   DISH's Allegations Are Plausible.

Second, Entropic argues (at 17-18) that DISH's allegations amount to a "legal impossibility" because Entropic now appears to agree that the asserted patents are subject to the MoCA IPR Policy.

Entropic's argument presents revisionist history. As is set forth in the Counterclaim complaint, there has been considerable back-and-forth concerning whether the patents are subject to RAND and regarding Entropic's failure to provide any RAND offer (or any offer at all). (*See, e.g.*, D.I. 316, ¶¶ 36-57.) That Entropic's CEO made vague references to RAND in one of the many pre-suit letters is of little consequence, as Entropic never followed through on the illusory statement. (*See, e.g.,* D.I. 316-8.) Moreover, neither Entropic nor MaxLinear has made any binding statement that the asserted patents are RAND-encumbered. For example, Entropic could do so simply by agreeing to the relief requested in Count I of DISH's counterclaims. That Entropic has not done this raises significant questions about the

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  veracity of Entropic's purported eleventh-hour change of heart.

2      Entropic's arguments concerning the Patent Purchase Agreement ("PPA") are

3  wrong.  Entropic argues (at 17-18) that the "MoCA RAND encumbrance *is expressly*

4  *listed* in the PPA."  (Emphasis in original.)  Yet, as alleged in DISH's counterclaim

5  complaint, MaxLinear specifically represented that the patents it transferred to

6  Entropic were ███████████████████████████████████████████████████████████

7  ██████████████████, which makes *no mention of MoCA or RAND*.  (*See* D.I. 316,

8  ¶ 47; D.I. 316-7 at § 3.1 (providing that ███████████████████████████████████

9  ████████████████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████████

11 ██████████████) (emphasis added); *id.* at § 5.3.1 ██████████████████████████

12 ████████████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████.

14     The provision Entropic points to as supposed evidence of the "legal

15 impossibility" of DISH's claims has nothing to do with encumbrances.  Rather, that

16 provision simply states that MaxLinear ███████████████████████████████████████

17 ████████████████████████████████████████████████████████████████████████████

18 ████████████████████████████ (D.I. 316-7, § 5.7.) █████████████████████████

19 █████████████████████████████ (*Id.* Exhibit I.)  Significantly, the section

20 identified by Entropic has a second, independent requirement—that the seller list

21 ████████████████████████████████████████████████████████████████████████████

22 ███████████████████████████ (*Id.* § 5.7.)  Nowhere did MaxLinear

23 identify such Commitments—not in the body of the agreement and not in any exhibit

24 to the agreement.  Indeed, given that MaxLinear elsewhere in the agreement

25 specifically asserted the patents were ████████████████ of any encumbrances, there is

26 no reasonable way to read the agreement as specifically requiring that the purchaser

27 (Entropic) maintain, or even informing the purchaser of, the RAND promises.

28     Entropic's assertion that the RAND promise is binding on successors-in-

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

interest, regardless of notice, is another last-ditch attempt to avoid the consequences of the actions underlying DISH's claims for fraud and conspiracy. Contrary to Entropic's assertion, the law is not settled on this point—the only relevant case Entropic cites simply holds that licenses (not RAND commitments) follow with the patent, regardless of notice. *See, e.g., Innovus Prime, LLC*, 2013 WL 3354390, at *5 (N.D. Cal. Jul. 2, 2013) (explaining that a covenant not to sue, i.e. a non-exclusive license, was binding on purchaser or patent). Notably, the other case Entropic cites indicates that ***not all*** encumbrances follow with the patent. *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008) (holding that arbitration clause in a license agreement was not binding on later assignee). Moreover, the longstanding default rule for property (including patents) favors bona-fide innocent purchasers. *See, e.g., Klang v. Pflueger*, 2014 WL 4922401, at *5 (C.D. Cal. July 10, 2014) ("The bona fide purchaser rule applies in patent law and provides that a purchaser for value and without notice of prior encumbrances takes ownership interest of the property free of those prior encumbrances."); *see also* 35 U.S.C. § 261 (stating that "patents shall have the attributes of personal property" and endorsing the bona fide purchaser rule).

