1  DAVID M. KEYZER (SB# 248585)
   david@keyzerlaw.com
2  LAW OFFICE OF DAVID KEYZER, P.C.
   5170 Golden Foothill Parkway
3  El Dorado Hills, CA 95762
   Telephone: (916) 243-5259
4  Facsimile: (916) 404-0436

5

6

7

**F I L E D**
CLERK, U.S. DISTRICT COURT

**4/22/24**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____cla_____ DEPUTY

~~**UNDER SEAL**~~

REDACTED

8              UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
9                  SOUTHERN DIVISION

10  ENTROPIC COMMUNICATIONS, LLC,     §
                                      §
11         Plaintiff,                 §    Case No. 2:23-cv-01043-JWH-KES
                                      §       LEAD CASE
12     v.                             §
                                      §    Case No. 2:23-cv-01049-JWH-KES
13  DISH NETWORK CORPORATION,         §       LEAD CASE
    et al.,                           §
14         Defendants.                §
    _____  §    Hon. John W. Holcomb
15                                    §    Special Master David M. Keyzer
    ENTROPIC COMMUNICATIONS, LLC,     §
16         Plaintiff,                 §    ~~**SEALED**~~  REDACTED
                                      §    **SPECIAL MASTER REPORT AND**
17     v.                             §    **RECOMMENDATION ON**
                                      §    **MOTIONS REFERRED BY THE**
18  COX COMMUNICATIONS, INC., et al., §    **COURT ON FEBRUARY 9, 2024,**
           Defendants.                §    **AND MARCH 26, 2024**
19                                    §

20

Pursuant to the Court's July 5, 2023 Order Appointing David Keyzer, Esq. as Special Master for Discovery Purposes (Civil Action No. 2:23-cv-1043 ("-1043"), Dkt. 74; Civil Action No. 2:23-cv-1049 ("-1049"), Dkt. 62), the Court's February 9, 2024 Order Referring Matters to Special Master (-1043, Dkt. 343; -1049, Dkt. 240), and the Court's March 26, 2024 Order Referring Matters to Special Master (-1043, Dkt. 431), the Special Master herein addresses motions involving Plaintiff Entropic Communications, LLC ("Plaintiff" or "Entropic"), Defendants Cox Communications, Inc., CoxCom LLC, and Cox Communications California, LLC (collectively, the "Cox Defendants" or simply "Cox"), Defendants DISH Network Corporation, DISH Network L.L.C., Dish Network Service L.L.C., DISH Network California Service Corporation, and Counterclaim-Plaintiff DISH Technologies, L.L.C. (collectively, "DISH"), and Counter-Defendants MaxLinear, Inc. and MaxLinear Communications, LLC (collectively, "MaxLinear").

Entropic alleges patent infringement by Cox and DISH, and Cox and DISH bring counterclaims against Entropic and MaxLinear.  Now before the Special Master upon referral by the Court are the following:

> MaxLinear's Motion to Dismiss Amended Counterclaims of Cox Communications, Inc., CoxCom, LLC, and Cox Communications California LLC (-1043, Dkt. 320 (redacted), Dkt. 335 (sealed)), Cox's opposition (Dkt. 385 (redacted); Dkt. 384-1 (sealed)), and MaxLinear's reply (Dkt. 407 (redacted); Dkt. 426 (sealed));
>
> Entropic's Motion to Dismiss Cox Defendants' Amended Counterclaims Pursuant to Rule 12(b)(6) (-1043, Dkt. 327 (redacted); Dkt. 336 (sealed)),

Cox's opposition (Dkt. 381 (redacted); Dkt. 380-1 (sealed)), and Entropic's reply (Dkt. 415 (redacted); Dkt. 425 (sealed));

MaxLinear's Motion to Dismiss Amended Counterclaims of Cox Communications, Inc., CoxCom, LLC, and Cox Communications California LLC (-1049, Dkt. 219 (redacted); Dkt. 235 (sealed)), Cox's opposition (Dkt. 271 (redacted); Dkt. 267-1 (sealed)), and MaxLinear's reply (Dkt. 282 (redacted); Dkt. 287 (sealed));

Entropic's Motion to Dismiss Cox Defendants' Amended Counterclaims Pursuant to Rule 12(b)(6) (-1049, Dkt. 226 (redacted); Dkt. 234 (sealed)), Cox's opposition (Dkt. 272 (redacted); Dkt. 270-1 (sealed)), and Entropic's reply (Dkt. 283);

MaxLinear's Motion to Dismiss (1) Amended Counterclaims by DISH Network California Service Corporation; and (2) Counterclaims by DISH Network Corporation, DISH Network L.L.C., DISH Network Service L.L.C., and DISH Technologies, L.L.C. (-1043, Dkt. 357 (redacted); Dkt. 371 (sealed)), DISH's opposition (Dkt. 389 (redacted); Dkt. 402 (sealed)), and MaxLinear's reply (Dkt. 411 (redacted); Dkt. 427 (sealed)); and

Entropic's Motion to Dismiss DISH's Counterclaims Pursuant to Rule 12(b)(6) (-1043, Dkt. 361 (redacted); Dkt. 363-1 (sealed)), DISH's opposition (Dkt. 395 (redacted); Dkt. 403 (sealed)), and Entropic's reply (Dkt. 420-1 (sealed)).

The Special Master held a hearing on April 11, 2024.  (-1043, Dkt. 445-1, Special Master Minutes; -1049, Dkt. 298-1, Special Master Minutes; *see* -1043, Dkt. 435-1, Special Master Order No. SM-18 (setting hearing); -1049, Dkt. 292-1 (same).)

To facilitate review of this Report and Recommendation, a Table of Contents is provided here:

<u>Table of Contents</u>

**I. Legal Principles** ................................................................................................7

   A. Rule 12(b)(1)—Lack of Subject Matter Jurisdiction ...............................7

   B. Rule 12(b)(6)—Failure to State a Claim .................................................8

**II.  Requests for Judicial Notice** ...........................................................................9

**III.  Entropic's Motions to Dismiss Cox Defendants' Amended Counterclaims (-1043, Dkt. 327; -1049, Dkt. 226)** ..................................................................10

   A.  Entropic's Motion to Dismiss Cox Defendants' Amended Counterclaims Pursuant to Rule 12(b)(6) (-1043, Dkt. 327) .................................................10

     (1) Tortious Interference (Count III) .......................................................10

      (a)  MaxLinear's Assignment of Patents to Entropic ........................11

       (i)  Injury ...............................................................................11

       (ii)  Breach .............................................................................14

      (b)  Disclosure of MoCA Documents ...............................................22

       (i)  Sufficiency of Allegations ................................................22

       (ii)  Supplemental Jurisdiction ..............................................25

      (c)  Conclusion ..................................................................................27

     (2)  Declaratory Judgment (Count II) ......................................................27

     (3)  Leave to Amend ...............................................................................28

   B.  Entropic's Motion to Dismiss Cox Defendants' Amended Counterclaims Pursuant to Rule 12(b)(6) (-1049, Dkt. 226) ..............................................28

     (1)  Tortious Interference (Count III) ......................................................29

      (a)  Parties to Agreement ..................................................................29

      (b)  Acts by Entropic ........................................................................31

      (c)  Injury..........................................................................................32

      (d)  Breach ........................................................................................34

      (e)  Conclusion ..................................................................................37

     (2)  Declaratory Judgment (Count II) ......................................................37

     (3)  Leave to Amend ...............................................................................38

**IV.  MaxLinear's Motions to Dismiss Cox Defendants' Amended Counterclaims (-1043, Dkt. 320; -1049, Dkt. 219)** ................................................................39

A.  MaxLinear's Motion to Dismiss Counterclaims Regarding MoCA IPR Policy (-1043, Dkt. 320)........................................................................................39

(1)  Breach of Contract (Count I)...........................................................39

(a)  Subject Matter Jurisdiction.........................................................39

(i)  Standing of CoxCom and Cox California............................39

(ii)  Request for a RAND License.............................................42

(iii)  Injury-in-Fact....................................................................43

(iv)  Ripeness.............................................................................45

(v)  Conclusion...........................................................................47

(b)  Sufficiency of Allegations.........................................................47

(i) Identifying the Operative Contract(s)...................................47

(ii) References Back to Prior Pleading......................................48

(iii) Reciting the Terms..............................................................48

(iv)  Privity................................................................................49

(v)  Performance.........................................................................49

(vi)  Breach.................................................................................51

(vii)  Damages.............................................................................52

(viii)  Conclusion........................................................................53

(2)  Declaratory Judgment (Count II).....................................................53

(3)  Unjust Enrichment or Quasi-Contract (Count IV)...........................55

(4)  Leave to Amend...............................................................................57

B.  MaxLinear's Motion to Dismiss Counterclaims Regarding ██████████ (-1049, Dkt. 219).......................................................................................58

(1)  Subject Matter Jurisdiction.............................................................58

(a)  Parties to ████████████.........................................................58

(b)  Scope of ████████████...........................................................60

(c)  Ripeness.....................................................................................61

(d)  Injury..........................................................................................62

(e)  Conclusion..................................................................................64

(2)  Sufficiency of Allegations..............................................................64

(a)  Breach of Contract (Count I).....................................................64

(i)  Formation of Contract and the Parties Thereto ............................................ 64

(ii)  Performance ............................................................................................. 66

(iii)  Breach ................................................................................................... 67

(iv)  Damages ............................................................................................... 69

(v)  Conclusion ............................................................................................ 70

(b)  Declaratory Judgment (Count II) ............................................................. 70

(c)  Unjust Enrichment or Quasi-Contract (Count IV) .................................... 72

(d)  Leave to Amend ...................................................................................... 74

**V.  Entropic's Motion to Dismiss DISH's Counterclaims (-1043, Dkt. 361) .............. 75**

A.  Breach of Contract (Count III) ..................................................................... 75

B.  Conspiracy (Count VI) ................................................................................. 76

C.  Sherman Act (Count VIII) and Cartwright Act (Count IX) ............................ 79

D.  Patent Misuse (Count X) .............................................................................. 85

E.  California Unfair Competition Law (Count XI) .............................................. 85

F.  Leave to Amend .......................................................................................... 86

**VI.  MaxLinear's Motion to Dismiss DISH's Counterclaims (-1043, Dkt. 357) ........ 86**

A.  Breach of Contract (Count IV) ..................................................................... 87

B.  Fraud/Misrepresentation (Count V) .............................................................. 88

C.  Conspiracy (Count VI) ................................................................................. 90

D.  Quasi-Contract or Unjust Enrichment (Count VII) ....................................... 91

E.  Sherman Act (Count VIII) and Cartwright Act (Count IX) ............................ 92

F.  Patent Misuse (Count X) .............................................................................. 93

G.  California Unfair Competition Law (Count XI) ............................................. 93

H.  Leave to Amend .......................................................................................... 94

**VII.  Recommended Dispositions ................................................................................. 94**

# I.  Legal Principles

## A. Rule 12(b)(1)—Lack of Subject Matter Jurisdiction

As the party seeking to invoke the federal court's jurisdiction, the plaintiff has the burden of alleging specific facts sufficient to prove Article III standing.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  When a plaintiff lacks standing, the Federal Rules of Civil Procedure allow the defendant to move to dismiss for lack of subject matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  The plaintiff bears the burden of demonstrating standing "for each claim" and "for each form of relief" that it seeks.  *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, 352 (2006) (internal citations and quotations omitted).  The court should dismiss an action when the face of the complaint does not demonstrate a basis for standing.  *See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003); Fed. R. Civ. P. 8(a) & 12(b)(1).

"Under Rule 12(b)(1), a defendant may challenge the plaintiff's jurisdictional allegations in one of two ways."  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  A *facial* attack accepts the plaintiff's allegations as true but asserts that they "are insufficient on their face to invoke federal jurisdiction."  *Id.* (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).  The court resolves a facial attack "as it would a motion to dismiss under Rule 12(b)(6)": in accepting the plaintiff's allegations as true and drawing all reasonable inferences in its favor, the court determines "whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction."

*Id.*  By contrast, a *factual* attack contests "the truth of the plaintiff's factual allegations," typically by introducing evidence outside the pleadings.  *Id.*  "When the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with 'competent proof,' under the same evidentiary standard that governs in the summary judgment context."  *Id.* (internal citation omitted).  The plaintiff bears the burden of proving—by a preponderance of the evidence—that it meets each of the requirements for subject matter jurisdiction, with one caveat: if the existence of jurisdiction turns on "disputed factual issues," then the court itself may resolve those factual disputes.  *Id.*

**B. Rule 12(b)(6)—Failure to State a Claim**

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint.  *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  In ruling on a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party."  *Am. Family Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1120 (9th Cir. 2002).  Although a complaint attacked through a Rule 12(b)(6) motion "does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

To state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions.  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Factual allegations must be enough to raise a right to relief

above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Twombly*, 550 U.S. at 555 (citations and footnote omitted).  Accordingly, to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," which means that a plaintiff must plead sufficient factual content to "allow[] the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A complaint must contain "well-pleaded facts" from which the Court can "infer more than the mere possibility of misconduct." *Id.* at 679.

## II.  Requests for Judicial Notice

Before the Special Master are the following requests for judicial notice:

Request for Judicial Notice in Support of Counter-Defendants MaxLinear, Inc. and MaxLinear Communications LLC's Motion to Dismiss Amended Counterclaims by Cox Communications, Inc., CoxCom, LLC, and Cox Communications California, LLC (-1043, Dkt. 323);

Request for Judicial Notice in Support of MaxLinear, Inc. and MaxLinear Communications LLC's Notice of Motion and Motion to Dismiss (1) Amended Counterclaims By Dish Network California Service Corporation; and (2) Counterclaims by Dish Network Corporation, Dish Network L.L.C., Dish Network Service L.L.C., and Dish Technologies, L.L.C. (-1043, Dkt. 360); and

Request for Judicial Notice in Support of Counter-Defendants MaxLinear, Inc. and MaxLinear Communications LLC's Notice of Motion and Motion to Dismiss Amended Counterclaims by Cox Communications, Inc., CoxCom, LLC, and Cox Communications California, LLC (-1049, Dkt. 222)

Neither Cox nor DISH has opposed these requests for judicial notice.  While a court may take judicial notice of material whose accuracy cannot reasonably be questioned, it may not take judicial notice of a fact that is subject to reasonable dispute. Fed. R. Evid. 201(b).  To that extent, these requests for judicial notice should be granted.

### III.  Entropic's Motions to Dismiss Cox Defendants' Amended Counterclaims (-1043, Dkt. 327; -1049, Dkt. 226)

**A.  Entropic's Motion to Dismiss Cox Defendants' Amended Counterclaims Pursuant to Rule 12(b)(6) (-1043, Dkt. 327)**

Entropic moves to dismiss Count II (declaratory judgment) and Count III (tortious interference) of Cox's Amended Counterclaims (-1043, Dkt. 276) ("Cox Am. Counterclaims (-1043)"), which relate to the Multimedia over Coax Alliance Intellectual Property Rights (IPR) Policy ("MoCA IPR Policy" or "IPR Policy").  (*See* -1043, Dkt. 307, Ex. 3.)  In their briefing and at the April 11, 2024 hearing, the parties referenced two different versions of the MoCA IPR Policy, one dated in 2011 (*id.*) and one dated in 2017 (-1043, Dkt. 360-1, Ex. A), but the parties have not relied on any of the minor differences between the relevant provisions of these two versions.  For the sake of simplicity, this Report and Recommendation refers to only the 2011 version.

(1)  Tortious Interference (Count III)

Cox asserts a state law claim for tortious interference with contract, and, under California law, such a claim requires: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts

designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 824–25 (9th Cir. 2023) (citations omitted).

Entropic submits that the allegations underlying Cox's counterclaim for tortious interference "fall into two basic categories: (i) allegations that the assignment of the Asserted Patents from MaxLinear to Entropic was improper; and (ii) allegations that MaxLinear disclosed confidential MoCA documents to Entropic."  (-1043, Dkt. 335 at 6.)

### (a)  MaxLinear's Assignment of Patents to Entropic

#### (i)  Injury

Entropic argues that "Cox's counterclaim fails because it has pleaded no facts connecting the patent assignments to any legally cognizable harm."  (-1043, Dkt. 335 at 7.)  Entropic argues that "[t]he MoCA IPR Policy does not provide a free license; it does not permit Cox to infringe without paying; and it does not provide Cox any freedom or immunity from lawsuits for such infringement."  (*Id.* at 2.)  Entropic urges that "[a] claim that Entropic did something its predecessor-in-interest, MaxLinear, was contractually authorized to do cannot be a plausible allegation of 'resulting damage' from any alleged breach of the IPR Policy."  (*Id.* at 7 (citation omitted).)  Further, Entropic argues that "there is no merit to Cox's assertion that it is entitled to receive an appropriate license offer from MaxLinear, and *only* MaxLinear."  (*Id.* at 9 (citation omitted).)

1    Cox responds that "the details of the timing and identities of Cox's written request

2    [for a license]" need not be pleaded.  (-1043, Dkt. 380-1 at 24.)  Moreover, Cox argues,

3    "Cox made written requests, including in its amended answer that originally raised its

4    defense (DE 48, ¶¶ 511, 513), the original counterclaims (DE 95), and in Cox

5    Communications' written correspondence referenced in the counterclaims (DE 266-1,

6    ¶ 571)."  (-1043, Dkt. 380-1 at 24.)  Cox further argues that because it was not a MoCA

7    "Alliance Party" at the relevant time, Cox was not subject to the IPR Policy requirement

8    to make a "written request" for a license.  (*Id.* at 25.)  Rather, Cox argues that "Section

9    7.1 is thus the operative provision; it does not specify a 'written' request, but instead says

10   former members like Cox may 'request or require' an appropriate RAND license. (DE

11   266-1, ¶541; DE 94-1, § 7.1.1)," and "Cox met those provisions simply by asserting its

12   defenses and claims. (*See, e.g.,* DE 48; DE 95; DE 266-1)."  (-1043, Dkt. 380-1 at 25.)

