UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES

| | | |
|---|---|---|
| ENTROPIC COMMUNICATIONS, LLC, | ) | Case No. CV 23-1043-JWH (KESx) |
| | ) | |
| Plaintiff, | ) | Santa Ana, California |
| | ) | Wednesday, August 20, 2025 |
| v. | ) | 10:00 A.M. to 11:26 A.M. |
| | ) | |
| DISH NETWORK CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN W. HOLCOMB
UNITED STATES DISTRICT JUDGE

Appearances:              See Page 2

Deputy Clerk:             Clarissa Lara

Court Reporter:           Recorded; CourtSmart

Transcription Service:    JAMS Certified Transcription
                          16000 Ventura Boulevard #1010
                          Encino, California  91436
                          (661) 609-4528

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Plaintiff:        Goldman Ismail Tomaselli Brennan and
                          Baum LLP
                          By:  DOUGLAS J. WINNARD
                          200 South Wacker Drive, 22nd Floor
                          Chicago, Illinois  60606
                          (312) 681-6000
                          dwinnard@goldmanismail.com

                          Olson Stein LLP
                          By:  DAVID M. STEIN
                          240 Nice Lane, No. 301
                          Newport Beach, California  92663
                          (949) 887-4600
                          dstein@olsonstein.com

For the Defendants:       Alston and Bird LLP
                          By:  YURI MIKULKA
                          333 South Hope Street, 16th Floor
                          Los Angeles, California  90071
                          (213) 675-1026
                          yuri.mikulka@alston.com

                          Alston and Bird LLP
                          By:  JOSHUA M. WEEKS
                               DAVID S. FRIST
                          One Atlantic Center
                          1201 West Peachtree Street
                          Atlanta, Georgia  30309
                          (404) 881-7000
                          david.frist@alston.com

                          Fish and Richardson PC
                          By:  CHRISTOPHER S. MARCHESE
                          4695 MacArthur Court, Suite 1100
                          Newport Beach, California  92660
                          (949) 623-7640
                          marchese@fr.com

                          Fish and Richardson PC
                          By:  ADAM R. SHARTZER
                          1000 Maine Avenue, SW, Suite 1000
                          Washington, D.C.  20024
                          (202) 783-5070
                          shartzer@fr.com

APPEARANCES (CON'T):

For the Defendants:       Fish and Richardson PC
                          By:   TYLER R. TRAIN
                          4695 MacArthur Court, Suite 1100
                          Newport Beach, California  92660
                          (858) 678-4362
                          train@fr.com

                          Kilpatrick Townsend and Stockton LLP
                          By:   APRIL E. ISAACSON
                          1801 Century Park East, Suite 2300
                          Los Angeles, California  90067
                          (310) 248-3830
                          aisaacson@kilpatricktownsend.com

                          Kilpatrick Townsend and Stockton LLP
                          By:   SARAH Y. KAMRAN
                          1801 Century Park East, Suite 2300
                          Los Angeles, California  90067
                          (310) 310-7015
                          skamran@kilpatricktownsend.com

                          Winston and Strawn LLP
                          By:   LOUIS L. CAMPBELL
                          255 Shoreline Drive, Suite 520
                          Redwood City, California  94065
                          (650) 858-6414
                          llcampbell@winston.com

SANTA ANA, CALIFORNIA, WEDNESDAY, AUGUST 20, 2025, 10:00 A.M.

(Call to Order of the Court.)

THE COURT:  All right.  Good morning, everybody. Please have a seat.

THE CLERK:  Calling item No. 1, Case No. 2:23-cv-01043, *Entropic Communications, LLC v. DISH Network Corporation, et al.*

Counsel, please state your appearance for the record beginning with plaintiff.

DOUGLAS J. WINNARD:  Doug Winnard of Goldman Ismail Tomaselli Brennan and Baum on behalf of plaintiff.

THE COURT:  Mr. Winnard, good morning.

MR. WINNARD:  Good morning.

DAVID M. STEIN:  Good morning, Your Honor. David Stein from Olson Stein also for Plaintiff Entropic Communications.

THE COURT:  Mr. Stein, good morning to you.

YURI MIKULKA:  Good morning, Your Honor. Yuri Mikulka on behalf of Defendants DirecTV and AT&T.  Bear with me.  I have Joshua Weeks, my colleague.

JOSHUA M. WEEKS:  Good morning, Your Honor.

MS. MIKULKA:  As well as David Frist, who will be leading the oral argument.  We also have here with us Melinda Green, senior legal counsel of DirecTV.

THE COURT:  Ms. Green.

So, counsel, good morning.

Ms. Green, good morning to you as well.

Yes?

CHRISTOPHER S. MARCHESE:  Good morning, Your Honor. Chris Marchese from Fish and Richardson on behalf of DISH -- DISH defendants, and with me is Adam Shartzer from Fish and Richardson, and Tyler Train.

THE COURT:  Okay.  Gentlemen and -- good morning to all of you.

Anybody else?

APRIL E. ISAACSON:  Good morning, Your Honor. April Isaacson on behalf of the Cox defendants, and along with me is my colleague Sarah Kamran and our client representative Stephanie Allen.

THE COURT:  All right.  Ms. Isaacson, good morning to you, and Ms. Kamran, and your client representative Ms.?

STEPHANIE ALLEN:  Stephanie Allen.

(Pause.)

STEPHANIE ALLEN:  Stephanie Allen.

THE COURT:  Allen?  Ms. Allen.

Good morning to all of you.

Okay.  Anybody else?

(Pause.)

THE COURT:  All right.  Welcome to all of you. We're here on DirecTV's motion for judgment on the pleadings.

I asked my clerk yesterday to circulate a tentative.  Did everybody get the tentative?

Looking at plaintiff.  Yes?

MR. WINNARD:  Yes, Your Honor.

UNIDENTIFIED SPEAKER:  Yes, Your Honor.

THE COURT:  Okay.  All right.  I'm seeing and hearing yeses from everybody.

By the way, we don't have a court reporter today. We have a professional -- skilled professional operating our court-recording equipment, but the record will not be made if you're not close to a microphone.

So, Ms. Isaacson, I appreciate that you stepped up to the microphone.

Everybody else as well, get close to a microphone if you're going to say something that you want a part of the record.

THE COURT:  Okay.  Back to the tentative, everybody got it.  Has everybody had enough time to absorb it and prepared to argue from it?

MR. WINNARD:  Yes, Your Honor.

MR. FRIST:  Yes, Your Honor.

THE COURT:  Okay.  Good.  It looks like -- I'll say what I always say when I issue a tentative, and that is it is truly a tentative.  I think you've heard this before from me in this case.  Please feel free to push back on anything, as

minor as a typo or as major as "No, you completely misunderstand the law, Judge."  As long as you say it respectfully, I want to hear it because I want to get this correct.

Okay.  I see that I have a couple of PowerPoint-like presentations, and that's fine.  I welcome those.  Please -- if I forget to tell you later, please lodge them with the court after the hearing so they're a part of the record.

I'm thinking, maybe, hearing 20 minutes of argument from each side, and then, if the other defendants want to say a few words, I'll hear from them.  Will that be enough time to cover -- I mean, this is a much more limited issue, it seems to me, than some of the other things we have done in this case.  Is 20 minutes going to be enough?

Mr. Frist, you're going to be arguing?

MR. FRIST:  Yes, Your Honor.  I can do it in 20 minutes.  That's no problem.

THE COURT:  Okay.  All right.  Let's try to stick to that, and we'll move smartly through this hearing.  I don't want to cut you off, but I think you know that I -- I believe I know the background here.

For the record, people may use the word "MoCA."  I think you're probably not referring to the delicious chocolatey-like substance but you are instead referring to an

acronym M-o-C-A, which stands for -- help me with that.

MR. WINNARD:  "Multimedia over Coax Alliance."

THE COURT:  Okay.  So for the record, it's M-o-C-A, and actually, what -- capital M -- lowercase o -- capital C - - capital A?

MR. WINNARD:  That's correct, Your Honor.

THE COURT:  Okay.  All right.

With that, Mr. Frist, please go ahead.  I think I should hear from you first because the tentative probably does not go the way that you were hoping; right?

MR. FRIST:  It did not, Your Honor.

THE COURT:  But I'm listening.  So please convince me that I'm -- do your best to convince me that I'm wrong here.

MR. FRIST:  Okay, Your Honor.  Well, one --

THE COURT:  And it's not cast in stone.  The other thing with tentatives is, if I had finally decided, I would not have brought you in here for a hearing.

So please go ahead.  Thank you.

MR. FRIST:  Well, Your Honor, first of all, thank you for the tentative.  I do think it helps us focus the argument, and obviously, as you stated, we do disagree with aspects of it.  So I'll try and focus on the key issues that I've seen in the tentative that hopefully Your Honor will reconsider.

First, why are we here today? I think Your Honor noted in the tentative it's DirecTV's position that the Court's claim construction did foreclose Entropic's main argument as to why these patents are not abstract and thus the patents are invalid under 101.

THE COURT: Can you get a little closer to the microphone.

MR. FRIST: Sure, Your Honor.