Given this uncertainty, and the facts set forth in DISH's complaint, it is at least plausible that Entropic and MaxLinear engaged in the conspiracy alleged. "Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the alleged wrongdoing]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007); *see also Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011); *Cousins*, 568 F.3d at 1067 (stating that at motion to dismiss stage allegations must construed in a light most favorable to non-movant). That Entropic ***now*** appears to have abandoned the alleged fraud—or at least now says that it has come around to the view shared by DISH that the patents are subject to RAND—is immaterial. Entropic ***still*** has not provided any RAND offer to DISH. And even if it had, DISH's

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

counterclaim complaint alleges past acts, undertaken by MaxLinear and Entropic together.  Entropic cannot undo those actions, nor the harm to DISH caused by them, by coming around to the correct view.

### C.   DISH Adequately Alleges It Has Been Harmed by the Conspiracy.

Lastly, Entropic argues (at 19-20) that DISH has failed to allege it was harmed by the conspiracy.  Entropic is again wrong.

Entropic begins (at 19) by arguing that there can be no harm because the RAND obligation "lives on."  This is the same "legal impossibility" argument addressed just above in Section II.B, and for the same reasons Entropic's argument fails here.

Entropic next argues (at 19) that, because DISH's harm stems from Entropic's failure to offer RAND terms, it cannot also have been harmed by the conspiracy.  The alleged conspiracy is part and parcel with Entropic's failure to offer a RAND license.  The conspiracy led to Entropic's failure to offer a RAND license because, as alleged, the conspirators sought to remove the RAND encumbrance from the asserted patents.  Indeed, the harms stemming from the conspiracy are exactly the ones courts have recognized as cognizable injuries.  *See, e.g.*, *HTC Corp. v. Telefonaktiebolaget LM Ericsson*, 2018 WL 6617795, at *4–5 (E.D. Tex. Dec. 17, 2018) (finding deprivation of contractual right to RAND license supported existence of injury in fact).

Lastly, Entropic points to the American rule (at 19-20), claiming that the attorneys' fees DISH has had to expend in this case are insufficient harm.  The authorities are to the contrary.  For example, the Ninth Circuit has held that the American Rule did not prohibit a party from seeking its attorneys' fees as damages for a breach of an IPR Policy promulgated by a standards-setting organization.  *See, e.g., Microsoft*, 795 F.3d at 1050.  Indeed, treating attorneys' fees as damages in the context of RAND commitment "makes particular sense in light of the purpose of the RAND commitment, which is to encourage widespread adoption of the standard."  *Id.* at 1051 (internal quotation marks omitted).  "That purpose would be substantially defeated if adopting the standard" would expose implementers to "absorb the cost of

defending themselves" in lawsuits that could otherwise be avoided had the RAND-related promises been followed.  *Id.*; *accord Evolved Wireless, LLC v. Apple, Inc.*, 2019 WL 831112, at *6 (D. Del. Feb. 21, 2019) (allowing attorneys' fees as damages resulting from a breach of an IPR Policy).  There is no reason the rule should be different for fraudulent attempts to remove a RAND promise, especially where (as here) "attorneys' fees are a fair measure of the harm impermissibly caused by the defendant."  *Microsoft*, 795 F.3d at 1050; *see also Zuniga v. United Can Co.*, 812 F.2d 443, 455 (9th Cir.1987) (explaining that "the traditional American rule that attorney fees are not ordinarily recoverable" does not "affect[ ] those cases in which attorney fees are not awarded to the successful litigant in the case at hand, but rather are the subject of the law suit itself"); *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1088 (N.D. Cal. 2007) (allowing "attorneys' fees from patent litigation" to "be awarded as antitrust damages").

## III.    DISH Has Properly Alleged Violations of Antitrust Law

Entropic also moves this Court to dismiss Counts VIII-XI, which allege violations of Federal and state antitrust laws.  These counts generally stem from the same nucleus of fact—that MaxLinear and Entropic entered an unlawful combination in restraint of trade by attempting to "wash" the asserted patents of RAND promises by transferring them (without mention of RAND encumbrances) to a purported innocent purchaser.  (*See generally* D.I. 316, ¶¶ 139.)  As DISH has alleged, this combination violated Section 1 of the Sherman Act (Count VIII); the California Cartwright Act (Count IX); and the California Business & Professions Code (Count XI).