13          As to Entropic's argument that it does not matter whether Cox is dealing with

14   Entropic or dealing with MaxLinear, Cox responds that "Cox's averments detailed the

15   importance of the counterparty in these situations."  (*Id.* (citing Cox Am. Counterclaims

16   (-1043) ¶¶ 540–44).)  Cox concludes that "inferences on this motion are drawn in Cox's

17   favor and the inference here is that but-for Plaintiff's interference, no suit would be

18   brought or the identi[t]y of MaxLinear as counterparty would result in far different

19   outcomes on RAND rates."  (*Id.* at 26–27.)

20

Cox interprets Section 4.1.1 of the MoCA IPR Policy as requiring ownership of relevant patents to remain within MoCA (emphasis added):

4.1 Ownership of Rights.

4.1.1 Alliance Party Intellectual Property. All right, title and interest in and to Alliance Party Intellectual Property *shall be owned exclusively by the Alliance Party(ies)* who developed the Intellectual Property or by the *Alliance Party(ies)* to whom the Intellectual Property was properly and legally assigned.

At least for purposes of the pleading stage, Cox's interpretation of Section 4.1.1 is plausible (as discussed further in subsection (ii), below).  Cox thus plausibly alleges harm in the form of losing the benefit of the bargain for only Alliance Parties to own any relevant patents.

Cox also persuasively argues that facing accusations of patent infringement from Entropic rather than from MaxLinear is a potentially cognizable injury.  On one hand, Entropic acknowledges that the patents are subject to RAND obligations, and Entropic submits authority that because a RAND offer must be non-discriminatory, "'the commercial relationship between the licensor and licensee' is irrelevant." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1230–31 (Fed. Cir. 2014) ((quoting *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.1970)).  On the other hand, Cox plausibly alleges that, notwithstanding any RAND obligations, dealing with Entropic is different than dealing with MaxLinear because Entropic is in a different economic and business position than MaxLinear.  For example, Cox cites a Federal Trade

1    Commission report regarding differences in dealing with a non-practicing entity rather

2    than a practicing entity.  (Cox Am. Counterclaims (-1043) § 542.)  Cox's arguments are

3    persuasive at the pleading stage.

4         Cox thus plausibly alleges a cognizable injury.

5                          (ii)  Breach

6         Entropic argues that "the IPR Policy expressly allows for assignments and transfers

7    to third parties."  (-1043, Dkt. 335 at 9.)  Entropic also submits, as to the Patent Purchase

8    Agreement ("PPA") between MaxLinear and Entropic, that "[t]he sections referenced by

9    Cox do not purport to transfer the patent without encumbrances."  (*Id.* at 12 (citation

10   omitted).)  Moreover, Entropic argues that "even if the PPA had purported to transfer the

11   patents without encumbrances, as Cox claims, the counterclaim still fails because legal

12   encumbrances, such as the licensing policy of MoCA, 'run with the patent.'"  (*Id.*

13   (quoting *Datatreasury Corp. v. Wells Fargo & Co.*, 552 F.3d 1368, 1372 (Fed. Cir.

14   2008)).)

15        Cox responds that "MaxLinear transferred numerous patents, including the

16   asserted patents, to [Entropic] via assignments seeking to avoid the RAND encumbrances

17   in exchange for payment and an interest in any profits [Entropic] may receive from

18   assertion of the patents," and "[t]hrough this transfer, MaxLinear breached the MoCA

19   IPR Policy by denying Cox and others the benefit of the fully paid-up license as well as

20

---

assignment obligations, resulting in voidance of the assignment." (-1043, Dkt. 380-1 at 8.) Cox urges that "while [Entropic] knew about MoCA and its policies, it deliberately sought and obtained the patents free of encumbrances from MaxLinear and is now improperly asserting these patents after refusing to provide RAND-compliant offers." (*Id.* at 12; *see id.* at 19.) Further, Cox argues that it adequately alleges an underlying breach of the IPR Policy by MaxLinear because "*either* MaxLinear must continue to own the relevant patents *or* it must 'retain the right to grant any licenses for essential patents via multiple provisions' in the IPR Policy." (*Id.* (citation omitted).) Cox submits that "the required language is absent in the PPA and various assignments filed with the Patent Office." (*Id.* at 21.)

Entropic replies that "[t]he IPR Policy does not require the original patent owner to retain the right to license because the assurance that RAND licenses will continue to be available is that the licensing obligations bind the *successors-in-interest*." (-1043, Dkt. 416-1 at 4.) Entropic argues that Cox's interpretation of the IPR Policy is unreasonable and is contrary to basic principles of patent law because the policy expressly contemplates "successors-in-interest" and also refers to "assignment" of rights, and "'[a]ssignment' in the patent context refers to the transfer of 'all substantial rights' in the patent," "includ[ing] the right to exclude or license others." (*Id.* at 7 (citations omitted).) Entropic also replies that Cox has not requested a license under the IPR Policy because IPR Policy § 7.1 "specifies that former members may request a license 'under Section

5.1,'" "Section 5.1 specifies that requests must be in writing," and "Section 7.1 in no way

grants more rights to *former* members than to *current* members." (*Id.* at 10.)  Further,

Entropic argues that Cox's allegation that Entropic and MaxLinear sought to unencumber

the patents is irrelevant because, even if this were true, an *attempted* breach is not a

breach.  (*Id.* at 11.)  Finally, Entropic argues that Cox "pleads no harm from receiving a

RAND offer from Entropic instead [of MaxLinear]." (*Id.*)

Section 5.1.1 of the IPR Policy states:

5. LICENSES.

5.1 RAND Licenses.

5.1.1 Limited Obligation to License Essential Patent Claims. Subject to the
terms in this IPR Policy, following Board of Director approval of an
Approved Draft Deliverable and upon the *written request* of any other then-
current Alliance Party, each Alliance Party shall offer to license to the
requesting Alliance Party(ies), under the terms of a separate written
agreement, such Alliance Party's and its Affiliates' Essential Patent Claims
to the extent necessary to use, make, have made, offer for sale, sell and
import Fully Compliant Products in conformance with or as described in
such Approved Draft Deliverable. Such licenses shall be non-exclusive, non-
transferable, non-sublicensable, world wide, and on fair, reasonable and
nondiscriminatory terms and conditions (collectively, "RAND") which may
include defensive suspension provisions.  Alliance Party (on behalf of itself
and its Affiliates) hereby agrees that it shall not seek an injunction and
hereby waives its rights to an injunction with respect to infringement of the
Alliance Party's Essential Patent Claims by Fully Compliant Products
against any other Alliance Parties that are entitled to receive a RAND
license as described in this Section. Such waiver of injunctive relief shall not
prohibit the waiving Alliance Party from seeking or receiving damages in
connection with such infringement, nor shall such waiver prohibit the
waiving Alliance Party from seeking injunctive relief against another
Alliance Party that has (i) filed or joined any action in a court of competent
jurisdiction seeking injunctive relief against the waiving Alliance Party

alleging patent infringement; or (ii) is in breach of a license granted pursuant to this Section. Upon joining the Alliance as a Voting Member or Participant, the Alliance Party is deemed to make the RAND commitment described in this Section 5.1 [for clarity, without the benefit of any exception set forth in Section 3.3 (i) or (ii)] with respect to Essential Patent Claims that are required to use, make and sell Fully Compliant Products described in Draft Deliverables approved by the Board of Directors as Approved Draft Deliverables prior to the Alliance Party joining the Alliance.

(IPR Policy at § 5.1.1.)

Cox identifies nothing in the IPR Policy that precludes assignment of patents, and § 5.1.2 (reproduced below) implies that assignments of patents are permissible. Cox argues that the IPR Policy required MaxLinear to retain a right to grant any licenses required by the IPR Policy. Cox maintains that the "Obligation to License" must remain with the "Alliance Party" and is an ongoing "covenant," such that, Cox argues, the IPR Policy required MaxLinear to retain a right to license:

Assignment of patents, however done, cannot convert the assignee into an "Alliance Party." Indeed, it is for precisely this reason that MoCA required each "Alliance Party" to maintain the right to grant licenses. Nor does § 5.1.2's requirement that transferees ensure future successors-in-interest understand these terms change the result, as Cox's averments demonstrate MaxLinear made no such assurance.

(-1043, Dkt. 380-1 at 21.) Cox argues that MaxLinear's failure to do so in the Patent Purchase Agreement was a breach of the IPR Policy. Cox also argues that MaxLinear had an obligation not to circumvent its licensing obligations. In particular, Section 4.1.2 of the IPR Policy states:

4.1.2 Authority to Grant Licenses; No Attempt to Circumvent.

Each Alliance Party represents, warrants and covenants to the Alliance and to other Alliance Parties that it has the power and authority to bind itself and all of its Affiliates to the obligations contained herein, including without limitation, the obligation to grant patent licenses as set forth in this IPR Policy. Each Alliance Party further represents and warrants and agrees that it has not and *will not intentionally transfer or otherwise encumber its patents that reasonably may contain Essential Patent Claims for the purpose of circumventing the obligation to grant licenses contained in this IPR Policy.* Each Alliance Party further agrees and states that it shall use commercially reasonable efforts to ensure all employees and Subcontractors used by the Alliance Party in connection with the conception, reduction to practice, creation, development or making of inventions that result in Essential Patent Claims have executed or will execute an assignment of Intellectual Property Rights sufficient to ensure that the Alliance Party has all the rights from such employees and Subcontractors necessary to grant patent licenses as set forth in this IPR Policy to any such Essential Patent Claims.

(*Id.* at § 4.1.2 (emphasis added).)

Yet, Cox does not demonstrate how this requirement that an Alliance Party will not "circumvent[] the obligation to grant licenses contained in this IPR Policy" purportedly required MaxLinear itself to retain a right to grant licenses. Such a reading of Section 4.1.2 lacks support in the language of that provision, as reproduced above, and Cox's allegations in this regard are not plausible. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.") (citation omitted). Cox's interpretation is also inconsistent with Section 5.1.2. of the IPR Policy, which states:

> 5.1.2 Transfer of Essential Patent Claims. Any sale, assignment or other transfer by an Alliance Party or its Affiliates to an unaffiliated third party of an Essential Patent Claim shall be subject to the terms in this IPR Policy. An Alliance Party may choose the manner in which it complies with this Section 5.1.2, provided that any agreement for transferring or assigning Essential Patent Claims *includes a provision that such transfer or assignment is subject to existing licenses and obligations to license* imposed on the Alliance Party by this Agreement and the Alliance Bylaws.

(*Id.* at § 5.1.2 (emphasis added).)  Cox's interpretation of Section 4.1.2 as requiring the assignor to retain a right to license is inconsistent with Section 5.1.2 contemplating that an Alliance Party can "assign[]" a patent "subject to existing licenses and obligations to license imposed on the Alliance Party by this Agreement and the Alliance Bylaws."  That is, Section 5.1.2 requires putting the obligation on the assignee, which runs counter to requiring any retaining of the obligation by the assignor.

Cox also alleges that MaxLinear's assignments affirmatively sought to strip out encumbrances, including encumbrances caused by the IPR Policy, so that Plaintiff would be unconstrained by the RAND license obligations to which MaxLinear was constrained. (*See* Cox Am. Counterclaims (-1043) ¶ 566; *see also id.* at ¶¶ 556–73.)  Turning to the Patent Purchase Agreement ("PPA"), however, ▓▓▓▓▓ states:



---

1    (-1043, Dkt. 338, Ex. B, Mar. 31, 2021 Patent Purchase Agreement (emphasis added).)

2    The content of ████ is reproduced here in its entirety:

3
4
█████████████████
5

6    (*Id.* at ███ (p. 155 of 157 of Dkt. 338, Ex. B).)

7    Although ██████████████████████████████████

8    ████████████████ of the PPA demonstrates that the PPA indeed acknowledged

9    that the patents being assigned were subject to RAND obligations with regard to MoCA.

10   Finally, "[g]enerally, legal encumbrances involving the right to use patented

11   technology 'run with the patent.'" *Entropic Commc'ns, LLC v. Comcast Corp.*, --- F.

12   Supp. 3d ----, 2023 WL 9189317, at *3 (C.D. Cal. Nov. 20, 2023) (Holcomb, J.) (quoting

13   *Datatreasury*, 522 F.3d at 1372).  Thus, not only did MaxLinear put Entropic on notice of

14   the MoCA RAND obligations (and assign patents as being subject to such obligations),

15   those obligations "r[a]n with the patent[s]," by operation of law, from MaxLinear to

16   Entropic. *Id.*

17   Nonetheless, as noted in subsection (i), above, Cox interprets Section 4.1.1 of the

18   MoCA IPR Policy as limiting patent ownership to Alliance Parties (emphasis added):

19   4.1 Ownership of Rights.

20   4.1.1 Alliance Party Intellectual Property. All right, title and interest in and
     to Alliance Party Intellectual Property *shall be owned exclusively by the*

1    *Alliance Party(ies)* who developed the Intellectual Property or by the *Alliance Party(ies)* to whom the Intellectual Property was properly and legally assigned.

2

3    Entropic argued at the April 11, 2024 hearing that Section 4.1.1 means merely that

4    a party does not give up its intellectual property rights when it joins MoCA, but, at least

5    for purposes of the pleading stage, Cox's interpretation of Section 4.1.1 as limiting patent

6    ownership to Alliance Parties is plausible.

7    Entropic argues that Section 5.1.2 would be unnecessary if assignments could only

8    be among Alliance Parties because MoCA already imposes such obligations on Alliance

9    Parties through its bylaws and through promoter agreements.  Cox persuasively argued at

10   the April 11, 2024 hearing, however, that Section 5.1.2's requirements are nonetheless

11   useful because, over time, parties join MoCA and parties leave MoCA, and Section 5.1.2

12   requires assignors to contractually impose obligations that will apply regardless of a

13   party's MoCA membership status at any particular time.

14   Entropic also urges that Section 5.1.2 (reproduced above) contemplates an

15   assignment to an "unaffiliated third party," but Cox plausibly argues that this reference to

16   an "unaffiliated third party" in Section 5.1.2 is merely contrasted with the "Affiliates"

17   referenced in the same sentence.  That is, where Section 5.1.2 states that "[a]ny sale,

18   assignment or other transfer by an Alliance Party or its Affiliates to an unaffiliated third

19   party of an Essential Patent Claim shall be subject to the terms in this IPR Policy," a

20

---

1   plausible reading is that "unaffiliated third party" simply refers to a MoCA member that

2   is not an Affiliate of the assignor.

3        Cox thus plausibly alleges that MaxLinear breached Section 4.1.1 of the MoCA

4   IPR Policy when MaxLinear assigned patents to Entropic and that Entropic induced

5   MaxLinear to do so.

6                    (b)  Disclosure of MoCA Documents

7                         (i)  Sufficiency of Allegations

8        Entropic argues that "[a]ny confidentiality obligations owed by MaxLinear to the

9   information disclosed in the [MoCA] specifications expired well before 2021, when Cox

10  alleges the disclosure to have occurred."  (-1043, Dkt. 335 at 15–16.)  Entropic also

11  submits that "the alleged information is not Cox's" because "[b]y its own admission, Cox

12  is no longer a member of MoCA."  (*Id.* at 16 (citation omitted).)  Entropic reiterates that

13  "the fact that Entropic was able to bring this lawsuit against Cox is not a cognizable

14  injury."  (*Id.*)  Entropic also submits that "Cox cites to no agreement or statute entitling it

15  to recover attorneys' fees for Entropic's alleged tortious interference, and it has therefore

16  failed to allege any cognizable harm."  (*Id.* at 16 n.7.)  Further, Entropic argues that "[i]t

17  is remarkable that Cox is pleading that it is injured because it could not conceal its

18  infringement."  (*Id.* at 17.)  Finally, Entropic argues that "[t]here is no allegation that

19  Entropic was aware of the confidential nature of the MoCA documents prior to their

20  disclosure; no allegation that Entropic sought their disclosure; and no allegation that

1  Entropic was aware of the terms of the membership agreements forming the basis of this

2  claim." (*Id.*)

3       Cox responds that "Cox's allegations, taken as true, adequately plead that

4  [Entropic] knew interference was substantially certain to occur as a result of its improper

5  requirement that MaxLinear disclose confidential MoCA documents." (-1043, Dkt.

6  380-1 at 18.) Cox argues that "[a]t best, Plaintiff is simply raising a defense that may

7  require discovery – but as stated, it has no merit since all Plaintiff says is the materials

8  'issued' more than 5 years ago, and cites not to MaxLinear's obligation of confidentiality,

9  but to Cox's – which depends on the date by which Cox received the information." (*Id.*

10  at 22.) Cox also argues that "the MoCA standards are confidential, and Cox can enforce

11  MaxLinear's breach of confidentiality," such that Cox "adequately plead[s] actual breach

12  or disruption." (*Id.* at 23.) Further, Cox argues that "Plaintiff's speculation that it did not

13  have to induce breach, as it did, because it *could* have filed suit without the MoCA

14  standards is just a hypothetical argument it (possibly) can ask a jury to accept, but does

15  not bar Cox's counterclaims." (*Id.* at 28.)