My goal today is to discuss that construction in detail and to specifically address the question you asked of why is determining a common bit-loading modulation scheme abstract under that construction? So I'd like to walk through that construction today, and hopefully, after we've looked at it, Your Honor will find that in fact determining a common bit-loading modulation scheme is abstract.

The other core issue I want to address is this concept of simultaneous transmission and whether a claim that does not include a specific term like "simultaneous transmission" can -- or whether a feature -- let me rephrase -- whether a feature like simultaneous transmission that's not claimed can provide the basis for converting an otherwise abstract idea to a technological improvement.

But I think probably the easiest place to start is to jump in and look at the claims, and so you should have a set of slides -- ours are the ones that are stapled together

that have "Defendant's Rule 12(c) Motion" on the front; correct?

THE COURT:  Got it.

MR. FRIST:  And why don't we jump to Slide 4. Slide 4 includes Claim 2 of the '759 patent and --

THE COURT:  Do my law clerks have a copy of this?

MR. FRIST:  I believe so.

THE COURT:  I'm getting nods.

And of course plaintiff has a copy?

MR. WINNARD:  Yes, Your Honor.

THE COURT:  Nods.  Okay.

Go ahead.  Thank you.

MR. FRIST:  Now, Claim 2 of the '759 patent, as is highlighted, includes the phrase "determining a common bit-loading modulation scheme," and I think even Entropic has admitted that's the heart of the invention in the '759 patent.  But it's important to note what's not required by Claim 2.  Claim 2 does require determining the scheme, but it doesn't require using it.  It doesn't say that common bit-loading modulation scheme needs to be used for simultaneous transmission.  It doesn't say it can be -- it needs to be used for "unicache" transmission.  It doesn't say it needs to be used at all.

All this claim is focused on is determining what that scheme is, and that's important because we do have a

claim in this case that goes further and actually adds a use. That's Claim 33 of the '450 patent that I'll address later. But it's important to know that Entropic knew how to claim -- or to claim an invention that involved use, and it tried to do so in the '450 patent.  Now, I still think that claim is abstract, and we'll talk about it, but it's important for Claim 2 of the '759 patent.  There is no requirement of use whatsoever.  You just have to get to whatever this common bit-loading modulation scheme is.

And I think that's where Your Honor's claim construction comes in.  So if we go to Slide 5, we can discuss that construction.  So the construction is the resulting set of lowest modulation values for each carrier supported by each of the channel paths wherein the resulting set of lowest modulation values is selected from among the highest values supported by each carrier.  And I've highlighted parts of that construction in blue and green to make sure we're focused on different parts.

And focusing on the blue part, which is the first part, I think that's real important because it describes what a "common bit-loading modulation scheme" is.  So when you determine it, what do we get?  What's the result of that?  If you wanted to look at piece of paper or computer program, how do I identify it?  It's just a set of values.  A common bit-loading modulation scheme is a set of values.  Now, those

values may represent modulation values, and there may be more than one because there's multiple carriers, but in the end, a common bit-loading modulation scheme is a set of values, and a set of values is an abstract idea.  It's not a technological improvement on its own.

So then we look at the second half of the Court's construction that refers to the resulting set of lowest modulation values as selected from among the highest values supported by each carrier.  Now, Entropic in its brief referred to this as the "lowest common denominator," and I think that's kind of fair.  What you're looking for here is, when you have a set of values and you're trying to identify which of those values to use as the common bit-loading modulation scheme, you look for the overlap.  You look for the common modulation values that can be used for all paths.

So in sum, when we look at common bit-loading modulation scheme, it's just a set of values that's selected from another set of values, and that's an abstract idea.  It falls squarely within the federal circuit case law that looks at comparing, analyzing sets of values, and we'll talk about that case law in a minute, but as a preview, you know, the *Trinity Info Media* case is directly on point, and we'll talk about that.

But before we get there, I want to talk a little bit more about examples of how this selection could happen

because the selection isn't particular.  There's not a discrete "how" do you select?  The claims leave open "how" you look at the set of values and compare them or do your business in order to get this final bit-loading modulation scheme.

In claim construction, the way the parties argued it -- and the Court referred to it in your claim construction order -- was with Figure 10.  And so if we look at Slide 6, we have Figure 10, and Figure 10 is just one way of getting a common bit-loading modulation scheme, and so illustrated on the left is Figure 10(a) which is for channel path AB, and as an example, for carrier 1 that's highlighted in pink, if you're looking for the highest modulation value there, it's 256 QAM.  That's Q-A-M.  On the right for channel path AC, we look at the same carrier, carrier 1 -- pink line -- and the highest modulation value is 128 QAM.

So when you're looking for the lowest common denominator, you just compare and you say, "Okay.  The common highest lowest" -- which gets confusing -- "is 128 QAM."  So one way of going about this exercise of determining a common bit-loading modulation scheme is to generate these graphs, compare them, and get to the result.  But respectfully, defendants didn't understand your Court's construction to say, "We need to create these graphs."  All you have to do is select a set of values -- resulting set of values that is the

lowest values among the highest values.

But there's other ways of doing it without these graphs, and so as an example, if we go to Slide 7, we created an illustration of another way of accomplishing this that's, frankly, a little easier to look at, in my view, than the graphs and the patent.   So here the setup is we have three nodes -- node A, B, and C, which is similar to Figure 4 and Figure 5 of the patent -- and on the right we have a table, and the table shows the modulation values that are supported by each path.   In this example, we're just using one carrier to keep it simple.   And so if you look at Path AB on our table, it's supports 16 QAM.   If you look at Path AC, it supports three different modulation values, 16 QAM to 64 QAM. So when you're determining a common bit-loading modulation scheme, you look for the overlap.   It's a simple test.   Go to Slide 8.   When you perform that task, you get an answer: 16 QAM.   That's the overlap.

So the test here is you compare a list of values, you find the commonality, and you select a set of values -- again, all falls within the case law about selecting, analyzing, comparing values is an abstract idea, and the patent describes one way, but it doesn't foreclose any other way in the claim.   So it's broad and just captures the idea of getting to the common bit-loading scheme and not the "how."

As another example, if you wanted to look at it, we do have on Slide 9 and Slide 10 another example that uses multiple carriers.  So we have carrier A and B, because it can get more complicated, but the same test is done.  You go to that table, you look for the overlap, and if you look on Slide 10, we've shown how that overlap works out, and we somehow worked that out to have the same value; right? 16 QAM is the commonality across the board.  So in the end you're looking at values, you're selecting the lowest among them, which is the lowest common denominator, and getting to a scheme, which is just a set of values.  It's just the value 16 QAM.  That's all you come up with.

So when we look at determining a common bit-loading modulation scheme under the Court's construction, respectfully, there's no specific process, hardware, or software required.  In the end it's just tied to the abstract idea of selecting a set of values from another set of values, which falls squarely within a number of federal circuit cases, including the *Trinity Media* case.

So if we go to Slide 11, we've excerpted the *Trinity Media* case because I think it's informative.  You know, as this Court is well aware -- because the case originated here but went up to the federal circuit, and the federal circuit affirmed this Court's order -- the federal circuit and Your Honor found that the claim was directed to

analyzing and comparing data and that was abstract.  When you look at the claim in *Trinity Media*, there's a lot of analogous language to the exact claim we're dealing with here.

If you look at the first elements of this poll-based networking system in *Trinity Media*, requires receiving user information, providing the user a first polling question.  It's the same as sending a probe signal.  I send a probe signal; I'm sending information.  Then it says "receiving and storing a selected answer."  The receiving note sends back "Here's the bit-loading modulation schemes I support."  And it says "comparing the selected answer against the selected answers of others."  Common bit-loading modulation scheme -- you're taking lists from different receiving nodes; you're comparing them together.  Then final element of the *Trinity Media* case: displaying to the user the user profiles of other users that have a likelihood of a match.  You're providing the overlap.  That's exactly what's happening here in the common bit-loading modulation scheme.

So in our view, *Trinity Media* is directly on point here.  And there are many other cases that touch on this, it's not just that case but with -- that if you're just comparing sets of data and getting to a result, that alone is an abstract idea, and you need something more in the claims.  And the problem for the '759 patent -- there is nothing else

in the claims.  The heart is that determination, that comparison, which is why it's directed to an abstract idea and we do need to go to Step 2 for that claim.

So that is our argument with respect to the Court's construction, but I know we need to address the "simultaneous transition" aspect because the Court recognized that the common bit-loading modulation scheme "could" be used to enable simultaneous transmission, but the Court's claim construction order was very clear that the claims don't specifically require -- for the '759 -- simultaneous transmission.  If you look at Slide 12, I have an excerpt from the order.  It says "simultaneous transmission is a desired possibility, which the common scheme enables.  However, using a common scheme does not mean that all transmissions must be simultaneous."

THE COURT:  You've called that order Docket 575 a couple of times the "claim construction order."  It's actually the order on the previous 101 motion; correct?

MR. FRIST:  Ah.

THE COURT:  Claim construction order, I think, is ECF 635.

MR. FRIST:  That may be an error in our slides.  But the point remains the same, and I apologize if we've mislabeled that and I've misstated where it came from, but this is a statement by the Court as to the scope of the

claims.

THE COURT:  Well, I think we should -- well, plaintiff will probably address this, but I want to make sure the claim construction order is consistent with what --

MR. FRIST:  Yeah.