Though Entropic asks this Court to dismiss each of these claims, it makes no separate argument concerning the California law claims (Counts IX and XI) and largely references its arguments on the federal claims.  DISH therefore responds to MaxLinear's arguments concerning both federal claims below and those arguments apply equally to the California law claims.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## A.    DISH Has Adequately Pled a Violation of the Sherman Act.

"To state a claim under Section 1 of the Sherman Act," a plaintiff must plead facts that would prove "(1) a contract, combination or conspiracy amongst two or more persons or distinct business entities; (2) by which the persons intended to harm or restrain trade or commerce among the several states, or with foreign nations; and (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

DISH's counterclaim complaint properly alleges each of these elements:

**(1)** "As discussed above, MaxLinear executed a Patent Purchase Agreement with Entropic that transferred ownership of the Asserted Patents. As also discussed above (*see* paragraphs 124-131) MaxLinear and Entropic entered into this agreement in an attempt to 'wash' the Asserted Patents of any obligation to license on RAND terms, despite each's obligation to do so pursuant to the MoCA IPR Policy." (D.I. 316, ¶ 144.) "Entropic and MaxLinear attempted to 'wash' the asserted patents of RAND-obligations in order to charge exorbitantly-high licensing fees (such as the $1 billion dollar demand made by Entropic)—thus driving up the cost of home networking and home television services for end users." (*Id.*, ¶ 145.)

**(2)** "There is a market in the United States for home networking. …" (*Id.*, ¶ 141.) "There is also a market in the United States for home television services. …" (*Id.* ¶ 142.) "[B]ecause (on information and belief), a purpose of the Patent Purchase Agreement was to avoid a RAND obligation, the intent of Entropic and MaxLinear was to engage in monopolistic behavior and unreasonably harm competition in the market for home networking and home television services. …" (*Id.* ¶ 145.)

**(3)** "Competition in the relevant markets has been injured as a result of Entropic's and MaxLinear's behavior. By way of example, MaxLinear's and Entropic's behavior forces the providers of home television services to engage in expensive litigation (rather than negotiate a RAND license)—costs that must eventually be passed on to end-users. Moreover, if Entropic gets its demand for $1

billion, those costs must also be additionally passed on to end-users of home television services, further driving up the costs. …"  (*Id.* ¶ 146.)

Most of Entropic's arguments in favor of dismissal are re-hashes of arguments raised elsewhere, and already addressed above.  For example, as it does repeatedly in its brief, Entropic's primary argument appears to be based on its now-apparent view that the RAND promise must run with the patents, regardless of notice.  That Entropic views the facts differently, or has had a change of heart, though, is no reason to dismiss.   Beyond these re-hashed arguments, Entropic does present a few unique arguments, none of which have merit.  We address each below.

## 1.    DISH Adequately Alleges Anti-Competitive Injury.

Entropic argues (at 22) that DISH has not, and cannot, plead that the scheme to remove RAND encumbrances from the asserted patents injures competition.  DISH's counterclaim complaint, though, does exactly that.  It alleges that, as a result of the scheme, Entropic has demanded non-RAND licensing rates, including $1 billion from DISH alone.  (*See, e.g.,* D.I. 316 at ¶ 145 ("Entropic and MaxLinear attempted to "wash" the asserted patents of RAND-obligations in order to charge exorbitantly-high licensing fees (such as the $1 billion dollar demand made by Entropic)—thus driving up the cost of home networking and home television services for end users.").)  The *Vizio* case Entropic cites is not to the contrary, as all it holds is that "the transfer of a valid patent 'has no antitrust significance,' but 'merely shifts a lawful monopoly into different hands'"—even where (as alleged in that case) obtaining the patents gives the recipient greater market power.  *Vizio, Inc. v. Funai Elec. Co.*, 2010 WL 7762624, at *4 (C.D. Cal. Feb. 3, 2010).  Here, though, DISH's antitrust allegations, including harm, do not stem from a straightforward transfer of patents from MaxLinear to Entropic.  Rather, the antitrust violation and harm arises from the attempt to remove a RAND promise from essential patents.