16       Entropic replies that any confidentiality obligations had already expired and,

17  moreover, "Cox's pleadings are devoid of any specific allegations as to how Entropic

18  induced MaxLinear to breach its confidentiality obligations." (-1043, Dkt. 416-1 at 12.)

19  Entropic argues that "[t]he term of a contract obligation, and expiration thereof, is a core

20  issue, not a detail," and "[c]ourts dismiss claims of breach where the confidentiality

requirements have expired on their own terms." (*Id.* at 13 (citations omitted).)  Entropic also argues that Cox nowhere alleges that Entropic was aware of the confidentiality of the MoCA documents prior to receiving them, and Entropic argues it would have become aware of any confidentiality stampings only after receiving the documents.  (*Id.*)

Entropic's arguments—relating to issues such as whether the documents were indeed confidential, whether any handling of those documents was improper, and what Entropic knew and when it knew it—do not demonstrate any lack of plausibility.  Cox's allegations amount to "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft*, 556 U.S. at 678–79.  For example, Cox alleges:

> MoCA standards were both confidential under [the MoCA IPR Policy] and were typically so marked. By way of example, the MoCA standards that Plaintiff produced in this action and which it relies upon in its Complaint to aver infringement bear a legend that says "MoCA Member Only Distribution," and include a notice on the first page that states: "This document and each element of this document are the Confidential Information of … MoCA and of the MoCA members that contributed to this document. Both MoCA and/or any such MoCA members may enforce such obligations of confidentiality directly." . . . [T]he MoCA Board has never authorized disclosure of approved draft deliverables, including MoCA standards, to third parties, including Plaintiff, who acquired patents from Alliance Parties. Only Alliance Parties were privy to the actual approved draft deliverables that included MoCA standards.

(Cox Am. Counterclaims (-1043) at ¶ 546; *see id.* at ¶ 544; *see also id.* at ¶ 569 ("Plaintiff obtained copies of the otherwise confidential MoCA standards and has relied on those clearly marked confidential material to which it should not have had access to prepare

and send its correspondence in 2022 to Cox and to prepare and bring this suit.") (citations omitted).)

At the pleading stage, Cox sufficiently alleges improper disclosure of confidential documents.

<u>(ii)  Supplemental Jurisdiction</u>

Entropic argues that the Court lacks supplemental jurisdiction over any claim based on purported disclosure of confidential information because "[n]othing about this claim depends on the resolution of a substantial question of patent law."  (-1043, Dkt. 335 at 18.)

Cox responds that "[t]he Court has supplemental jurisdiction over Cox's tortious interference claim based on MaxLinear's breach of its confidentiality obligations because these claims arise from the same set of facts as the federal claims," and "Cox's tortious interference claim avers facts relating to ownership and enforcement of the asserted patents, and necessarily overlap with the facts relating to the patent infringement claims." (-1043, Dkt. 380-1 at 28 & 29.)

Entropic replies that "[t]here is no 'chain rule' of supplemental jurisdiction," so although "Cox also argues that the confidentiality claim arises from the same case or controversy as the other tortious interference claims," "[i]t is not sufficient to be connected only to one of the other state claims."  (-1043, Dkt. 416-1 at 15.)

At the April 11, 2024 hearing, Entropic emphasized that Entropic's patent infringement claims are based on Cox's infringement, not any contract, and Entropic argued that none of the facts regarding purported confidentiality obligations are relevant to patent infringement or invalidity.

Title 28 U.S.C. § 1367 provides (emphasis added):

(a) . . . [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form *part of the same case or controversy* under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
    (1) the claim raises a novel or complex issue of State law,
    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
    (3) the district court has dismissed all claims over which it has original jurisdiction, or
    (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

"In order for a claim to 'form part of the same case or controversy,' the claims must 'derive from a common nucleus of operative fact.'" *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

Here, Cox's counterclaim for tortious interference based on disclosure of purportedly confidential MoCA documents is part of the same case or controversy as Entropic's claims for patent infringement because Cox alleges that Entropic used those

MoCA documents to formulate Entropic's allegations of infringement.  Indeed, Entropic's infringement contentions rely upon those documents.

The Court should therefore exercise supplemental jurisdiction over Cox's counterclaim for tortious interference based on disclosure of MoCA documents.

### (c)  Conclusion

Entropic's motion to dismiss as to Cox's counterclaim for tortious interference (Count III) should therefore be denied.

### (2)  Declaratory Judgment (Count II)

Entropic argues that whereas "Cox alleges that the assignments violate the IPR Policy because they omit language required by the IPR Policy, because they purport to be free of encumbrances, and generally because they would allow the patent owner to circumvent the policy's FRAND licensing obligations," "none of these things is an actual breach of the IPR Policy."  (-1043, Dkt. 335 at 19 (citations omitted).)  Entropic also argues that "[i]t is well-established that an assignment is not void simply because it fails to recite an existing encumbrance, nor does that omission somehow wipe away a prior encumbrance," "[n]or can Cox point to any language in the IPR Policy that purports to void third party assignments."  (*Id.* at 19–20.)

Cox responds that Plaintiff's arguments fail because "[t]he crux of Cox's counterclaim seeking declaratory judgment is that Plaintiff and MaxLinear affirmatively sought to strip out any encumbrance on the patents through their assignment and doing so

1   was a violation of the IPR Policy, the remedy for which is the assignment is void."

2   (-1043, Dkt. 380-1 at 30 (citing Cox Am. Counterclaims (-1043) at ¶¶ 567, 579, 581–

3   82).) Cox urges that "declaratory judgment in Cox's favor on this issue would clarify and

4   settle issues in this case—including Plaintiff's ability to make infringement claims." (*Id.*

5   at 31 (citation omitted).)

6        Cox's counterclaim for declaratory judgment is not merely duplicative because

7   whereas Cox's counterclaim for tortious interference seeks damages, Cox's counterclaim

8   for declaratory judgment is directed to both MaxLinear and Entropic and seeks a

9   declaration that the assignment from MaxLinear to Entropic is void. (*Compare* Cox Am.

10   Counterclaims (-1043) §§ 580–82 *with id.* at §§ 583–86.)

11        Entropic's motion to dismiss Cox's counterclaim for declaratory judgment

12   (Count II) should therefore be denied.

13        <u>(3) Leave to Amend</u>

14        Entropic's motion to dismiss should be denied, as discussed above, so Cox's

15   alternative request for leave to amend is moot.

16   **B. Entropic's Motion to Dismiss Cox Defendants' Amended Counterclaims Pursuant to Rule 12(b)(6) (-1049, Dkt. 226)**

17        Entropic moves to dismiss Count II (declaratory judgment) and Count III (tortious

18   interference) of Cox's Amended Counterclaims (-1049, Dkt. 194) ("Cox Am.

19   Counterclaims (-1049)"), which relate to the so-called ████████ (attached to

20   Cox's original counterclaims, Dkt. 87, at Ex. A).

(1)  Tortious Interference (Count III)

Cox asserts a state law claim for tortious interference with contract, and, under California law, such a claim requires: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Honey Bum*, 63 F.4th at 824–25 (citations omitted).

(a)  Parties to Agreement

Entropic argues that "Cox is not a party to ████████████████ and does not have standing to enforce it."  (-1049, Dkt. 228-1 at 9.)  Entropic urges that "the facts support only that Cox's *suppliers* may be intended beneficiaries, for they are the ones who are allegedly sub-licensed," "[b]ut Cox is merely a customer of those sublicensees." (*Id.* at 10.)  Entropic also submits that Cox does not allege that it ever complied with the obligations that the█████████████████████████████.  (*Id.* at 11.) Entropic concludes that Cox is, at most, merely an incidental beneficiary, which Entropic argues is insufficient for Cox to maintain its claim for tortious interference.  (*Id.*)

Cox responds that "[t]o participate in CableLabs' [DOCSIS] initiative, MaxLinear executed the████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.”  (-1049, Dkt. 270-1 at 9.)  Cox

5 argues that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (*Id.*

10 at 11; *see id.* at 17.)

11   At the April 11, 2024 hearing, the parties discussed authority that "[t]he contract

12 must 'clearly evidence' an intent by the parties to permit enforcement by the third party."

13 *See Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 53

14 (2d Cir. 2012).

15   For purposes of the pleading stage, Cox sufficiently alleges that it has been an

16 intended third party beneficiary of the ▮▮▮▮▮▮▮▮▮▮▮▮▮

17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Cox

Am. Counterclaims (-1049) at ¶¶ 287–295); *cf. G+ Commc'ns, LLC v. Samsung Elecs. Co.*, No. 2:22-CV-00078-JRG, 2023 WL 3167416, at *5 (E.D. Tex. Apr. 28, 2023) (". . . G+ has sufficiently pled that it was an intended beneficiary of the Samsung/ETSI contract.  G+ alleges that Samsung is a signatory of ETSI, that ETSI members are bound to the ETSI IPR policy, that Clause 3.2 of the ETSI IPR policy requires members to 'reward' IPR holders irrespective of whether the IPR holder is a member or a third party, and that G+ is a third-party IPR holder.  This is sufficient at the pleading stage to put Samsung on notice that G+ is an alleged third-party beneficiary.") (citations omitted).

### (b)  Acts by Entropic

Entropic argues that "it is not enough for Entropic to have been aware of the ███████████ and standards" and that "Cox would need to allege facts showing Entropic *knew or was substantially certain* that the Asserted Patents are subject to the license—and that its actions would disrupt ███████████."  (-1049, Dkt. 228-1 at 16 (citation omitted).)

Cox responds that it need not allege that Entropic had knowledge of a specific contract and need not allege that Entropic knew or was substantially certain the asserted patents were subject to the ███████████.  (-1049, Dkt. 270-1 at 22 & 23.)  Cox argues that it is sufficient that Cox "alleges Plaintiff knew about ███████████ and MaxLinear's obligations thereunder at least because it was publicly available information

and the asserted patents reference and/or implicate the DOCSIS standards." (*Id.* at 23 (citation omitted).)

On balance, Cox sufficiently alleges relevant acts by Entropic in relation to MaxLinear.

### (c)  Injury

Entropic submits that the only harm alleged by Cox is the defense of this lawsuit, which Entropic argues "is not a legally cognizable harm because, among other reasons, such conduct is covered by the litigation privilege." (-1049, Dkt. 228-1 at 12.)  Entropic also argues that, under California law, the bringing of a lawsuit is potentially actionable only if brought in bad faith, and Entropic submits that it brings this lawsuit in good faith because MaxLinear represented to Entropic that the patents-at-issue are not subject to any RAND obligations and because the Eastern District of Texas found on summary judgment that three of the patents do not contain any DOCSIS-essential claims.  (*Id.* at 13 (citing *Entropic Commc'ns, LLC v. Charter Commc'ns, Inc.*, No. 2:22-cv-00125-JRG, Dkt. 357 at 6–9 (E.D. Tex. Nov. 28, 2023) (report and recommendation), Dkt. 399 (E.D. Tex. Dec. 8, 2023) (adopting report and recommendation)).)  Finally, Entropic argues that the purported tortious interference has caused no possible harm because "there is no impediment to MaxLinear bringing this action were it still the patent owner," and "MaxLinear would be fully entitled to pursue this action under the good faith belief that the Asserted Patents do not contain DOCSIS-essential claims." (*Id.* at 14.)

1    Cox responds that the litigation privilege does not apply because the alleged

2    interference is not the bringing of this lawsuit but rather is that Entropic induced

3    MaxLinear to breach ████████████. (-1049, Dkt. 270-1 at 29.) Cox also argues

4    that it can properly allege that Entropic has brought this lawsuit in bad faith because

5    "Plaintiff's Complaint makes averments demonstrating the asserted patents are DOCSIS-

6    essential, yet Plaintiff understood it was acquiring the asserted patents from MaxLinear

7    without DOCSIS licensing obligations thus confirming the parties' efforts to strip the

8    patents of their encumbrances so Plaintiff could monetize them through litigation." (*Id.*

9    at 30.) Further, Cox argues that Entropic cannot rely on the findings by the Eastern

10   District of Texas because judicial notice would not be proper as to facts that are disputed.

11   (*Id.*) As to whether the assignment merely resulted in Cox being sued by Entropic

12   instead of by MaxLinear, Cox responds that Entropic "ignores that MaxLinear *did* own

13   the patents and *did not* bring suit, presumably because it recognized the asserted patents

14   are DOCSIS-essential and therefore licensed to Cox." (*Id.* at 32.)

15   Entropic acknowledges that it received the patents subject to any obligations to

16   DOCSIS, so Cox cannot plausibly allege any injury from a purported removal of such

17   obligations by way of the assignment of patents from MaxLinear to Entropic. *See also*

18   *Entropic*, 2023 WL 9189317, at *3 (quoting *Datatreasury*, 522 F.3d at 1372)

19   ("[g]enerally, legal encumbrances involving the right to use patented technology 'run

20   with the patent'").

1    Cox thus fails to plausibly allege any cognizable injury.

2        (d)  Breach

3        Entropic argues that none of the conduct alleged by Cox amounts to a breach of

4    any provision of ██████████████, namely accepting an interest in the outcome of

5    this litigation, purportedly attempting to assign the Asserted Patents free of any

6    encumbrances, and transferring patents to Entropic purportedly without ensuring Entropic

7    would honor the licensing obligations.  (-1049, Dkt 228-1 at 14.)  Entropic submits that

8    Cox does not identify ████████████████████ purportedly violated by MaxLinear

9    accepting an interest in the outcome of this litigation.  (*Id.*)  As to assigning and

10   transferring, Entropic submits that ████████████████████████████████████

11   ██████ and Entropic emphasizes that any obligations or encumbrances were automatically

12   passed from MaxLinear to Entropic by operation of law, as the Court recently found as to

13   a covenant-not-to-sue as to these same patents.  (*Id.* at 14–15.)

14       Cox responds that, by accepting an interest in the litigation, MaxLinear breached

15   its obligation to ensure that Cox received a perpetual, non-exclusive, irrevocable

16   and royalty-free license.  (-1049, Dkt. 270-1 at 27.)  As to assigning and transferring, Cox

17   responds that Entropic "ignores Cox's averments showing MaxLinear's assignments

18   *affirmatively* sought to strip out any encumbrance, including encumbrances caused by the

19   ████████████████, so that Plaintiff was unconstrained by the royalty-free license

20

---

1  obligations to which MaxLinear was constrained." (*Id.* at 28 (citing Cox Am.

2  Counterclaims (-1049) ¶¶ 308–18, 331–32).)

3       Entropic replies that "there is no such thing as an attempted breach of contract, nor

4  any tort based upon such a concept." (-1049, Dkt. 283 at 2.)  As to Entropic's

5  knowledge, Entropic replies that "Cox offers only generic allegations that 'one or more'

6  of the Asserted Patents 'may be' DOCSIS-essential, and not even that Entropic knew this

7  to be the case." (*Id.* at 2–3.)  Entropic also argues that "even if Cox ultimately prevails in

8  proving that any of the Asserted Patents are DOCSIS-essential, this would simply be a

9  case of the patent owner misconceiving the scope of its rights, which cannot give rise to a

10 claim." (*Id.* at 3 (citation omitted).)  Further, Entropic argues that "Entropic has never

11 alleged anywhere that any of the Asserted Patents are DOCSIS-essential," and Entropic

12 submits: "Entropic merely cited DOCSIS as evidence for some—but not all—elements in

13 its claim charts for certain patents.  This is not enough.  To be essential to a standard, the

14 standard must meet each and every element of a claim." (*Id.* at 5 (citation omitted).)

15      On balance, Entropic persuasively argues that "[e]ither ██████████████

16 ████████ continue to run with the patents automatically, or the patents were never

17 subject to ████████████ in the first place." (-1049, Dkt 228-1 at 15.)  As Entropic

18 emphasizes, ████████████████████████████████████

19 ████████████████████████████

20             ████████████████████████████



Also, "[g]enerally, legal encumbrances involving the right to use patented technology 'run with the patent.'" *Entropic*, 2023 WL 9189317, at *3 (quoting *Datatreasury*, 522 F.3d at 1372).

Cox cites the statement in ▮▮▮▮▮ of the Patent Purchase Agreement that ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (-1049, Dkt. 228-2, Ex. A, ▮▮▮▮ ▮▮.) At the April 11, 2024 hearing, Cox further emphasized that the assignments recorded with the PTO did not refer to any DOCSIS encumbrances.

Any inference of an attempt to remove encumbrances is undermined, however, by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*, ▮▮▮▮▮.) Further, even if Entropic *intended* to remove the DOCSIS obligation, Cox does not identify any viable cause of action based on a purported *attempted* breach. Finally, Cox does not identify any ▮▮▮▮▮▮▮▮▮▮▮ that is purportedly breached by MaxLinear agreeing to assist Entropic or by MaxLinear accepting an interest in the outcome of the present litigation.

(e)  Conclusion

Because breach or disruption, as well as injury, are required elements of a claim for tortious interference but have not been plausibly alleged, Entropic's motion to dismiss as to Cox's counterclaim for tortious interference (Count III) should be GRANTED.

(2)  Declaratory Judgment (Count II)

Entropic argues that "an assignment is not void simply because it fails to recite an existing encumbrance, nor does that omission somehow wipe away a prior encumbrance."  (-1049, Dkt. 228-1 at 17.)