THE COURT:  -- what I said previously in the previous order on the 101 motion.

MR. FRIST:  And I can pull that up right now because I have it right here.

(Pause.)

MR. FRIST:  So if you go to the claim construction order and go to page -- the quote here is from page 23 of the claim construction order.  It was just an error in the slide. And that is Docket 635, not 575.

THE COURT:  Okay.  I'm there.  Thank you.

MR. FRIST:  Okay.  And apologies for that confusion, Your Honor.

So in the Court's claim construction order -- now that we've corrected that -- the simultaneous transmission was not incorporated in the claims, and Your Honor recognized that it -- there could be scenarios where the common bit-loading modulation scheme was not used, and that's important. Again, the '759 patent doesn't require a use.  It just requires determining the common bit-loading modulation scheme.

So the question then that faces the Court is: Can some potential use that's described in the specification breathe life into the claims and convert an abstract idea into a technological improvement?  The answer to that is no. The case law is clear that the claim itself is the focus of the 101 analysis, and the technological improvement must be in the claim and so -- to emphasize that, I think it would be helpful to look at a couple cases.  So we have a couple slides on what we believe to be cases on point.

The first case is *ChargePoint*.  So in *ChargePoint* the court set out the premise: Even a specification full of technical details without a physical invention may nonetheless conclude with claims claim nothing more than the broad law or abstract idea underlying the claims, and that's on Slide 13.  And the point the *ChargePoint* case was making is that an abstract idea standing alone is abstract.  You could then apply it in the technical environment and transform it and give it details about how to incorporate that abstract idea into a technical environment, but the abstract idea standing alone is just an abstract idea.  So from the *ChargePoint* case, you need to look at the claims to figure out: Do the claims have the underlying technological improvement, or do they just cover the abstract idea?

Now, *ChargePoint* was applied in *Hawk Tech System*, and that's the case I'd like to go through in detail.  So if

we go on to Slide 14, in *Hawk Tech* -- and I'll just call it "*Hawk*" for short -- the plaintiff made a very similar argument to Entropic in this case, and so on this first slide, Slide 14, is really the argument that Hawk made and the claim that they were relying on.  And what Hawk argued was that the claims in that case were directed to a solution to a technical problem, and they said that that technical problem can be solved by performing special data conversion of the video streams and by digitizing and converting data to change the nature of the data.

Now, the claim, which is shown on the right, Claim 1, does reference converting.  So the challenge before the federal circuit in that case was: Is there enough detail in the claim to capture this technical improvement that was the focus of the invention in *Hawk*?  And if we go Slide 15, the *Hawk* court decided there wasn't and for a very specific reason.  They said the analysis at step one "must" focus on the claim language.  It says: The claims themselves do not disclose performing any special data conversion -- which was what Hawk said was special about their patent -- or otherwise describe how the alleged goal of conserving bandwidth while preserving data is achieved.

So in *Hawk* the focus was you've got to look at the claim, and you've got to find an improvement in the claim, and what's missing from the '759 patent -- there's no

requirement of simultaneous transmission there.  Now, that does appear in the '450.  I still think that doesn't solve their problem, but for the '759 I think it's -- it's a different analysis from the '450.  For the '759 there is no simultaneous transmission requirement, and under this case law that's fatal to the abstract idea test.

Now, notably, on Slide 16 the *Hawk Tech* -- or the *Hawk* court distinguishes the claims there from *TecSec*.  *TecSec* was one of the primary cases that Entropic cited in its brief and is cited in the tentative.  And they distinguish *TecSec* for a very specific reason.  They said in *TecSec*, contrary to in *Hawk*, the purported improvement to the technology was directly in the claims.  It says this object-oriented key manager, this use of labels and encryption -- you could find direct hooks in the claim for those features.

So there's two lines of cases.  If your claim covers the improvement and it's in the claim, there's a claim requirement, you "may" survive 101.  If it's not in the claim, then it's directed to an abstract idea and you can't use it.

THE COURT:  So do you think it would be correct to think of this 101 analysis on a continuum, where *TecSec* is on one end and *Hawk* is on another?

MR. FRIST:  Yes.

THE COURT:  Perhaps not at the end, but on the continuum, *TecSec* okay; *Hawk* not okay?

MR. FRIST:  Yes.  I think that's exactly right. The distinction is -- they're both applying the same principles in actually the same way, but *Hawk* is an example where the claims were insufficient because they didn't include the requirement.  *TecSec* is an example where the claims were sufficient because you could find the technical improvement directly in the claim.

THE COURT:  And Entropic here is more like *Hawk* than *TecSec*?

MR. FRIST:  Correct.

THE COURT:  Or the -- at least the '759 patent --

MR. FRIST:  Correct.

THE COURT:  -- claim -- claim --

MR. FRIST:  Claim 2.

THE COURT:  2.  Yes.  Thank you.

MR. FRIST:  Yes.  Claim 2 does not include simultaneous transmission.  So if that's an improvement, it needed to be in the claim.  So then we're just left with determining a common bit-loading modulation scheme, and as I went through earlier, it's our position that that's abstract because it's just selecting a set of values.

THE COURT:  Okay.  I understand.

MR. FRIST:  If you look at Slide 17 just for

reference, there's more detail about *TecSec*, and it's two quotes from *TecSec* that explain the claimed advance is this labeling and encryption, and I've color-coded it with green and blue and yellow to make it a little easier, but if you look on the right, there's Claim 1, and you see every element the federal circuit talked about as being an improvement is directly in the claim.  You see object-oriented key manager, labels, encryption.  So that shows the dichotomy.  *Hawk* missing; *Tec* is directly there.  '759 is missing the key simultaneous limitation that the Court referenced in the tentative and Entropic focuses on.

THE COURT:  I understand your argument.

MR. FRIST:  All right.  *SRI* I'll just touch briefly -- similar analysis.  I think *SRI* falls on the *TecSec* side, and that's another case that was cited that the technical improvement was directly in the claims.

So that's my remarks on step one for the '759 patent.  I do have some quick remarks about step two, and then I want to briefly touch on the '450 patent.

On step two, Your Honor said if you pass step one that the -- there was open factual issue as to whether the common bit-loading modulation scheme is routine and conventional, and if you look at Slide 20, we cite a case that stands for the premise the inventive concept can't be tied to the abstract idea.  You have to look at other

elements.  So you can't rely on common bit-loading modulation scheme to transform the claim into an inventive concept.  You have to look at other elements in here.

THE COURT:  But did you say there's -- were you referring to a particular statement in the tentative --

MR. FRIST:  Yes.  In --

THE COURT:  -- you think is wrong?

MR. FRIST:  In the tentative on page 16, lines 3 through 6 refer to (reading) a fact question still exists concerning whether determining the disclosed common bit-loading modulation scheme was (indecipherable) nonconventional?

In our view, that's contrary to the law that says the abstract idea can't be used to provide the inventive concept.  You have to look to other elements in the claim.  And the case is *BSG Tech*.  That's cited on Slide 20.

THE COURT:  All right.  Thank you.  I understand your argument there.

MR. FRIST:  Okay.  Now -- I'm almost running out of time here.  If -- could I have three minutes to discuss the '450 patent?

THE COURT:  Yes.  Yes.

MR. FRIST:  Okay.  All right.

'450 patent, as I mentioned, is different.  There is a claim -- one claim, Claim 33, that actually expressly

includes a simultaneous requirement.  And it's our view that that still doesn't change the analysis.  It's under a different body of case law.  It's not the *TecSec* case law we were looking at.  It's a different set of case law, but it's still a problem.  There's a body of case law that talks about claiming functional results, and what a "functional result" is, if you just claim the high-level idea -- abstract idea of performing a function but don't disclose the "how" to perform it that that runs afoul of federal circuit case law and should be found to be abstract.

And so probably the best case -- or the case we'd like to highlight is on Slide 27, which is the *Two-Way Media* case.  In slide -- in the *Two-Way Media* case, the court had a very technical sounding claim.  If you look at Claim 1 on the right, there's converting a plurality of streams of audio or visual information into a different type of plurality streams of digital packets complying with protocols.  It talks about controlling the routing based on signals received from users and then monitoring the reception of packets by the users, accumulating records and -- it goes on and gives a lot of detail.

And so when you look at that, you say, "Well, this is a problem that exists in these specific audio-video networks, and it's describing steps to solve that problem," but the court said that describing the steps were not enough.

It says (reading): Claim 1 recites a method for routing information using result-based functional language.  The claim requires the functional results of converting, routing, controlling, monitoring, and accumulating records, but it does not sufficiently describe how to achieve those results. And if you look at the bottom quote, it says (reading): The inquiry therefore must turn to any requirements for how the desired result is achieved.

Now, if you look Entropic's brief, they say prior to this patent -- these patents you could never simultaneously transmit, that wasn't possible.  Now all they've said is "Well, now I'd like to simultaneously transmit," but there's no detail of how to accomplish that. How do you send out the packets simultaneously?  How do you apply the bit-loading scheme?  On what channel do you put it on?  There's a lot of decision factors there that would enable, maybe, simultaneous transmission, but the claim doesn't cover any of those.  It just covers the broad idea of "Well, let's add simultaneous transmission as a functional result."  Any way of how -- any option of how would (indecipherable) the claims, and that runs afoul, in our view, of this *Two-Way Media* case.