Entropic also argues (at 22-23) that its actions cannot harm competition because it is suing all users of MoCA technology—thus apparently leveling the

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

competitive playing field.  This argument ignores several things.  For one, MoCA is not the only technology in the markets identified by DISH.  For example, WiFi may be used both for home networking and for transmitting television signals within a home.[4]  (*See* D.I. 316 at ¶¶ 141-142 (identifying the markets affected).)  Thus, the providers within the TV and home networking markets who opted to use MoCA technology are competitively harmed as compared to those providers that opted to use different technologies.   In any event, DISH's counterclaim complaint includes allegations (which must be taken as true at this stage) that consumers in each of these markets will be harmed by unjustifiably higher prices—exactly the type of injury "the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp v Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 489 (1977); *see also Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1096–97 (1st Cir. 1994) ("Anticompetitive effects, more commonly referred  to as 'injury to competition' or 'harm to the competitive process,' are usually measured by a reduction in output and an increase in prices in the relevant market.").

## 2.     DISH Adequately Alleges Anti-Competitive Effect.

Entropic argues (at 23-24) that DISH has failed to plead anti-competitive effect. Entropic's arguments are confusing and attempt to overcomplicate what (as set forth in DISH's counterclaim complaint) is a straightforward theory of anti-competitive effect.  According to the DISH counterclaim complaint:

- MaxLinear and Entropic concocted a scheme to transfer patents to remove RAND encumbrances from those patents with the goal of obtaining vastly greater royalty demands than could be obtained from RAND-encumbered patents.  (*See, e.g.,* D.I. 316 at ¶ 145.)
- Believing itself to be unconstrained by RAND, Entropic refused to offer RAND

---

[4]  *See, e.g.,* "Install a Wireless Access Point and U-verse TV receiver," AT&T, https://www.att.com/support/article/u-verse-tv/KM1009882 (last visited March 2, 2024); "FiOS TV," Verizon, https://www.verizon.com/home/fios-tv/ (last visited March 2, 2024) (explaining that, because the set-top boxes are "connected to the main unit *by Wi-Fi*, they do not need coax cables").

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

terms and instead filed the present suit, demanding $1 billion in damages, an enormous amount given the size of DISH.  (*See id.*, ¶ 146.)

- As a result of Entropic and MaxLinear's actions, DISH has incurred significant expense defending itself in a lawsuit that could have been avoided; and will have to pay an exorbitant sum if Entropic gets what it has demanded.  These costs may have to be passed on to its customers.  (*See id.*)

Whether a combination has an anti-competitive effect is determined through application of a flexible "rule of reason" analysis which "compares the costs and benefits of a restraint of trade, and permits even significant restrictions if the benefits outweigh the costs."  *Gen. Commercial Packaging, Inc. v. TPS Package Eng'g, Inc.*, 126 F.3d 1131, 1133 (9th Cir. 1997), *as amended on denial of reh'g and reh'g en banc* (9th Cir. Sept. 16, 1997).  It doesn't take much reasoning, though, to determine that MaxLinear's and Entropic's actions present a significant risk of competitive harm to the consumer based on the factual allegations set forth above.

Entropic's arguments confuse what must be pled at the pleadings stage and what must be proven at summary judgment.  For example, Entropic cites (at 23) the Supreme Court's decision in *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018), for the proposition that anti-competitive effects must be shown with "proof of actual detrimental effects…"  Entropic, ignores, though, that that the Supreme Court's decision resulted from an appeal following a 7-week bench trial.  *See id.* at 2293.  Yet Entropic would have this Court dismiss DISH's complaint for alleged lack of proof before DISH has even had a chance to take discovery.

Entropic next argues (at 23) that this Court should ignore its $1 billion demand, arguing that (perhaps) it wasn't serious about making it and because no one has paid it.  But Entropic made that demand in a public pleading signed by counsel and subject to Rule 11, and its assertion that it seeks $1 billion in damages must be taken seriously. Moreover, contrary to Entropic's assertions (at 24), this demand was directed specifically to DISH for alleged infringement of the asserted patents, as it appears in

1  Entropic's portion of the Joint Rule 26(f) report *filed in this case*.  (D.I. 76 at 11; *see*

2  *also* D.I. 316 at ¶ 56.)  These and other factual issues are inappropriately decided on

3  a motion to dismiss.