Cox responds that Entropic's argument fails because "[t]he crux of Cox's counterclaim seeking declaratory judgment is that Plaintiff and MaxLinear affirmatively sought to strip out any encumbrance on the patents through their assignment and doing so was a violation of the ███████████████████[,] the remedy for which is the assignment is void."  (-1049, Dkt. 270-1 at 32 (citing Cox Am. Counterclaims (-1049) § 328).)  Cox urges that "Cox has sufficiently pled that MaxLinear and Plaintiff sought to assign the patents free of any obligations under ███████████████████████████████ *Id.* at 32–33.)

As discussed in subsection (1), above, Entropic persuasively argues that "[e]ither ███████████ obligations continue to run with the patents automatically, or the patents were never subject to ███████████ in the first place."  (-1049, Dkt 228-1

at 15.)  And even if Entropic *intended* to remove the DOCSIS obligation, Cox does not identify any viable cause of action based on a purported *attempted* breach.

Entropic's motion to dismiss Cox's counterclaim for declaratory judgment (Count II) should therefore be GRANTED.

(3)  Leave to Amend

Cox argues that if the Court is inclined to dismiss one or more of Cox's claims, then Cox should be given leave to amend because "Cox did not delay and has not acted in bad faith or with dilatory motive," and "the Court has not ruled that any deficiencies exist in Cox's counterclaims to date."  (-1043, Dkt. 270-1 at 33.)

Because the lack of plausibility is based not on a lack of detail in Cox's allegations but rather on an inconsistency between Cox' allegations and the plain language of the ███████████, as discussed above, amendment would be futile.  The other factors under Rule 15 need not be addressed because "[f]utility alone can justify the denial of a motion for leave to amend."  *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004).

Cox's counterclaims for declaratory judgment (Count II) and tortious interference (Count III) should therefore be dismissed with prejudice.

**IV.  MaxLinear's Motions to Dismiss Cox Defendants' Amended Counterclaims (-1043, Dkt. 320; -1049, Dkt. 219)**

**A.  MaxLinear's Motion to Dismiss Counterclaims Regarding MoCA IPR Policy (-1043, Dkt. 320)**

MaxLinear argues that Cox's counterclaims should be dismissed for lack of standing and ripeness under Rule 12(b)(1) as well as based on failure to properly plead a breach of contract claim under Rule 12(b)(6).  MaxLinear also argues that Cox's counterclaims should be dismissed with prejudice because Cox has already amended once and any further amendment would be futile.

(1)  Breach of Contract (Count I)

(a)  Subject Matter Jurisdiction

(i)  Standing of CoxCom and Cox California

MaxLinear argues that CoxCom and Cox California lack standing because, under the MoCA IPR Policy, "Alliance Parties *alone* enjoy the right to request RAND licenses, not their Affiliates."  (-1043, Dkt. 335 at 15–16.)

Cox responds that "neither the IPR Policy nor ▮▮▮▮▮▮▮▮ prevent Cox Communications from demanding, as it has through its counterclaims, a RAND license on behalf of the Cox Affiliates."  (-1043, Dkt. 385 at 13.)

MaxLinear replies that "[b]y the plain text of the IPR Policy, ▮▮▮▮▮▮▮ ▮▮▮▮ and well-established California law, CoxCom and Cox California possess neither standing to request a license nor standing to assert any cause of action arising

under the IPR Policy since they are not third-party beneficiaries." (-1043, Dkt. 406-1 at 11.) MaxLinear urges that neither the "purpose" of the IPR Policy nor the purchase of MoCA products confers standing because "the text of the IPR Policy and ▮▮▮▮▮ ▮▮▮▮▮ expressly treats members and affiliates differently." (*Id.* at 12.) Finally, MaxLinear argues that "nothing in the IPR Policy permits a MoCA member, current or former, to infringe on another member's patents, wait until sued, and then deign its answer a 'written request' under Section 5.1 [of the IPR Policy]." (*Id.*)

Section 5.1.1 of the IPR Policy provides that an "Alliance Party" can request licenses:

5. LICENSES.

5.1 RAND Licenses.

5.1.1 Limited Obligation to License Essential Patent Claims. Subject to the terms in this IPR Policy, following Board of Director approval of an Approved Draft Deliverable and upon the *written request of any other then-current Alliance Party*, each Alliance Party shall offer to license to the *requesting Alliance Party(ies)*, under the terms of a separate written agreement, such Alliance Party's and its Affiliates' Essential Patent Claims to the extent necessary to use, make, have made, offer for sale, sell and import Fully Compliant Products in conformance with or as described in such Approved Draft Deliverable. Such licenses shall be non-exclusive, non-transferable, non-sublicensable, world wide, and on fair, reasonable and nondiscriminatory terms and conditions (collectively, "RAND") which may include defensive suspension provisions. * * *

(IPR Policy at § 5.1.1.)

Although CoxCom and Cox California have not been "Alliance Parties," Cox sufficiently alleges that CoxCom and Cox California have been intended third party

beneficiaries of the IPR Policy. (Cox Am. Counterclaims (-1043) ¶ 541.) At the April 11, 2024 hearing, the parties discussed authority that "[t]he contract must 'clearly evidence' an intent by the parties to permit enforcement by the third party." *See Bayerische*, 692 F.3d at 53. Section 1 of the IPR Policy states:

> The Alliance has been formed as a non-profit mutual benefit corporation for the purpose of developing and promoting specifications for the transport of digital entertainment and information content over in-home coaxial environments, and to develop a certification process for products implementing the specifications to ensure interoperability between products and manufacturers.
>
> This Intellectual Property Rights Policy ("IPR Policy") is intended to maximize the likelihood of widespread adoption of such specifications.

(IPR Policy at § 1.) For purposes of the pleading stage, Cox plausibly alleges that CoxCom and Cox California are intended third party beneficiaries.

Finally, at the April 11, 2024 hearing, MaxLinear argued that Cox affiliates could have applied for rights within MoCA but never did so, and MaxLinear also argued that Cox is no longer a member of MoCA and therefore cannot enforce on behalf of MoCA. These arguments are unpersuasive at the pleading stage in light of Cox's allegations regarding third party beneficiary status and also when considering that a Cox entity was a member of MoCA at the time of the alleged breaches by MaxLinear in 2021.

MaxLinear's argument that CoxCom and Cox California lack standing should therefore be rejected.

(ii)  Request for a RAND License

Cox alleges: "Plaintiff additionally did not and, despite Cox's prior request in writing, has not, provided or procured any RAND-compliant offer to the relevant patents consistent with the IPR Policy."  (Cox Am. Counterclaims (-1043) ¶ 571.)

MaxLinear argues that this one-sentence allegation is insufficient because "the timing and the identities of the requestor and requestee are crucial for standing."  (-1043, Dkt. 335 at 17.)  MaxLinear argues that this information is crucial because the rights and responsibilities under the MoCA IPR Policy can vary depending on which parties were involved and when the request was purportedly made.  (*Id.*)

Cox responds that MaxLinear "incorrectly claims that the details of the timing and identities of Cox's written request are both defective and crucial to the standing and ripeness challenges."  (Dkt. 385 at 14.)  Cox also submits: "Cox made written requests, including in their amended answer that originally raised its defense (DE 48 ¶¶ 511, 513), the original counterclaims (DE 95), and in Cox Communications' written correspondence referenced in the Amended Counterclaims at paragraph 571, provided to MaxLinear before its motion and referenced in Entropic's motion to dismiss.  (DE 329-4)."  (*Id.* at 14–15 (footnote omitted).)  Cox argues that because it was not a MoCA member at the time it asserted its claims, the provision cited by MaxLinear does not apply.  (*Id.* at 15.)  Instead, Cox argues, Section 7.1 of the IPR Policy applies, and "Cox met those provisions simply by asserting its defenses and claims."  (*Id.*)

Entropic does not persuasively demonstrate that any issue of whether Cox appropriately requested a license is an issue of subject matter jurisdiction.  Alternatively, to whatever extent this is deemed to be an issue of subject matter jurisdiction, Cox sufficiently alleges that it has requested a license offer under the IPR Policy.  (Cox Am. Counterclaims (-1043) ¶ 571.)

### (iii)  Injury-in-Fact

MaxLinear argues that Cox "does not explain how MaxLinear's patent assignment to Entropic caused it any injury or describe what the injury is in any detail."  (-1043, Dkt. 335 at 18.)

Cox responds that "the IPR Policy promised that Cox would only have to deal with MaxLinear in terms of obtaining any applicable license for essential patents," and "[i]t included multiple enforcement mechanisms to ensure that any subsequent owner of a MaxLinear essential patent would be aware of, and bound by these provisions."  (-1043, Dkt. 385 at 17 (citing Cox Am. Counterclaims (-1043) ¶¶ 538–50).)  Cox argues that the improper assignment from MaxLinear to Entropic resulted in Cox being deprived of "the benefits of MaxLinear's promises."  (*Id.* (citing Cox Am. Counterclaims (-1043) ¶¶ 556–73).)  Further, Cox argues: "Standing here is not grounded on some recovery by Cox from Entropic under, for example, 35 U.S.C. § 285, or even on Cox's recovery of expenses defending some claim advanced by MaxLinear.  Cox instead asserts a breach of contract counterclaim not against Entropic, the plaintiff in this case, but against

1   MaxLinear, the third party whose breach of contract caused Entropic to assert patents,

2   demand royalties, and bring suit."  (*Id.* at 19.)

3          MaxLinear replies that "[b]eing sued for infringement is not a cognizable injury,

4   especially when the IPR Policy offers no sanctuary to infringers."  (-1043, Dkt. 406-1

5   at 6.)  MaxLinear also argues that "[t]he IPR Policy expressly permits transfers of patents

6   (§ 5.1.2) and gives MoCA members like MaxLinear wide latitude in how to do so

7   (Mot. at 24)—a point Cox did not dispute."  (*Id.* at 10.)  Further, MaxLinear argues that

8   Cox's attempt to use its opposition brief to clarify its damages (as being attorney fees) is

9   inadequate because no such allegation appears in Cox's pleading, because litigation costs

10  do not confer standing (because "[t]he IPR Policy itself offers no shield for infringers to

11  hide behind"), and because "swapping out licensors does not redress that so-called

12  injury."  (*Id.* (citing IPR Policy § 5.1.1).)

13         MaxLinear also cites authority that "[l]itigation costs are insufficient to establish

14  standing for purposes of Article III," and "[t]he litigation must give the plaintiff some

15  other benefit besides reimbursement of costs that are a byproduct of the litigation itself."

16  *San Diego Unified Port Dist. v. Monsanto Co.*, 309 F. Supp. 3d 854, 866 (S.D. Cal. 2018)

17  (citations and internal quotation marks omitted).

18         Here, Cox does not seek merely to recover its costs for litigating Cox's

19  counterclaim for breach of contract.  Cox alleges injury based on MaxLinear having

20  allegedly breached the IPR Policy, which allegedly gave rise to the present litigation.

(*See* Cox Am. Counterclaims (-1043) ¶¶ 578, 592.)  Cox submits authority that attorney fees may in some cases be recoverable as part of damages for a breach of contract.  *See Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1341–43 (Fed. Cir. 2013); *see also Copenbarger v. Morris Cerullo World Evangelism, Inc.*, 239 Cal. Rptr. 3d 838, 844–847 (2018); *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 903 (N.D. Cal. 2020); *In re Facebook Privacy Litig.*, 192 F. Supp. 3d 1053, 1058–59 (N.D. Cal. June 28, 2016); *Lee v. Hum. Biostar, Inc*., No. CV-12-05668 MWF (MRWx), 2013 WL 12130258, at *2 (C.D. Cal. Jan. 28, 2013).

Further, Cox alleges an additional breach by MaxLinear having "provided confidential MoCA standards and other confidential MoCA information and materials to Plaintiff in breach of MaxLinear's obligations."  (*Id.* ¶ 569.)

Finally, Cox seeks not only damages but also to void the assignment of patents from MaxLinear to Entropic.

Through these allegations, Cox sufficiently alleges injury-in-fact.

### (iv)  Ripeness

MaxLinear argues that "because no cause of action can accrue until the Court determines the patents' essentiality, Cox's counterclaims remain speculative and contingent."  (-1043, Dkt. 335 at 10).

Cox responds that "induced by millions in payments, MaxLinear breached [its] confidentiality obligations and provided Entropic the MoCA standards that form the basis

1  of Plaintiff's infringement claims." (-1043, Dkt. 385 at 21 (citing Cox Am.

2  Counterclaims (-1043) ¶¶ 568–70).) Cox also argues that, under Rule 8(d)(2), Cox is

3  permitted to plead in the alternative by "simultaneously deny[ing] infringement while

4  pursuing a breach of contract claim should the patents be deemed essential." (*Id.* at 22.)

5      MaxLinear replies by reiterating: "[T]here is a preliminary factual dispute over

6  whether any of the asserted patents are standard essential. Entropic says they are

7  essential; Cox says they are not." (-1043, Dkt. 406-1 at 7.) MaxLinear argues that

8  "Cox's Counterclaims are premature precisely because they assert no theory of relief

9  independent of the IPR Policy." (*Id.* at 8 (emphasis omitted).) MaxLinear also urges that

10 "[p]arties may plead inconsistent claims in the alternative, yes, but those claims must still

11 be *ripe*." (*Id.*) MaxLinear further argues that "Cox says its breach of contract

12 counterclaim is ripe as it relates to an alleged disclosure of MoCA's confidential

13 information," but "Cox pleads no damages traceable to that alleged disclosure, except for

14 the so-called 'injury' of being sued for infringement," and "[l]itigation costs, however,

15 are not cognizable injuries for standing." (*Id.*)

16     Cox persuasively submits authority that a party can plead that "patents are

17 not standard essential while reserving the right to pay the FRAND rate should the

18 Court ultimately determine otherwise." *TCL Commc'ns Tech. Holdings*

19 *Ltd v. Telefonaktiebologet LM Ericsson*, No. SACV 14–00341 JVS (ANx), 2014 WL

20 12588293, at *4 (C.D. Cal. Sept. 30, 2014) (footnote omitted); *see Realtek*

*Semiconductor Corp. v. LSI Corp.*, No. C–12–03451 RMW, 2012 WL 4845628, at *5–*6 (N.D. Cal. Oct. 10, 2012) (". . . Realtek can simultaneously pursue a determination of the RAND royalty rate while denying infringement or asserting invalidity, even though those issues may ultimately obviate the need for a license").  The general concern articulated in the *Richardson* case cited by MaxLinear, that a case may depend upon "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all," does not override the RAND-specific authorities cited by Cox.  *Richardson v. City & Cty. of Honolulu*, 124 F.3d 1150, 1160 (9th Cir. 1997) (citation and internal quotation marks omitted).

MaxLinear's ripeness argument is therefore rejected.

### (v)  Conclusion

MaxLinear's motion to dismiss Cox's counterclaim for breach of contract (Count I) based on lack of subject matter jurisdiction should be denied.

### (b)  Sufficiency of Allegations

### (i) Identifying the Operative Contract(s)

MaxLinear argues: "While Cox clearly invokes its right to sue based on one Cox entity's membership in MoCA and the IPR Policy, it also alludes to MaxLinear's 2011 'Associate Agreement' and a 'Membership Agreement' and MoCA's 'bylaws.'  Due to Cox's imprecision, it remains unclear to what extent Cox believes MaxLinear is in breach

1   of contractual obligations beyond the IPR Policy."  (Dkt. 335 at 21 (citing Cox Am.

2   Counterclaims (-1043) ¶¶ 539, 546).)

3       Cox responds that it is obligated only to provide fair notice of its counterclaims,

4   and "MaxLinear admittedly has all the notice it needs – Cox is suing over MaxLinear's

5   breach of the IPR Policy, which is binding on MaxLinear under its prior agreements."

6   (-1043, Dkt. 385 at 23.)

7       On balance, Cox provides MaxLinear with adequate notice of the relevant IPR

8   Policy.

9   <u>(ii) References Back to Prior Pleading</u>

10      MaxLinear argues that Cox violates Local Rule 15-2 by "refer[ring] back to

11  exhibits from prior pleadings" and "invok[ing] documents allegedly produced in

12  discovery but not attached to the pleadings."  (-1043, Dkt. 335 at 21.)

13      Cox persuasively responds that MaxLinear's assertion of Local Rule 15-2 is moot

14  in light of MaxLinear requesting that the Court take judicial notice of the relevant

15  documents, such as ████████████████████.  (-1043, Dkt. 385 at 24.)

16  <u>(iii) Reciting the Terms</u>

17      MaxLinear argues that Cox fails to meet the pleading requirement to either attach

18  the contract that is allegedly breached or to set out the contract verbatim in the pleading.

19  (-1043, Dkt. 335 at 22.)

20

---

Cox responds that "Counsel for Cox apologizes for that clerical oversight, but it is immaterial where the counterclaims recite the relevant provisions as the cases require. MaxLinear nowhere suggests that a relevant contractual term was omitted."  (-1043, Dkt. 385 at 24.)  Alternatively, Cox requests that the Court take judicial notice of the IPR Policy as filed with Cox's original counterclaims.  (*Id.* at 24 n.3.)

Cox's pleading recites sufficient portions of the IPR Policy for purposes of the present motion, particularly when considering that no party disputes the contents of the IPR Policy.  (*See, e.g.,* Cox Am. Counterclaims (-1043) at § 547–49.)

### (iv)  Privity

MaxLinear argues, as to CoxCom and Cox California, that "[t]he Cox Affiliates were never members of MoCA and thus have no colorable breach of contract counterclaim in the first place."  (-1043, Dkt. 335 at 23.)