And as an example of that, if you look at Slide 28, Slide 28 shows figures from the patent.  I believe it's Figure 9.  And what the patent describes for the simultaneous

transmission is that you create this new channel -- which is the ABC channel, and I've highlighted it in kind of a pinkish-red there -- and that's how you would accomplish this simultaneous transmission.  That's not in the claims.  Under the claims you could use other channels, like the AB channel and AC channel in blue.  Because the point is they didn't describe how to do it.  They're just claiming the idea, the functional result of simultaneously transmitting.

So without that level of detail, it's our view it runs afoul of the *Two-Way Media* case and other cases cited in our brief about claiming a functional result.  Because, again, really, this patent -- the heart of it, even when you add that element, is about determining common bit-loading modulation scheme.  That's what they were trying to add to the art, and that's abstract, and just adding this additional transmission step doesn't fix the problem.  We're still in abstract land because we're still just claiming high-level concepts instead of the how to implement them.

THE COURT:  Okay.  I understand your argument.

MR. FRIST:  Thank you, Your Honor.

THE COURT:  Thank you.  And I'll give you a chance to respond.  Does it make sense -- I said I'd hear from Entropic next.  Does it make sense to hear from any of the other defendants first?

MR. MARCHESE:  Your Honor, we -- DISH has nothing

to add.

MS. ISAACSON:  Your Honor, neither does Cox.  Thank you.

THE COURT:  All right.  Thank you.

Mr. Winnard, go ahead, please.

MR. WINNARD:  Good morning, Your Honor.

I wanted to start with a couple of points on the Court's tentative and then respond to about, maybe, three or four of the arguments that Mr. Frist just made.

Starting on the tentative -- which obviously we agree with the result, and I think we just have some suggestions on some of the language that the Court is -- we would suggest the Court take another look at, and that's starting on page 15 of the tentative.

THE COURT:  Okay.  I'm there.

MR. WINNARD:  And looking at the sentence beginning "Additionally" on line 5.

THE COURT:  I'm there.

MR. WINNARD:  And we think the Court is exactly right.  The Court's claim construction order construed the common bit-loading scheme in a way that tied the specific method from the specification into the claim.  So we fully agree with the Court on that.  And we think that resolves the step one inquiry, and so here are my two main suggestions for the discussion on page 15 into 16:

The next sentence says that claims that disclose a specific solution "often" survive *Alice* step one when they are directed to improvements in the relevant art.  Entropic would suggest striking the word "often."  We're not aware of any case where a specific method was claimed and that method was directed to an improvement in the art and yet it still failed step one.  I believe under federal circuit precedent, including *TecSec* and the *SRI* case that the Court cites here -- once we have determined that the claims recite a specific method and that that specific method is an improvement -- a technological improvement in the art, that passes step one.

THE COURT:  So "often" should be "always" or stricken completely?

MR. WINNARD:  That's correct.  We believe that is close -- that is the proper articulation of the step one analysis.  And I haven't seen any case to the contrary.  I don't believe DirecTV cites any case to the contrary.  My understanding -- and I believe the cases the Court cites bears this out -- is that once we have determined the claim recites a specific method and that that method is directed to an improvement, we pass step one.  There's no way to fail step one after that.

THE COURT:  Okay.  I understand your argument.

MR. WINNARD:  And then the second part is at the very bottom, the last two sentences -- I think is exactly

where the Court is correct in finding that determining the common scheme -- the specific method from the specification -- is solving the specific problems that the '759 and '450 patents identify in the specific networks that they're trying to improve.

And because of that, if we turn to page 16, lines 1 and 2, the way the Court phrased this is, I think, in the negative, and we would suggest flipping it.  So instead of "does not foreclose" the possibility, we believe the Court's claim construction order and prior analysis would -- we should -- it should be revised to say the claim construction order "establishes" that Claim 2 is directed to an improvement in the art, which in turn would render the claims eligible at step one.  And we think that's consistent with how the Court is analyzing it because the next part, the second, says "even if."  So it seems to be assuming in the alternative that Claim 2 were not directed to an abstract idea, but the discussion on 15, we think, proves that it is directed to a patentable improvement in technology rather than abstract idea.  That passes step one.  We don't need to go further.

THE COURT:  So one of the things that I was thinking about in connection with this tentative was, if I stick with my current thinking, do I deny this motion without prejudice?  Isn't it possible -- I think in the earlier

order, ECF 575, I said something about -- well, I -- in this order -- in this tentative I said -- on page 6 -- the eligibility question potentially turned on resolution of both claim construction issues and fact issues concerning conventionality.  Even if I stick with this tentative, cannot defendants still raise a 101 defense later in the case on, say, summary judgment?  Maybe a 102, 103, and 101 defense?  That should still be -- that should still be available to the defendants, should it not?

MR. WINNARD:  I would disagree.

THE COURT:  Okay.  Tell me why.

MR. WINNARD:  And that's because the step one analysis is about what the claims are directed to.  So here, after the Court's claim construction order that says the common bit-loading scheme is a result of a specific set of steps and that that specific step -- set of steps, that scheme, is "directed to" improving the functionality of the network.  The factual questions relate to: Well, did it in fact improve upon the art?  That's step two.  Fact questions about unconventionality go to step two.  If the claims are directed to the improvement, whether or not in fact that improvement would bear out based on analysis of the prior art -- we don't care about that.  Once they are found to be directed to the improvement, they pass step one.

THE COURT:  You win on step one; so it's game over

for a 101 challenge?

MR. WINNARD:  That's correct.  All those factual questions about conventionality at that point would collapse into a 102, 103.  So defendants could make -- you know, build their record on that, bring up a challenge as to, you know, whether this was known or well-known -- all that -- but that would have to come in a 102, 103 context because at this point the Court's construction and the analysis on page 15 establishes that the claims are "directed to" the improvement.

THE COURT:  Okay.  I understand your argument.

MR. WINNARD:  And just because Mr. Frist brought it up, the sentence in lines 3 to 6 on page 16 -- I believe he suggested this was somehow incorrect or imprecise.  I would disagree.  I think this is an accurate statement, and the reason is that the Court's assumption, the "even if" part of this, defines the abstract idea as -- at a more general level.  I believe that's taken from DirecTV's own briefing based on the citation.  In that case, that high-level recitation of the idea does not capture the common bit-loading scheme specifically.

And so the problem you -- the problem that DirecTV is normally -- or is trying to focus on is you can't say, "The abstract idea is X, and then at that point we don't look to that piece as to whether it's providing the unconventional

or an improvement on the art."  What's happening here is the Court has defined the abstract idea -- or rather, DirecTV has done so in a very general way, in which case we would look to whether the common bit-loading scheme is a specific -- or unconventional way of achieving that, quote, "abstract idea."  Now, obviously this is all counterfactual.  We don't agree with that recitation of the abstract idea or that there even is an abstract idea here, but I would say that the Court's tentative is correct in terms of how it has framed DirecTV's argument, and it is consistent with the law on how to analyze an abstract idea and whether there's something more beyond that idea.

On -- just a quick typo fix.

THE COURT:  Yeah.

MR. WINNARD:  On -- I believe it's line 20 of page 16.

THE COURT:  Yes.

MR. WINNARD:  There's a -- the phrase "even though issues of novelty and eligible."  I believe that should be "eligibility."

THE COURT:  Thank you.

MR. WINNARD:  And the only other two points I wanted to make on the tentative come at the end of 16 onto 17, and this relates to, first, the PTAB discussions --

THE COURT:  Yes.

MR. WINNARD:  -- and second, the "field of use" idea.

So on the first, with respect to the PTAB, I want to clarify that our argument is not the claims are eligible because the PTAB denied institution.  That is not the argument.  The argument is that it is a mistake to assume that activity that occurred in one network without any factual basis or support renders that same activity routine, well-known, and conventional in a different network context. You can't just assume that to be the case.  There has to be factual support or record support.  That is the core argument that we made in both the PTAB and in front of Your Honor.

So our point was they -- that DirecTV has made the same mistake here as it made in front of the PTAB, and that was to assume without factual support that you could simply say, "I found this activity in other network.  That renders this same activity routine, conventional, or well-known in a different network."  That's all we are -- that's the only argument we are seeking to make based on the PTAB.  It's not an intent to collapse the 101 or 103 inquiries.

THE COURT:  So how would you change the language here in the tentative?  Would you just omit this part?

MR. WINNARD:  Yeah.  I think -- or if we want to introduce it, it could be a "to the extent Entropic were to argue" or "one were to argue that" the PTAB's denial itself

rendered the claims eligible, that would be incorrect, but the Court takes notice of the fact that it is a mistake -- it was a mistake in front of the PTAB, just as a mistake here, for -- to assume -- allowed factual basis that activity in one network renders that same activity or similar activity routine and conventional in another.

THE COURT:  Okay.  I understand.

MR. WINNARD:  And then the last point is on the "field of use" concept, and I think we'll get into this as we talk about the other issues about what the claims are directed to, but "field of use" is a concept that shows up when there's an idea and then we just say, "Now apply that idea to this context," even though the idea doesn't improve what's happening in that context.