4        Lastly, Entropic invokes the *Hynix* doctrine (at 24), claiming that DISH's

5  allegations of litigation fees are insufficient because there is no "independent

6  competitive injury."  Not so.  The *Hynix* doctrine—an extension of the *Noerr-*

7  *Pennington* doctrine (discussed further below)—applies when a party alleges antitrust

8  liability for actions taken while petitioning the government.  *See, e.g., Hynix*

9  *Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1088 (N.D. Cal. 2007).  In

10 particular, the court in *Hynix* grappled with the question of whether *Noerr-Pennington*

11 immunity applied where one part of the antitrust scheme involves patent litigation.

12 *See id.*  The result: "a plaintiff seeking to establish the right to antitrust damages from

13 petitioning activity . . . must plausibly allege: (1) the existence of an independent

14 anticompetitive injury and (2) a causal connection between the petitioning conduct

15 and the pre-existing anticompetitive injury."  *AliveCor, Inc. v. Apple Inc.*, 2023 WL

16 9181478, at *4 (N.D. Cal. June 30, 2023).

17       Both prongs are easily met here.  DISH has alleged that MaxLinear and

18 Entropic entered into a contract designed to remove RAND encumbrances from the

19 asserted patents.  (D.I. 316, ¶ 145.)  As the Court in *Hynix* itself recognized, standards

20 body misconduct—such as circumventing the IPR Policy as alleged here—"can be

21 considered anticompetitive conduct under the Sherman Act" and "can independently

22 qualify as an anticompetitive harm."  *See, Hynix*, 527 F. Supp. 2d at 1098.  DISH has

23 further alleged that, as a result of this scheme, Entropic refused to provide a RAND

24 offer and instead filed suit, demanding $1 billion.  (*See id.*, ¶ 146.)  Indeed, courts

25 have allowed attorneys' fees in closely-analogous situations. *See, e.g., Microsoft*, 795

26 F.3d at 1050.  Thus, as alleged, there is a causal connection between the antitrust

27 injury and the later lawsuit.

28

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

### B.     DISH's Antitrust Claims Are Not Barred by the *Noerr-Pennington* Doctrine.

As a last-ditch effort, Entropic argues that DISH's counterclaims are barred by the *Noerr-Pennington* doctrine.  They are not.

Contrary to Entropic's assertions, DISH's antitrust counterclaim does not arise from the prosecution of a lawsuit.  Rather, as is explicit in the counterclaims, the antitrust violation arises from the *assignment* of the asserted patents—in other words, from an unlawful *contract*.  As courts have universally found, the *Noerr-Pennington* doctrine does not protect non-petitioning activity, such as the private agreement between MaxLinear and Entropic here.  *See, e.g., In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 635 (E.D. Mich. 2000) (finding that *Noerr-Pennington* did not immunize party for entering into a private agreement).  This is true even where follow up to the contract may involve some sort of petitioning to the government (such as the subsequent filing of this lawsuit by Entropic).  *See, e.g., Columbia Steel Casting Co. v. Portland Gen. Elec. Co.*, 111 F.3d 1427, 1446 (9th Cir. 1996) (finding *Noerr-Pennington* doctrine inapplicable to antitrust claim where liability was predicated on an agreement rather than follow up activity relating to submitting an application to the government). "This principle follows in part from basic notions of causation: namely, when the government acts based on petitioning, any purportedly unlawful result is most proximately caused by government action, not by the private petitioning." *Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, 2017 WL 1178224, at *3 (N.D. Ill. Mar. 30, 2017).  "Conversely, where private parties take unlawful action merely hoping the government will later ratify it, government action is not an intervening cause, and *Noerr-Pennington* immunity does not arise." *Id*. Thus, the "doctrine applies when [anti-competitive] action is the consequence of legislation or other governmental action, not when it is the means for obtaining such action." *Id.* at *6 (quotation marks omitted); *see also Hynix Semiconductor Inc. v. Rambus, Inc.*, 2006 WL 1883353, at *2 (N.D. Cal. July 7, 2006) (holding that *Noerr–Pennington*

immunity applies only to protected litigation-related activities, but would not immunize defendant from antitrust claims premised on broader unlawful course of anticompetitive conduct).