As discussed in Section IV.A.(1)(a)(i), above, Cox sufficiently alleges that CoxCom and Cox California have been intended third party beneficiaries of the IPR Policy.  (Cox Am. Counterclaims (-1043) ¶ 541.)

MaxLinear's argument that CoxCom and Cox California lack privity should therefore be rejected.

### (v)  Performance

MaxLinear argues that "[a]s a former MoCA member, Cox is entitled only to a license under Draft Deliverables or Approved Draft Deliverables approved prior to Cox's

1   termination," and "Cox does not allege any of its products are 'Fully Compliant Products'

2   or identify any 'Approved Draft Deliverable' with which its products conform—let

3   alone one that was approved prior to its termination from MoCA." (-1043, Dkt. 335

4   at 23–24.)

5       Cox responds that "[n]either standing, nor any other doctrine MaxLinear recites,

6   requires Cox's averments trace the history of each draft deliverable as it was

7   converted to a relevant standard." (-1043, Dkt. 385 at 15.) Cox also submits that

8   Entropic alleges that Cox's products infringe by complying with MoCA 1.0, 1.1, and 2.0,

9   which were ratified by MoCA in 2006, 2007, and 2010, respectively, long before Cox left

10  MoCA in 2022. (*Id.* at 16.) Cox argues that "it has performed all it needs to in order to

11  obtain the benefit of the IPR Policy." (*Id.* at 24.)

12      On balance, Cox plausibly alleges it has performed under the IPR Policy (at least

13  for purposes of Cox's alleged expectation that MaxLinear could assign relevant patents

14  only to other Alliance Parties and Cox's alleged expectation that certain MoCA

15  documents were confidential and would not be disclosed outside of MoCA) such as by

16  paying membership dues and participating as a member of the MoCA Board. (Cox Am.

17  Counterclaims (-1043) ¶ 552.) MaxLinear does not demonstrate that any great degree of

18  specificity in this regard is required at the pleading stage. MaxLinear's arguments on this

19  issue should be rejected.

20

1

### (vi)  Breach

2

MaxLinear submits that "[t]he IPR Policy expressly contemplates the ability of

3

Alliance Party members, like MaxLinear, to transfer its patents to third parties."  (-1043,

4

Dkt. 335 at 24 (citing IPR Policy § 5.1.2).)  As to Cox's allegation that MaxLinear

5

improperly disclosed confidential MoCA information to Entropic, MaxLinear argues that

6

Cox fails to identify the confidential information or whether it is ███████████████

7

██████  set forth in the applicable Promotor Agreements.  (*Id.* at 26.)

8

Cox responds that "MaxLinear just ignores Cox's entire pleading, which explains

9

how the MoCA IPR Policy required *MaxLinear* to maintain the right to grant licenses and

10

mandated that MaxLinear could only transfer by providing notice of such requirements in

11

the transfer agreement."  (-1043, Dkt. 385 at 16 (citing Cox Am. Counterclaims (-1043)

12

at ¶¶ 540–50, 556–67).)  Cox argues that whereas "MaxLinear plainly warranted and

13

covenanted that it would maintain the right to grant licenses under the IPR Policy,"

14

"MaxLinear neither retained rights to satisfy the continuing obligations imposed by the

15

IPR Policy nor met the specific obligations of the IPR Policy's transfer provisions."  (*Id.*

16

at 25 & 26.)  Cox also submits that it adequately pleads that "the MoCA standards are

17

confidential to the MoCA Alliance itself, and Cox can enforce MaxLinear's breach of

18

confidentiality."  (*Id.* at 27.)

19

MaxLinear replies that "[o]ne cannot breach that which a contract expressly

20

allows—a point which Cox does not dispute."  (-1043, Dkt. 406-1 at 13 (citation

omitted).)  MaxLinear submits that "both parties agree the patents remain subject to a MoCA RAND commitment."  (*Id.*)  MaxLinear also argues that the IPR Policy "confers no residual standing to a former member, like Cox Communications, or non-members like the Cox Affiliates, to act as MoCA's own private attorney general and enforce alleged disclosures of MoCA's confidential information."  (*Id.* at 14.)  Further, MaxLinear submits that "Cox also failed to allege a single fact to support its conclusory accusation that MaxLinear, and not another culprit, disclosed confidential information."  (*Id.* at 17.)

As discussed in Section III.A.(1)(a) of this Report and Recommendation, above, Cox plausibly alleges that MaxLinear's act of assigning patents to a non-MoCA party (Entropic) constituted a breach of Section 4.1.1 of the MoCA IPR Policy.

Also, as discussed in Section III.A.(1)(b), above, Cox plausibly alleges that "MaxLinear provided confidential MoCA standards and other confidential MoCA information and materials to Plaintiff in breach of MaxLinear's obligations."  (Cox Am. Counterclaims (-1043) ¶ 569.)

### (vii)  Damages

MaxLinear argues that Cox fails to allege any damages because "the IPR Policy itself provides that assignments are valid" and because "Cox has not pleaded any facts to show that Entropic seeks remedies other than those that MaxLinear could equally assert, had it kept its patents."  (-1043, Dkt. 335 at 27.)

---

Cox responds that "[t]he injury flowing from MaxLinear's breach that allowed Entropic [(]a patent monetization entity that seeks to maximize its damages claims by avoiding its RAND obligations[)] to pursue this suit is apparent."  (-1043, Dkt. 385 at 10.)

As discussed in Section III.A.(1)(a) of this Report and Recommendation, above, Cox plausibly alleges that dealing with Entropic is different than dealing with MaxLinear because Entropic is in a different economic and business position than MaxLinear.  (Cox Am. Counterclaims (-1043) § 542.)  Also, as discussed in Section III.A.(1)(b), Cox alleges that it has been harmed by MaxLinear's disclosure of purportedly confidential MoCA documents.

Cox thus plausibly alleges that is has been harmed by the alleged breaches.

### (viii)  Conclusion

MaxLinear's motion to dismiss Cox's counterclaim for breach of contract (Count I) for failure to state a claim should be denied.

### (2)  Declaratory Judgment (Count II)

MaxLinear argues that "the declaratory judgment claim is nothing more than a duplication of the breach claim."  (-1043, Dkt. 335 at 27.)

Cox responds that "[b]reach of contract and declaratory judgment are different claims seeking two different types of remedies, and as such are not duplicative."  (-1043, Dkt. 385 at 27 (citation omitted).)  Cox submits that "Entropic asserts infringement

claims based on patents obtained through assignments that are void in view of the IPR Policy," and "MaxLinear never disputes that declaratory judgment in Cox's favor on this issue would clarify and settle issues—including Entropic's ability to make infringement claims." (*Id.* at 28.)

MaxLinear replies that "[w]hile declaratory relief can be used to seek different remedies, Cox does not do so here," and "Cox rehashes the same allegations regarding the avoidance of encumbrances, and it seeks relief identical to that which it already asks in its breach of contract counterclaim." (-1043, Dkt. 406-1 at 14 (citations omitted).)

Cox alleges breaches of contract and, as discussed in Section III.A.(1), above, Cox's allegations are plausible for purposes of the pleading stage. Also, Cox's claim for declaratory judgment is not merely duplicative because whereas Cox's counterclaim for breach of contract primarily seeks damages, specific performance, and injunctive relief as to MaxLinear, Cox's counterclaim for declaratory judgment is directed to both MaxLinear and Entropic and seeks a declaration that the assignment from MaxLinear to Entropic is void. (*Compare* Cox Am. Counterclaims (-1043) §§ 580–82 *with id.* at §§ 574–79.)

MaxLinear's motion to dismiss Cox's counterclaim for declaratory judgment (Count II) should therefore be denied.

### (3)  Unjust Enrichment or Quasi-Contract (Count IV)

MaxLinear argues that "[b]ecause Cox insists that a binding contract exists, the quasi-contract claim cannot stand, even on the pleadings."  (-1043, Dkt. 335 at 28 (citations omitted).)  MaxLinear also argues that any incidental benefits that inured to MaxLinear from Cox's participation in MoCA do not give rise to any quasi-contract unjust enrichment claim, and to the extent Cox relies on purported misrepresentations by MaxLinear then Cox fails to satisfy Rule 9(b)'s heightened pleading standard for such allegations, such as "*which* statements were false or misleading, *how* they could be false or misleading (especially when the IPR Policy permits patent sales), or *when* they occurred."  (*Id.* at 29.)

Cox responds that unjust enrichment is a valid claim under California law and, alternatively, Cox adequately alleges a "quasi-contract" claim.  (-1043, Dkt. 385 at 29.)  Cox also argues that Rule 8(d) permits Cox to pursue contract claims and quasi-contract claims simultaneously.  (*Id.* at 29–30.)  Further, Cox argues that "Rule 9(b) only requires that Cox's pleadings provide enough detail to put MaxLinear on notice of the misconduct Cox claims is fraudulent, rather than requiring the precise statements that MaxLinear seeks," and, alternatively, "Cox did identify false and misleading statements and when they were made (the content and date of the [securities] filings)."  (*Id.* at 31.)  Finally, Cox argues that "[t]he counterclaims explain how MoCA support helped MaxLinear defeat alternative technology so Cox and others would adopt MoCA," and

"MaxLinear itself benefitted from Cox's participation and support in MoCA, including by having Cox help expand the market for MoCA and approve standards while acting as a Board member."  (*Id.* at 32 (citing Cox Am. Counterclaims (-1043) ¶¶ 532–33).)

MaxLinear replies that "[u]nder California's substantive law, a party cannot assert a quasi-contract claim while simultaneously asserting a valid and enforceable contract." (-1043, Dkt. 406-1 at 15.)  MaxLinear argues that "[f]or a quasi-contract claim to pass Rule 12(b)(6), it must allege the benefit was *directly* transferred to MaxLinear," and "Cox concedes it only conferred benefits directly to MoCA, not MaxLinear."  (*Id.* at 17.) Further, MaxLinear urges that it could not have misled Cox into using MoCA products because Cox joined MoCA six years before MaxLinear did.  (*Id.*)

Federal Rules of Civil Procedure 8(d)(2) and 8(d)(3) allow for pleading in the alternative, and a party may do so "regardless of consistency."  *Intelligent Mgmt. Solutions, Inc. v. Crown Glendale Assocs., LLC*, No. SACV 12-2119 JVS (RNBx), 2013 WL 12130317, at *2, n.2 (C.D. Cal. Feb. 20, 2013) (applying federal procedural law as to pleading in the alternative).  Also, at least one district court has found that California recognizes claims for unjust enrichment and for quasi-contract.  *Stark v. Patreon, Inc.*, 635 F. Supp. 3d 841, 857 (N.D. Cal. 2022).

Nonetheless, because Cox has not challenged the existence or validity of the MoCA IPR Policy, Cox cannot pursue a claim for unjust enrichment or quasi-contract:

> Under California law, unjust enrichment is an action in quasi-contract, which does not lie when an enforceable, binding agreement exists defining

the rights of the parties. While Federal Rule of Civil Procedure 8 allows pleading in the alternative, the liberal pleading policy has its limits. For example, a pleader may assert contradictory statements of fact only when legitimately in doubt about the facts in question. Where, as here, there is no dispute about the existence or validity of the express contract and Plaintiffs do not allege that the contract is void, rescinded, or otherwise [un]enforceable, Plaintiffs cannot plead alternative theories that necessarily fail where an express contract defines the rights of the parties. Indeed, Plaintiffs acknowledge that the Terms of Service and Privacy Policy govern the relationship of the parties.

*Huynh v. Quora, Inc.*, No. 18-cv-07597-BLF, 2019 WL 11502875, at *12 (N.D. Cal. Dec. 19, 2019) (citations and internal quotation marks omitted).

MaxLinear's motion to dismiss Cox's counterclaim for unjust enrichment or quasi-contract (Count IV) should therefore be GRANTED.

(4)  Leave to Amend

MaxLinear argues that dismissal should be with prejudice because any attempt to amend would be futile.  (-1043, Dkt. 335 at 30–31.)

Cox responds that "Cox did not delay and has not acted in bad faith or with dilatory motive," and "the Court has not ruled that any deficiencies exist in Cox's counterclaims to date."  (-1043, Dkt. 385 at 33.)  Cox also argues that, even if the Court finds any deficiencies in Cox's counterclaims, permitting amendment would be appropriate because "*all* of the issues identified in MaxLinear's motion amount, at most, to assertions that it cannot understand Cox's claims without additional words to further address elements of the claims."  (*Id.*)

1  MaxLinear replies that "[a]busing the amendment process to keep alive stale

2 claims otherwise lacking standing, just to keep MaxLinear in the lawsuit, constitutes . . .

3 prejudice" such that there should be no leave to amend.  (-1043, Dkt. 406-1 at 16.)

4  Because the lack of plausibility is based not on a lack of detail in Cox's allegations

5 but rather on legal insufficiency as discussed in subsection (3), above, amendment would

6 be futile.  The other factors under Rule 15 need not be addressed because "[f]utility alone

7 can justify the denial of a motion for leave to amend."  *Nunes*, 375 F.3d at 808.

8  Cox's counterclaim for unjust enrichment or quasi-contract (Count IV) should

9 therefore be dismissed with prejudice.

10 **B.  MaxLinear's Motion to Dismiss Counterclaims Regarding** ▮▮▮▮▮▮
**(-1049, Dkt. 219)**

11

12  MaxLinear argues that Cox's counterclaims should be dismissed for lack of subject

13 matter jurisdiction under Rule 12(b)(1) as well as based on failure to properly plead a

breach of contract claim under Rule 12(b)(6).  MaxLinear also argues that Cox's

14 counterclaims should be dismissed with prejudice because Cox has already amended

15 once and any further amendment would be futile.

16  (1)  Subject Matter Jurisdiction

17   (a)  Parties to ▮▮▮▮▮▮

18 MaxLinear submits that "the ▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮," and "Cox now claims rights as a third-party

20

1   beneficiary, ███████████████████████████████████████████████████."

2   (-1049, Dkt. 235 at 14.)

3       Cox responds that MaxLinear's arguments "are just challenges to Cox's pleading

4   under Rule 12(b)(6)," and "[b]reach of contract actions are quintessential common-law

5   analogues and are the type of actions that confirm standing."  (-1049, Dkt. 267-1 at 12–13

6   (citation omitted).)

7       MaxLinear replies that "[a]pplying Cox's logic, *anyone* could bring claims based

8   on a contract to which it has no interest or rights."  (-1049, Dkt. 281-1 at 5.)

9   ████████████████████████████████████████████████████████

10  ██████████

11  ██████████████████████████████████████████████

12

13

14

15  ███████████████████████

16      MaxLinear does not persuasively demonstrate that this provision bars third party

17  beneficiaries.  Rather, read in context, ███████████████████████████████

18  ████████████████████████████████████.  For example, this expressly precludes

19  ████████████████████ from being interpreted as granting ████████████████████

20  ████████████████

---

1   Cox sufficiently alleges that it has been an intended third party beneficiary of the

2   █████████████ (*See* Cox Am. Counterclaims (-1049) at ¶¶ 287–295); *cf. G+*

3   *Commc'ns*, 2023 WL 3167416, at *5 (". . . G+ has sufficiently pled that it was an

4   intended beneficiary of the Samsung/ETSI contract.  G+ alleges that Samsung is a

5   signatory of ETSI, that ETSI members are bound to the ETSI IPR policy, that Clause 3.2

6   of the ETSI IPR policy requires members to 'reward' IPR holders irrespective of whether

7   the IPR holder is a member or a third party, and that G+ is a third-party IPR holder.  This

8   is sufficient at the pleading stage to put Samsung on notice that G+ is an alleged third-

9   party beneficiary.") (citations omitted).

10   <u>(b)  Scope of</u> ███████████

11   MaxLinear argues that "[p]er its plain terms, ████████████████

12   ████████████████████████████████

13   ████████████.)  MaxLinear urges that "Cox intentionally avoids definitively

14   stating that the asserted patents are essential to practicing the DOCSIS standard," and

15   "[a]bsent a clear allegation that the asserted patents are essential to practicing the

16   DOCSIS standard, ██████████████ cannot apply to Cox or its DOCSIS

17   compliant products."  (*Id.* at 15 & 16.)

18   Cox responds that its counterclaims explain that Plaintiff's complaint and

19   infringement contentions rely on DOCSIS, and Cox argues that "it is enough for Cox to

20   point to Plaintiff's own admissions, accusations and positions, the character of the

1   asserted patents, and/or the DOCSIS specifications to plausibly show essentiality."

2   (-1049, Dkt. 267-1 at 13 & 14.)

3          MaxLinear replies that "Cox's references to *Entropic's* alleged positions hardly

4   constitute a clear allegation by *Cox* that the patents are standards-essential," and also

5   "Entropic has made clear its belief that the asserted patents are *not* standards-essential."

6   (-1049, Dkt. 281-1 at 5–6 (citation omitted).)

7          Cox sufficiently alleges that the patents at issue are essential for compliance with

8   DOCSIS.  As discussed in Section IV.A.(1)(a)(iv), above, Cox need not take a definitive

9   position on essentiality at the pleading stage.

10                    (c)  Ripeness

11         MaxLinear argues that "Cox's Amended Counterclaims are unripe because they

12   are contingent on the asserted patents being standards-essential—a finding that no court

13   has yet made."  (-1049, Dkt. 235 at 18.)