So the example here of *Affinity Labs* -- *Affinity Labs* was about transmitting video content out of -- in certain regions, and what Affinity Labs did was say, "Well, we're going to add on that this is done wirelessly," but they didn't actually improve how to transmit wirelessly. That's a different circumstance than our case, where the broadband cable network, that local coaxial network, provides the problem to be solved.  It's a technological problem with the way those networks are architected.  And so when we're focusing on that network, it's not an after-the-fact "Yeah, and now do this idea in this network."  That network is the

reason for the invention in the first place.  It is the problem and ends up being the solution that is implemented is how to overcome challenges in a specific networking environment, as opposed to just tacking on "Do this general process in a specific network."  Those are different ideas conceptually.  So I would just note that given the Court's prior constructions in terms of limiting these claims to a specific method and a specific networking context, I don't believe the "field of use" concept is applicable here.

THE COURT:  All right.  I understand your argument.

MR. WINNARD:  So as to Mr. Frist's arguments, the first one I want to go through is about -- that the step of broadcasting itself was not claimed, and for that I would direct the Court to Slide 16 of plaintiff's presentation.

THE COURT:  And everybody has a copy of this?

Okay.  I see nods all around.  Thank you.

Slide 16 -- I'm there.

MR. WINNARD:  And here we're citing a federal circuit case.  The short cite is here, but it's the *KPN* case, 942 F.3d 1143, Fed. Circuit 2019, and here the Fed. Circuit rejected exactly the same argument that DirecTV is making.  DirecTV is arguing that because the claims don't recite the step of using the common bit-loading scheme to broadcast that they must somehow fail the eligibility analysis, but the federal circuit in *KPN* made clear that if an invention is

directed to improving a tool or some aspect of network functionality that is eligible at step one even if the claims don't add on the step of "and now use the tool" -- "the new invention to do" -- whatever function that that is intended to perform.  So we think *KPN* forecloses the argument that the omission of the broadcasting step has any effect on the eligibility of the claims here.

I would direct Your Honor to the next page, Slide 17, where we've quoted language from the *TecSec* case, and *TecSec* is on all fours on this point, in particular. There the claims at issue were "directed to" improving the network by "enabling" a more efficient means of multicast transmission.  That was patent eligible even though the claims didn't recite the step of "and now use this new method to send data."  The court instead said, "When use is made" -- when broadcasts are done in the '759 would be the same example -- "the invention will improve the way the network operates."  That renders the claims eligible at step one even if the step of broadcasting is not explicitly recited.  The improvement is enabling that broadcast transmission.  We don't have to recite "and now do the transmission."  The improvement is already claimed.

THE COURT:  When Mr. Frist was arguing, I had a discussion with him about the -- a continuum, *TecSec* and *Hawk* being points on that continuum, where *TecSec* said patent

eligible and *Hawk* said not patent eligible.  Do you agree with that way of thinking about what's happening here?

MR. WINNARD:  I think that's fair in the sense -- although it's always difficult to characterize these cases given the way this doctrine has evolved, where it would be nice if it was on a cleaner spectrum, but it feels a little more of a scatterplot.  But yes, I think that's fair in the sense that the claims of those patents were very different in terms of how -- the "how" was missing or the improvement was missing in *Hawk*.  It was just, you know, "analyze some data and display it," you know, sort of thing, as opposed to claims like our claims -- the '759 and '450 -- or *TecSec*, where the steps are done to improve how the network operates. They're not simply saying, "Take the network as it exists and do what it always has done to manipulate data in a way and then display it."

And that would be similar to the -- what happened in the *Trinity* case that Your Honor addressed.  There it was a polling system, and it was just "Collect some data and display it."  It didn't improve any aspect of how that polling network operated.  It was just to use that network as a tool to do what the network could already do but with certain abstract data.

Our claims are different.  Our claims are focused on: How do we make the network better?  How do we imbue it

with a new capability, efficient broadcast transmissions that it didn't have before?  And simply enabling that in a network environment that was previously hostile or didn't allow it to occur -- simply allowing that broadcast to occur is a technological improvement, and we don't have to say "and now use the invention" or "now use the broadcast with the scheme we've now developed."

THE COURT:  So does it boil down to Entropic says that the challenged claims in the '759 and '450 patents are closer to *TecSec* than *Hawk*?

MR. WINNARD:  Absolutely.  Like --

THE COURT:  So is that the bottom-line analysis that I need to do: Are we in "*TecSec* land" or "*Hawk* land"?

MR. WINNARD:  Absolutely.  I would say that that is -- that is the dispositive question as to step one: Are these claims like *TecSec*, where we are improving how a network works -- or imbuing it with new capabilities or enabling new functionality even though we don't claim the use of the functionality but we build a new tool.  That's exactly our case, and it's the same as *TecSec*.

THE COURT:  Okay.

MR. WINNARD:  *Hawk* wasn't improving how the network operated.

THE COURT:  I understand your argument.

MR. WINNARD:  And I think that would actually

resolve all the rest of the points I was going to make regarding some of the cases: *Trinity*, *Hawk*, and so on.

I think the point at the end that counsel made was that there's no "how" here, there's -- the "how" is missing. The claim is the "how." And with the Court's constructions that we're now armed with that we are talking about a specific coaxial network -- I believe the construction was a system of coaxial wiring downstream of a point of entry -- we're in that specific networking environment, which has specific limitations -- or had limitations in the art per the patent, and now our claim says: We're going to follow a series of steps to probe the channels, follow the specific method for comparing and determining a common scheme, and it is that scheme -- that is the "how" for how we are making these networks better. That's enough at step one. That requires denying this motion with prejudice.

And we could say, you know, where the Court goes into the step two piece of it, the factual questions about unconventionality, that can remain, but it would be in the alternative in the sense of "even if" this somehow didn't pass step one, which we fully believe it does, we can't decide in DirecTV's favor at step two because they haven't proven that the activity is purely routine and conventional at the -- but those factual questions only show up if we get past step one. We believe the Court's constructions and its

prior analysis confirm we don't have to go any further than that.

THE COURT:  Okay.  I understand your argument.

MR. WINNARD:  Nothing further unless the Court has questions or anything else to respond to.

THE COURT:  I should have asked Mr. Frist, but am I right that this is really a 12(b)(6) motion and not a 12(c) motion?

MR. WINNARD:  Mr. Frist and I were discussing that just before.  I think there's -- I'll let him field that question.  I think there was some confusion in the sense that, when DirecTV reached out to us to confer about the motion, we had not yet filed an answer.  I believe the ultimate timing of the filings worked out where we did file the answer, and then this motion came right after that, maybe a day or so later.  So procedurally it may end up being a 12(c), but I don't know that it affects any of the substantive analysis and I -- so I don't know that it would necessarily change any other aspect of how the Court has approached the question, but I would need to look back at the specific timing to understand -- to get you a precise answer on that sequence of events.  But in any case, we're not lodging any objection to the 12(c) is somehow untimely given the way these --

THE COURT:  And I wasn't --

MR. WINNARD:  Yeah.

THE COURT:  -- suggesting that it should be.  This is more -- I don't think the analysis is any different.  But you said "your" answer.  I know there are claims and counterclaims, and it's a procedural morass, but aren't we talking about -- doesn't this motion attack Entropic's affirmative claims for relief --

MR. WINNARD:  That's right.

THE COURT:  -- in the First Amended Complaint?

MR. WINNARD:  Yes.  So --

THE COURT:  So why do I care about "your" answer?

MR. WINNARD:  So I guess it would come down to the interpretation of what it means for the pleadings to be closed.  If we view that in the narrower sense of "Are the pleadings closed as to the issue that the motion is addressing?" then that's fully closed and had been closed for months at the time that DirecTV filed it.

THE COURT:  So taking a step back.

MR. WINNARD:  Yes.

THE COURT:  There are claims that -- claims for relief that Entropic has asserted against DirecTV.  You're saying DirecTV has asserted counterclaims.  They're essentially mirror images.  And a party can move for judgment on the pleadings under 12(c) on its affirmative claim, I think.  Can't it?  Maybe not.

MR. WINNARD:  So that was a question I remember looking into, and I don't know I got a definitive answer as to the meaning of the pleadings being closed, whether that meant globally in the case that the pleading stage was final or whether you look at it on a, I guess, pleading-by-pleading basis, whether the pleadings as to our complaint were closed to the -- the patent infringement claims.  But DirecTV had asserted counterclaims against those.  We answered right around the time of this motion.  I think it may have been a day earlier.  So it may end up being a moot question.

THE COURT:  Well, so a counterclaim is one thing, but I mean, in general, a defendant has to respond to a plaintiff's claim for relief with a Rule 12 motion or an answer -- probably some other things-- but -- the bottom line question is has DirecTV answered -- it has?

MR. WINNARD:  Yes.  That was --

THE COURT:  Did I miss that somehow?

MR. WINNARD:  No.  So I think what had happened was they had filed a first motion.  That's the one the Court resolved.  They -- there was some passage -- I think that happened earlier this year -- when the Court issued that.  So then their answer was due, like, a month-or-so after, and I would look back -- I would need to check, but I would say it was -- I want to say around end of March.