None of the cases cited by Entropic show otherwise.  Entropic cites, for example, *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*, 2016 WL 7049263, at *2-4 (C.D. Cal. Aug. 9, 2016), but that case simply explains that antitrust liability cannot stem from a legitimately-filed patent-infringment suit. As discussed above, DISH's antitrust allegations do not stem from the filing of this suit, but rather the scheme to remove RAND encumbrances from the asserted patents. So too with *In re Innovatio IP Ventures, LLC Pat. Litig.*, 921 F. Supp. 2d 903, 922 (N.D. Ill. Feb. 4, 2013), *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1076 (W.D. Wis. Aug. 10, 2012)—both of which again involved nothing more than the filing of a patent infringement suit.

## IV.   DISH Will Withdraw Its Patent Misuse Counterclaim

Lastly, Entropic argues for dismissal of DISH's patent misuse counterclaim, arguing that patent misuse is not an affirmative claim and that it is duplicative of DISH's affirmative patent misuse affirmative defense.  Though DISH disagrees that patent misuse cannot be raised as a counterclaim, and disagrees with Entropic's characterization and arguments concerning misuse, DISH is sensitive to the duplication between DISH's affirmative defenses and the counterclaim.  Accordingly, to prevent duplicative efforts, DISH withdraws patent misuse as a counterclaim but maintains it as an affirmative defense.  For the avoidance of doubt, DISH continues to maintain that patent misuse is one of the predicate acts for its claim for violation of the California and Business Professions Code.  (*See, e.g.,* D.I. 316, ¶ 161.)

## CONCLUSION

For the reasons explained above, DISH respectfully requests that this Court deny Entropic's motion to dismiss.

1  Dated:  March 5, 2024                    FISH & RICHARDSON P.C.

2

3                                           By: */s/ Oliver Richards*
                                               Oliver Richards (SBN 310972)
4                                              orichards@fr.com
                                               John-Paul Fryckman (SBN 317591)
5                                              fryckman@fr.com
                                               Fish & Richardson P.C.
6                                              12860 El Camino Real, Suite 400
                                               San Diego, CA 92130
7                                              Tel: (858) 678-5070

8                                              Christopher S. Marchese (SBN 170239)
9                                              marchese@fr.com
                                               Tyler R. Train (SBN 318998)
10                                             train@fr.com
                                               633 West Fifth Street, 26th Floor
11                                             Los Angeles, CA 90071
                                               Tel: (213) 533-4240
12

13                                             Adam R. Shartzer *(pro hac vice)*
                                               Ruffin B. Cordell *(pro hac vice)*
14                                             cordell@fr.com
                                               Richard A. Sterba *(pro hac vice)*
15                                             sterba@fr.com
                                               Ralph A. Phillips *(pro hac vice)*
16                                             rphillips@fr.com
                                               shartzer@fr.com
17                                             Michael J. Ballanco *(pro hac vice)*
                                               ballanco@fr.com
18                                             Taylor C. Burgener (SBN 348769)
19                                             burgener@fr.com
                                               FISH & RICHARDSON P.C.
20                                             1000 Maine Ave., SW, Suite 1000
                                               Washington, DC 20024
21                                             Tel: (202) 783-5070
22

23                                             David M. Barkan (SBN 160825)
                                               barkan@fr.com
24                                             FISH & RICHARDSON P.C.
                                               500 Arguello Street, Suite 400
25                                             Redwood City, CA 94063
                                               Tel: (650) 839-5070
26

27                                             Ashley A. Bolt *(pro hac vice)*
                                               bolt@fr.com
28                                             FISH & RICHARDSON P.C.

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

1180 Peachtree Street NE, 21st Floor
Atlanta, GA 30309
Tel: (404) 892-5005

Aaron P. Pirouznia (*pro hac vice*)
pirouznia@fr.com
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
Tel: (214) 292-4073
Fax: (214) 747-2091

Attorneys for Defendants and Counter-Claimants DISH Network Corporation, et al.