14         Cox responds that, under Rule 8(d)(2), "Cox can . . . simultaneously deny

15   infringement while pursuing breach of contract and unjust enrichment claims should the

16   patents prove essential."  (-1049, Dkt. 267-1 at 19.)  Cox also argues that "[t]he

17   counterclaims plausibly establish an immediate and concrete dispute over who actually

18   owns the asserted patents and the very nature of MaxLinear's continued interest in the

19   patents."  (*Id.*)

20

MaxLinear replies: "Cox's counterclaims require ████████████ apply. If the patents are not standards-essential (which is Entropic's position), the agreement is irrelevant, and Cox's counterclaims fail.  Until a court holds the asserted patents standards-essential, Cox's counterclaims are premature and speculative and should be dismissed."  (-1049, Dkt. 281-1 at 7.)

As discussed in Section IV.A.(1)(a)(iv), above, Cox need not take a definitive position on essentiality at the pleading stage.

MaxLinear's ripeness argument is therefore rejected.

### (d)  Injury

MaxLinear argues that "Cox alleges that it has already received the benefit of a sublicense to the asserted patents through its vendors," and "[i]f so, then MaxLinear 'avoided' no 'encumbrance,' and Cox was not injured."  (-1049, Dkt. 235 at 16 (citing Cox Am. Counterclaims (-1049) ¶ 291).)  MaxLinear also argues that "Cox does not explain how MaxLinear's patent assignment to Entropic caused it any injury or describe what that injury is in any detail."  (*Id.* at 17 (citing Cox Am. Counterclaims (-1049) ¶¶ 325, 333).)  MaxLinear also argues that the pendency of litigation is not a cognizable injury, particularly when considering that "[i]f MaxLinear's patent transfer to Entropic is void, as Cox alleges, that would simply mean that MaxLinear is the patent owner," and "Cox then would be liable to MaxLinear for any alleged patent infringement, not Entropic—and the purported harm is the same."  (*Id.* at 17.)

1    Cox responds that "[d]espite MaxLinear accepting all the benefits that participation

2    in DOCSIS and the patent pool provided . . ., MaxLinear chose to accept payments from

3    Entropic, represent that there were no encumbrances, and transfer the asserted patents

4    free of any encumbrances in violation of the ████████████." (-1049, Dkt. 267-1 at 15

5    (citing Cox Am. Counterclaims (-1049) at ¶¶ 291–95, 297–301, 308–311).)  Cox argues

6    that "[o]nly by virtue of [MaxLinear's] breaches was this suit brought, as a result of

7    which Cox's substantial investments in DOCSIS are thwarted, Cox did not receive the

8    benefit of ████████████ and standards, and has instead been forced to address

9    Plaintiff's claims."  (*Id.* at 15 (citing Cox Am. Counterclaims (-1049) at ¶¶ 313–18)).)

10   Cox also argues that "MaxLinear's unjust enrichment from its misrepresentations

11   provides standing."  (*Id.* at 16–17 (citation omitted).)  Further, Cox argues that "[t]he

12   costs of responding to Entropic's assertions count as damages for MaxLinear's breach of

13   contract."  (*Id.* at 17.)

14   MaxLinear replies that "Cox identifies no specific statement or false representation

15   [by MaxLinear]," "[n]or does Cox address MaxLinear's express recognition of its

16   DOCSIS commitments and affiliation in the PPA."  (-1049, Dkt. 281-1 at 6 (citation

17   omitted).)  MaxLinear also argues that the costs of litigation do not establish standing

18   because the authorities cited by Cox "involved breach of an agreement to which both the

19   plaintiff and defendant were parties."  (*Id.*)

20

---

Entropic acknowledges that it received the patents subject to any obligations to DOCSIS, so Cox cannot plausibly allege any injury from a purported removal of such obligations by way of the assignment of patents from MaxLinear to Entropic.  *See also Entropic*, 2023 WL 9189317, at *3 (quoting *Datatreasury*, 522 F.3d at 1372) ("[g]enerally, legal encumbrances involving the right to use patented technology 'run with the patent'").

Cox thus fails to plausibly allege any cognizable injury.

### (e)  Conclusion

Because Cox fails to plausibly allege any cognizable injury, MaxLinear's motion to dismiss for lack of subject matter jurisdiction should be granted.

### (2)  Sufficiency of Allegations

### (a)  Breach of Contract (Count I)

### (i)  Formation of Contract and the Parties Thereto

MaxLinear argues that "Cox claims to be a third-party beneficiary under the ███████████████ but "[i]ts allegations, however, fall far short of the legal and the express contractual requirements for asserting third-party beneficiary status."  (-1049, Dkt. 235 at 19.)  MaxLinear submits that ██████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████, and MaxLinear argues that Cox does not allege having done any of these things.  (*Id.* at 19–20; *see id.* at

1    20–21.)  Finally, MaxLinear submits that █████████████████████████████

2    ████████████████████████████████████████████████████████████

3    █████████████   (*Id.* at 23.)  MaxLinear concludes that Cox is at most merely an

4    incidental beneficiary, not an intended beneficiary.  (*Id.* at 22.)

5          Cox responds that it helped to found CableLabs and that ████████████████

6    ████████████████████████████████████████████████.  (-1049, Dkt.

7    267-1 at 20–21.)  Cox also argues that "Cox has alleged it is an intended beneficiary in

8    part because it is an implied licensee and beneficiary of the patent exhaustion that results

9    from its purchasing equipment from its vendors who executed ████████████  and

10   joined the patent pool."  (*Id.* at 22 (citing Cox Am. Counterclaims (-1049) at ¶¶ 292,

11   322).)  Further, Cox argues that the purported ███████████  cited by MaxLinear has

12   been subject to "creative cropping" in MaxLinear's brief, and Cox argues that █████

13   ████████████████████████  (*Id.* at 23 (emphasis

14   modified).)  Cox argues that "the fact that the ██████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ███████████████████  (*Id.*)  Finally, Cox argues that ██████████

18   ████████████████████████████████████████  to Cox—the

19   purchaser of the licensed equipment and operator of the fiber/coax network for delivery

20   of data."  (*Id.* at 24.)

1    MaxLinear replies that the allegations cited by Cox do not support Cox's assertions

2    in its brief and do not contain any allegation that Cox founded CableLabs or that Cox

3    participated in creating the DOCSIS standard.  (-1049, Dkt. 281-1 at 7.)  MaxLinear also

4    argues that "[a]s ███████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████" (*Id.* at 9.)  Further, MaxLinear argues that "Cox's interpretation of the

7    ████████████████████████████████████████████████████████████

8    ████████████████████████." (*Id.*)

9        As discussed in Section III.B.(1)(a), above, Cox sufficiently alleges that it has been

10   an intended third party beneficiary of ████████████████ . (*See* Cox Am.

11   Counterclaims (-1049) at ¶¶ 287, 294–98, 302–03, 310–18.)

12                    (ii)  Performance

13   MaxLinear argues that "[a]bsent an allegation that [Cox's] vendors (or other

14   licensees or sublicensees) performed under t███████████████, Cox cannot rely on

15   their license or sublicense, and Cox's Amended Counterclaims fail to state a claim."

16   (-1049, Dkt. 235 at 23.)

17   Cox responds that "[t]he law is clear that a third party beneficiary need not perform

18   the obligations of the contract, and MaxLinear recited no contrary rule."  (-1049, Dkt.

19   267-1 at 22.)  Cox also argues that "Cox's pleadings establish that it receives implied

20   license due to its purchase and use of licensed equipment to operate the very DOCSIS

network that creates the market for any DOCSIS-compliant equipment," and also

"MaxLinear points to nothing indic[a]ting it ever asked CableLabs or anyone else to . . .

mark." (*Id.*)

MaxLinear replies that Cox has still not explained how any of its vendors

purportedly met the requirements to ███████████████████████████████████

███████████████████████████████. (-1049, Dkt. 281-1 at 8.)  MaxLinear

also argues that ██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████" (*Id.*)

MaxLinear does not demonstrate that Cox, as an alleged third party beneficiary,

had any obligation to perform any of the obligations of ████████████████.

(iii)  Breach

MaxLinear argues that "Cox does not cite any provision that prohibits MaxLinear

from accepting an interest in a lawsuit's outcome," "Cox does not cite any provision that

prohibits MaxLinear from attempting to assign its patents free of encumbrances," and

"Cox does not cite any provision that requires MaxLinear to ensure Entropic's

compliance with the Agreement." (-1049, Dkt. 235 at 25.)

Cox responds that "[t]he fundamental character of a license is that it is a promise

by the licensor not to sue," and "MaxLinear's transactions with Entropic breached this

promise." (-1049, Dkt. 267-1 at 25 (citation omitted).)  Cox argues that "one cannot

1  evade a contractual promise barring suit by transferring patents to a third party to strip

2  out such encumbrances, fail to obligate the transferee to respect granted licenses,

3  affirmatively promise the transferee help in prosecuting the resulting lawsuit and accept a

4  share in the proceeds of same." (*Id.*)

5         MaxLinear replies that Cox identifies no misrepresentation or any action to

6  purportedly remove the encumbrances of ██████████████, and MaxLinear

7  submits that "[a]s the PPA and Cox's own pleadings confirm, MaxLinear's commitments

8  ran with the patents, and it has not breached ██████████████." (-1049, Dkt.

9  281-1 at 11.)

10        As discussed in Section II.B.(1)(d), regarding Entropic's motion to dismiss,

11  ████████████████████████████████████████████████

12  ████████████████████████████████████ (emphasis

13  added).)  Also, "[g]enerally, legal encumbrances involving the right to use patented

14  technology 'run with the patent.'" *Entropic*, 2023 WL 9189317, at *3 (quoting

15  *Datatreasury*, 522 F.3d at 1372).  Further, even if MaxLinear *intended* to remove the

16  DOCSIS obligation, Cox does not identify any viable cause of action based on a

17  purported *attempted* breach.  (*See* Cox Am. Counterclaims (-1049) ¶ 267 (". . .

18  MaxLinear has *sought* to avoid encumbrances on its patents . . ."); *see also id.* ¶ 324

19  ("breaching the DOCSIS License Agreements by *attempting* to assign the Asserted

20  Patents free of any encumbrances").)  Finally, Cox does not identify any ████

1    ███████████████ that is purportedly breached by MaxLinear accepting an interest in the

2    outcome of the present litigation.

3         Cox thus fails to plausibly allege non-performance by MaxLinear.

4                        (iv)  Damages

5         MaxLinear argues that "Cox has taken no action to secure any benefits as a

6    'sublicensee' under █████████████████," and "[i]t cannot suffer harm from

7    something to which it has no right."  (-1049, Dkt. 235 at 25.)  MaxLinear also argues that

8    "[i]f the assignment to Entropic were void, Cox would simply owe damages to

9    MaxLinear instead."  (*Id.* at 26.)

10        Cox responds that "Cox specifically pled the right to be free of claims from

11   MaxLinear's DOCSIS-essential patents due to its implied license and patent exhaustion

12   given its purchases from vendors who received the relevant sublicenses," and "Cox has

13   suffered injury both from disruption of its investment in DOCSIS in reliance and

14   expectation of being free from claims concerning MaxLinear's essential patents, and

15   from Entropic's suit, which would not have occurred but for MaxLinear's breaches."

16   (Dkt. 267-1 at 27 (citing Cox Am. Counterclaims (-1049) ¶¶ 315–18).)  Cox also argues

17   that "[t]he costs of responding to Entropic's assertions count as Cox's damages for

18   MaxLinear's breach of contract."  (*Id.* at 28.)

19        MaxLinear replies that Cox fails to plead causation and that "litigation costs cannot

20   supply the requisite harm."  (-1049, Dkt. 281-1 at 12.)

1    Entropic acknowledges that it received the patents subject to any obligations to

2  DOCSIS, so Cox cannot plausibly allege any injury from a purported removal of such

3  obligations by way of the assignment of patents from MaxLinear to Entropic.  *See also*

4  *Entropic*, 2023 WL 9189317, at *3 (quoting *Datatreasury*, 522 F.3d at 1372)

5  ("[g]enerally, legal encumbrances involving the right to use patented technology 'run

6  with the patent'").

7    Cox thus fails to plausibly allege any cognizable damages.

8    (v)  Conclusion

9    Because Cox fails to plausibly allege breach by MaxLinear or any cognizable

10  damages, MaxLinear's motion to dismiss as to Cox's counterclaim for breach of contract

11  (Count I) should be GRANTED.

12    (b)  Declaratory Judgment (Count II)

13    MaxLinear argues that "Cox's request for declaratory relief depends entirely on the

14  same facts and issues as its breach of contract counterclaim," and "[b]ecause that claim is

15  deficient, and the declaratory judgment claim is nothing more than a duplication of the

16  breach claim, the Court should dismiss Cox's declaratory relief request with prejudice."

17  (-1049, Dkt. 235 at 27 (citations omitted).)  MaxLinear also argues that "[b]ecause

18  Cox's declaratory relief counterclaim falsely assumes that it has rights under the

19  ████████████, it should be dismissed."  (*Id.* at 28.)

20

---

1    Cox responds that "[t]he counterclaims' averments support a grant of declaratory

2  judgment on the grounds that the patent assignments to Entropic are void," and "breach

3  of contract and declaratory judgment are different claims seeking two different types of

4  remedies, and are not duplicative."  (-1049, Dkt. 267-1 at 28 & 29.)  Cox argues: "Here

5  the issues are particularly unsettled and in need of clarification.  Entropic asserts

6  infringement claims based on patents obtained through assignments that are void.

7  MaxLinear never disputes that declaratory judgment in Cox's favor on this issue would

8  clarify and settle issues—including Entropic's ability to make infringement claims.

9  Cox's counterclaim is thus appropriate."  (*Id.* at 29.)

10   MaxLinear replies that Cox's declaratory judgment claim is duplicative and that

11  "Cox does not explain . . . why resolution of its breach counterclaim would not provide

12  the same clarity."  (-1049, Dkt. 281-1 at 12.)

13   As discussed in Sections III.B.(2) and IV.B.(2)(a)(iii), above, as to Entropic's

14  motion to dismiss, "[e]ither ███████████ obligations continue to run with the

15  patents automatically, or the patents were never subject to the ███████████ in the

16  first place."  (-1049, Dkt 228-1 at 15.)  Even if MaxLinear *intended* to remove the

17  DOCSIS obligation, Cox does not identify any viable cause of action based on a

18  purported *attempted* breach.

19   MaxLinear's motion to dismiss Cox's counterclaim for declaratory judgment

20  (Count II) should therefore be GRANTED.

1

### (c)  Unjust Enrichment or Quasi-Contract (Count IV)

2      MaxLinear argues that "[b]ecause Cox does not dispute the validity of the █████

3      █████, it cannot raise a quasi-contract claim."  (-1049, Dkt. 235 at 29 (citations

4      omitted).)  MaxLinear also argues: "MaxLinear was a DOCSIS Licensor, so any benefit

5      received was not unjust"; Cox fails to meet Rule 9(b)'s heightened standard for pleading

6      that MaxLinear made misleading representations; Cox only alleges it conferred benefits

7      to DOCSIS, not MaxLinear; and "MaxLinear received the same benefits as other

8      participants."  (*Id.* at 29–30.)

9      Cox responds that all potentially relevant jurisdictions (Colorado, New York, and

10     California) recognize a cause of action for unjust enrichment.  (-1049, Dkt. 267-1 at 30.)

11     Alternatively, Cox argues that "[b]ecause DOCSIS was developed and overseen by

12     CableLabs from its Colorado offices and ██████████████████████████

13     ██████████████" either Colorado or New York has a stronger interest than

14     California.  (*Id.*)  Further, Cox argues that MaxLinear's assertion that it was a licensor

15     who properly received benefits from ████████████ does not bar a claim for

16     unjust enrichment because the focus of such a claim is "*not* on the initial receipt of

17     benefits when all was well, but instead on whether circumstances resulted that make

18     retention of the benefits unjust."  (*Id.* at 31.)  Further, as to Rule 9(b), Cox responds that

19     "[t]he counterclaims need only provide enough detail to put MaxLinear on notice of the

20     misconduct, rather than requiring the precise statements that MaxLinear seeks," and

1  "even if Rule 9(b) did require Cox to precisely identify how and why which statements

2  were false or misleading, or when made, Cox did so." (*Id.* at 32; *see id.* at 32–33.)

3      MaxLinear replies that "[w]hether under California, Colorado, or New York law,

4  Cox cannot maintain an unjust enrichment counterclaim separate from quasi-contract."

5  (-1049, Dkt. 281-1 at 13.)  MaxLinear also argues that "[a]s Cox does not deny the

6  existence of an enforceable contract, Cox's quasi-contract claim is dead on arrival." (*Id.*

7  at 14 (citation omitted).)  Further, MaxLinear argues that "[b]ecause MaxLinear's

8  commitments ran with the patents and Cox offers no evidence that MaxLinear has

9  repudiated them, MaxLinear could not have been unjustly enriched." (*Id.*)

10      Federal Rules of Civil Procedure 8(d)(2) and 8(d)(3) allow for pleading in the

11  alternative, and a party may do so "regardless of consistency."  *Intelligent Mgmt.*

12  *Solutions*, 2013 WL 12130317, at *2, n.2 (applying federal procedural law as to pleading

13  in the alternative).  Also, at least one district court has found that California recognizes

14  claims for unjust enrichment and quasi-contract.  *Stark*, 635 F. Supp. 3d at 857.

15      Nonetheless, because Cox has not challenged the existence or validity of the

16  ███████████, Cox cannot pursue a claim for unjust enrichment or quasi-contract.