THE COURT:  And so DirecTV did answer and then

filed this motion after that.  So I just missed DirecTV's answer?

MR. FRIST:  I believe so, Your Honor.

THE COURT:  What docket number is that?

MR. FRIST:  We are looking that up for you, Your Honor.

THE COURT:  Okay.

MR. FRIST:  Have that answer before we leave today.

THE COURT:   I just -- I don't want to put something stupid in an order if there was an answer and this really is a 12(c) motion.

MR. FRIST:  Your Honor, we'll get that information for you.

THE COURT:  Okay.

Okay.  No more questions.  Thank you.

MR. WINNARD:  Thank you, Your Honor.

THE COURT:  And again, do any of the other defendants -- I don't want to ignore you.  I do want to hear from Mr. Frist, of course, but does anybody else want to be heard at this point?

MR. MARCHESE:  On behalf of DISH, Your Honor, we would just reserve -- if there's something we wanted to add after Mr. Frist speaks, we could do it then, but we don't have anything now.

THE COURT:  Okay.  Thank you.

MS. ISAACSON:  And neither does Cox, and we don't intend to.

THE COURT:  Roger that.  Thank you.

Okay.  Mr. Frist, I think DirecTV and Entropic are on the same page that the bottom-line question here, at least with respect to step one, is are these claims for relief -- are these patent claims -- are they more like *TecSec*, or are they more like *Hawk*; right?

MR. FRIST:  I think that's fair, Your Honor.

THE COURT:  Okay.

MR. FRIST:  I have some comments about that, but I think that continuum -- I do think that's the right way of looking at things.  But I do have some feedback on that continuum and things that Mr. Winnard mentioned.

THE COURT:  And I want to hear it.  Yes.

MR. FRIST:  So first, there was a pointing to -- I believe it was page 15 of the tentative and the "often" language -- or actually, sorry.  It was not page 15.

THE COURT:  Yes.  "Always" and "often."

MR. FRIST:  Yeah, "always" and "often."  It was -- sorry.  It was page 14, lines 5 to 6 -- no, that's not right. 15.  I had it right to start.

THE COURT:  15, line 8.

MR. FRIST:  Line 8.  I disagree with Mr. Winnard that there's no case that's ever said a specific method can't

be abstract.  I mean, when we look at the *Hawk* case, the *Two-Way Media* case, the *Trinity Media* case -- those are specific claims; they're specific functions described.  The question is whether those functions are abstract or whether they're detailed and directed at a technological improvement.  So just having specificity alone isn't the test.  You have to look at: Is it a technological improvement or an abstract idea?

So I do agree with Your Honor that sometimes finding specificity leads you more towards *TecSec*, but it's usually that specificity is providing the basis for finding that technological improvement.  In our view, that's what's deathly missing from the '759 patent.  There is no specificity as to enabling simultaneous transmission, and determining common bit-loading modulation scheme is just abstract.

As far as the '450 patent, again, it's just a functional result.  It claims a broad idea of simultaneous transmission.  So there's no detail there.

As to Mr. Winnard's comment about field of use -- sure.

THE COURT:  Before we get into that, you're essentially arguing that the patent claims here at issue are directed to a mental process?

MR. FRIST:  It's an abstract idea that "could" be

performed by a mental process, but it doesn't have to be.  I noted in the tentative that you said you didn't agree with mental process.  I don't think that's the gating issue.  The point here is the idea of selecting values from another set of values -- that is an abstract idea that doesn't necessarily have to fall on the mental process case law.  There's the other case law, like *Trinity Media*, where you just look at "We're just looking at data and comparing data."  That's not enough.  You have to have something more.

THE COURT:  You kind of anticipated where I was going or what my question was going to be, and that is how does the mental-process concept fit into the *TecSec-Hawk* continuum?  And maybe the answer is it doesn't because that's another dimension.

MR. FRIST:  I think it is.  It's another route that defendants will go to try and invalidate claims.  I think it's -- there's two arguments: One, if it's just a mental process, federal circuit is clear that that's abstract, but even if it's not a mental process, you have to look at "What is the focus?  Is it a technological improvement, or is it just an idea?" and this idea of analyzing and comparing data has clearly fallen in the "abstract idea" category in that context.

THE COURT:  Okay.

MR. FRIST:  I want to touch on the "field of use,"

if we can move to that now, Your Honor?

THE COURT: Yes, please.

MR. FRIST: So Mr. Winnard mentioned the *Affinity* case, and he mentioned that these claims are special because they solve a problem in broadband coaxial networks. This case falls squarely within *Affinity*. If you take an abstract idea and just provide it in a new context, that's abstract. That's what these claims do. The only reference to broadband coaxial networks is in the preamble. Yeah, there's also nodes and that the nodes are coaxed, but it doesn't tell you "Here's how to change a node" -- "Here's" -- "Go in and tinker with the mode. Change this software" or "this hardware to give it a new ability." Instead, it says, "Here's an abstract idea that you could use -- common bit-loading modulation scheme. Let's put it somewhere in the box." That's exactly what *Affinity* is about. You take an abstract idea to use it in a new context, that's still an abstract idea.

And so I do think these claims fall squarely within the *Affinity* case law, and the idea that you're working a coax doesn't change things. If anything, it shows why these are abstract because it emphasizes the "how" is missing. If you couldn't do something in a coax network before, you need to give some details, and all they've sais is "This would be a good idea to implement," but the implementation details are

missing.

On the *KPN* case -- I think it was Slide 16 of Mr. Winnard's presentation.

THE COURT:  Yes.

MR. FRIST:  I -- obviously, this is the quote.  I think it's being taken out of context, and so I have part of the *KPN* case with me, and I was -- pulled it back up to look at: What was the heart of the decision in *KPN*?  And I am looking at -- also at page 1151, and so I'm sure Your Honor will look at this since there's a difference of opinion on this.  But if you look at the *KPN* case, if you look -- there's a paragraph that starts (reading): In the present case, the appealed claims recite sufficiently specific implementation, i.e., modifying the permutation applied to the original data, quote, in time of an existing tool -- and it goes on and on and on.

THE COURT:  Get closer to the mic.

MR. FRIST:  Sorry.  And it goes on and on and on.

Then the next quote it says (reading): Importantly, the claims do not simply recite without more the mere desired result of catching previously undetectable systematic errors -- and then it continues.

What the *KPN* case was doing was similar to *TecSec*.  It was looking at the claims and looking whether the claims included the technological improvement or just the abstract

idea, and here they found the claims have a technological improvement.  Now, that technological improvement may have follow-on benefits to the system, but the test was: Can I find that improvement in the claim?  When we're talking about the claims here, we're talking about determining a common bit-loading modulation scheme.  That's not a technological improvement, from our view.  That is an abstract idea.  And so even though it's in the claims, that doesn't save it.  You needed more, and that's missing.  So, in our view, *KPN* doesn't change the analysis.  It's not dispositive.  It's in line with the continuum you drew earlier with *Hawk* and *TecSec*.  It's more to the *TecSec* side.

One or two last points on the --

THE COURT:  Please.

MR. FRIST:  -- on the PTAB issue.

THE COURT:  Yes.

MR. FRIST:  We agree with Your Honor that consideration of the PTAB decision is not appropriate here. We cited case law in our briefing about how courts have distinguished the 101 inquiry from the 102, 103 inquiry, and it seems like Mr. Winnard doesn't disagree with that case law.  And I think one of the quotes I liked from it, it says, "A new abstract idea is still an abstract idea."  And I think that tells us it's a completely different analysis.

Now, Mr. Winnard focused, though, on the

conventional, the step two part, and he said, "Well, maybe this PTAB decision gets into whether things were conventional or not," because in the prior art we -- in that PTAB decision we were looking at twisted pair wiring.  And I will note when we talk about the invention of -- or, not the invention -- call it -- the purported invention -- sorry -- of the '759 patent -- when you look at the details of when they talk about bit-loading, the patent doesn't actually tell you "Here's how to implement bit-loading."  What it says is "Use another patent in the twisted pair context and look at that to see how bit-loading works."  So the idea that looking to other context in the context of 101 is appropriate especially when the patent tells you to do so.

So the decision on why the PTAB came out differently -- it's a different standard.  For 101, what's conventional, you're looking at: Are these ideas that have been used in communication?  Is the idea of bit-loading something that's well-known and used all throughout different wireless, and wired, twisted pair coax?  And that's a hundred percent true, and the patent acknowledges that because it doesn't tell you how to do bit-loading.  If it wasn't known how to do bit-loading, we need an explanation in the patent that tells you "The 16 QAM -- what is that?  How do you do it?  How do you implement it?" and it's not there because it's routine and conventional, and the patent acknowledges

that.

So to me, again, the PTAB decision is irrelevant. The idea that some of these features come from twisted pair -- it goes, again, back to the *Affinity*.  We're just taking known concepts and saying, "Do it in the coax environment," and that's still one abstract and falls squarely within the *Alice* framework of what patents are not eligible.

THE COURT:  Okay.

MR. FRIST:  With -- one final point, I think, is on -- turning back to where I started about the specific method in the construction and there's a specific method.  I obviously touched on earlier that it's our view that while there are additional details in the construction that you're selecting values -- one set of values from another.  It's our view of the construction that it left open how you implement that.  You could use the graphs of Figure 10, or you could use other figures.