17  *See Huynh*, 2019 WL 11502875, at *12.

18      MaxLinear's motion to dismiss Cox's counterclaim for unjust enrichment or quasi-

19  contract (Count IV) should therefore be GRANTED.

20

(d)  Leave to Amend

MaxLinear argues that "[t]he futility of Cox's anticipated future amendments warrants denial of leave to amend," and "further amendments would increase the parties' litigation costs, add delay, and consume additional judicial resources."  (-1049, Dkt. 235 at 27 (citation omitted).)

Cox responds that "the Court has not ruled that any deficiencies exist in Cox's counterclaims to date," and "*all* of the issues identified in MaxLinear's motion amount, at most, to assertions that it cannot understand Cox's claims without additional words to further address elements of the claims."  (-1049, Dkt. 267-1 at 34.)

MaxLinear replies that "[t]here is no reason to believe Cox would cure its pleading defects via further amendments."  (-1049, Dkt. 281-1 at 15.)

Because the lack of plausibility is based not on a lack of detail in Cox's allegations but rather on an inconsistency between Cox' allegations and the plain language of the ███████████ as well as operation of law, as discussed above, amendment would be futile.  The other factors under Rule 15 need not be addressed because "[f]utility alone can justify the denial of a motion for leave to amend."  *Nunes*, 375 F.3d at 808.

Cox's counterclaims for breach of contract (Count I), declaratory judgment (Count II), and unjust enrichment or quasi-contract (Count IV) should therefore be dismissed with prejudice.

## V.  Entropic's Motion to Dismiss DISH's Counterclaims (-1043, Dkt. 361)

## A.  Breach of Contract (Count III)

Entropic's motion to dismiss DISH's counterclaims regarding breach of contract presents many of the same disputes addressed above regarding Entropic's motion to dismiss Cox's counterclaims regarding tortious interference and MaxLinear's motion to dismiss Cox's counterclaims regarding breach of contract.

For example, DISH argues that when MaxLinear sold the asserted patents to Entropic, "MaxLinear failed to include language in the assignment agreement required by MoCA," "MaxLinear made a contrary representation in the Patent Purchase Agreement," and "despite repeated written requests, Entropic failed to provide *any* licensing offer to DISH."  (-1043, Dkt. 395 at 12 (emphasis omitted).)  DISH also argues that "the IPR Policy makes any party wishing to implement a MoCA standard a third-party beneficiary."  (*Id.* at 16.)

Entropic replies that "Entropic is, and always has been, committed to licensing its patents that are essential to the MoCA standard on terms that are fair, reasonable, and non-discriminatory (RAND)."  (-1043, Dkt. 420-1 at 1.)  Entropic also argues that "DISH's lack of commitment to take a RAND license underscores the lack of any actual harm arising from Entropic's suit."  (*Id.* at 6–7.)  Further, Entropic argues that the DISH entities other than DISH Technologies are not parties to the MoCA IPR Policy and that,

1  regardless, any license request from DISH entities came *after* Entropic filed suit.  (Id. at 7

2  & 11–12.)

3        For essentially the same reasons discussed above as to Entropic's motion to

4  dismiss Cox's counterclaim for tortious interference and MaxLinear's motion to dismiss

5  Cox's counterclaim for breach of contract, DISH plausibly alleges that the DISH entities

6  have standing and DISH plausibly alleges a breach of contract.  In particular, DISH

7  alleges that it has requested that Entropic provide a license offer on RAND terms and,

8  DISH alleges, Entropic has failed to do so.  (*See* DISH Counterclaims ¶¶ 48–56 & 83.)

9  Despite Entropic's arguments that such requests were not in the proper form or were from

10  the wrong DISH entities, DISH's allegations are sufficient to meet the plausibility

11  threshold at the pleading stage.  DISH also plausibly alleges that it has been harmed.

12  (*See id.* at ¶ 63.)

13        Entropic's motion to dismiss DISH's counterclaim for breach of contract (Count

14  III) should therefore be denied.

15  **B.  Conspiracy (Count VI)**

16        Conspiracy is not a stand-alone cause of action but rather is "a legal doctrine that

17  imposes liability on persons who, although not actually committing a tort themselves,

18  share with the immediate tortfeasors a common plan or design in its preparation," and the

19  elements of a civil conspiracy are "(1) the formation and operation of a conspiracy, (2)

20  wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the

1   wrongful conduct." *Mintel Learning Tech., Inc. v. Beijing Kaidi Educ.*, No. C 06-7541

2   PJH, 2007 WL 2288329, at *4 (N.D. Cal. Aug. 9, 2007).

3   Entropic argues that DISH has not adequately alleged any underlying tort that

4   could support a claim for conspiracy.  (-1043, Dkt. 362-1 at 16.)  Entropic urges that

5   "DISH cannot allege harm from a supposed removal of the RAND obligation because no

6   matter what Entropic or MaxLinear did, that obligation lives on."  (*Id.* at 19 (citation

7   omitted).)

8   DISH responds that it sufficiently alleges that "Entropic and MaxLinear conspired

9   to commit fraud and negligent misrepresentation to avoid having to license the Asserted

10  Patents on RAND terms."  (-1043, Dkt. 395 at 21.)  DISH also argues that "neither

11  Entropic nor MaxLinear has made any binding statement that the asserted patents are

12  RAND-encumbered."  (*Id.* at 22.)

13  Entropic replies that "DISH's alleged wrongful act is a fraudulent scheme to

14  disregard the plain the terms of the IPR Policy," but "[t]here can be no fraud claim as a

15  matter of law based on 'an alleged promise to interpret the [PPA and IPR Policy] in a

16  way that contradicts the plain language of [those agreements].'" (-1043, Dkt. 420-1 at 14

17  (quoting *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d 272, 281

18  (9th Cir. 1992).)

19  At the April 11, 2024 hearing, DISH pointed to paragraphs 114–119 of its

20  counterclaims, which allege:

114.   That MaxLinear knew that its representations were false, or at least lacked reasonable grounds for believing them true, is evidenced by MaxLinear's behavior after its acquisition of Original Entropic [(Entropic Communications, Inc.)].

115.   . . . In its 2012 Annual Report, for example, Original Entropic stated "[i]n connection with our membership in MoCA, we are required to license any of our patent claims that are essential to implement the MoCA specification to other MoCA members under reasonable and non-discriminatory terms."

116.   . . . MaxLinear knew of Original Entropic's statements prior to acquiring Original Entropic[,] and because of MaxLinear's own participation in MoCA, MaxLinear was aware of the MoCA IPR Policy and its obligations.  However, in its own Annual Report in 2015, MaxLinear touted its acquisition of Original Entropic and the MoCA patents without disclosing encumbrances on those patents.

117.   That MaxLinear knew that its representations were false, or at least lacked reasonable grounds for believing them true, is further evidenced by MaxLinear's transfer of the Asserted Patents to Entropic.

118.   * * * MaxLinear warranted that the only known encumbrances on the Asserted Patents were two license agreements unrelated to the MoCA IPR Policy.

119.   That MaxLinear knew that its representations were false, or at least lacked reasonable grounds for believing them true, is further evidenced by Entropic's failure to offer DISH a license to the Asserted Patents under RAND terms, despite repeated requests by DISH.

DISH's allegations are sufficient to meet the plausibility and Rule 9(b) standards that are applicable at the pleading stage.

1      Entropic's motion to dismiss DISH's counterclaim for conspiracy (Count VI)

2   should therefore be denied.

3   **C. Sherman Act (Count VIII) and Cartwright Act (Count IX)**

4      Entropic argues that DISH's claims under the Sherman Act (and, correspondingly,

5   California's Cartwright Act) should be dismissed because it is "implausible that

6   MaxLinear and Entropic intended to harm or restrain trade by achieving the impossible—

7   removing an encumbrance from patents." (-1043, Dkt. 362-1 at 21.)  Entropic also

8   argues that DISH cannot show any injury to competition or anti-competitive effect

9   because any encumbrances run with the patents, because the Patent Purchase Agreement

10  does not specify any particular fees, because all competitors who practice the technology

11  of the patents are facing the same demands from Entropic, because any fees demanded by

12  Entropic have not yet been paid, because DISH does not allege that Entropic's patent

13  portfolio has prevented DISH from making or practicing any technology, and because

14  "anticompetitive effects based on litigation [(such as litigation expenses)] are derivative;

15  they cannot stand alone." (*Id.* at 21–24.)

16     DISH responds that "Entropic has demanded non-RAND licensing rates, including

17  $1 billion from DISH alone," and "the antitrust violation and harm arises from the

18  attempt to remove a RAND promise from essential patents." (-1043, Dkt. 395 at 28

19  (citation omitted).)  DISH also responds that Entropic's reliance on suing all users of

20  MoCA (thus purportedly affecting all competitors equally) is unavailing because "MoCA

is not the only technology in the markets identified by DISH," and "[f]or example, WiFi may be used both for home networking and for transmitting television signals within a home." (*Id.* at 28–29 (citation and footnote omitted).)  DISH argues that it is harmed by the scheme of Entropic and MaxLinear to avoid the RAND obligations, whereby Entropic is demanding exorbitant royalties and, as a result, "DISH has incurred significant expense defending itself in a lawsuit that could have been avoided; and will have to pay an exorbitant sum if Entropic gets what it has demanded," and "[t]hese costs may have to be passed on to its customers." (*Id.* at 29–30.)  Further, DISH argues that although no one has paid Entropic's demand, "Entropic made that demand [(directed specifically to DISH for alleged infringement of the asserted patents)] in a public pleading signed by counsel and subject to Rule 11, and its assertion that it seeks $1 billion in damages must be taken seriously." (*Id.* at 30.)  Finally, DISH argues that the *Noerr-Pennington* doctrine does not apply because the antitrust violation arises not from the prosecution of a lawsuit but rather from "the *assignment* of the asserted patents—in other words, from an unlawful *contract*." (*Id.* at 32.)

Entropic replies that "an antitrust claim cannot stand where the alleged violation cannot be committed as a matter of law." (-1043, Dkt. 420-1 at 14 (citation omitted).) Entropic also argues that "[b]ecause all Parties agree that Entropic did *not* 'wash' the patents of 'any obligation to license on RAND terms,' there is no harm," and, moreover, "[e]ven eliminating the obligation would not be an injury unless DISH actually paid too

1   much for a license."  (*Id.*)  Finally, Entropic argues that the *Noerr-Pennington* doctrine

2   applies because the harms alleged in DISH's counterclaim are based on attorney fees and

3   purported reputational harm from the present litigation.  (*Id.* at 15.)

4        At the April 11, 2024 hearing, DISH submitted that it relied on MaxLinear's

5   commitments to MoCA when, for example, DISH developed its "Hopper" and "Joey"

6   product lines.  Although DISH stated that it tends to agree with Entropic that the RAND

7   obligations ran with the patents, DISH argued that it is not a legal impossibility to have

8   removed those encumbrances (arguing that the bona fide purchaser rule could potentially

9   be applicable), and DISH argues that MaxLinear's effort to do so was anti-competitive.

10  *See Klang v. Pflueger*, No. SACV 13–01971 JVS (DFMx), 2014 WL 4922401, at *5

11  (C.D. Cal. July 10, 2014) ("The bona fide purchaser rule applies in patent law and

12  provides that a purchaser for value and without notice of prior encumbrances takes

13  ownership interest of the property free of those prior encumbrances.").

14       "Anticompetitive effects, more commonly referred to as 'injury to competition' or

15  'harm to the competitive process,' are usually measured by a *reduction in output* and an

16  *increase in prices* in the relevant market."  *Sullivan v. Nat'l Football League*, 34 F.3d

17  1091, 1096–97 (1st Cir. 1994) (citations omitted).

18       On one hand, as a general matter, misconduct in relation to a standards-setting

19  organization "can be considered anticompetitive conduct under the Sherman Act" and

20

1  "can independently qualify as an anticompetitive harm."  *Hynix Semiconductor Inc. v.*

2  *Rambus, Inc.*, 527 F. Supp. 2d 1084, 1098 (N.D. Cal. 2007).

3      On the other hand, DISH does not allege that Entropic manipulated the standards-

4  setting process itself.  That is, DISH does not allege that MaxLinear steered MoCA

5  toward a particular technology or away from a particular technology.  *Cf. Allied Tube &*

6  *Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988) ("What petitioner may not do

7  (without exposing itself to possible antitrust liability for direct injuries) is bias the process

8  by, as in this case, stacking the private standard-setting body with decisionmakers sharing

9  their economic interest in restraining competition.").

10      Rather, DISH alleges that MaxLinear transferred patents to Entropic in such a way

11  that purportedly removed RAND obligations (or attempted to do so).  *Cf. Broadcom*

12  *Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310–14 (Fed. Cir. 2007) ("Deceptive FRAND

13  commitments, no less than deceptive nondisclosure of [intellectual property rights], may

14  result in [anti-competitive] harm.").

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ██████████████████████████████████

1    DISH thus argues that its antitrust claims are based on a private commercial

2    agreement rather than any "petitioning" activity that could be protected by the *Noerr-*

3    *Pennington* doctrine.

4    Yet, because Entropic acknowledges that any RAND obligations necessarily ran

5    with the patents (including by operation of law) when MaxLinear assigned the patents to

6    Entropic, DISH does not state any plausible claim for anticompetitive conduct based on

7    any purported attempt to avoid the RAND obligations.

8    That is, even if MaxLinear had *attempted* to remove the encumbrances, it did not.

9    Entropic affirms that it has RAND obligations for the relevant patents.  DISH argues that

10   even if Entropic's position in this regard is accepted, Entropic has asserted this only

11   recently (in its briefing and oral arguments on the present motions) while DISH has

12   already incurred substantial costs of litigation up to the present time.  But to whatever

13   extent DISH attempts to base its antitrust claims on Entropic filing suit (and the ensuing

14   costs of litigation), the *Noerr-Pennington* doctrine bars antitrust claims based on anything

15   other than "sham" litigation, and DISH does not allege that the present litigation is a

16   "sham."  *See, e.g., Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 938 (9th Cir. 2006); *In re*

17   *Innovatio IP Ventures, LLC Patent Litig.*, 921 F. Supp. 2d 903, 915, 922 (N.D. Ill. 2013)

18   ("The existence of an obligation to license a patent on RAND terms, without more, is not

19   an actual express license providing a defense to infringement."; "Innovatio's [licensing]

20   campaign is protected petitioning activity under the First Amendment and *Noerr–*

1    *Pennington*."); *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1304–05 (Fed.

2    Cir. 2004); *Vizio, Inc. v. Funai Elec. Co.*, No. CV 09-0174 AHM RCX, 2010 WL

3    7762624, at *5 (C.D. Cal. Feb. 3, 2010) ("enforcing a patent does not constitute harm to

4    competition unless the enforcement action is brought in bad faith").

5        Even accepting DISH's arguments that costs of litigation can be considered as a

6    harm for purposes of antitrust claims, Entropic persuasively argues that the costs of

7    litigation cannot themselves give rise to antitrust liability.  *See Hynix*, 527 F. Supp. 2d at

8    1097 ("before otherwise protected litigation can be a part of an 'anticompetitive scheme'

9    claim, the court must first find that the other aspects of the scheme independently

10   produce anticompetitive harms").  DISH identifies no other actions that purportedly

11   "independently produce anticompetitive harms."  *Id.*  Further, although DISH argues that

12   Entropic's demand for $1 billion from DISH to license the patents-in-suit is

13   unreasonable—which DISH argues is a failure to meet Entropic's RAND obligations and

14   thus constitutes anticompetitive conduct—DISH identifies no authority for its apparent

15   proposition that a demand in other-than-sham litigation can give rise to antitrust liability.

16       *Noerr-Pennington* thus bars DISH's antitrust counterclaims even if DISH alleges

17   that the royalties demanded by Entropic are exorbitant.  *See In re Innovatio*, 921 F. Supp.

18   2d at 915, 922 (applying *Noerr-Pennington* where patentee "asserted infringement

19   against [defendants] before offering them a RAND license [and] offered licenses on

20   terms less favorable than RAND terms").

Entropic's motion to dismiss DISH's counterclaims under the Sherman Act (Count VIII) and the Cartwright Act (Count IX) should be GRANTED.

**D.  Patent Misuse (Count X)**

DISH "withdraws patent misuse as a counterclaim but maintains it as an affirmative defense."  (-1043, Dkt. 395 at 33.)  Entropic's motion is therefore moot as to Count X of DISH's counterclaims.

**E.  California Unfair Competition Law (Count XI)**

Entropic argues DISH does not allege any "unlawful, unfair, or fraudulent business practices," which Entropic argues is necessary to support an Unfair Competition Law ("UCL") claim.  (-1043, Dkt. 362-1 at 26.)

DISH responds as to this counterclaim together with DISH's response as to its Sherman Act and Cartwright Act counterclaims, arguing that its UCL claim is based on Entropic and MaxLinear attempting to wash the patents of their RAND obligations.  (*See* -1043, Dkt. 402 at 12.)

Because Entropic's motion should be granted as to DISH's Sherman Act, Cartwright Act, and patent misuse counterclaims, as discussed above, Entropic's motion to dismiss DISH's counterclaim under the California Unfair Competition Law (Count XI) should be GRANTED.

### F.  Leave to Amend

DISH's counterclaims for the Sherman Act (Count VIII), Cartwright Act (Count IX), and California Unfair Competition Law (Count XI) are unviable because of legal obstacles, not because of any lack of detail in the allegations.  Amendment would therefore be futile.  The other factors under Rule 15 need not be addressed because "[f]utility alone can justify the denial of a motion for leave to amend."  *Nunes*, 375 F.3d at 808.  These counterclaims should therefore be dismissed with prejudice.