It seems like Mr. Winnard is saying the graphs of Figure 10 -- you have to use those.  I don't see that in the construction, but if it's supposed to be, I think we need clarification there, and I think that could raise some infringement issues later.  But I don't think that's the right result.  That would be contrary to claim construction principles in importing a preferred embodiment.  I think the right result here is Your Honor's construction establishes

that you select values from another set of values, but that falls squarely within the problematic abstract idea cases that we've talked about, like *Trinity Media.*

THE COURT:  Okay.  I understand your argument.

MR. FRIST:  And I think that concludes my arguments unless -- or -- unless you have any other questions for me.

THE COURT:  Just the docket number.

MR. WEEKS:  I have that for you, Your Honor.  It is -- DirecTV's answer was filed publicly as 613, and there was a sealed version that is Docket 621.  Those are on March 28th and April 1st.

THE COURT:  Got it.  Thank you.  Yeah, this is -- double-sided this is the docket in this case so -- sorry I missed it.  So I'll -- whatever I do with the underlying motion, I will take out the propriety of 12(c).  Okay.  That was a very housekeeping thing.

Those are the questions that I had.  Thank you.

Did anybody else want to weigh in?

MR. MARCHESE:  Nothing further form DISH, Your Honor.

THE COURT:  Nothing further from Cox?

MS. ISAACSON:  Correct, Your Honor.

THE COURT:  Okay.  Did you have any more?

MR. WINNARD:  Two short points, if I may?

THE COURT:  Yes, please.  And then I will give

DirecTV a last -- the last word if they want it.

MR. WINNARD:  Absolutely.

So the first is on our favorite language on page 15, lines 7 to 9.

THE COURT:  Yes.

MR. WINNARD:  And I think maybe it would help structurally if the "directed to improvements" language came before the "survives step one."  So Entropic would say the correct recitation of the law is "Claims that disclose a specific solution that is directed to improvements in the relevant art survives *Alice* step one."  And I don't think Mr. Frist disagreed with that.  I think he took issue with what he believed our position to be, that it was only about the specificity, and that's not correct.  When it is a specific method directed to an improvement it -- in the art -- technological improvement -- it survives step one, and we don't need the word "often" in that case.

THE COURT:  Okay.  I understand your suggestion there.

MR. WINNARD:  And then the second point is about the claim construction -- the common bit-loading scheme.

THE COURT:  Yes.

MR. WINNARD:  And it might be easiest to view this using DirecTV's slides, and I'll direct you to Slide 5 to start, where they've listed the Court's construction.

THE COURT:  Okay.  I'm there.

MR. WINNARD:  And the language of the construction refers to the resulting set of lowest modulation values for each carrier supported by each of the channel paths.

THE COURT:  And that is the construction because this was a citation to that earlier order.

MR. WINNARD:  That's correct.  And so if I go through DirecTV's examples -- and I point you to Slide 7.

THE COURT:  Hold on one second, please.

Okay.  Now I'm caught up with you.  Go ahead.

MR. WINNARD:  So this example is not a correct application or understanding of the construction.  The construction refers to "each carrier."  This is a method of some kind that doesn't involve carriers at all.  And we can -- you can distinguish that if you look to Slide 9, for example, where there's a discussion by carrier.

To state it succinctly, I don't believe that there's a current live dispute as to claim construction on this issue, but I would note that Slides 7 and 8 are not a correct application.  So we're not saying that you have to create the graphs.  We're saying you have to apply the Court's claim construction, and Slides 7 and 8 are not looking at each carrier; so those are not a correct interpretation or application of the construction.  Beyond that, I don't believe there's a dispute between the parties

as to what this construction means, but I would say that Slides 7 and 8 in DirecTV's presentation are not an accurate application of that construction because it requires values for each carrier supported by the channel paths.  So it distinguishes carriers and channel paths.  It's not a channel-path-alone analysis, which is what seems to be in Slides 7 and 8.

THE COURT:  Okay.  I understand your argument.

MR. WINNARD:  That's all that I have, Your Honor.

THE COURT:  Thank you.

MR. FRIST:  I was hoping not to have to say anything, but I do think I need to correct that one.

In my remarks about -- in my remarks about Slides 7 and 8, that example is a single-carrier example.  So those blues lines are -- although it's a path, it's also a carrier. So we understand Your Honor's construction says that the values have to be for each carrier, and so the idea here is there's a single carrier, and it's the same carrier on each channel path, which is typical.  Because a carrier is a frequency typically; so if you add a path and everything operates on the same frequency, you would have the single carrier on both paths.  So we understand Your Honor's construction, and we're not trying to run afoul of that.  But in the end, even with a carrier limitation, when we go back to the construction, the construction says you have a set of

values for each carrier, and that's the focus of our argument -- a set of values is abstract.

THE COURT:  All right.  I understand -- I believe I understand your argument -- both of you.

MR. FRIST:  Okay.  I think with that -- I think we've gone back and forth on a lot of the key issues.  So I think that concludes my remarks unless you have any further questions.

THE COURT:  No.  No further questions.

Anything else from anybody?

Seeing --

MR. MARCHESE:  Nothing from DISH, Your Honor.

MS. ISAACSON:  Nothing from Cox, Your Honor.  Thank you.

THE COURT:  Thank you.

Okay.  So I will take this motion under submission and think about all that you've provided to me here in your arguments.  Please do lodge your presentations.

Have I set a case schedule here in the MoCA cases?

MR. WINNARD:  No, Your Honor.

THE COURT:  But I -- sorry.  There are three sets of cases, and I remember recently in the 1049 case, the cable cases, I received a pretty hefty status report, right, about -- am I remembering that correctly?

MR. WINNARD:  Yes, Your Honor.  There was a status

report, I believe, in March for that case.

THE COURT:  For that case or for this case?

MR. WINNARD:  For that case, the 1049.  And then Your Honor recently adopted a magistrate R-and-R in that case for Entropic to file an amended pleading.  I think that deadline is this Friday.

THE COURT:  That's in 1049?

MR. WINNARD:  That's in 1049.

THE COURT:  Okay.

MR. WINNARD:  That's correct.

THE COURT:  Okay.  And -- but I also recently received -- was it in the 7775? -- a pretty hefty status report?  Am I thinking of a different constellation of cases?

MR. WINNARD:  I'm not sure what status --

THE COURT:  Okay.

MR. WINNARD:  But there were a number of notices filed in the MoCA cases regarding various PTAB rulings.  I don't believe that to be a hefty status report, but I wasn't sure what exactly the Court may have in mind.

THE COURT:  Okay.  Well, let me get to the main point, and that is are you still waiting for a scheduling order from me?

MR. WINNARD:  We are, Your Honor.  But I would note that Entropic made a couple of comments in response to the PTAB notice of decisions on the defendants that had some

suggestions as to how it would make the most sense to proceed here.  In particular, we filed for director review of at least one of those.  I think in our response we said we would.  We have since done so.  We anticipate getting a response from the director within a month or two, which, after that, depending on how that result comes down and how quickly the PTAB acts in response to that, if necessary, that may inform the appropriate scheduling process that we would propose.

THE COURT:  Maybe that's what I'm thinking of.  So bottom line is Entropic suggests that I refrain from issuing a scheduling order until we figure out what's going on with that piece of the -- of this world?

MR. WINNARD:  I don't know if we went so far as to say "refrain," but I think we do believe it would make the most sense to wait until we have that update.  Because if we --

THE COURT:  And how long --

MR. WINNARD:  Oh, sorry, Your Honor.

THE COURT:  Sorry.  How long do you think that'll take to get that update?

MR. WINNARD:  My understanding from people that work in front of the Patent Office is that a director review response usually comes within -- the action is about a month or two, and depending on what that action is -- and it often

-- if it is some step, it would be the director, typically, remanding it back to the board to address the issue, and in that circumstance, my understanding is they respond within a month or two after that.  So depending on if the director denies our petition, we would know that, I believe, within the 30 to 60 days.  If it is granted and some action is requested of the board, we -- my understanding is we would get that result by the end of the year -- is the expectation.

THE COURT:  So bottom line, what should I do in terms of a scheduling order, from plaintiff's perspective?  Maybe ask for a status report in a month-ish and set a scheduling conference -- which hopefully I can vacate if I get what I need in the status report.  Does that make sense from plaintiff's perspective?

MR. WINNARD:  From our perspective, that sounds reasonable, Your Honor.

THE COURT:  Okay.

Ms. Isaacson, you're standing at the lectern.  What are your thoughts?

MS. ISAACSON:  Oh, don't disagree with that, and obviously we'll defer to my colleagues as well.  But I just wanted to make sure if anything came up about the 0 -- 1049 or 50 because your court -- the Court had severed the cases because Comcast had wanted to stay, and I wasn't sure if something was going to come up related to that.  And I had

spoken to Mr. Winnard earlier.  We do plan to file a customer suit exception motion, and then we will meet and confer in order to do so.

THE COURT:  So that's in the 1049 cases?

MS. ISAACSON:  That's correct.  And -- yes. Correct.