## VI.  MaxLinear's Motion to Dismiss DISH's Counterclaims (-1043, Dkt. 357)

As a threshold matter, MaxLinear argues that DISH's opposition brief exceeds the word limit imposed by Local Rule 11-6.1, which states that "[e]xcept as otherwise provided in this rule or ordered by a judge, no memorandum of points and authorities, pretrial brief, trial brief, or posttrial brief may exceed 7,000 words . . . ."

Judge Holcomb's Standing Order (Rev. 2-24-23) provides: "Notwithstanding L.R. 11-6.1 & 11-6.2, Memoranda of Points and Authorities in support of or in opposition to motions shall not exceed 25 pages."  MaxLinear argues that the Standing Order imposes an *additional* limitation on number of pages, such that the word limit of L.R. 11-6.1 remains in effect.  As the Special Master stated to counsel by e-mail on March 29, 2024 (and only for purposes of the present briefing), the Special Master rejects MaxLinear's interpretation and instead interprets Judge Holcomb's Standing Order on this point as permitting exceeding the word count set forth in L.R. 11-6.1.  The Special Master

1  therefore rejects MaxLinear's request that the Special Master disregard everything after

2  the 7,000th word of DISH's opposition.  (*See* Dkt. 427 at 6.)

3  **A.  Breach of Contract (Count IV)**

4  MaxLinear's motion to dismiss DISH's counterclaims regarding breach of contract

5  presents essentially the same dispute as addressed above regarding MaxLinear's motion

6  to dismiss Cox's counterclaims regarding breach of contract.  For example, MaxLinear

7  argues that "any alleged breach is rendered implausible by Entropic's written

8  commitment to license on RAND terms."  (-1043, Dkt. 357 at 22 (citations omitted).)

9  MaxLinear also submits that "Dish only alleges that Dish Network L.L.C., which is not

10  an Alliance Party, submitted written requests for a license offer."  (*Id.* at 17 (citations

11  omitted).)

12  DISH responds that MaxLinear breached by "attempting to circumvent the RAND

13  promise it made and for failing to include language required by the IPR Policy when it

14  transferred ownership of the patents to Entropic."  (-1043, Dkt. No. 402 at 12 (citation

15  omitted).)  DISH also submits that Defendant DISH Technologies L.L.C. ("DISH

16  Technologies), which was formerly named Echostar Technologies, is a party to the

17  MoCA IPR Policy.  (*Id.* at 14.)  DISH also argues that "the IPR Policy makes any party

18  wishing to implement a MoCA standard a third-party beneficiary."  (*Id.* (citation

19  omitted).)  Further, DISH argues that all of the DISH entities became "de facto" members

20  of MoCA "because, during the many years in which the DISH entities participated in

MoCA, they were treated as members," and DISH urges that "course of conduct is a classic fact issue that cannot be resolved at th[e] [pleading] stage."  (*Id.* at 15 & 17.)

MaxLinear replies that DISH is wrong that MoCA members must give RAND licenses to "all comers," and MaxLinear submits that the authorities cited by DISH involved standards-setting organizations that voluntarily included non-members within the scope of their licensing obligations.  (-1043, Dkt. 427 at 7.)  MaxLinear also argues that course of conduct is relevant only when a contract is ambiguous and, moreover, it must relate to the parties to the contract.  (*Id.* at 9–10.)  Further, MaxLinear argues that DISH has performed under the contract because "[t]he first allegation of any potential *written* request is March 31, 2023, after Entropic had filed suit."  (*Id.* at 11.)

For the same reasons discussed as to Entropic's motion to dismiss DISH's counterclaim for breach of contract in Section V.A., above, MaxLinear's motion to dismiss DISH's counterclaim for breach of contract (Count IV) should be denied.

## B.  Fraud/Misrepresentation (Count V)

MaxLinear argues that DISH does not allege fraud or negligent misrepresentation with particularity because DISH does not allege what statements were made, when, or by whom, and MaxLinear also argues that "[a]lleged acts or omissions that Entropic performed in the *present* cannot show that a *past* MaxLinear statement was false." (-1043, Dkt. 357 at 23.)  Further, MaxLinear argues that DISH fails to plead reliance and causation.  (*Id.* at 24.)

DISH responds that MaxLinear fraudulently committed to compliance with the MoCA IPR Policy when, in reality, it had no intention of doing so—promises on which DISH relied when deciding what technology to implement in its products.  (-1043, Dkt. 402 at 12 (citation omitted); *see id.* at 25.)  DISH submits its allegations are sufficient because DISH "point[s] to MaxLinear's actions and other statements (such as its transfer of patents to Entropic and statements made to the SEC (*see* [DISH Am. Counterclaims (-1043)] ¶¶ 115–117)), as evidence of MaxLinear's intent."  (*Id.* at 27.)

MaxLinear replies that "Dish does not identify any duty or conduct independent of the MoCA commitment, so any fraud claim is barred by the economic loss rule."  (-1043, Dkt. 427 at 13 (citation omitted).)  MaxLinear also reiterates that DISH fails to allege any particular person who purportedly made a false or misleading statement.  (*Id.* at 14.)

"[W]hen the defendant is an entity, a complaint generally must also identify the person who made the false representations on behalf of the entity."  *Hurd v. Bos. Sci. Corp.*, No. 5:22-cv-00032-JWH-KK, 2023 WL 3564741, at *3 (C.D. Cal. Apr. 10, 2023) (Holcomb, J.) (quotation and citation omitted).

Although DISH does not identify any particular person by name, paragraphs 114–119 of DISH's counterclaims specifically point to securities filings by Entropic and MaxLinear as well as the contract that assigned the patents from MaxLinear to Entropic, as reproduced in Section V.B., above.

1   DISH's allegations are sufficient to meet the plausibility and Rule 9(b) standards

2   that are applicable at the pleading stage.  Finally, MaxLinear does not persuasively

3   demonstrate that the economic loss rule applies in the context of alleged fraud.

4   MaxLinear's motion to dismiss DISH's counterclaim for fraud and

5   misrepresentation (Count V) should therefore be denied.

6   **C.  Conspiracy (Count VI)**

7   MaxLinear argues that DISH's conspiracy claim "hinges on its claim for fraud and

8   negligent misrepresentation" and should therefore be dismissed as well.  (-1043, Dkt. 357

9   at 24.)  MaxLinear also submits that "there is no wrongful conduct—or damage—where

10  Entropic has complied with the RAND obligations, even going so far as to acknowledge

11  its commitment to RAND licensing before receiving an IPR Policy-compliant request

12  from Dish Technologies."  (-1043, Dkt. 357 at 25 (citations omitted).)

13  DISH responds that "MaxLinear conspired with Entropic to further th[e] fraud by

14  attempting to 'wash' the asserted patents of any RAND commitment through the transfer

15  to Entropic."  (-1043, Dkt. 402 at 12 (citation omitted); *see id.* at 28.)

16  MaxLinear replies that this claim should be dismissed if the underlying fraud claim

17  is dismissed, and "[t]he conspiracy claim also fails because the counterclaims are bereft

18  of any factual allegation showing that MaxLinear and Entropic formed a conspiracy,

19  acted in furtherance of the conspiracy, or damaged Dish."  (-1043, Dkt. 427 at 15

20  (citations omitted).)

Because MaxLinear's motion should be denied as to DISH's fraud and misrepresentation counterclaim, as discussed above, and for essentially the same reasons discussed above in Section V.B. (as to Entropic's motion to dismiss DISH's counterclaim for conspiracy), MaxLinear's motion to dismiss DISH's counterclaim for conspiracy (Count VI) should be denied.

**D. Quasi-Contract or Unjust Enrichment (Count VII)**

MaxLinear argues that "[b]ecause Dish does not dispute the validity of the applicable MoCA agreement, it cannot raise a quasi-contract claim." (-1043, Dkt. 357 at 25.) MaxLinear also argues that "MaxLinear was a MoCA member, so any benefit received was not unjust." (*Id.* at 26.) Further, MaxLinear argues that DISH fails to sufficiently allege fraud or coercion and, moreover, MaxLinear argues that it could not have induced DISH to adopt MoCA because a DISH affiliate was a founding member of MoCA long before MaxLinear became a member. (*Id.*)

DISH responds that "MaxLinear was unjustly enriched by the widespread adoption of MoCA technology (which was achieved by its wrongful and fraudulent statements concerning the IPR Policy) and should be disgorged of those unjust gains." (-1043, Dkt. 402 at 12 (citation omitted).) DISH also submits that because MaxLinear disputes whether the DISH entities are parties to the MoCA IPR Policy, "DISH is entirely within its rights to plead breach of contract and quasi-contract in the alternative." (*Id.* at 29 (citation omitted).) Further, DISH argues that "the benefits MaxLinear received from

1   MoCA were unjustly received because MaxLinear made fraudulent statements to become

2   a MoCA member and receive those benefits." (*Id.*)

3   MaxLinear replies by reiterating that "[u]nder California's substantive law, a party

4   cannot assert a quasi-contract claim while simultaneously asserting a valid and

5   enforceable contract." (-1043, Dkt. 427 at 15.) MaxLinear also argues that "[t]he quasi-

6   contract claim is dependent on the allegations of its fraud claim and fails for the same

7   reasons." (*Id.* at 16.)

8   As discussed above in Sections IV.A.(3) and IV.B.(2)(c) (regarding MaxLinear's

9   motions to dismiss Cox's counterclaims), MaxLinear persuasively argues that DISH

10   cannot pursue a quasi-contract or unjust enrichment claim while also alleging that there is

11   a binding contract. *See Huynh*, 2019 WL 11502875, at *12.

12   MaxLinear's motion to dismiss DISH's counterclaim for quasi-contract or unjust

13   enrichment (Count VI) should therefore be GRANTED.

14   **E.  Sherman Act (Count VIII) and Cartwright Act (Count IX)**

15   As to the antitrust counterclaims, MaxLinear presents substantially the same

16   arguments as Entropic, which are discussed above. (*See* -1043, Dkt. 357 at 27.)

17   MaxLinear also argues that "if the IPR Policy does apply, the Court will impose damages

18   at a RAND rate, where appropriate." (*Id.* at 28.)

19   DISH's response in support of its counterclaims as to MaxLinear is essentially the

20   same as DISH's response in support of its counterclaims as to Entropic. For example,

DISH responds that "DISH alleges that, by attempting to wash the patents of their RAND obligations after widespread adoption of MoCA technologies, Entropic and MaxLinear became unrestrained monopolists." (-1043, Dkt. 402 at 12 (citation omitted).) DISH also urges that "the *Noerr-Pennington* doctrine does not protect non-petitioning activity, such as the private agreement between MaxLinear and Entropic here." (*Id.* at 31 (citation omitted); *see id.* at 31–32.)

MaxLinear replies that "[t]he antitrust injury question is whether the harm Dish alleges *Dish* suffered is antitrust injury; it is not some generalized injury to the marketplace," and "Dish claims only patent damages and litigation costs, which are not antitrust injuries." (-1043, Dkt. 427 at 17 (citations omitted).)

For the same reasons discussed in section V.C., above, as to Entropic's motion to dismiss DISH's counterclaims under the Sherman Act (Count VIII) and the Cartwright Act (Count IX), MaxLinear's similar motion should be GRANTED.

**F.  Patent Misuse (Count X)**

DISH has withdrawn its patent misuse counterclaim as to MaxLinear and instead intends to assert patent misuse as an affirmative defense.  MaxLinear's motion is therefore moot as to Count X of DISH's counterclaims.

**G.  California Unfair Competition Law (Count XI)**

MaxLinear argues that DISH's UCL claim should be dismissed together with DISH's antitrust claims because "Dish pleads no new allegations in its UCL claim that

are not present in its Sherman Act, Cartwright Act, or patent misuse counterclaims."
(-1043, Dkt. 357 at 29.)

DISH responds as to this counterclaim together with DISH's response as to its Sherman Act and Cartwright Act counterclaims, arguing that its UCL claim is based on Entropic and MaxLinear attempting to wash the patents of their RAND obligations.  (*See* -1043, Dkt. 402 at 12.)

Because MaxLinear's motion should be granted as to DISH's Sherman Act, Cartwright Act, and patent misuse counterclaims, as discussed above, MaxLinear's motion to dismiss DISH's counterclaim under the California Unfair Competition Law (Count XI) should be GRANTED.

## H.  Leave to Amend

DISH's counterclaims for Quasi-Contract or Unjust Enrichment (Count VII), Sherman Act (Count VIII), Cartwright Act (Count IX), and California Unfair Competition Law (Count XI) are unviable because of legal obstacles, not because of any lack of detail in the allegations.  Amendment would therefore be futile.  The other factors under Rule 15 need not be addressed because "[f]utility alone can justify the denial of a motion for leave to amend."  *Nunes*, 375 F.3d at 808.  These counterclaims should therefore be dismissed with prejudice.

## VII.  Recommended Dispositions

The Special Master hereby RECOMMENDS:

| Motion | Recommended Disposition |
|---|---|
| Entropic Communications, LLC's Motion to Dismiss Cox Defendants' Amended Counterclaims Pursuant to Rule 12(b)(6) (Civil Action No. 2:23-CV-1043, Dkt. 327) | Denied |
| Entropic Communications, LLC's Motion to Dismiss Cox Defendants' Amended Counterclaims Pursuant to Rule 12(b)(6) (Civil Action No. 2:23-CV-1049, Dkt. 226) | GRANTED, such that Cox's counterclaims for declaratory judgment (Count II) and tortious interference (Count III) are DISMISSED WITH PREJUDICE |
| MaxLinear, Inc. and MaxLinear Communications LLC's Motion to Dismiss Amended Counterclaims of Cox Communications, Inc., CoxCom, LLC, and Cox Communications California LLC (Civil Action No. 2:23-CV-1043, Dkt. 320) | GRANTED-IN-PART and DENIED-IN-PART such that:<br><br>Cox's counterclaim for unjust enrichment or quasi-contract (Count IV) should be DISMISSED WITH PREJUDICE; and<br><br>MaxLinear's motion should be otherwise denied. |
| MaxLinear, Inc. and MaxLinear Communications LLC's Motion to Dismiss Amended Counterclaims of Cox Communications, Inc., CoxCom, LLC, and Cox Communications California LLC (Civil Action No. 2:23-CV-1049, Dkt. 219) | GRANTED, such that Cox's counterclaims for breach of contract (Count I), declaratory judgment (Count II), and unjust enrichment or quasi-contract (Count IV) are DISMISSED WITH PREJUDICE |

| Entropic Communications, LLC's Motion to Dismiss Dish's Counterclaims Pursuant to Rule 12(b)(6) (Civil Action No. 2:23-CV-1043, Dkt. 361) | GRANTED-IN-PART and DENIED-IN-PART such that:<br><br>DISH's counterclaims under the Sherman Act (Count VIII) and the Cartwright Act (Count IX) are DISMISSED WITH PREJUDICE;<br><br>DISH's counterclaim for patent misuse (Count X) is DISMISSED as moot (because withdrawn by DISH);<br><br>DISH's counterclaim under the California Unfair Competition Law (Count XI) is DISMISSED WITH PREJUDICE; and<br><br>Entropic's motion should be otherwise denied. |
|---|---|
| MaxLinear, Inc. and MaxLinear Communications LLC's Motion to Dismiss (1) Amended Counterclaims by DISH Network California Service Corporation; and (2) Counterclaims by DISH Network Corporation, DISH Network L.L.C., DISH Network Service L.L.C., and DISH Technologies, L.L.C. (Civil Action No. 2:23-CV-1043, Dkt. 357) | GRANTED-IN-PART and DENIED-IN-PART such that:<br><br>DISH's counterclaim for Quasi-Contract or Unjust Enrichment (Count VII) is DISMISSED WITH PREJUDICE;<br><br>DISH's counterclaims under the Sherman Act (Count VIII) and the Cartwright Act (Count IX) are DISMISSED WITH PREJUDICE;<br><br>DISH's counterclaim for patent misuse (Count X) is DISMISSED as moot (because withdrawn by DISH);<br><br>DISH's counterclaim under the California Unfair Competition Law (Count XI) is DISMISSED WITH PREJUDICE; and<br><br>MaxLinear's motion should be otherwise denied. |

| Requests for Judicial Notice (Civil Action No. 2:23-CV-1043, Dkts. 323, 360; (Civil Action No. 2:23-CV-1049, Dkt. 222) | GRANTED |
|---|---|

Any objections to the findings, conclusions, and recommendations contained in this report should be filed no later than within the time period set forth by the Federal Rule of Civil Procedure 53(f)(2). The Special Master believes that the shorter time period set forth in the Court's Order Appointing (*see* Civil Action No. 2:23-CV-1043, Dkt. 74 at 4 ¶ 8; *see also* Civil Action No. 2:23-cv-1049, Dkt. 62 at 4 ¶ 8) applies to "orders" rather than reports and recommendations. To whatever extent the parties dispute this or any other aspect of the procedure for submitting any objections to the Court, the parties should contact the Special Master and/or the Court for assistance. Failure to timely object might preclude consideration of objections or may affect the standard of review applied by the District Judge or other appellate tribunal.

The parties shall submit to the Special Master a jointly proposed redacted version of this Report and Recommendation no later than May 9, 2024.

Dated: April 22, 2024          By: _____
                                    David M. Keyzer
                                    Special Master