THE COURT:  Okay.  Well, I'll see what gets filed there and --

MS. ISAACSON:  I just wanted to make sure for housekeeping if something related to that -- just in terms of the status.

THE COURT:  Thank you.  I appreciate that.

But as far as the 1043, Cox is fine with me setting a deadline in a -- roughly a month for a joint status report and a scheduling conference thereafter?

Mr. Frist, did you want to respond?

MR. FRIST:  Yeah, yeah.  So I'm perfectly happy with that approach if that's what Your Honor would like us to do.  One minor suggestion would be, because the director review is going to come out right at that time, if our report is due three days before it comes out, it seems -- so I wonder if you don't want to trigger it, as soon as we get that report, we owe you a status report in a week -- or whatever you think is reasonable -- because it will be that time line, but that way we'll have information to report

versus we're in holding pattern.

THE COURT:  That makes sense.  I don't really like relative dates because they -- I think they introduce ambiguity.  I'd prefer to pick a specific date.  45 days?  Are we pretty safe expecting we'll have more information at that point?

MR. FRIST:  So I think we're as safe as we're going to get to the -- I mean, it's the PTAB.  They sometimes -- but I think 30 to 40 days is typical of their response time so --

MR. WINNARD:  That's my understanding as well.  I don't practice in front of the Patent Office.  But I think 45 days should be safe, and if it hasn't come out by then -- oh, excuse me -- we would have to include that in the report, but we'll plan on 45 as a safe time line.

THE COURT:  That sounds good.

Anybody else?

MR. MARCHESE:  Your Honor, I -- 45 seems fine.  I just was wondering if maybe we'd want to stretch it a little bit to 60 to make sure we have enough time to get the director's review and then digest it and put together a status report.

THE COURT:  Plaintiff want to go 60?  I feel like I'm auctioning it off here.

(Laughter.)

MR. WINNARD:  It does feel like an -- you know, I -- the only thing I'm trying to think of is, if it comes earlier or quicker -- I don't know that it makes sense for us to wait, you know, 40 days if it comes out in three weeks. It's hard to predict in some --

THE COURT:  I guess I could say 60 days or within, what, 10 days of a decision?

MR. WINNARD:  Sure, Your Honor.

MS. ISAACSON:  Yeah.

THE COURT:  What's the best way to characterize the decision?

MR. FRIST:  It is a decision of whether to -- that's a good question.

MR. WINNARD:  I'd --

MR. FRIST:  -- frame it.  It's director review. It's a decision of whether they take up director review.  So I think it's -- it's almost like a --

THE COURT:  Should I look at your -- plaintiff's response?  What -- 671 or 672 on the docket?

MR. WINNARD:  Yeah.  It might be as simple as a "decision on Entropic's petition for director review."

MS. ISAACSON:  One thing: I know that my colleague from Comcast is here because they are differently situated; so I believe he has some things he would like to say on the record.

THE COURT:  Good.  And I want to hear it.

LOUIS CAMPBELL:  Yes, Your Honor.  This is Louis Campbell representing Comcast.  Didn't make an appearance earlier because we have not joined the motion that we're all here for.  I'm just here observing that.

As for the schedule, Comcast still has a motion to dismiss this case in its entity that Your Honor needs to rule on, and if you rule on that before we have the scheduling conference, that will certainly help things.

THE COURT:  In the 1043?

MR. CAMPBELL:  In the 1043.

THE COURT:  What --

MR. CAMPBELL:  The order -- the motion is Docket 595.  It was argued back on May 1st, and that's still pending your decision.

THE COURT:  So you think it would be good to have a decision on that before --

MR. CAMPBELL:  Absolutely, Your Honor.

THE COURT:  -- before scheduling?

MR. CAMPBELL:  If you dismiss Comcast entirely, we don't need to be at that scheduling conference.  If you don't, we would.  So I think it would definitely clarify things a lot.  As for the timing, that all sounded fine with us.

THE COURT:  So maybe I should issue the order on

that motion and in that order set a deadline for a report --

MR. CAMPBELL:  I think that would work.

THE COURT:  Keeping in mind that we may be still waiting for the decision on director review from Entropic's petition.  That make sense?

MR. CAMPBELL:  It does.

THE COURT:  Does anybody oppose that course of action?

MR. MARCHESE:  No opposition from DISH.

MR. FRIST:  No, Your Honor.

MS. ISAACSON:  Neither from Cox.  Thank you.

MR. WINNARD:  Just to clarify, Your Honor, I don't know if you have a time line in mind for that.  And obviously, that is entirely up to the Court.  The reason I ask is we had a hearing back in May, and there was extensive discussion of certain key dates that would occur, I think, this week, August 21st, 22nd kind of timeframe, and so that's why I -- I just want to get an understanding as to the Court has an expectation that it has it ready and just plans to issue it or if there's further consideration the Court is doing.  We would just point out that there were certain -- a lot of discussion about triggering events occurring kind of, I think, this week that may affect how that plays into the way the case proceeds.

THE COURT:  Sorry.  I'm not understanding your --

MR. WINNARD:  Yeah.  So --

THE COURT:  What motion are you talking about?

MR. WINNARD:  This is Comcast's motion to dismiss, and it's effectively implicating a jurisdictional question.

THE COURT:  ECF 595?

MR. CAMPBELL:  Yes.

THE COURT:  The one we just talked about.

MR. CAMPBELL:  Yes.

THE COURT:  Okay.

MR. WINNARD:  That's right.

THE COURT:  And we had a hearing on that in May?

MR. CAMPBELL:  Yes.

MR. WINNARD:  That's correct.

THE COURT:  Yes?

MR. WINNARD:  And there was extensive discussion there that the -- the agreement at issue had -- there were certain dates that were going to come into effect in -- this August related to that, and there was discussion of, you know, can Entropic file a new complaint once those dates have passed?  And so that's why I was just bringing up the timing is that depending on how that jurisdictional question is or is not resolved, we would -- you know, may have to file certain things to preserve our rights.

THE COURT:  And therefore what?

MR. WINNARD:  This was -- my question was in terms

of, if the order is going to also address the schedule for submitting the director review update, just to understand the Court's -- if it has an expected time line for when it would issue that.  Because it does affect the steps Entropic may or may not take depending on what happens with the agreement that's underlying that jurisdictional dispute.

THE COURT:  So my decision on Comcast's motion, ECF 595 -- depending on which way that goes will affect what Entropic is going to do in the rest of the case, and that will affect the time line?

MR. WINNARD:  It would affect the time line only as to Comcast, but it wouldn't affect the discussions we're having regarding the other defendants.

THE COURT:  Okay.  And so you want to know how quickly I'm going to decide ECF 595?  Can't answer.

MR. WINNARD:  I guess that's a blunt way to put what I just said.  I try to avoid it, but I knew that -- yeah, that's -- I'm not really something -- but I just wanted to have the Court be aware that there were certain dates in August that --

THE COURT:  Okay.

MR. WINNARD:  -- affected by this.

THE COURT:  I appreciate that.

So let me turn to 595, and after I get that decided, then we'll think about what the case schedule is

going to look like.  Does that work for everybody?

MR. CAMPBELL:  Yes.

MR. MARCHESE:  Yes, Your Honor.

MR. FRIST:  Yes, Your Honor.

THE COURT:  Okay.

MS. ISAACSON:  Yes, Your Honor.

THE COURT:  One final thing from me, and then I'll see if you have anything else -- collectively.

I mentioned this in an earlier hearing, and I can't remember if it was here in the MoCA cases or the satellite or the cable cases.  At some point you're going to be talking about settlement, and you're going to need the assistance of a mediator, I think.  I think you've told me you want to use a private mediator.  Have you engaged anybody?  Have you thought about that process?

MR. WINNARD:  Based on Your Honor's recommendation, which I believe came at this May 1st hearing, we did reach out to, I think, Scott Keefe --

THE COURT:  Yes.

MR. WINNARD:  -- was the name Your Honor suggested, and we did reach out to certain -- you know, defendants about that.  The responses vary, but we did broach that.  I don't have a further update on that front, but we did.

THE COURT:  That's all I want to know.  You can obviously hire whoever you want, but I wanted to make sure

that was on your radar screen to think about and to reject, if you want, if it doesn't make sense but -- that's good.

So that's all I had.  What else does anybody want to talk about from a housekeeping standpoint?  Is there anything else?  We're all here; so I want to use the time efficiently.

MR. FRIST:  Nothing from DirecTV, Your Honor.

MR. MARCHESE:  Your Honor, nothing from DISH. Thank you.

MS. ISAACSON:  Nothing from Cox, Your Honor.  Thank you.

MR. WINNARD:  Nothing further from Entropic.

THE COURT:  All right.  Counsel, thank you very much for your robust argument, as always.  It's a pleasure to have you lawyers in my courtroom.  I'll try to get to 595 as quick as I can and, of course, finalize -- I don't know which way I'm going to go but finalize the order on the instant motion.

Thank you very much, have a good rest of the week, and I'll see you next time I see you.  Thank you.

MULTIPLE SPEAKERS:  Thank you, Your Honor.

THE CLERK:  All rise.  Court is adjourned.

(Proceedings adjourned at 11:26 a.m.)

///

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa _____        September 7, 2025 _____
Julie Messa, CET**D-403          Date
Transcriber